# EXHIBIT B

RECEIVED, 08/04/2021 10:04:33 AM, Clerk, First District Court of Appeal

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR BRADFORD COUNTY, STATE OF FLORIDA

CASE NO.: 04-2018-CF-246-FCAM
DIVISION: FELONY

STATE OF FLORIDA,

Plaintiff,

vs.

TIMOTHY GENE MALONE,

Defendant.

_____/

**TRANSCRIPT OF RECORDED
PROCEEDINGS**

DATE TAKEN: **May 18, 2021**

PLACE:        Bradford County Courthouse
              945 N. Temple Avenue
              Starke, Florida 32091
              **Honorable James M. Colaw, Circuit Judge**

Proceedings were transcribed by:

Jami Stanley, FPR, Court Reporter

Notary Public, State of Florida at Large

Advantage Court Reporters
305 NE 1st Street
Gainesville, Florida 32601
(352) 373-7778

```
1                    A P P E A R A N C E S

2

3        Luis Bustamante, Esquire
         Office of the State Attorney
         945 North Temple Avenue
4        Starke, Florida 32091
         (904)966-6208
5        bustamantel@sao8.org

6        Attorney for State of Florida

7


8


9
         Michael T. Ruppert, Esquire
10       500 East University Avenue, Suite E
         Gainesville, Florida 32601
11       (352)373-0337
         mtruppert@gmail.com
12
         Attorney for Defendant
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2    Testimony of STEPHANIE SAPP                 Page No.

3    Direct Examination by Mr. Bustamante           53

4    Cross Examination by Mr. Rupert                 80

5    Redirect Examination Mr. Bustamante             83

6

     Testimony of TERRELL WILLIAMS
7
     Direct Examination by Mr. Bustamante           86
8
     Cross Examination by Mr. Rupert               108
9
     Redirect Examination by Mr. Bustamante        121
10

11   Testimony of DALTON SUMNER

12   Direct Examination by Mr. Bustamante          123

13   Cross Examination by Mr. Rupert               155

14   Redirect Examination by Mr. Bustamante        179

15
     Testimony of MATTHEW PARDEKOOPER
16
     Direct Examination by Mr. Bustamante          188
17
     Cross Examination by Mr. Rupert               229
18

19   Testimony of SCOTT MATHEWS

20   Direct Examination by Mr. Bustamante          244

21   Cross Examination by Mr. Rupert               258

22
     Testimony of LISA MATHEWS
23
     Direct Examination by Mr. Bustamante          265
24
     Cross Examination by Mr. Rupert               271
25
     Redirect Examination by Mr. Bustamante        276

1   Testimony of TIMOTHY MALONE

2   Direct Examination by Mr. Rupert          294

3   Cross Examination by Mr. Bustamante        341

4   Redirect Examination by Mr. Rupert        358

5

6                      STATE'S EXHIBITS

7
    1 - photograph of Mr. Pardekooper          93
8
    2 - photograph of Mr. Pardekooper          93
9
    3 - photograph of Mr. Pardekooper          93
10
    4 - photograph of Mr. Pardekooper          93
11
    5 - photograph of bat at Lost Valley scene  98
12
    6 - photograph of bat, axe, et cetera at    98
13  Lost Valley scene

14  7 - photograph of bat taken by Deputy Sumner 134
    in office
15
    8 - photograph of bat taken by Deputy Sumner 134
16  in office

17  9 - photograph of bat taken by Deputy Sumner 134
    in office
18
    10 - Bowie knife                          144
19
    11 - flash drive                          147
20
    12 - photograph of tablet                 149
21
    13 - photograph of tablet                 149
22
    14 - bat                                  150
23

24                  DEFENDANT'S EXHIBITS

25                    *****NONE*****

```
 1              P R O C E E D I N G S
 2           THE COURT:  All right.  So we're on the
 3      record in the State of Florida versus Timothy
 4      Malone, 2018-CF-246.  Let the record reflect
 5      that Mr. Malone is present in the courtroom
 6      with his counsel.  The State is present with
 7      counsel.  I've been advised we have all of our
 8      jurors present and are ready to go.
 9           Is the State ready to proceed?
10           MR. BUSTAMANTE:  Yes, Your Honor.
11           THE COURT:  Is Defense ready to proceed?
12           MR. RUPERT:  Your Honor, we do have some
13      preliminary matters to address with the
14      Court --
15           THE COURT:  Okay.
16           MR. RUPERT:  -- as indicated yesterday.
17      I did speak with my investigator, the court
18      appointed, J.V. Thomas.  We are still concerned
19      about the current number of convictions of Mr.
20      Pardekooper.  Mr. Thomas does not have access
21      to NCIC, FCIC, that type of thing, but he did
22      come through with a whole bunch of records.  We
23      got these last night, and we talked on the way
24      up here this morning.  There's maybe like, two
25      convictions out of even Polk County for a
```

```
1    forgery and uttering of forgery.
2         We don't -- a lot of this is clerk
3    information.  We won't have the adjudications.
4    I -- I was just hoping the Court would direct
5    the State to get an exact number of those.  I
6    know, he's -- I did speak with Mr. Bustamante,
7    he's not adverse to it.  It's just the time
8    thing with him.  So I think in good faith, he
9    believes it's four/one now.
10        THE COURT:  He believes it's...
11        MR. RUPERT:  Four and one.
12        THE COURT:  Okay.  Four felony and one
13   dishonesty?
14        MR. RUPERT:  Yes, sir.  The thing that
15   sparked our concern from the start, was that at
16   first it was four and two, and then
17   he didn't -- didn't ever seem to really know
18   the numbers or to be sure of it.  And then it
19   went four to one, it raised concerns for us, so
20   he is the key witness for the State.  He is the
21   alleged victim.  His testimony is crucial.  If
22   it's five or six and not four, and we don't
23   know that, and it's not presented to the jury,
24   I think that that could be an issue.  So I just
25   wanted to see if there's anything we can do
```

1       between now and the time that -- that Mr.

2       Pardekooper testifies, maybe during the

3       mid-morning break, maybe we could address that?

4       I don't know.

5           THE COURT:  So you probably know the

6       first thing I'm going to say is, I don't know

7       how such a relatively minor issue, and an

8       easily ascertainable issue, isn't known three

9       years into the case, but I'll let you all

10      continue to work together to see if you can't

11      come to some agreement.  I assumed you all had

12      already reached that agreement prior to the

13      immunity hearing.

14          MR. RUPERT:  We -- we did for the purpose

15      of the immunity hearing.  I don't think it's as

16      important for -- for the immunity hearing as it

17      is for a jury trial.

18          THE COURT:  Right, but what you're --

19      what you're saying is, you believe J- -- your

20      Investigator Thomas has seen some other things

21      subsequent to that --

22          MR. RUPERT:  Yes.

23          THE COURT:  -- hearing?

24          MR. RUPERT:  Yes, sir.  And as late as

25      last night, and -- and there's a bunch of

```
 1    attachments, because when -- I mean, he can't
 2    get an FCIC/NCIC or whatever it is that the
 3    State can get.  He has to go through separate
 4    clerk offices, take screen shots and -- and
 5    look at those (indiscernible,) but I remember
 6    last night, specifically -- which surprised me,
 7    because it was Polk County, Pardekooper
 8    convicted and adjudicated guilty of -- of
 9    forgery and uttering of forgery, so that would
10    be two just on that.  So...
11         THE COURT:  Does the State wish to be
12    heard on this issue?
13         MR. BUSTAMANTE:  Well, Your Honor, I
14    think that when it comes to NCI -- NCIC and
15    FCIC, I think that there is a contractual issue
16    between law enforcement agencies, and I'm not
17    allowed to disclose that to the Defense.  I
18    know that this is something that they knew at
19    least, that he had a criminal record back last
20    week, and that, you know, they had plenty of
21    opportunity, not until last night, to just go
22    ahead and verify that number.  I have been
23    busy, of course, doing everything else that I
24    have to do to put together their case and
25    doing -- following those and trying to find
```

```
 1        certified copies of convictions for them is not
 2        the job of the State to do.  And I think, I'm
 3        willing to, at least to an agreement, whether
 4        there's four and two, but I don't think that --
 5        it would be unfair to, at least at the
 6        beginning of trial, to have the State start
 7        going through things, and then figure out what
 8        it is in NCIC, because sometimes that's not
 9        accurate.  And in order for the proper
10        impeachment to go through, you actually have to
11        have the certified copies of conviction, which
12        he is not going to have.
13             THE COURT:  And I think you -- yes, I
14        don't disagree with that being a relatively
15        recent shift in the law that -- that does
16        require you to have them.  I'm going to say
17        this, and I'm going to let you all continue to
18        work on it and figure it out.  And then you can
19        bring it up as you mentioned, Mr. Rupert, when
20        it comes time --
21             MR. RUPERT:  Yes, sir.
22             THE COURT:  -- but the only -- I don't
23        have access to that sort of information, but in
24        looking in one of the cases that the Court has
25        access to in Mr. Pardekooper's case, when he
```

1    was last sentenced, it looks like in February

2    of 2020, the score sheet that was completed by

3    the State and provided to the Court had five

4    felonies on it, and one -- one dishonesty of

5    petit theft.  So the score sheet that was

6    provided to the Court by the State at that

7    time, February of 2020, was five and one.

8    Again --

9            MR. RUPERT:  I think if the State would

10   agree to five and one, I think that's -- that's

11   pretty good information.

12           MR. BUSTAMANTE:  The State will agree to

13   that.

14           THE COURT:  Okay.  So that settles that

15   issue for you.

16           MR. RUPERT:  Mr. Malone, have you heard,

17   do you understand and agree?

18           MR. MALONE:  Yeah.

19           MR. RUPERT:  All right.  Five to one,

20   yes, sir.  And I appreciate the Court.

21           THE COURT:  All right.  What's your next

22   issue?

23           MR. RUPERT:  I move for an ore tenus

24   motion in limine to restrict Ms. Sapp's

25   testimony.  She's -- I know the Court's fully

1    aware and heard her testimony during the Stand

2    Your Ground.  I understand further, that the

3    Court allowed certain testimony with the idea

4    that it would be filtered out, whether or not

5    it's relevant and how -- how it fits in, so I

6    understand that.  My assumption is --

7        MR. BUSTAMANTE:  Can you repeat that

8    again, I'm sorry?

9        MR. RUPERT:  Whether you're going to call

10   Ms. Sapp on -- in your case in chief, so --

11       THE COURT:  He's making an ore tenus

12   motion to restrict her -- are you saying to

13   limit what she's testifying to, or prevent her

14   altogether as a witness?

15       MR. RUPERT:  I don't know what she could

16   say that would be relevant, so I'm -- I

17   think -- I think this is the key right here, so

18   I -- so the State's assumption is that my

19   client had a phone, and on that phone, there

20   was an SD card that had internet access and,

21   you know, potentially downloaded something that

22   would -- would be the issue; I think that's --

23   that's clearly what the State's motive is.  In

24   order to get there, they're going to call Ms.

25   Sapp, and they're going to make a whole bunch

```
1     of assumptions.  Num- -- Number one, they don't
2     have the phone; number two, they don't have the
3     SD card, so everything is just pure speculation
4     about what Ms. Sapp testified to.  She doesn't
5     have the answers to any of those questions.
6     Now --
7          THE COURT:  Isn't there going to -- isn't
8     Mr. Pardekooper?  I mean, consistent with what
9     was testified to in the immunity hearing, isn't
10    he going to testify?  And Mr. Malone, as well,
11    testified that the whole event is predicated on
12    this issue of a phone and SD cards and -- and
13    whatnot.  I understand Mr. Malone's testimony
14    was it didn't have internet access.  I think
15    Ms. Sapp's testimony was if it did, that would
16    be a potential violation --
17         MR. RUPERT:  Right.
18         THE COURT:  -- of probation.
19         MR. RUPERT:  But there are SD cards that
20    don't have internet connections, right, so --
21    so her testimony, all it does is -- is it
22    creates a cloud of prejudice that is consuming
23    the probative value in that it just opens this
24    door to just pure speculation that it might
25    have been that way, it might have been an SD
```

1    card with internet access, but there's -- but

2    there's -- Mr. Pardekooper doesn't have any

3    knowledge as to that.  Ms. Sapp doesn't have

4    any knowledge of that, and in fact, my client

5    contradicts that.  So just open- -- that just

6    opens the door to the jury to -- to -- and begs

7    them to speculate that, oh, maybe it did have

8    internet access, and if it did, what did it

9    have on it.

10           THE COURT:  All right.  I understand your

11   argument.

12           MR. RUPERT:  Okay.

13           THE COURT:  State?

14           MR. BUSTAMANTE:  Your Honor, the -- in

15   regards to those kinds of issues with the SD

16   card and -- and the phone, we know that there's

17   an SD card involved.  We know that there is a

18   cell phone that's involved.  We also know that

19   there was actually a tablet that was stolen

20   from the Defendant that had internet access

21   that was found --

22           THE COURT:  That Mr. Pardekooper --

23           MR. BUSTAMANTE:  Pardekopper's, and it

24   was found in his possession at the Matthew'

25   residence.  Specifically, the Defendant is not

14

```
1      allowed to have acc- -- supposed to register
2      that cell phone, and he didn't.  And that also
3      those items are subject to search, which if --
4      again, if those things are true, then just a
5      regular search of those items prove that he
6      does not have internet access, that would have
7      been fine.  The fact is that he kept those
8      hidden, and he was so frantic to keep those
9      hidden that he was able to hit somebody over
10     the head with a bat in order to keep that
11     secret.  So I think it's extremely relevant,
12     and in fact, that this is -- all deals with the
13     fact that he's trying to get a -- not stay in
14     trouble with the Department of Corrections
15     Probation Department, because those items there
16     could possibly be something that is very
17     damaging to him.  And, in fact, Mr. Pardekooper
18     in one -- in his deposition on -- he said that
19     the Defendant told him, because he thinks the
20     things that are on it can put him in jail for
21     life, and that's something that I will bring up
22     Mr. Pardekooper to testify to.  So those kinds
23     of items are extremely probative.  I know
24     they're prejudicial, but the probative value
25     outweighs any of the prejudicial, because this
```

1    is the very -- this is one of the keys of the
2    case.
3         THE COURT:  So I understand your motion,
4    but I would overrule, and let me understand
5    why.
6         MR. RUPERT:  Can I just put one thing on
7    the record.  Just so it's clear, my client is
8    not required to register the cell phone, I'm
9    just saying.
10        THE COURT:  So to -- the way that the
11   Court is understanding the issue is, obviously
12   my expectation from what you all have
13   represented yesterday at the pretrial meeting
14   and what I heard at the immunity hearing, Mr.
15   Malone is planning on presenting to the jury a
16   defense of self-defense that he acted in the
17   manner he did, because Mr. Pardekooper, in an
18   agitated state, had armed himself with an axe,
19   I think Mr. Malone said, and was approaching
20   him, and that's why he acted.  The State is
21   entitled to present an alternative theory that
22   explains and corroborates Mr. Pardekooper's
23   version, which when he testified at the
24   immunity hearing, said none of that had
25   occurred prior to him being hit.  This -- that

1    information, in some format, is what explains

2    the State's theory as to why Mr. Pardekooper

3    was hit over the head with a bat.  So I'm not

4    going to let anyone go wild on this stuff,

5    because your -- your point is correct.  Now, I

6    wasn't aware of that statement from Mr.

7    Pardekooper, because I don't think that came

8    out in the immunity hearing, the deposition --

9        MR. BUSTAMANTE:  No, Your Honor.  And the

10    deposition was taken back in 2019, and so I was

11    intending on refreshing his recollection --

12        THE COURT:  Sure.

13        MR. BUSTAMANTE:  -- but that's a

14    statement that was made from before.

15        THE COURT:  Yeah.  So I mean, with that

16    type of statement, if that were to come in,

17    that certainly makes it much less intuitive

18    than your argument suggests.  So I -- I do

19    understand your point.  It's well taken, but

20    I'm going to overrule that, and I would allow

21    that testimony in some format; that he did have

22    a phone; he did have an SD card; may or may not

23    have had internet access; that will be up for

24    the jury to determine, but the significance of

25    what that would mean, and why that would make

```
 1        someone potentially react in the way that the

 2        State's alleging Mr. Malone act, I would allow

 3        that to come in.

 4            MR. RUPERT:  All right.  I understand.

 5        Thank you, Your Honor.  One -- one other small

 6        item, is that during the Stand Your Ground

 7        hearing --

 8            THE REPORTER:  During -- during what?

 9            MR. RUPERT:  The Stand Your Ground

10        hearing, I did introduce a picture of the axe.

11        (Indiscernible) another picture of it, so I

12        don't know if the clerk can somehow retain it.

13        It's there, okay.

14            THE COURT:  Okay.

15            MR. RUPERT:  Okay.  And then I did go

16        over the jury instructions, and there's just

17        one section where it starts talking about the

18        duty to retreat.  I would -- I would suggest

19        that --

20            THE COURT:  Of course, we'll talk about

21        that --

22            MR. RUPERT:  Yeah.

23            THE COURT:  -- when we get to the charge

24        conference.

25            MR. RUPERT:  -- okay, fantastic.
```

```
 1            THE COURT:  We don't have to address that

 2       now.

 3            MR. RUPERT:  And then yesterday, my

 4       client informed the Court and informed me that

 5       he wanted to file a Motion for Disqualification

 6       of the Trial Judge, so he provided me with his

 7       factual allegations.  He is my client, so I did

 8       prepare a written motion.  I did have him read

 9       it this morning to make sure it is clear.  He

10       has not been sworn yet, so I'd ask the clerk

11       to -- to swear him in.

12            THE CLERK:  Do you solemnly swear or

13       affirm the testimony you're about to get -- are

14       about to give shall be the truth, the whole

15       truth and nothing but the truth, so help you

16       God?

17            THE WITNESS:  Yes, ma'am.

18            MR. RUPERT:  All right.

19  BY MR. RUPERT:

20       Q    State your full name?

21       A    Timothy Gene Malone.

22       Q    You can have a seat.  Do you recognize

23  this document entitled, Motion for Disqualification

24  of Trial Judge?

25       A    Yes, sir.
```

```
1          Q    All right.  And did you have a chance to
2     read it today?
3          A    Yes, sir.
4          Q    All right.  And you had provided me your
5     written form of your factual allegations, as well as
6     your concern for a fair -- a fair trial; is that
7     right?
8          A    Yes, sir.
9          Q    All right.  And you understand that
10    you've been -- you've been sworn?
11         A    Yes, sir.
12         Q    All right.  So if it's -- how it would
13    play out, but you understand that perjury in a
14    proceeding carries with it criminal penalties?
15         A    Yes, sir.
16         Q    All right.  So potentially, I believe
17    that since you're facing up to 40 years on the
18    current allegations, that if, in fact, that you
19    would perjuriously sign this document, in that you
20    don't really have a true concern, that you could
21    potentially be looking at up to 40-years in prison;
22    is that correct?
23         A    Yes, sir.
24         Q    All right.  And I've advised you of that?
25         A    Yes, sir.
```

1        Q    All right.  And that's my duty to tell

2    you that?

3        A    Yes, sir.

4        Q    All right.  Now, you did tell me about

5    these factual allegations --

6        A    Yes, sir.

7        Q    -- is that true?

8        A    Yes.

9        Q    All right.  So one in particular was

10   where you were offered by the State ten years to

11   resolve your case --

12       A    Yes.

13       Q    -- is that correct; do you remember that?

14       A    Yes, sir.

15       Q    My advice to you was to take the ten

16   years; was that not true?

17       A    Yes, sir.

18       Q    All right.  Notwithstanding that, you

19   elected, as you're entitled to, to contest the

20   allegations and to take it to trial; is that

21   correct?

22       A    Yes, sir.

23       Q    All right.  And you explained to me that

24   you had concern as to how Judge Colaw addressed you

25   and explained it to you; do you understand that?

1          A     Yes, sir.

2          Q     All right.  And in -- and in fairness, I

3    told you that what Judge Colaw did was more clearly

4    explain your exposure to be 80 years instead of

5    40 years?

6          A     Yes, sir.

7          Q     All right.  So -- and my advice to you

8    was that there was nothing improper about that; is

9    that correct?

10         A     Yes, sir.

11         Q     All right.  There was some other issues,

12   and I'm not going to take up the Court's time, but

13   the other factual issues, I also addressed and --

14   and told you that you should have no concern about;

15   is that fair?

16              THE REPORTER:  And told you what, I'm

17       sorry?

18              MR. RUPERT:  The factual allegations

19       that -- that you wrote out; is that correct?

20              THE WITNESS:  Yes, sir.

21   BY MR. RUPERT:

22         Q     All right.  Are you -- are you now

23   telling this Court, and you're telling me, that

24   you're -- you believe your factual allegations are

25   correct?

1          A    Yes, sir.

2          Q    Are you telling me, and you're telling

3    this Court, that notwithstanding my representation,

4    that you still have a fear of not receiving a fair

5    trial?

6          A    Yes, sir.

7          Q    And -- and I clearly understand and

8    instructed you on potential adverse outcomes as a

9    result of this?

10         A    Yes, sir.

11         Q    All right.  So theoretically, we could go

12   to trial, and you could be fully acquitted,

13   theoretically, right?

14         A    Yes, sir.

15         Q    And then the State could bring

16   allegations and put you right back in the same spot

17   where you're looking at 40 to 80; do you understand

18   that?

19         A    Yes, sir.

20         Q    All right.  Well, on Page 3, there's a

21   place where it says, Defendant's sworn oath, it

22   reads, I, Timothy Gene Malone, due hereby solemnly

23   swear that the above statements are true, accurate

24   and correct; is that true?

25         A    Yes, sir.

23

```
 1          Q    All right.  And as your attorney, you
 2     know that I advised you that -- of what we just
 3     talked about?
 4          A    Yes, sir.
 5          Q    Okay.  So I'm not a mind reader, so if
 6     you're telling me that's what it is, I'll sign it,
 7     that in good faith that you believe that your
 8     statements are made in good faith.  Were they made
 9     in good faith?
10          A    Yes, sir.
11               MR. RUPERT:  I'm going to present this to
12          the Court.
13               (Photographs tendered to the Court.)
14               THE COURT:  All right.  I don't believe
15          that I can proceed any further until I at least
16          read it in response, so we will be in recess
17          until I go do that.
18               (Short recess.)
19               THE COURT:  All right.  We're back on the
20          record in the State of Florida versus Timothy
21          Malone, 2018-CF-246.  Let the record reflect
22          Mr. Malone is present, in Court with counsel.
23          The State is present with counsel.  I did
24          review the motion that was just filed.  It is,
25          in most respects identical to what Mr. Malone
```

1    read to the Court on the record on Tuesday.

2    Having reviewed the motion, I do find that the

3    motion is legally insufficient, and therefore,

4    it is denied.  Given the timing of the motion

5    being filed, and the fact that we have our

6    jurors here awaiting trial, I will do a written

7    order that follows up with my oral order here

8    on the record and provide that -- I'll try to

9    do that over the lunch recess; is there any

10   objection to that?

11        MR. RUPERT:  No, sir.

12        MR. BUSTAMANTE:  No, Your Honor.

13        THE COURT:  All right.  Any other

14   matters?

15        MR. BUSTAMANTE:  Yes, Your Honor.  There

16   is a stipulation that was signed by the State

17   and Defendant and Defense Counsel in regards

18   to, that the Defendant was a convicted felon at

19   the time of the commission of these offenses,

20   and that would not necessitate the State

21   bringing in witnesses to say he's a convicted

22   felon or deducing those, the five different

23   convictions, certified copies of convictions

24   that the State has.  So we will -- if the

25   Defendant does testify, I will bring up the

1    fact that he has been convicted five times,

2    five felonies, and I think that's the number

3    that we have agreed on, and that the State has

4    provided certified copies of convictions with

5    those convictions.

6            THE COURT:  All right.  Anything else?

7            MR. RUPERT:  No, sir.

8            MR. BUSTAMANTE:  No, Your Honor.

9            THE COURT:  All right.  So in the

10   introductory instruction, Mr. Rupert, there are

11   the -- there is the section about a defendant

12   not testifying; are you asking that I give

13   that?

14           MR. RUPERT:  Yes.

15           THE COURT:  Okay.  And again, the jury

16   was advised of all four counts, right?

17           MR. RUPERT:  Yes, sir.

18           MR. BUSTAMANTE:  Yes, sir.

19           THE COURT:  All right.  All right, let's

20   bring them in.  And while we're getting the

21   jury in, bringing them in, I will note for the

22   record, Mr. Malone again, is dressed in

23   civilian clothing and not shackled or

24   restrained in any manner whatsoever.

25           All right, let the record reflect that

```
1     the ladies and gentlemen of the jury are all

2     present in the courtroom.

3          You may be seated.  All right, ladies and

4     gentlemen, good morning.  I know I didn't get

5     the pleasure to meet all of you on Tuesday for

6     your jury selection, as I had some other

7     matters, and Judge Davis graciously stepped in

8     and presided over your jury selection.  But let

9     me introduce myself, my name is James Colaw.

10    I'm your circuit felony judge here in Bradford

11    County, and welcome back to your courthouse.

12         I want to just give you a little bit of a

13    road map as to how we're going to work today.

14    So we're going to begin the trial this morning.

15    We'll work until about mid-morning and take a

16    break of about 15 minutes.  Then we'll come

17    back and work until the lunch hour.

18         Your lunch is going to be provided for

19    you, so we'll have some lunch ordered, and

20    we'll have that brought into the courthouse for

21    you.  And then we'll take that break to let you

22    eat, and then we'll come back and work in the

23    afternoon and work until about a mid-afternoon

24    point and take a break.  That's the plan.

25    We're not stuck to that, so if at any time
```

1    today any of you need a break for any reason

2    whatsoever, you just need to give me a signal,

3    and let me know that's the case.  Get the

4    deputy's attention or something, to -- to let

5    me know, and I'll make sure you're accommodated

6    in that regard.

7        Before I get started this morning, let me

8    ask, did anything happen from the time that you

9    all were selected and left the courthouse

10   yesterday until the time that you arrived back

11   here this morning that has in any way affected

12   any of you all's ability to serve as a juror in

13   this case?  All right.  I'm seeing all negative

14   responses.  All right.  So first thing, if

15   you'll stand for me and raise your right hand,

16   Madam Clerk will swear you in to try the case.

17        THE CLERK:  Do you solemnly swear or

18   affirm that you will well and truly try the

19   issues between the State of Florida and the

20   Defendant whom you shall have in charge and a

21   true verdict rendered according to the law and

22   the evidence, so help you God?

23        THE COURT:  All right, you may be seated.

24   All right.  So ladies and gentlemen of the

25   jury, you've been selected to try the case of

1    the State of Florida versus Timothy Malone.

2    This is a criminal case.  As you were advised

3    yesterday, the Defendant is charged with the

4    crimes of aggravated battery with a deadly

5    weapon, possession of a concealed weapon by a

6    convicted felon, grand theft and armed

7    trespass.  The definition of the elements of

8    those four crimes will be explained to you

9    later.  It is your solemn responsibility to

10   determine if the State has proved its

11   accusations against the Defendant beyond a

12   reasonable doubt.  Your verdict must be based

13   solely on the evidence or the lack of evidence

14   and the law.  The information is not evidence,

15   and it's not to be considered by you as any

16   proof of guilt.  It's my responsibility to

17   decide what laws apply to this case and to

18   explain those laws to you.  It's your

19   responsibility to decide what the facts of the

20   case may be and to apply the facts to the law.

21   Thus, the province of the jury and the province

22   of the Court are well defined, and they do not

23   overlap.  This is one of the fundamental

24   principles of our system of justice.

25        Now, before we proceed further, it will

1      be helpful if you understand how a trial is

2      conducted.  At the beginning of the trial, the

3      attorneys will have an opportunity, if they

4      wish, to make an opening statement.  The

5      opening statement gives the attorneys a chance

6      to tell you what evidence they believe will be

7      presented during the course of the trial.  What

8      the lawyers say is not evidence, and you're not

9      to consider it as such.

10         Following the opening statements,

11     witnesses will then be called to testify under

12     oath.  They'll be examined and crossed examined

13     by the lawyers.  Documents or other exhibits

14     may also be produced and entered into evidence

15     during that time.  Now, once the evidence has

16     been presented, the attorneys will then have a

17     chance to make final arguments to you.

18         Following those arguments, I'll then

19     instruct you on all of the laws that apply to

20     this particular case.  And once you receive my

21     instructions, you'll then retire to consider

22     and deliberate your verdict.  Now, you should

23     not form any definite or fixed opinion on the

24     merits of the case until you've heard all of

25     the evidence, the argument of the lawyers and

1          the instructions that I give you.  Until that

2          time, you're not to discuss the case amongst

3          yourselves.

4               So during the breaks and the recesses,

5          you're more than welcome, and certainly

6          invited, to socialize with one another, you

7          just can't talk yet about the facts of the case

8          until you are sent back to begin your

9          deliberations.  I am now going to remind you,

10         you're not to communicate with anyone, that

11         includes each other, about the case.  That

12         includes no emailing, text messaging, tweeting,

13         blogging, any other form of communication.  You

14         can't do any research about the case or look up

15         any information about the case, and if you

16         become aware of any violation of this

17         instruction or any instruction I give you in

18         this case, you must tell me by notifying the

19         deputy.

20              Now, during the course of the trial, I

21         may need to take recesses.  During those

22         recesses, you are not to discuss the case with

23         anyone, nor permit anyone to say anything to

24         you or in your presence about the case.  If

25         anyone attempts to say anything to you or in

```
1    your presence about the case, tell him or her
2    that you're on the jury trying the case and ask
3    them to stop.  If they persist, then leave that
4    area immediately and report the matter to the
5    deputy, who will then advise me.
6          Now, all phones, anything like that, that
7    you may have brought with you to the
8    courthouse, while we're in the courtroom
9    working, they have to be off.  And by off, I
10    don't mean vibrate or silent, but actually off.
11    You're welcome to use those devices during our
12    breaks and recesses, just so long as you don't
13    use them in violation of the communication
14    instructions that the Court has given you in
15    this case.  There is one exception to that that
16    I want to make you aware of now, because I
17    don't know what any of you-all might personally
18    have going on in your lives, but when you
19    retire to start your deliberations today, you
20    can no longer even have those devices with you
21    in the jury room.  So at that time, you'll have
22    to turn over your cell phones or tablets or
23    other electronics to the deputy, and he's going
24    to guard over them while you deliberate.  But
25    if any of you have something going on in your
```

1    life where you might need to get an emergency

2    message this afternoon when you're

3    deliberating, tell the deputy that on our first

4    break, and I can get you a court number that

5    you can pass onto your family or loved ones.

6    And I can receive those types of emergency

7    messages for you and make sure I get them

8    delivered to you without any delay.  So if you

9    have a situation that fits in that, let the

10   deputy know on the first break, so I can get

11   you taken care of.

12       Now, in every criminal proceeding, a

13   defendant has the absolute right to remain

14   silent.  At no time is it the duty of a

15   defendant to prove his innocence.  From the

16   exercise of a defendant's right to remain

17   silent, a jury is not permitted to draw any

18   inference of guilt.  And the fact that a

19   witness did not take the witness stand must not

20   influence your verdict in any manner

21   whatsoever.

22       The attorneys are trained in the rules of

23   evidence and trial procedure, and it's their

24   duty to make all objections that they feel are

25   proper.  When an objection is made, you should

1    not speculate on the reason why it is made;

2    likewise, when an objection is sustained or

3    upheld by me, you must not speculate on what

4    might have occurred had the objection not been

5    sustained, nor what a witness may have said had

6    he or she been permitted to answer that

7    particular question.

8        During the trial it may be necessary at

9    times for me to confer with the lawyers outside

10   of your hearing to discuss matters of law or

11   other matters that require only consideration

12   by the Court.  It's impossible for me to

13   predict when such a conference may be required,

14   or how long it will last, but I do promise you

15   folks that when they occur, they will be

16   conducted in a manner so as to consume as

17   little of your time as is necessary for a fair

18   and orderly trial of this case.

19       Now, if you would like to take notes

20   during the trial, you may do so.  On the other

21   hand, of course, you're not required to take

22   notes if you don't want to.  I'm going to leave

23   that decision up to each of you individually,

24   but as you can see, you've been provided with a

25   notepad and a pen for your use in taking notes

1    if you want to.  Your notes are for your

2    personal use.

3         However, while the trial is still

4    ongoing, you can't take them from the courtroom

5    with you.  So during breaks and recesses, if

6    you just leave them face down on your chair,

7    the deputy will guard over them and make sure

8    they're returned to you when we reconvene the

9    trial.  Again, there's one exception to that

10   and that's when you retire to deliberate.  When

11   you go back to deliberate your verdict, at that

12   time you can take your notes with you and use

13   them during the course of your deliberations.

14        Once you've rendered a verdict, the

15   deputy will gather up your notes, deliver them

16   to me, and then I will make sure they're

17   destroyed.  So no one's ever going to see or

18   read any notes that any of you do decide to

19   take in the case.  If you take notes, don't get

20   so involved in the note taking that you become

21   distracted from the proceedings.  Your notes

22   should be used only as aids to your memory.

23        Whether or not you take notes, you should

24   rely on your memory of the evidence, and you

25   should not be unduly influenced by the notes of

1    other jurors.  Notes are not entitled to any

2    greater weight than each juror's individual

3    memory of the evidence.  So ladies and

4    gentlemen, I thank you for your attention

5    during those introductory instructions.  We're

6    now going to begin with the opening statements.

7    State?

8        MR. BUSTAMANTE:  May it please the Court,

9    Counsel.

10       Good morning.  Once again, my name is

11   Luis Bustamante, and I would, along with Mr.

12   Rojas -- Rozas, it's our privilege to represent

13   the State of Florida in this case.  Let me

14   bring you back three years and one week to

15   May 12th, 2018.

16       I'll bring you to the area in Starke to a

17   place called the Lost Valley.  It's a place

18   that -- it's a campground that also has some

19   trailers, and several people live there.  Some

20   people gathered at Mr. McCaullie's (phonetic)

21   place to watch some television.  Amongst them

22   is our victim, Mr. Pardekooper, the Defendant

23   and Mr. McCaullie and others who might be

24   there.

25       During the -- and you have to understand,

1     when you're dealing with Lost Valley, these are

2     not houses that have electricity.  Sometimes,

3     you have to get creative in how you get power.

4     And in order to watch television, you have to

5     make sure it gets plugged into some type of

6     power source.  This is not plugged into the

7     City of Starke, you know, an electric grid.

8          And, also, as with everything else

9     that comes with modern society, people have

10     cell phones, People have tablets, and those

11     have to be charged.  And at some point, during

12     the people watching television, Mr.

13     Pardekooper, who will come and testify, offered

14     to have some of the electronic devices to be

15     charged in his car or pickup truck.  You turn

16     on the car, you plug it in, and you start

17     charging those -- sometimes lifelines that we

18     have, which are these smart phones and things

19     of that nature.  So Mr. Pardekooper offers

20     that, along with the Defendant offers his cell

21     phones and other things in order to -- for him

22     to go outside and go to his vehicle and go

23     ahead and start charging those electronic

24     equipment.

25          Soon after that, the Defendant goes to

1    where this -- the charging of -- the charging

2    of these particular phones, and he says to Mr.

3    Pardekooper, Where is my SD card.  He looks at

4    his cell phone, and he wants his SD card.  It

5    is urgent.  Mr. Pardekooper says, What are you

6    talking about, I don't have your SD card.  I

7    have my own cell phone with its SD card.  I

8    have my own tablet with SD card.  Why do I need

9    to have your SD card?  The Defendant becomes

10   agitated, and there's a reason for that

11   agitation.

12        The Defendant at the time was under

13   probation, and what does that mean.  When a

14   person's on probation, there's certain

15   restrictions that society gives you, certain

16   things that people who are not on probation are

17   not res- -- do not have those type of

18   restrictions.  Under the terms of his

19   probation, he's not allowed to have a cell

20   phone that has access to the internet, any

21   computer storage devices that are not

22   registered with the Department of Corrections,

23   with the probation officer.  He's not allowed

24   to have any weapons.

25        You're not allowed to have any tablets

1    that have access to the internet.  Those have

2    to be approved and registered with the

3    Department of Corrections.  He also has terms

4    of his supervision as an anklet that monitors

5    where he's at, where the Department of

6    Corrections keeps track of where he's at.

7        So as we're putting this picture in,

8    there's an understanding as to why the SD card

9    and not having it, why he's -- the Defendant's

10   concerned about this.  And, in fact, at one

11   point, he tells Mr. Pardekooper, If they find

12   that SD card, I can be put away for life.  Mr.

13   Pardekooper at this point says, Hey, search my

14   pockets, I don't have anything here.  Look,

15   search my car; in fact, he helped him search

16   through the car to make sure, I don't have this

17   SD card.

18       As they're still looking and this process

19   is going on, unknown to Mr. Pardekooper, the

20   Defendant grabs a bat, a metal bat, and hits

21   him right in his forehead with such force that

22   it creates a gash that starts bleeding all over

23   the place.  Mr. Pardekooper is knocked back

24   (demonstrating,) a normal reaction after

25   somebody has been hit with such force to their

1    forehead with a metal instrument.  After he

2    gets his wits about him, he is angry, and he's

3    searching for something, and he grabs an axe to

4    retaliate.  At this point, one of the friends

5    says, Wait, wait, wait, look at the injury you

6    have, we need to take you to the hospital.

7        So Mr. Pardekooper does not retaliate,

8    and there's blood gushing from him, getting all

9    over his clothing, and you will see pictures of

10   that.  He is taken to the hospital where he's

11   treated.  And again, it's almost like one of

12   those television episodes, there's something

13   going on in different places.

14       It's past eight o'clock at night, there's

15   an alarm that is triggered.  An alarm that is

16   triggered when your -- an anklet is cut from

17   the ankle of the person who's supposed to be

18   wearing it.  That alarm goes to a person at the

19   Department of Corrections, and that person will

20   call the probation officer, which is Stephanie

21   Sapp.  Mr. Malone's anklet has been cut off,

22   you need to contact him immediately, go to

23   where he's at, and she knows where he lives.

24       So she has, as one of her duties, this is

25   at night, she has to make sure she gets into

```
1        work clothing, and then drives over to the Lost
2        Valley looking for the Defendant.  At this
3        point, she gets there around, maybe
4        nine o'clock at night.  And to describe Lost
5        Valley, it's not a huge place, but it's not a
6        small place, but some place that you can look
7        and make sure that, amongst the different
8        campers and different tents, to see where Mr.
9        Malone is at.
10            One of the things that she can do is,
11       there's a number that she can call.  It's a
12       device they can use in order to track down
13       where this anklet is at, and it's almost like
14       if somebody has -- let's say your cell phone,
15       and it's not on ring, but it's on vibrate, and
16       you call, and then you have to figure out where
17       the vibration is coming from, that kind of
18       stuff.  It takes her a while, and she finds it.
19       She finds the cut anklet that is near a pile
20       of, what can be described as, it's about to get
21       burned, it's a burn pile.
22            She searches for 30 minutes or so, and
23       it's dark.  Along with, at that time -- like I
24       said, there's almost like -- there's a lot of
25       things going on at the same time.  There's the
```

1    police officers that are also looking.  They've

2    already got the call, the call about somebody

3    getting hit in the head and that person being

4    in the hospital.

5        One of the sergeants who was on duty that

6    night goes to the hospital and sees Mr.

7    Pardekooper and is able to -- and at least

8    see -- and you'll see the injuries, and you'll

9    see the clothing and the extent of his

10   injuries.  After the law enforcement and the

11   probation officer searched the area, they

12   cannot find Mr. Malone.  They cannot find him.

13   So the lead investigator, Mr. Sumn- -- Deputy

14   Sumner goes back to the office so that he can

15   actually type up a warrant, that way -- let's

16   go type up a warrant, and we can have him

17   arrested and -- once he is found.

18       As he gets back in the office and is

19   typing this up, there's a call, and the call is

20   back from the campground.  At this time, it is

21   for the Matthew, a young couple.  They live in

22   that campground, and they have a seven-month

23   old, Isaiah.  They had heard as to what

24   happened earlier in the evening.

25       Of course, this is not a big community,

```
 1          it's not a small community, but word travels

 2          fast, and what they'll describe to you is the

 3          Defendant shows up at their door.  Mrs. Mathews

 4          opens the door slightly, and he kind of pushes

 5          his way in and says, Let me in, let me in.

 6          They know, kind of who he is, but they're not

 7          friends.  And when they see this, and they know

 8          what he has been accused of by what the

 9          neighborhood has been saying, they're

10          concerned.  So Mrs. Mathews, who had her

11          seven-month-old child with her, tells her

12          husband, I need to go, because the situation

13          for a parent is extremely dangerous, especially

14          for a child that is this -- this small.

15               Mr. Mathews stays behind making sure that

16          the wife is back, and the Defendant just sits

17          down on their couch.  Meanwhile, what Mrs.

18          Mathews does is called her father -- maybe it's

19          the stepfather, and the stepfather says, Let's

20          call the police.  Then the police gets called

21          into the -- back into Lost Valley to where the

22          Matthew are at, and Mr. -- but Mr. Mathews

23          stayed inside for a short period of time with

24          Mr. Malone.  And what you'll find is that Mr.

25          Malone showed him a knife, a Bowie knife that's
```

1    this big (indicating,) that he had kept hidden

2    underneath his clothing, and he will tell you

3    that he told Mr. Mathews, the Defendant told

4    Mr. Mathews, that he was going to use that to

5    get Pardekooper, because he stole his SD card.

6    Mr. Mathews, after seeing that, then went

7    outside and waited for the police to come.

8    When the police came, Deputy Sumner, who was

9    back writing the report and all that stuff and

10    so forth, comes and then sees the Defendant

11    inside the Matthew' home, and what he finds

12    with him as this knife this big (indicating.)

13    And you'll see the knife that was inside.  They

14    searched his pockets.  They found a thumb drive

15    that belonged, or at least was in the truck of

16    Mr. Pardekooper.  And also, they found Mr.

17    Pardekooper's tablet, the tablet that belongs

18    to him, that has access to the internet if you

19    get a Hotspot, like if you go to McDonald's,

20    that kind of stuff.

21    The charges that he's facing are the

22    aggravated battery with a weapon, that is when

23    he hit Mr. Pardekooper with a metal bat to the

24    middle of his forehead.  Charge Number II is

25    possession of a weapon by a convicted felon,

1    that is the Bowie knife that you'll see, razor

2    sharp, that he had with him when Deputy Sumner

3    arrested him inside the house that Matthew

4    (indiscernible.)  Another charge is the

5    trespass, armed trespass, that's where he went

6    with that knife inside the Matthew' home where

7    he did not belong.  He was not invited in.

8         And the last charge -- and I think that's

9    actually Charge Number III -- Number IV is the

10   trespass -- is the grand theft.  It is the

11   tablet that belonged to Mr. Pardekooper, that

12   when Mr. Pardekooper left to go to the

13   hospital, was inside his vehicle.  And when the

14   area was searched where Mr. Malone was seated

15   at the Matthew' residence, where he did not

16   belong, the tablet was right there.  After you

17   hear testimony from all of the witnesses, the

18   State is going to ask you to find the Defendant

19   guilty of all the charges.  Thank you.

20        THE COURT:  Thank you, State.

21        Defense?

22        MR. RUPERT:  Counsel.  May it please the

23   Court?

24        Ladies and gentlemen, good morning.  My

25   name, again, is Michael Rupert, and I have the

1    honor and privilege of representing Timothy

2    Malone, who is seated to my left at the table.

3    May 12th, 2018, at the McCaullie's home, my

4    client was there, so was Mr. Pardekooper.  My

5    client and Mr. Pardekooper, at that point in

6    time, did not get along and had not gotten

7    along for a while.

8        There were specific instances of conduct

9    by Mr. Pardekooper, that over time, caused my

10   client concern.  Not only for Mr. Pardekooper's

11   violence, but also his thievery.  So on

12   May 12th, 2018, indeed, my client was over

13   there at the McCaullie's, and Mr. Pardekooper

14   was over there, as well, and they were charging

15   their cell phones.  They were watching a movie

16   called, Man on Fire.

17       And just as the good part starts on Man

18   on Fire, where it gets intense, where Denzel

19   Washington is exacting revenge, all of a sudden

20   Mr. Pardekooper ducks out on it.  Well, based

21   on that and the situation, my client becomes

22   concerned, like why would he leave at that

23   point.  So he goes over immediately to his

24   phone.  He finds Mr. Pardekooper walking away.

25       He goes to his phone, and indeed, his SD

1    card is missing.  The only way it could be

2    missing is if Mr. Pardekooper took that SD

3    card, so my client asks him to give it back.

4    Pardekooper at first refuses, and then he says,

5    Well, go ahead and check my pockets, check

6    this, check my truck, check my tablet.  Here,

7    here's my tablet, check that.

8         And my client says, Well, where did you

9    put it, and Pardekooper does not have an

10   answer.  And Pardekooper gets mad at this point

11   and says, he's had enough, and he picks up a

12   full-sized axe, and you'll see a picture of

13   that full-sized axe.  You won't see the

14   full-sized axe like you do the bat brought into

15   evidence, because Deputy Sumner did not collect

16   it.  They took a picture of it, but they didn't

17   collect it.  And if you watch the movie, Fargo,

18   you understand just how deadly a full-sized axe

19   can be and how quickly it can be utilized.

20        My client will tell you his back is

21   slightly turned, he's looking over his

22   shoulder, and he sees Mr. Pardekooper with that

23   axe come at him.  One hand on the bottom, one

24   up by the table, getting ready to strike

25   (demonstrating.)  He does the only thing that

```
1    he can possibly do to save his life at that

2    point in time, which is -- just happened to be

3    that that little league metal bat was in the

4    truck where he could grab it.  If that wasn't

5    there, we wouldn't be here right now.

6        He grabs that, tries to defend himself

7    and -- and goes to strike Mr. Pardekooper

8    before he's hit with the axe.  Mr. Malone will

9    tell you, that as he came forward, so did the

10   axe (demonstrating,) and that's the reason the

11   gash on Mr. Pardekooper's head was only what it

12   was.  Because had there not been that collision

13   of the axe and the -- and the bat, then Mr.

14   Pardekooper probably would have sustained a

15   more serious injury.  As a result of that, Mr.

16   Pardekooper dropped the axe.

17       Karen McCaullie saw the whole thing, but

18   she won't be here to testify.  Mr. McCaullie

19   heard the interaction.  He'll tell you it

20   was -- he heard the argument escalate over

21   time.  So he's inside when the argument

22   occurred, and he said, You guys go outside, and

23   you -- you take care of that, you know, it's

24   ridiculous, stop arguing.  The argument is

25   still --
```

1          McCaullie goes out there, he sees -- he

2     will tell you that he sees Mr. Pardekooper with

3     that axe, again, pick it up, and says, I want

4     to take his hat off.  Mr. Pardekooper will tell

5     you that, that if Mr. McCaullie did not, at

6     that point stop him, he would have indeed,

7     again utilized that axe.  My client will tell

8     you that he, indeed, was on probation.  He's

9     sitting there, and Mr. Pardekooper has a gash

10    on the head, and he's sitting there, and he

11    knows what time it is.  He figures he's going

12    to end up and -- and go to jail, so -- so he

13    leaves, and he runs, and he does some things.

14         Deputy Sumner comes and talks with Mr.

15    Pardekooper and gets his side of the story,

16    so -- so the investigation from the law

17    enforcement side is only from Mr. Pardekooper,

18    and whatever Mr. Pardekooper told the police

19    became the gospel, that's what happened.  They

20    never attempted to get that information from my

21    client as to what happened.  So Mr. Pardekooper

22    will tell you that he's a five-time convicted

23    felon.  He has a crime -- he's convicted of a

24    crime of dishonesty.  He has a reputation in

25    the community for being dishonest, and Deputy

1    Sumner took his version of events as gospel.

2         Deputy Sumner has a bodycam on that day.

3    That body cam, he will tell you, was never --

4    and I don't know if it was a mistake, or

5    whether or not it was intentional.  It doesn't

6    really matter at the end of the day for the

7    purposes of here today.  I mean, it certainly

8    matters overall.  In an intentional situation

9    where a professional law enforcement officer

10   fails to put valuable, relevant information

11   into the system for the purpose at a later

12   time, where there's a court proceeding and a

13   jury like yourself can actually view that

14   bodycam.

15        So witness statements of Mr. Pardekooper

16   that was on there.  Mr. -- Dep- -- wouldn't you

17   want to see what Mr. Pardekooper, in the heat

18   of the moment, actually said?  The bodycam

19   also, Deputy Sumner will tell you that he had

20   it on and it was activated as he went into the

21   Matthew' trailer.  My client will testify, and

22   he'll tell you that he went into the home.  He

23   didn't have that tablet.  He didn't trespass,

24   that he went in there and that he sat down and

25   that yes, indeed, Lisa Mathews picked up her

1    seven-month-old child and went outside.  And

2    that Scott Mathews talked to him, never, told

3    him to leave, never said, you've got to go,

4    never said, you were trespassing.

5         My client sat there for five minutes, and

6    then Mr. Mathews talked to him for about five

7    or ten minutes and then left and -- and waited

8    for the police, all the long while, my client

9    is sitting there, clearly had consent to be in

10   there.  At no point in time did Lisa and Scott

11   Mathews tell Deputy Sumner on that day that

12   that was a problem.  They never said, you know,

13   he wasn't welcome, and he trespassed, and I

14   asked him to leave, never told law enforcement

15   that.  And if we had Deputy Sumner bodycam,

16   that would back that up.  But again, he failed

17   to present -- to bring that bodycam to the

18   station properly to download it and preserve it

19   as evidence.

20        And again, and I don't know if it's

21   mistake, or if it's intentional.  If it's

22   intentional, certainly that is horrendous and

23   inexcusable, but as we talk to jury selection,

24   everybody, even law enforcement officers,

25   obviously can make mistakes, but that's not my

1       client's fault either.

2              Deputy Sumner will tell you that when he

3       went in there, my client was just sitting down

4       and that -- sitting on the couch, and Deputy

5       Sumner will also tell you, at that point in

6       time, his bodycam would show it, that he jumped

7       on my client, threw him to the ground and

8       stuck, what my client thought was a gun at that

9       time, to his forehead.  He'll tell you it was a

10      Taser, and I'm going to ask Deputy Sumner

11      whether or not he did any kind of report for

12      using the Taser.  We'll see what he says, but

13      certainly, when you pull out a Taser, or when

14      you arrest somebody, and you put an instrument

15      that can kill you to the Defendant's head, and

16      if you have a bodycam of that, I'll let the

17      jury decide whether or not it was intentional

18      that that bodycam went away, or whether or not

19      it was a mistake.

20             You can find reasonable doubt a number of

21      ways.  You can find it from the evidence

22      itself.  You can look at the evidence and say,

23      you know what, the State hasn't met it's

24      tremendous burden of beyond an exclusion of all

25      reasonable doubt.  You can find reasonable

1    doubt in the conflict of the evidence.

2         One witness's testimony does not match

3    the other witness's testimony.  There's a

4    conflict in the evidence, and that alone,

5    again, is sufficient for reasonable doubt.  You

6    also can find reasonable doubt in the lack of

7    evidence.  If the State fails to produce for

8    the jury relevant, material evidence, you can

9    find reasonable doubt.

10        At the conclusion of the case, I'm going

11   to ask you to come back with the only true and

12   just verdict in this case, a verdict of not

13   guilty because the doubt is reasonable.  Thank

14   you.

15        THE COURT:  Thank you, Counsel.

16        State, you may call your next witness.

17        MR. BUSTAMANTE:  Stephanie Sapp.

18        THE COURT:  Good morning, ma'am.  Do you

19   swear or affirm any testimony you give the jury

20   today will be the truth, the whole truth and

21   nothing but the truth, so help you God?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  Thank you.  You may be

24   seated.  Ms. Sapp, you have the opportunity, if

25   you want to, to take your mask off while you're

1    testifying.

2              THE WITNESS:  Thank you, Your Honor.

3                   DIRECT EXAMINATION

4    BY MR. BUSTAMANTE:

5        Q    Good morning.

6        A    Good morning.

7        Q    Can you please tell us your name and

8    spell your last name, for the record?

9        A    Stephanie Sapp, S-a-p-p.

10       Q    And what do you do for a living, ma'am?

11       A    I'm a correctional/probational specialist

12   for the Florida Department of Corrections.

13       Q    And what exactly is that?

14       A    I supervise people that are placed on

15   probation or have been released from the Department

16   of Corrections to probation.

17       Q    And how long have you been employed in

18   that capacity?

19       A    24 years.

20       Q    When somebody is put on some type of

21   supervision and probation, what is the process that

22   that person goes through?

23       A    They report to the probation office, and

24   then I instruct them on the terms and conditions of

25   probation and their probation order.

1          Q    So a lot of times, those conditions may

2     be different from case to case?

3          A    Correct.

4               MR. RUPERT:  Objection, Your Honor,

5          leading.

6               THE COURT:  Overruled.

7               THE WITNESS:  Correct.

8     BY MR. BUSTAMANTE:

9          Q    And do you -- on each individual person,

10    do you, as a probation officer, let them know the

11    specific conditions that those persons have to abide

12    by during the period of probation?

13         A    Yes.

14         Q    Okay.  During the time -- let me bring

15    you back to May 12th of 2018; were you working as a

16    probation officer in Bradford County?

17         A    Yes.

18         Q    And during that time, were you

19    supervising somebody known to you as Timothy Malone?

20         A    Yes.

21         Q    Can you tell the jury, did you at some

22    point prior to that day give Mr. Malone, or at least

23    explain to him, the conditions that he was -- had to

24    abide by during the period of probation or period of

25    supervision?

1      A    Yes.

2      Q    Okay.  And do you have a date as to when

3  those conditions were explained to him?

4      A    March 5th, 2018.

5      Q    So it would have been, at least, more

6  than two-months before this incident that we're

7  going to be talking about?

8      A    Correct.

9      Q    Okay.  Now, in regards to those

10  conditions, are there any conditions regarding to

11  firearms or weapons?

12     A    Yes.

13     Q    And what are those conditions?

14     A    It's Condition 4 of his order of

15  probation.

16     Q    And what is explained -- what was

17  explained to Mr. Malone in regards to that

18  condition?

19     A    I have the condition if you would like me

20  to read it.

21     Q    Okay.  Would it refresh your recollection

22  if you read it?

23     A    Yes.

24     Q    Okay.  And once you read it, can you tell

25  me what is -- what's explained to them in regards to

1    that condition?

2        A    Yes.  Condition 4 is, order of -- or any

3    order of supervision is, You will not possess,

4    Carrie or own any firearm.  You will not possess,

5    Carrie or own any weapon without first procuring the

6    consent of your probation officer.

7        Q    Okay.  Would a knife be something that

8    would fit in that particular condition?

9        A    Yes.

10       Q    Okay.  And during the time that you were

11   supervising Mr. Malone, did he ever try to procure

12   permission from you to Carrie a knife?

13       A    No.

14       Q    Okay.  If the person was found to be in

15   possession of such a weapon, what would happen, if

16   you were to have found out about it?

17       A    They could have possibly violated his

18   probation or their probation.

19            THE REPORTER:  I'm sorry?

20            THE WITNESS:  It could possibly violate

21       their probation.

22   BY MR. BUSTAMANTE:

23       Q    And there's consequences when somebody

24   violates probation, would that be -- when somebody

25   violates their probation, there's consequences to

1    that?

2         A    Correct.

3         Q    Okay.  Are there -- is the person subject

4    to any type of search of their -- their property?

5         A    Yes.

6         Q    Okay.  Can you explain to -- what is it

7    that was explained to Mr. Malone in regards to any

8    searches?

9         A    The standard condition that is discussed

10   with them during orientation.

11        Q    Okay.  And what -- what is -- when is

12   that explained -- what's explained to them with

13   regards to searches?

14        A    That they're subject to a warrantless

15   search of their person, property or vehicle on

16   probation.

17        Q    Okay.  And tell me, if you were searching

18   somebody who was a probationer, somebody you were

19   supervising, what is -- how do you do a search?

20        A    We would search their property.  We

21   search their residence, and we search their

22   vehicles.

23        Q    And when you say, "we," you're talking

24   about officers with the Department of Corrections,

25   the probation agency?

1          A      Or law enforcement officers.

2          Q      Okay.  When you do those kind of

3    searches, are they thorough searches?

4          A      Yes.

5          Q      Okay.  Would that also include searches

6    of any type of computer equipment or

7    internet-accessible equipment?

8          A      Yes.

9          Q      How about possession of certain

10   electronic equipment that may have access to the

11   internet?

12         A      Those items can be searched if -- if

13   they're on his possession.

14         Q      Okay.  Now, is -- was there a condition

15   in Mr. Malone's probation in which he was not

16   allowed to have such items?

17         A      Yes.

18         Q      Okay.  And which condition is that?

19         A      That's Condition 21.

20         Q      And what does that condition say?

21         A      Unless otherwise indicated in a treatment

22   program, provider or a qualified practitioner in a

23   sex-offender treatment program, the prohibit of

24   viewing, accessing, owning or possessing any

25   obscene, pornographic --

1          MR. RUPERT:  Your Honor, can we approach?

2          THE COURT:  You may.  On the record?

3          MR. RUPERT:  Yes.

4          (The following side-bar conference was

5      had out of the hearing of the jury:)

6          MR. RUPERT:  Your Honor, at this time,

7      the Defense is going to move for a mistrial.

8      The State purposefully elicited that my client

9      wasn't just on probation, but he's on

10      sex-offender probation.  The clear intent on

11      that is truly prejudicial, and has no impact

12      whatsoever of -- on the -- I think it's

13      (indiscernible) to the -- the point of the

14      State's case in that he was on probation and

15      had conditions, but adding sexual-offender

16      probation, it raises the bar as to the

17      prejudice.  The reaction that I saw from the

18      jury was just not good as opposed to regular

19      probation, and I think the only purpose of it

20      would have been to prejudice my client.  So for

21      that reason, I would ask for a mistrial, so

22      that we would be in a position that a later

23      jury would not be so prejudiced.

24          MR. BUSTAMANTE:  Your Honor, this is

25      relevant evidence when it comes to what they're

1   looking for.  If the Defendant is not allowed

2   to have pornographic images, that is something

3   that needs to be told about, and that's one of

4   the things that they searched for during a

5   search of those computer devices.

6       THE COURT:  I thought (indiscernible) of

7   a retrial.  (Indiscernible.)  It would only

8   be --

9       MR. RUPERT:  But why should we ever

10  include that he was on the sex-offender

11  probation?  Mr. Bustamante never mentioned

12  sex-offender probation.  He said probation.

13  There's -- there's no purpose -- again, there's

14  no purpose for the designation of sex offender.

15      Certainly, he could be on probation and

16  still have those same restrictions.  This --

17  I'm -- I'm asking for a mistrial.  That's the

18  only way that this -- this can be cured.

19      THE COURT:  Mr. Bustamante?

20      MR. BUSTAMANTE:  No, Your Honor, I'm not

21  essentially (indiscernible) that he's on

22  sex-offender probation.  I've been very careful

23  for that; however, we have to be able to

24  explain why there's certain things he's not

25  allowed to have.  And so, we're not going to

1    make it a feature of the probation, and we have

2    been very careful, but of course, we can't not

3    get around that in looking for sexual images.

4        THE COURT:  I -- I don't know if it makes

5    any sense (indiscernible) motion.  I don't know

6    how it makes any sense to raise a motion that

7    you can't have (indiscernible) unless it is --

8    I mean (indiscernible) --

9        MR. RUPERT:  Well, it's --

10       THE COURT:  (Indiscernible) watching

11   porn.  (Indiscernible.)

12       MR. RUPERT:  There -- there is not porn.

13   There never was any porn.

14       THE COURT:  (Indiscernible.)  The motion

15   for a mistrial is denied.  The motion asking

16   (indiscernible.)

17       MR. RUPERT:  Well, I'm asking for a jury

18   instruction and for the Court to state to stop

19   using the designation, sexual-offender

20   probation, Your Honor.

21       THE COURT:  (Indiscernible.)

22       MR. RUPERT:  Number one, I'd ask that --

23   that the jury disregard Ms. Sapp's condition of

24   the designation -- or type of probation that my

25   client was on.

1          MR. BUSTAMANTE:  I mean, we will try to

2     be as careful as possible, but it's really

3     difficult to divorce the reality here, and

4     again, the State's not going to try to

5     accentuate the sexual-offender probation;

6     however, we have to be able to explain the

7     nature of the supervision.

8          THE COURT:  Yes, but I don't -- I

9     don't -- I think I'm bound (indiscernible) -- I

10    certainly (indiscernible.)  I don't know how

11    else the State can explain (indiscernible.)

12    That's their theory.  I can't (indiscernible.)

13    It doesn't make any sense, unless we know

14    (indiscernible.)

15         MR. RUPERT:  Well, it could make perfect

16    sense under regular probation if, in fact, the

17    client let -- the Defendant is not allowed to

18    have internet access, that the fact that it's

19    sexual offender probation and the fact that

20    it's got to be pornography.

21         THE COURT:  Okay.  It doesn't make sense

22    if it's going to make your client

23    (indiscernible.)

24         MR. RUPERT:  Well, I think the --

25         THE COURT:  (Indiscernible.)

1          MR. RUPERT:  And the -- the only thing

2      that would explain that is that my client had

3      child pornography on his phone; that's the only

4      thing.  That's the only explanation.  That's

5      the only link.

6          THE COURT:  It may be, but I mean, it's a

7      statement that's attributable to him.

8      (Indiscernible.)

9          MR. RUPERT:  Right.  I don't have a

10     problem with the statement; it's the linking of

11     a specific reason (indiscernible,) and -- and

12     the designating a specific --

13         THE COURT:  I don't think anyone can give

14     a specific reason, other than making logical

15     arguments, and that's what could be the reason

16     to be associated with Mr. Malone

17     (indiscernible) these pieces of evidence, and

18     they argue that they think the reasonable and

19     logical conclusions that you could draw from

20     that.  (Indiscernible,) so the motion for

21     mistrial is denied.  (Indiscernible.)

22         MR. RUPERT:  My objections are noted for

23     the record?

24         THE COURT:  Yes, they are.

25         MR. RUPERT:  All right.  Thank you, Your

1        Honor.

2    BY MR. BUSTAMANTE:

3        Q    Ms. Sapp, just to clarify, according to

4    the terms of the Defendant's probation, he is not

5    allowed to have access to the internet?

6        A    Correct.

7        Q    All right.  And would it be fair to say

8    that during one -- if you do a search of -- any one

9    of the searches that you are allowed to do, that you

10   would search any type of computer, tablet, phone,

11   that would be the possession of the Defendant, Mr.

12   Malone, and you're searching whether there was

13   access to the internet and whatever may be gathered

14   from the internet?

15       A    Correct.

16       Q    All right.  If -- in regards to that

17   particular condition, if -- the Defendant, Mr.

18   Malone, was he allowed to have any type of

19   smartphone, computers or things of that nature?

20       A    As long as it doesn't have access to the

21   internet.

22       Q    Okay.  And let's say that this particular

23   equipment does not have access to the internet, is

24   that something that would have to be registered with

25   you or the probation department?

1          A     Correct.

2          Q     Okay.  If a person that you were

3    supervising under this condition had equipment

4    that's not registered with the Department of

5    Corrections or with you, what would that -- what

6    would happen?

7          A     It could possibly -- it could possibly

8    violate their probation.

9          Q     Ankle monitor, did the Defendant, as part

10   of his supervision, have an ankle monitor that was

11   assigned or given to him?

12         A     Yes.

13         Q     Okay.  Was what was explained to Mr.

14   Malone with regards to the ankle monitor?

15         A     You have to submit to electronic

16   monitoring and follow the order of it.

17         Q     Okay.  How does that work?

18         A     (No audible response.)

19         Q     Let's say that I'm on probation, and you

20   explain this to me, how does that happen?

21         A     As far as the rules of electronic

22   monitoring?

23         Q     Yes.  And -- well -- and also, somebody

24   also putting an anklet on you, I guess.

25         A     They have to keep -- the tracking device

1    and the monitor is placed on the -- or the bracelet

2    is placed on their leg, and then they have a

3    tracking device, which is like a cell phone.

4         Q    Okay.  What is -- explain to me, what

5    does that bracelet or anklet look like?

6         A    It's a bracelet, like a black bracelet,

7    about that big (indicating,) that has a strap on it,

8    and it's put together on his leg.  So it's attached

9    to his leg.

10         Q    Is it like loose on the leg, is it tight,

11    how is it; how does it work?

12         A    It's not loose, and it's not tight, so

13    it's normal.

14         Q    All right.

15         A    We measure it.

16         Q    How do you take a shower with it?

17         A    You can shower.

18         Q    All right.  So it's like, a waterproof

19    kind of thing?

20         A    To a certain extent, yes.

21         Q    Okay.  And do they get any instructions

22    in regards to how to take care of that?

23         A    Yes.

24         Q    Okay.  And when are they allowed to take

25    that off?

1          A     They can't remove the bracelet, unless

2     probation or another agency removes it.

3          Q     And when they have that bracelet, is

4     it -- I guess it's on 24-hours a day?

5          A     Correct.

6          Q     And who monitors this?

7          A     I monitor it, and also, our monitoring

8     center monitors it.

9          Q     Okay.  And when you monitor it, what does

10    that mean?

11         A     It means to make sure the equipment is

12    working proper, making sure that he's in compliance

13    with the rules of electronic monitoring.

14         Q     Now, when the person has a monitor, are

15    there certain areas that they're not allowed to go

16    to?

17         A     There are certain areas that are defined

18    as part of their probation.

19         Q     Okay.  And those -- was Mr. Malone

20    restricted from going to certain areas?

21         A     As far as what areas?

22         Q     Okay.  And what I'm talking about is

23    that, is he allowed to leave the -- the county; is

24    he allowed to go to Union County?

25         A     No, he is not.

1          Q    Okay.  And is he allowed to go to

2     Gainesville to go shopping?

3          A    Unless he has permission.

4          Q    So he -- that's something that permission

5     would have to be granted with you?

6          A    Correct.

7          Q    All right.  So you just keep track of him

8     during this -- you know where he's at within

9     Bradford County?

10         A    I know where Mr. Malone is at, at all

11    times, through the electronic monitoring.

12         Q    Okay.  Now, at what point would you get

13    an alert?

14         A    When there's a malfunction with the

15    equipment.

16         Q    Okay.  And when you talk about a

17    malfunction, can you explain that to the jury,

18    what -- what it -- what does that mean?

19         A    There could be different types of alarm

20    notifications that we have to investigate.

21         Q    Okay.  And in saying that, say the person

22    was dunked inside a water -- water, you know, like a

23    tub or something like that, and the -- the anklet

24    drowns for lack of a better word, is there some type

25    of --

1          A    You could possibly get a bracelet-gone

2    alarm, which means the bracelet is too far away from

3    the tracking device.

4          Q    And if something like that happens, who

5    is notified?

6          A    The alarms go to the monitoring center

7    initially, and then they're sent out to the on-call

8    officer for that area.

9          Q    In your experience, how long did

10   something like that -- you know, the alarm goes to

11   the monitoring center and then it gets to you, if

12   you're the person monitoring, what is the lag time

13   between that?

14         A    It depends on the alarm.

15         Q    Okay.  And -- well, just give me a

16   guesstimate.

17         A    A bracelet-gone alarm, we usually get it

18   within 10 or 15 minutes.

19         Q    Okay.  So it doesn't take days?

20         A    No.

21         Q    All right.  Is that different as to when

22   somebody cuts it off?

23         A    Yes.

24         Q    And so how is that -- how is it reported

25   to you differently?

1          A      You get that alarm immediately.

2          Q      And when you say, "immediately," what

3     you're saying is, it goes to the monitoring company

4     and then it goes to you?

5          A      Straight to us, yes.

6          Q      Approximately, how long when you say,

7     almost immediately?

8          A      Probably seconds, to like --

9          Q      Okay.  Less than 30 seconds?

10         A      Yes.

11         Q      During the -- during the period that you

12    were supervising him, back from March of 2018 until

13    May 12th of 2018, had Mr. Malone ever registered any

14    type of computer equipment with you?

15         A      No.

16         Q      Would that include if they had some type

17    of computer access, you know, like thumb drives or

18    memory cards or things of that nature?

19         A      Yes.  He hasn't -- I was not aware that

20    he had any of those.

21         Q      And if he had those, those are the kind

22    of things that would have to be registered with you

23    as the supervising probation officer?

24         A      Or notify me that he has those, yes.

25         Q      Okay.  And if those was notified, what is

1    it that you do at that point?

2        A    That could -- it could possibly be

3    searched.

4        Q    All right.  So -- but not letting you

5    know about it, that is an issue with --

6            MR. RUPERT:  Objection, leading and the

7        form.

8            THE COURT:  Overruled.

9    BY MR. BUSTAMANTE:

10       Q    Not -- not providing that information

11   could lead to a non-issuing of the terms of the

12   probation?

13       A    Correct.

14       Q    Right.  Let me bring you to May 12th,

15   2018; did there come a time in which you were

16   alerted in regards to one of your supervised

17   probation clients?

18       A    Yes.

19       Q    Tell us, around what time were you

20   notified?

21       A    I was notified around 8:20.

22       Q    And that's in the evening?

23       A    p.m.

24       Q    p.m., okay.  And what is the nature of

25   the notification?

1          A      I received a notification from our

2     on-call night officer of a bracelet-strap alarm.

3          Q      Bracelet-strap alarm, what does that

4     mean?

5          A      That means there was an issue with a

6     bracelet that it could have been cut, damaged or

7     anything like that.  And we have to go out and

8     immediately or -- to check it.

9          Q      Okay.  And in what county do you live in?

10         A      I'd prefer not to say.

11         Q      But you live in the area?

12         A      I live about 30-minutes away.

13         Q      Okay.  30-minutes away from...

14         A      Mr. Malone's residence.

15         Q      Okay.  And where was that?

16         A      At the time, he was located in Lost

17    Valley Campground.

18         Q      All right.  And that is within the

19    general area of Starke?

20         A      It was in Bradford County.

21         Q      Bradford County.  And when we talked

22    about that it takes you a half-an-hour, when you get

23    that call, what do you have to do in order to go to

24    the scene?

25         A      I tried to locate the Defendant to check

1    his equipment and make sure it was working properly.

2        Q    Right, but I mean, when you get the call

3    at home, it's 8:12 at night, you're not dressed for

4    work?

5        A    Correct --

6        Q    So --

7        A    -- I was off duty.

8        Q    -- so you kind of have to get ready, get

9    in your car and then drive?

10       A    Correct.

11       Q    All right.  And approximately, what time

12   would you have gotten over to the Lost Valley area?

13       A    I arrived at 9:00 p.m.

14       Q    So it took you about 45 minutes to get

15   ready and drive?

16       A    Correct.

17       Q    Once you got there, what did you see?

18       A    I tried to locate Mr. Malone.

19       Q    Now, was Mr. Malone living in a

20   particular, I'm going to call it lot, tent, whatnot,

21   in Lost Valley?

22       A    Yes.

23       Q    And you knew where that was?

24       A    Yes.

25       Q    When you got there, what did you see?

```
 1        A    His tent was there.

 2        Q    And was he there?

 3        A    No.

 4        Q    All right.  Did you go looking for him?

 5        A    Yes.

 6        Q    And when you looked for him, how do you

 7   do that?

 8        A    I went looking for him where his last GPS

 9   position was.

10        Q    Okay.  And when -- his last GPS position,

11   how do you get that; do you have like a phone, or

12   explain that to the jury?

13        A    I use my work cell phone; it has internet

14   access.

15        Q    Were you able to find him during -- when

16   you were looking for him?

17        A    No.

18        Q    Now, was law enforcement there, also, at

19   the time?

20        A    Yes.

21        Q    Did you get there before law enforcement

22   got there?

23        A    I believe we arrived about, at the same

24   time.

25        Q    Okay, but you're not the one who called
```

```
 1    law enforcement?

 2         A     No.

 3         Q     No.  When an anklet is cut, how do you

 4    find it?

 5         A     We -- basically, through GPS points.  We

 6    try to pinpoint the last-known location of that

 7    GP- -- of that GPS monitor.

 8         Q     And so, when you say you're trying to do

 9    that, I mean, how do you find that in a -- in an

10    open field or whatnot?

11         A     As long as the tracking device is active

12    and the battery is not dead, we can call that

13    tracking device, or we can send messages to that

14    tracking device, and it makes a noise.

15         Q     And what type of noise does it make?

16         A     Like a really loud beeping noise.

17         Q     Okay.

18         A     If you send a message to it, or if you

19    call it, it rings like a cell phone.

20         Q     So it's not like -- it's not like a buzz,

21    but it's more like bing, bing, bing, bing, or

22    whatever, you know, that kind of stuff?

23         A     Correct.

24         Q     All right.  And were you trying to do

25    that with this device?
```

```
 1          A     Yes.

 2          Q     Okay.  And how long did it take you to go

 3    ahead and find this device?

 4          A     I found the device at 9:43 p.m.

 5          Q     You looked for it for about 43 minutes?

 6          A     Yes.

 7          Q     And where did you find it?

 8          A     I located it in a brush pile located

 9    inside of the Lost Valley Campground.

10          Q     Okay.  A brush pile, would -- describe

11    for the jury what that looked like.

12          A     It's a pile of limbs and tree limbs and

13    stuff in the middle of an open field.

14          Q     Almost something like, would be discarded

15    or something to be done with it?

16          A     Correct.

17          Q     And how far was that from Mr. Malone's

18    tent?

19          A     It was like, two rows over.  He lived in

20    the front of the campground.  The brush pile was in

21    the back of the campground.

22          Q     Okay.  And if you were to guesstimate

23    the -- the distance, is it from like -- from me to

24    you, or from you to, maybe the end of the courtroom?

25          A     A little bit further than that, maybe to
```

1    the -- probably the next courtroom.

2            Q    Okay.

3            A    So there's like two rows, and the way the

4    campground was, you had -- it's kind of like this,

5    like you go in and out.  There's three entrances to

6    it.

7            Q    So if you're looking at a football field,

8    it may be 50 yards?

9            A    Yeah, about that.

10           Q    Okay.  And again, this is dark?

11           A    Correct.

12           Q    Not easy to locate?

13           A    Correct.

14           Q    All right.  After you found the

15    anklet/bracelet, what did you do?

16           A    I de-activated the equipment.

17           Q    Did you continue looking for Mr. Malone?

18           A    No.

19           Q    Okay.  During the time you were

20    searching, was there anybody else there, in that

21    area, helping you search?

22           A    Initially, Bradford County Sheriff's

23    Office arrived.  They were there on the scene, on an

24    unrelated case as far as why I was there.  They

25    helped search for the bracelet and the tracking

```
 1    device, and then they had -- they had to go leave

 2    the scene.

 3         Q    So Bradford County Sheriff's Office was

 4    at -- was there, also searching for Mr. Malone?

 5         A    Yes.

 6         Q    Okay.  And during the -- during the time

 7    that you were searching, did you see any type of

 8    weapons or anything else like that in the area?

 9         A    As far as a weapon, we located, while

10    looking for his tracking device, a bat.

11         Q    Uh-huh.

12         A    It was located on the campground.

13         Q    And which campground would that be at?

14         A    Let me check.  I believe it belonged to a

15    Roger McCaullie or -- I don't know how to pronounce

16    his last name.

17         Q    Okay.  And how far is Roger McCaullie's

18    camper from where Mr. Malone's tent is?

19         A    It's located behind the campground, so it

20    was actually behind it.  So it was probably like,

21    four-rows over from the campground.

22         Q    Okay.  And just again, to describe to the

23    jury, about how many yards would that be?

24         A    Probably 75, 100 yards.

25         Q    Okay.  Say 75 yards or -- or so?
```

1        A    Or -- or a little bit more, yeah.

2        Q    So about three-quarters of a football

3   field?

4        A    Yeah.

5        Q    All right.  Did you see anything about

6   that particular bat that -- when -- when you saw it,

7   anything that struck you as not a regular bat, or

8   maybe something about it?

9        A    Nothing -- not me, but I believe law

10  enforcement was looking for that bat at the time --

11       Q    Okay.

12       A    -- or the -- for their investigation.

13       Q    Right, but part -- your part of the

14  investigation, that had nothing to do -- that's just

15  something that you saw?

16       A    Yes, correct.

17       Q    Do you see the -- Mr. Malone in the

18  courtroom today?

19       A    Yes.

20       Q    Can you please point him out and describe

21  an item of clothing he may be wearing?

22       A    He's wearing a gray jacket with black

23  glasses.

24       Q    All right.

25            MR. BUSTAMANTE:  Your Honor, may the

```
 1            record reflect that the witness has identified

 2            the Defendant?

 3                 THE COURT:  The record will so reflect.

 4    BY MR. BUSTAMANTE:

 5       Q    And all of this happened in Bradford

 6    County?

 7       A    Yes.

 8       Q    All right.

 9                 MR. BUSTAMANTE:  One moment, Your Honor.

10            Nothing further.

11                 THE COURT:  All right.  Cross?

12                 MR. RUPERT:  May I have a moment, Your

13            Honor?

14                 THE COURT:  Yes.

15                 MR. RUPERT:  May it please the Court?

16                 THE COURT:  (Nods head in the

17            affirmative.)

18                     CROSS EXAMINATION

19    BY MR. RUPERT:

20       Q    Good morning.

21       A    Good morning.

22       Q    Now, people on probation certainly can

23    have items without coming to you and first

24    registering them; is that correct?

25       A    Yes.
```

1      Q    And those items would include

2  televisions?

3      A    Yes.

4      Q    Phones that don't have internet access?

5      A    If the phone is active, on certain types

6  of probation that has an active number, like where

7  you can make calls and texts, that has to be

8  registered with me --

9      Q    Okay.

10     A    -- with the type of probation that I have

11  (indiscernible.)

12     Q    So he can have a phone that he doesn't

13  have to register that doesn't have that capability?

14     A    Yes.

15     Q    All right.  And that's true with tablets?

16     A    As long as it doesn't have internet

17  access.

18     Q    MP3 players?

19     A    Yes.

20          THE REPORTER:  PN what?

21          MR. RUPERT:  MP3 players.

22  BY MR. RUPERT:

23     Q    All right.  So when you went out there to

24  Lost Valley, on May 12th, 2018, you did not see any

25  conflict between Matthew Pardekooper and Timothy

```
 1   Malone?
 2        A    Correct.
 3        Q    All right.  So you can't tell this jury
 4   who started the fight?
 5        A    That's correct.
 6        Q    And you weren't present at the Matthew'
 7   trailer?
 8        A    Correct.
 9        Q    All right.  So when Deputy Sumner came
10   with his bodycam and recorded statements, you
11   weren't there at the Matthew' home?
12        A    Correct.
13        Q    Were you there -- did you talk to Deputy
14   Sumner that night?
15        A    I received a call from Deputy Sumner,
16   stating that he had the Defendant in custody.
17        Q    All right.  So you didn't meet Deputy
18   Sumner out there?
19        A    No.  I was back at my residence.
20        Q    Okay.  And Deputy Sumner was at the
21   police station?
22        A    He just -- I was unaware of where he was
23   located when he called me.
24        Q    And you have thumb drives without
25   registering them with you?
```

```
 1          A    Yes.

 2          Q    All right.  And I'm not a computer guy or

 3    IT by any stretch of the imagination, but a thumb

 4    drive is something that just stores data, right?

 5          A    Yes.

 6          Q    Okay.  You can't access the internet with

 7    a thumb drive?

 8          A    That's correct.

 9          Q    And so you would not have to register a

10    thumb drive at all with you if someone's on

11    probation?

12          A    That is correct.

13          Q    All right.

14          MR. RUPERT:  Nothing further.

15          THE COURT:  All right.  Redirect?

16          MR. BUSTAMANTE:  Just briefly.

17                    REDIRECT EXAMINATION

18    BY MR. BUSTAMANTE:

19          Q    A thumb drive that is in the possession

20    of the Defendant would be subject of a search by

21    you?

22          A    Correct.

23          Q    If -- just because somebody's on

24    probation, do they lose the right to defend

25    themselves?
```

1        A    No.

2        Q    So if there's an altercation and your

3    probationer says, I have been attacked, I defended

4    myself; is that something you would take into

5    consideration in regards to your report?

6        A    Yes.

7        Q    Okay.

8             MR. BUSTAMANTE:  Nothing further.

9             THE COURT:  Thank you.  Ms. Sapp, you may

10   step down.

11            May Ms. Sapp be excused, or do you want

12   her to remain?

13            MR. BUSTAMANTE:  She can be excused, as

14   far as the State's concerned.

15            MR. RUPERT:  We would like her to remain,

16   Your Honor.

17            THE COURT:  All right.  You may step

18   down.

19            State, you may call your next witness.

20            MR. RUPERT:  May -- while he's doing

21   that, may we approach on -- one minute?

22            THE COURT:  Sure.  Let's announce the

23   next witness, so that --

24            MR. MALONE:  Terrell (phonetic) Williams.

25            THE COURT:  Okay.

```
1              THE WITNESS:  So, Your Honor, I have to

2        stay?

3              THE COURT:  You can be nearby if you want

4        to leave them with your contact number, that's

5        fine too.

6              MR. RUPERT:  A contact number is fine.

7              THE COURT:  Okay.

8              MR. RUPERT:  I don't believe we invoked

9        the Rule of Sequestration this morning, and so

10       I would like to invoke the Rule of

11       Sequestration.

12             THE COURT:  We did not.

13             MR. RUPERT:  Yeah, so I would like to.

14       (Indiscernible.)

15             MR. BUSTAMANTE:  I'll let them know

16       outside.

17             MR. RUPERT:  Thank you.

18             THE COURT:  Just give me one minute and

19       let my court reporter get set up.

20             All right.  Sir, do you swear or affirm

21       any testimony you give this jury today will be

22       the truth, the whole truth and nothing but the

23       truth, so Help you God?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Thank you, please be seated.
```

```
1          And, sir, it's up to you, if you're more

2       comfortable, and you want to lower your mask

3       while you're testifying, you have my

4       permission.

5              THE WITNESS:  Thank you.

6              THE COURT:  All right.

7              MR. BUSTAMANTE:  My apologies, Your

8       Honor.  I was letting the witnesses know about

9       the status of (indiscernible.)

10             THE COURT:  No, understood.  That's what

11      I expected you to do.

12                    DIRECT EXAMINATION

13   BY MR. BUSTAMANTE:

14      Q    Good morning, sir.

15      A    Good morning.

16      Q    Can you please tell us your name and

17   spell your last name, for the record?

18      A    Terrell Williams.  It's W-i-l-l-i-a-m-s.

19      Q    And sir, what do you do for a living?

20      A    I am a police officer, law enforcement.

21      Q    And who do you work for currently?

22      A    Currently, I work for the University of

23   Florida Police Department.

24      Q    And what is your rank there?

25      A    I'm an officer.
```

```
 1          Q     And how long have you been employed with

 2    the University of Florida Police Department?

 3          A     Coming up on two years.

 4          Q     Okay.  And previously to that, who did

 5    you work for?

 6          A     Bradford County Sheriff's Office.

 7          Q     And how long did you work for the

 8    Bradford County Sheriff's Office?

 9          A     Five years.

10          Q     Five years.  Is that the extent of your

11    law enforcement experience?

12          A     Yes, sir.

13          Q     May I bring you back to May 12$^{th}$ of 2018,

14    about three-years ago.  Were you working as a deputy

15    with the Bradford County Sheriff's Office?

16          A     I was a sergeant with the Sheriff's

17    Office, yes, sir.

18          Q     Okay.  And as a sergeant with the

19    Sheriff's Office, what were your duties?

20          A     To basically oversee deputies, to respond

21    to calls, and basically ensuring that everything was

22    done the way it was supposed to be.

23          Q     Bradford County is not a huge county?

24          A     Not too big, 300-square miles.

25          Q     And when -- there's different shifts
```

```
 1    that -- that are worked in order to patrol the area?

 2         A    Yes, sir.

 3         Q    Okay.  Can you explain to the jury how

 4    that works?

 5         A    There are two shifts.  When I was here,

 6    it was a 5 A to -- 5:00 A to 5:00 P, and then a 5:00

 7    P to 5:00 A, so you basically had a day shift, then

 8    you had a nighttime shift.

 9         Q    And is there -- based on the different

10    shift, is there a difference in the manpower of the

11    patrolling that that goes on?

12         A    It could be.  When I was here, again,

13    there was typically three people on duty.  So it was

14    a sergeant and two deputies.

15         Q    And so on that particular -- back on

16    May 12th, what shift were you working?

17         A    I was working a night shift.

18         Q    So that's the 5:00 p.m. to the 5:00 a.m.

19    the next day?

20         A    That is correct.

21         Q    Okay.  And you say there's three

22    deputies?

23         A    Including myself at that time, yes.

24         Q    Okay.  And so how do you divide up the

25    county?
```

 1          A      It's divided up -- again, we're talking

 2     back from then, it was divided north and south.

 3     So -- and east and west, I guess.  So State Road 100

 4     was your -- everything below that, south of that was

 5     the south end.  Everything north of 100 was the

 6     north end, 301 separated the county from east and

 7     west.

 8          Q      And that's not taking into account the

 9     Starke Police Department?

10          A      No, it does not.

11          Q      Okay.  They have their own --

12          A      They have their own sector, yes, sir.

13          Q      The area, it was a location called Lost

14     Valley --

15          A      Uh-huh.

16          Q      All right.  Would that have been within

17     the county jurisdiction?

18          A      Yes.

19          Q      Okay.  Did there come a time on -- during

20     your shift that there was a call for something that

21     had happened in Lost Valley?

22          A      Yes.  I -- the call was -- came out as me

23     needing to respond to the hospital.

24          Q      Okay.  So when you have a call like that,

25     how is it that you divide up amongst the sergeant,

1  and also the deputies who are on call?

2      A    Well, if it's going to be a call where

3  deputies are going to have to split up, then I have

4  to make the call as to who is going to which point.

5  So on this particular call, I went to the hospital

6  and sent someone else to Lost Valley.

7      Q    Okay.  So you were the person in charge,

8  and so you make those decisions?

9      A    Yes, sir.

10     Q    And so based on the information that you

11  had when you got the call, there was two different

12  places to look at --

13     A    Uh-huh.

14     Q    -- hospital and Lost Valley?

15     A    Correct.

16     Q    Okay.  Do you recall approximately what

17  time you would have gotten to -- to the hospital?

18     A    It would have been sometime after

19  8:00 p.m.

20     Q    It was nighttime?

21     A    It was at night, yes.

22     Q    Okay.  And kind of dark?

23     A    Yes.

24     Q    When you got there, what did you see?

25     A    When I got to the hospital, I seen a

1    gentleman standing outside, blood on his face, holes

2    in his shirt, with blood all over his shirt.

3         Q    You identify yourself as a law

4    enforcement to him?

5         A    Yes.  He seen me pull up in the patrol

6    car, yes, sir.

7         Q    And as a sergeant, you also wear your --

8    your patrol suit?  I guess, your -- I call it the

9    picket suit.

10        A    Yes.

11        Q    And that's the green one that marks you

12   as a law enforcement officer?

13        A    Yes, sir.

14             MR. BUSTAMANTE:  Your Honor, may I

15        approach the witness?

16             THE COURT:  You may.

17   BY MR. BUSTAMANTE:

18        Q    Can you please look at (indiscernible) --

19   can you please look at States Exhibits A, B, C and

20   D?

21             (Photographs tendered to the witness.)

22        A    (Witness photographs documents.)

23        Q    Do you recognize those?

24        A    Yes, sir.

25        Q    And how do you recognize them?

1        A      This was the gentleman that I observed

2     when I pulled up to the hospital.

3        Q      And do they accurately reflect what he

4     would have looked like and the injuries that you saw

5     on that particular night?

6        A      Yes, sir.

7        Q      And what are the photographs of?

8        A      They're photographs of him and his

9     injuries.

10       Q      And what is the name of the -- of that

11    particular person?

12       A      I believe this is going to be Mr.

13    Pardekooper.

14       Q      Okay.  Matthew Pardekooper?

15       A      Yes, sir.

16       Q      Okay.

17              MR. BUSTAMANTE:  Your Honor, at this time

18         the State would move it into evidence as 1, 2,

19         3, and 4.

20              THE COURT:  Any objection?

21              MR. RUPERT:  No, sir.

22              THE COURT:  All right.  They'll be

23         received; do you want them as a composite or

24         individual?

25              MR. BUSTAMANTE:  Individual.

```
1              THE COURT:  All right.  These will be
2         marked into evidence as 1 through 4.
3              (The photographs last-above referred to
4         were marked for evidence as State's Exhibit
5         Numbers 1-4.)
6              MR. BUSTAMANTE:  Your Honor, may I
7         publish these to the jury?
8              THE COURT:  You may.
9              (State's Exhibits 1 - 4 tendered to the
10        jury.)
11   BY MR. BUSTAMANTE:
12        Q    When you talked to Mr. Pardekooper, in
13   what kind of emotional state was he?
14        A    He seemed like he was coherent.  He knew
15   what was happening and what was going on, so we had
16   a conversation about what took place and what
17   happened.
18        Q    And based on the information that he gave
19   you, did you relay that information over to the
20   person who was investigating over in Lost Valley?
21        A    Yes, sir.
22        Q    Okay.  Who was the other person that --
23   who was the person that was over in the Lost Valley
24   area for -- for the Sheriff's Office?
25        A    The -- it was Deputy Sumner.
```

1        Q    Okay.  And at some point, did he make it
2   to the hospital or --
3        A    Deputy Sumner?
4        Q    Yeah.
5        A    I don't believe that he did.
6        Q    Okay.  And that was three-years ago?
7        A    Uh-huh.
8        Q    And how long were you at the hospital
9   dealing with Mr. Pardekooper?
10       A    I don't -- I don't recall.  Probably an
11  hour, maybe a little bit longer.
12       Q    Okay.  And based on the information that
13  Mr. -- you know, you're there an hour and dealing
14  with, you know, all of the kind of things that you
15  have to deal with, when you're dealing with the
16  information that was given to you, is that
17  information that is given over to the deputy on the
18  scene for items to be looking out for?
19       A    He -- definitely things of importance is
20  going to get relayed back to the other deputy, so
21  certain things would get relayed to him to be on the
22  look out for.
23       Q    Okay.  Would one of the things to be on
24  the lookout for, may be a bat?
25       A    Yes.

1          Q     Okay.  What about some computer

2    equipment, like an SD card?

3          A     That, possible.  I don't recall that.

4    The bat, yes, just because that was what was told to

5    me was how he sustained his injuries.

6          Q     Okay.  And was there also any kind of

7    conversation about an axe?

8          A     Yes.

9          Q     Okay.  And what was relayed to you with

10   regards to the axe?

11         A     Was just that it had gotten picked up in

12   response to being hit with the bat.

13              MR. RUPERT:  Your Honor, I would object

14         at this point for hearsay.

15              MR. BUSTAMANTE:  It's not the truth of

16         the matter asserted, it's the fact that they're

17         also looking for another item in order for it

18         to come back to evidence.  Where the bat's

19         not -- they're looking for an axe.

20              THE COURT:  Overruled, I'll allow it for

21         that limited nature.

22   BY MR. BUSTAMANTE:

23         Q     So you were looking for an axe, also,

24   that was also involved, but was the axe, as you

25   understood at the time, something that was picked up

1    before the bat, or how -- how was it that you were

2    able to put that together?

3              MR. RUPERT:  Objection, Your Honor.  This

4         is already -- may we approach?

5              THE COURT:  You know -- don't approach.

6         I would sustain that it's hearsay.

7              MR. RUPERT:  Thank you.

8    BY MR. BUSTAMANTE:

9         Q    One of the items that you were also

10   looking for was an axe?

11        A    Yes.

12        Q    Based on the information that you

13   received, will you make decisions as to what items

14   you were going to seize in evidence; would that be

15   fair to say?

16        A    The items that we were looking for, yes.

17        Q    Yes, okay.  At some point, did you go to

18   the Lost Valley scene?

19        A    I did.

20        Q    Okay.  And did you leave Mr. Pardekooper

21   behind at the hospital?

22        A    Yes.

23        Q    All right.  So he was there -- you're

24   there an hour, he's still there?

25        A    Yes.

1      Q    As far as you know, being treated

2    medically?

3      A    Yes.

4      Q    I'm now showing you what's been marked as

5    State's Exhibit I and J for identification purposes.

6    Can you please look at those?

7          (Photographs tendered to the witness.)

8      A    (Witness photographs documents.)

9      Q    Do you recognize those?

10     A    Yes, sir.

11     Q    And how do you recognize them?

12     A    It was taken at the -- the scene out in

13   Lost Valley.

14     Q    And is that how -- what is purported was

15   photographs found at the time when the investigation

16   was ongoing?

17     A    Yes.

18          (Conclusion of video/audio recording.)

19          MR. RUPERT:  There would be no objection.

20          THE COURT:  All right.  Without objection

21      it will be received.

22          And there's two of them?

23          MR. BUSTAMANTE:  Yes.

24          THE COURT:  All right.  It will be

25      received as 5 and 6 then.

```
 1              (The photographs last-above referred to

 2         were marked for evidence as State's Exhibit

 3         Numbers 5 and 6.)

 4              MR. BUSTAMANTE:  Your Honor, may we

 5         publish to the jury?

 6              THE COURT:  You may.

 7    BY MR. BUSTAMANTE:

 8         Q    On the night that -- of this

 9    investigation, was the -- the bat was something that

10    was seized into evidence?

11         A    I believe that it was.

12         Q    Okay.  Are you the one who seized that

13    evidence?

14         A    No, sir.

15         Q    How does that work when it comes to

16    during the investigation?

17         A    Each investigation is different.

18    Typically, the primary law enforcement officer on

19    the scene is going to be the one to retrieve and

20    enter those things into evidence.  If they ask for

21    assistance, then they could be assisted with the

22    collection and entering of that property, but at

23    this point in time, I -- I wasn't involved in that

24    part of it.

25         Q    Okay, but if there's any questions, you
```

1    would be able to help and give advice?

2        A    Correct.

3        Q    Do you know if the axe was seized during

4    the --

5        A    I would have to refer to my report to see

6    if it was --

7        Q    Okay.

8        A    -- in the evidence.

9        Q    All right.  And you don't know if it was

10    seized or not, or at least put into evidence?

11        A    I do not.

12        Q    Okay.  Do you give -- when it comes to

13    your -- the persons that you're supervising, do you

14    give them discretion with regards to what to put

15    into evidence and what not?

16        A    Certain things should go into evidence,

17    and certain things may not need to; it really just

18    depends.  We always err on the side of caution, and

19    we should always collect more than what it

20    necessary.

21        Q    Okay.  What kind of considerations does

22    law enforcement have in a situation like that of

23    seizing evidence and not seizing evidence?

24        A    If it was something that was actually

25    used, if it was something that's important and vital

```
 1    to the case, at those point in times, those things
 2    should be -- should be collected.
 3         Q    Okay.  At the very least, is at least a
 4    photograph taken?
 5         A    Yes.
 6         Q    All right.  Do you take into account the
 7    ownership of certain items?
 8         A    Yes.
 9         Q    Okay.  Explain as to why that would be.
10         A    Well, certain items belong to people;
11    it's their property.  At some point, we have to
12    seize and take other people's property to hold it
13    for times such as these, but if it's not vital to
14    the case, then they're allowed to -- to keep it.
15         Q    In this case, three-years-and-a-week
16    ago -- so those items would remain in evidence for
17    three years?
18         A    They should.  They should remain there
19    until the case is dismissed or basically done.
20         Q    When you got to the scene, did you see
21    the probation officer there, also?
22         A    At...
23         Q    At that scene in Lost Valley, I'm sorry?
24         A    At some point, yes, I did.
25         Q    Okay.  And at some point, she left?
```

```
 1        A    Yes.

 2        Q    All right.  How long -- when you went to

 3   Lost Valley, how long were you there?

 4        A    I -- I don't recall how long I was there.

 5        Q    At some point, you left?

 6        A    Yeah.

 7        Q    And at the time that you left, had you

 8   searched for Mr. Malone?

 9        A    Yes.

10        Q    And you were looking for Mr. Malone?

11        A    Yes.

12        Q    All right.  And you were able to talk to

13   other witnesses, or at least, maybe one or two of

14   the witnesses who were there?

15        A    I spoke with the deputy.  I spoke with

16   probation and parole.  At that particular scene, at

17   the Lost Valley, at that time, I can't recall

18   speaking to anybody else there.

19        Q    Okay.  You let your -- your leading agent

20   do all that kind of work?

21        A    Correct.

22        Q    Okay.  During the time you were there,

23   did you ever find Mr. Malone?

24        A    No, sir.

25        Q    Did you help in the search process?
```

```
 1        A    Yes.

 2        Q    And were you successful in finding him

 3   during the time you were searching for him?

 4        A    No.

 5        Q    Was it dark?

 6        A    Yes.

 7        Q    At some point, you left?

 8        A    Yes.

 9        Q    Did you go back to Lost Valley at some

10   point later that evening or at night?

11        A    Yes.

12        Q    And when -- when did you-all -- when did

13   you go back?

14        A    We were advised over the radio that

15   someone had called in advising that they saw him

16   back there at the scene.

17        Q    Okay.  And after that was -- that message

18   was received, how long did it take you to go back to

19   Lost Valley?

20        A    When I got that call, I believe I was at

21   the hospital, so I left there.  So I would say less

22   than ten minutes.

23        Q    Okay.  And why you were at the hospital;

24   did you go back to the hospital?

25        A    Yes, sir.
```

1    Q    And why did you go back to the hospital

2    for?

3    A    I went back to the hospital, because

4    there was a gentleman there who was on scene when

5    the altercation took place.

6    Q    Okay.  And that would potentially be a

7    witness?

8    A    Correct.

9    Q    Did you talk to that person?

10   A    I did.

11   Q    Okay.  And do you recall the name of that

12   person?

13   A    I would have to look at the report to --

14   Q    Would it help to refresh your

15   recollection?

16   A    Yes.

17   Q    Okay, go ahead.

18   A    It's a Mr. McCaullie.

19   Q    Okay, Mr. McCaullie.  And you received

20   information from him?

21   A    Yes.

22   Q    Okay.  And you -- you put that in the

23   report?

24   A    Yes.

25   Q    Okay.  So you're back at the hospital,

1    and then, now you rush back to Lost Valley?

2        A    Correct.

3        Q    Okay.  And when you got there, what did

4    you see?

5        A    Deputy Sumner was out there.  I don't

6    recall if anyone else was out there, but he was

7    already out there in his patrol vehicle.

8        Q    Okay.  At that point, was -- where was

9    Mr. Malone?

10        A    I believe he was already in the back of

11    Deputy Sumner's police vehicle.

12        Q    Okay.  So you did not actually see the

13    physical arrest of him when you got out there?

14        A    No, sir.

15        Q    Okay.  After you saw him in the back of

16    the patrol vehicle, did you do anything else in this

17    case?

18        A    Just made sure -- to see if he needed any

19    help with anything, and if he didn't, I was -- I was

20    gone.

21        Q    Okay.  So you didn't have to call like,

22    emergency evac or anything like that to help with

23    Mr. Malone with anything?

24        A    No, sir.

25        Q    Okay.  Do you see the Defendant in the

```
 1   courtroom today, Mr. Malone?

 2        A    Just by -- I'm assuming who he was,

 3   but --

 4        Q    You don't even remember him, do you?

 5        A    No, sir.

 6        Q    Okay, three-years ago.

 7             MR. BUSTAMANTE:  I don't have anything

 8        further.

 9             THE COURT:  All right.  Counsel, I'm

10        going to pause you before you do your cross.

11        Let's take a ten-minute break.

12             All right.  And so, if you'll leave your

13        notepads face down, and remember, don't talk to

14        each other yet about the case.  Let's take a

15        ten-minute break.

16             Mr. Wahl (phonetic,) can I see you just

17        briefly?  I just need to convey a message to

18        you.

19             MR. WAHL:  Yes, sir.

20             (Off-the-record discussion.)

21             THE COURT:  So let the record reflect the

22        ladies and gentlemen of the jury are out of the

23        courtroom on a brief recess.  You can be in

24        recess.  I just want to make Counsel aware.  I

25        received a message that Juror 4935, Mr. Wahl,
```

1    needs to make a phone call, and that's what I

2    just advised him of at sidebar.  So that

3    there's everything -- his mother-in-law is on

4    the way to the hospital, maybe having some

5    chest pains or things like that.  I don't know

6    if it's any more clear, but he's going to make

7    that call now.  I'll find -- get an update on

8    what's going on, and I asked him to please let

9    the deputy or myself know immediately as soon

10   as he knows, so I can figure out what, if

11   anything, we need to -- need to address about

12   it --

13        MR. RUPERT:  Thank you.

14        THE COURT:  Okay -- all right.  We'll be

15   in recess.

16        (Short recess.)

17        THE COURT:  All right.  We're back on the

18   record in the State of Florida versus Timothy

19   Malone, 2018-CF0246.  Mr. Malone's present in

20   the courtroom with Counsel.  State is present

21   with Counsel.  Gentlemen, the update that he

22   just provided me is, Mr. Wahl, the juror with

23   the issue with the mother-in-law, has been able

24   to make that call.  And he says, right now

25   everything -- he seems to think that

1    everything's okay.  I'm just going to advise

2    him, you know, that my expectation would be at

3    each of our breaks and recesses that he'll

4    reach back out, and if there ever develops to

5    be an issue or concern, or if he ever feels

6    like he's having difficulty maintaining his

7    focus or attention to the trial, to let me

8    know, and I can address it.

9         Do you -- does Counsel wish me to do

10    anything more than that?

11         MR. RUPERT:  I fully agree with how the

12    Court tends to deal with this issue.

13         THE COURT:  Okay.

14         MR. BUSTAMANTE:  Yes, Your Honor, we

15    agree.

16         THE COURT:  All right.  So anything we

17    need to address before we bring them back in?

18         MR. RUPERT:  No, sir.

19         THE COURT:  All right.  Let's bring them

20    back in.  All right, let the record reflect

21    that the ladies and gentlemen of the jury are

22    back and present in the courtroom.

23         Those breaks go fast, don't they?  All

24    right.  You-all may be seated.

25         So, Mr. Wahl, would you just keep me

```
 1            updated.
 2                 MR. WAHL:  Yes, sir.
 3                 THE COURT:  And if it ever arises
 4            anything that -- that is causing you concern or
 5            drawing your interest away, you let me know,
 6            okay?
 7                 MR. WAHL:  Yes, sir.
 8                 THE COURT:  All right.  You may be
 9            seated.  And, Counsel, again, I apologize for
10            the interruption.  You may cross.
11                 MR. RUPERT:  Yes, sir, may it please the
12            Court?
13                 THE COURT:  Yes, sir.
14                      CROSS EXAMINATION
15    BY MR. RUPERT:
16         Q    Deputy Williams, how are you doing?
17         A    I'm doing pretty good.  How about
18    yourself, sir?
19         Q    Good, sir.  Thank you.  All right.  I
20    think where we left off, was that it had been three
21    years, and certainly you cannot recognize who the
22    Defendant was; is that correct?
23         A    No, sir.
24         Q    All right, thank you.  And I think, also,
25    you said that the reason it's important to fully
```

1  collect evidence is that sometimes cases go on for a

2  period of time; is that correct?

3       A    Correct.

4       Q    All right.  And so if you have the

5  evidence, and if you have the item in evidence, then

6  it's much easier to know exactly what that evidence

7  is, because you can look at it again, correct?

8       A    Correct.

9       Q    All right.  Did you take the picture of

10 State's 6?  And let me --

11           MR. RUPERT:  May I approach the witness?

12           THE COURT:  You may.

13 BY MR. RUPERT:

14      Q    Did you -- did you take that picture?

15           (Photograph tendered to the witness.)

16      A    (Witness perusing photograph.)

17           I'm not sure if this is a picture that I

18 took or the other deputy.

19      Q    All right.  It wasn't your responsibility

20 to collect the bat and the axe; is that correct?

21      A    That's correct.

22      Q    All right.  Now, do you know today,

23 three-years later, the exact size of that axe?

24      A    No, sir.

25      Q    All right.  This picture doesn't help,

1    does it?

2         A    To know the size of it?

3         Q    Yeah.

4         A    No, sir.

5         Q    All right.  I mean, you know it's bigger

6    than the bat; I guess, you can do that, right?

7         A    Yes, sir.

8         Q    All right.  Do you know how heavy it is?

9         A    No, sir.

10        Q    All right.  So if it was in evidence, you

11   could actually weigh it; is that correct?

12        A    Correct.

13        Q    To your knowledge, is this the only

14   picture of the bat that we have?

15        A    Of the picture you just showed me?

16        Q    Yes.

17        A    I think there was another picture that I

18   saw that showed the grip portion of the bat.

19        Q    No, I'm talking about the axe, I'm sorry.

20   I said --

21        A    Oh, you said bat, yes.

22        Q    Yeah.

23        A    That -- that very well could be the --

24   the only picture.

25        Q    So we have no idea what's on the other

1    side of the axe, other than what's viewed on this

2    picture (indicating)?

3         A    No, sir.

4         Q    The State went to great lengths to ask

5    you about personal property, sometimes that's given

6    back because the owner, for some reason would, you

7    know, have to have it.  Do you -- were you part of

8    any conversation that said this person really needs

9    his axe back, so let's give it back?

10        A    I was not part of any conversation like

11   that, no, sir.

12        Q    Does it look like a particularly new

13   bat -- new axe to you?

14        A    I can't tell from the picture, but I'm

15   assuming not.

16        Q    It looks kind of old?

17        A    Yes, sir.

18        Q    All right.  Do you have any idea how much

19   that axe is worth?

20        A    No clue.

21        Q    Are there other axes at stores that don't

22   have evidentiary value that could be purchased or

23   loaned out?

24        A    I would assume so.

25        Q    Okay.  So you're not aware of any

112

```
 1    particularized reason why this axe was not taken

 2    into evidence so we would have it today?

 3         A    No, sir.

 4         Q    Would -- were you -- did you take any

 5    pictures of Mr. Pardekooper after he was seen by

 6    medical professionals?

 7         A    I don't recall taking pictures after

 8    that.

 9         Q    All right.  Did you see him after that?

10         A    I don't recall seeing him after that.

11         Q    Do you have any medical training?

12         A    Do I?

13         Q    Yes, sir.

14         A    Such as like, CPR, things such as that?

15         Q    Do you have that?

16         A    I have that.

17         Q    Okay.  All right, have you ever dealt

18    with cuts or abrasions to the human person?

19         A    I have.

20         Q    Okay.  All right, even just accidents

21    surrounding -- if you have kids or playing sports,

22    would you agree that the skin around the forehead

23    where Mr. Pardekooper was struck, in that area, it's

24    kind of a thin skin, and it tends to bleed more?

25         A    It's possible.
```

1      Q     Okay.  All right.  Certainly, you don't

2   have the training for that?

3      A     Correct.

4      Q     You wouldn't be surprised, though, if

5   that's the case?

6      A     Correct.

7      Q     All right.  That would be consistent with

8   your experiences?

9      A     Correct.

10      Q     You never actually saw the altercation

11   between Timothy Malone and Matthew Pardekooper?

12      A     I did not.

13      Q     So the first place you went was Shands of

14   Starke?

15      A     Yes, sir.

16      Q     All right.  And Mr. Pardekooper was out

17   there waiting for you, or did he come out?

18      A     He was just standing outside.

19      Q     Okay.  Do you know why he wasn't already

20   in?

21      A     I do not know.

22      Q     Would you agree that he was mad?

23      A     That he was upset?

24      Q     Yeah.

25      A     Yes, sir.

```
 1          Q    And he was so upset he told you that he
 2    hopes law enforcement finds him, meaning my client,
 3    before he does?
 4                MR. RUPERT:  Objection, calls for
 5        hearsay.
 6                THE COURT:  Sustained.
 7    BY MR. RUPERT:
 8          Q    Are you aware of any threats that Mr.
 9    Pardekooper made to my client in your presence?
10                MR. BUSTAMANTE:  Objection, hearsay.
11                THE COURT:  Sustained.
12    BY MR. RUPERT:
13          Q    Did you have a body camera on that day?
14          A    I would assume that I did have a body
15    camera.
16          Q    All right.  So how does that work?
17          A    As far as...
18          Q    As when is it turned on, do you turn it
19    on, is it automatically turned on?
20          A    The ones that we had at that point in
21    time, unless you activated your emergency lights and
22    sirens, it did not come on.  It would only come on
23    if you actually activated it yourself.
24          Q    Did you activate your lights and siren to
25    trip your bodycam?
```

1      A      No, I did not.

2      Q      Okay.  You interviewed Mr. Pardekooper at

3  the hospital?

4      A      Yes, sir.

5      Q      Okay.  So there is no video of actually

6  what Mr. Pardekooper said, as far as a video

7  recording of it?

8      A      If you don't have it, then I will assume

9  that there is not.

10     Q      Okay.  Well, did you turn on your lights?

11     A      I did not turn on my lights.

12     Q      Okay.  Is that the only way the bodycam

13  can come on?

14     A      It comes on with the lights activation,

15  or you have to activate it yourself.

16     Q      Okay.  So you can, you, as a law

17  enforcement officer, you make the decision at this

18  point, you're going to activate your bodycam?

19     A      That is correct.

20     Q      All right.  And how does one do that?

21     A      I'm assuming, if I remember correctly

22  with that one, it's the push of a -- of a button.

23     Q      All right.  So have you ever activated

24  your bodycam?

25     A      Yes.

1        Q    All right.  So how do you do it?

2        A    The one that I have now, or are you

3    talking about when I was with the Sheriff's Office?

4        Q    Okay.  So the one with the Sheriff's

5    Office, that would have been three-years ago?

6        A    Yes.

7        Q    Okay.

8        A    So I'm saying, I believe that one was

9    with the push of a button.

10       Q    All right.  And the officer at his

11   discretion, at any point in time, when he thinks

12   he's dealing with something that needs to be kept as

13   evidence, can make the decision to go ahead and push

14   his -- push that button and memorialize it?

15       A    Correct.

16       Q    And once he does that, what's the

17   procedure to keep it as evidence?

18       A    It should be downloaded into the -- the

19   evidence system basically, and backed up or recorded

20   on a disk.

21       Q    Does the officer or deputy that takes the

22   bodycam and does the recording, are they the ones

23   that are responsible for -- for taking it to law

24   enforcement and then downloading it?

25       A    Each individual person --

1      Q     Yes.

2      A     -- for their own equipment?

3      Q     Yes.

4      A     Correct.

5      Q     All right.  So logistically, how does

6    that -- how does that work?

7      A     You take it off of your -- off of your

8    person, off of your body, and you would place it

9    into a cradle, which is basically a downloading

10    system and a charging dock, as well.  It will take

11    some time to upload, and then once it uploads, you

12    should be able to review it and attempt to extract

13    it and put it onto a DVD.

14      Q     So that's done where at the Sheriff's

15    Office?

16      A     When I was there, it was done in the

17    patrol room.

18      Q     In the patrol room.  So there was a room

19    at the Sheriff's Office called a patrol room where

20    routinely you'd download your bodycam video?

21      A     Correct.

22      Q     And by downloading it, you'd put it on a

23    disk only, or you'd put it on a hard drive?

24      A     I put mine on a disk at the time.  So I

25    don't know what they do now, but then we were

1    putting it on blank DVDs.

2        Q    Did you have the option to put -- to

3    download it into like a mainframe?

4        A    It's possible.  I put mine on DVDs, so I

5    wasn't concerned with anything else.

6        Q    All right.  So you put it on DVD, what

7    did you do -- what do you do after that?

8        A    It would be collected as any other

9    evidence, sealed, dated and placed in property, like

10   anything else would.

11       Q    Would you do the --

12       THE REPORTER:  Placed where?  I'm sorry.

13       THE WITNESS:  In property.

14   BY MR. RUPERT:

15       Q    So you put it in like a plastic bag?

16       A    In the -- there's like a -- like a sleeve

17   that disks come in.  It was just a sleeve that you

18   would put it in.  You would close it, tape it, and

19   then put it into evidence.

20       Q    Would you initial it and save the date

21   and substance of what's on the disk?

22       A    You would initial it, you could date it,

23   and at last put a case number and a name.

24       Q    So this is in the patrol room, you're

25   doing it by yourself; is anybody watching you, or is

1    there any supervisors or hierarchy that would

2    oversee whether or not what you're doing is correct?

3         A    Each case is different.  Is there

4    somebody looking over your shoulder, watching you do

5    it, no, but there could be other people in the room,

6    if that's what you're asking.

7         Q    I -- I guess -- you didn't answer,

8    because it's -- like, there's no one specifically in

9    charge of -- of monitoring the collection of the

10   evidence, each individual deputy on their own makes

11   that determination?

12        A    Correct.

13        Q    All right.  And each individual deputy on

14   their own does the downloading, the sealing and

15   placing them into evidence?

16        A    Correct.

17        Q    All right.  So once you put it in that

18   DVD and you put all of the documentation in it, do

19   you walk it down somewhere to put it into evidence?

20        A    It should, yes.

21        Q    All right.  Where do you go from there?

22        A    You would go to the -- the area where the

23   evidence is kept.  If there's an evidence custodian

24   there, you could hand deliver it.  If there was not

25   one that was there, then you would fill out an

1    evidence log.  And it would get placed into a

2    locked, some type of locked container that only the

3    evidence custodian had the key to in order to get

4    out.

5         Q     Kind of like a locked suggestion box, you

6    just slip it in and it drops down and it --

7         A     I mean, it would be bigger than like a

8    suggestion box, but yes, the same concept.

9         Q     Now, you mention the term, evidence

10   custodian, does -- did Bradford County Sheriff's

11   Office, three-years ago, have an evidence custodian?

12        A     I believe so, yes, yes.

13        Q     Do you remember who that was?

14        A     I believe that it was Deputy Frankie

15   Crole (phonetic,) if I'm not mistaken.

16        Q     All right.  Was there just one, or is

17   there multiple evidence custodians that worked on

18   shift, like three eight-hours, or how does that

19   work?

20        A     I'm -- I'm not sure.  As far as I knew,

21   he was the only one at that time.

22        Q     All right.  And did he have specific

23   hours that he worked; do you remember if he was

24   scheduled, or if he was just -- if he was there, he

25   was there; if not, so be it?

```
 1        A    That's how I looked at it.  That
 2   wasn't -- I mean, I put my stuff in.  If he was
 3   there, he was.  If he wasn't, then he wasn't.
 4        Q    Okay.
 5        A    And I worked nights, too, so most people
 6   worked the normal -- what we would consider normal
 7   hours, so I don't expect to see too many people by
 8   the time I came in.
 9        Q    Right.  So you're there, you download,
10   you do the proper things, you -- you mark, you seal
11   it, and then you take it to the evidence room.  If
12   Deputy Crole's not there, you secure it in the
13   evidence box?
14        A    Correct.
15        Q    Thank you.
16             THE COURT:  Redirect?
17             MR. BUSTAMANTE:  Yes.
18                  REDIRECT EXAMINATION
19   BY MR. BUSTAMANTE:
20        Q    Defense Counsel spent a lot of time on
21   body cameras and things of that nature.  Let's go
22   back three-years ago.  At some point the Bradford
23   County Sheriff's Office got a body camera system --
24        A    Correct.
25        Q    -- right?  Would it be fair to say that
```

1    there was a lot of bugs in the system?

2        A    Yes.

3        Q    A lot of -- there was a learning curve?

4        A    Yes.

5        Q    And that people needed to figure out

6    exactly how this operates?

7        A    Correct.

8        Q    Right.  And at some point, maybe some

9    things were not kept?

10       A    Yes.

11       Q    All right.  Was that -- any of this done

12   on purpose?

13       A    No.

14       Q    All right.  And regardless of whether

15   there's body cameras or not, you still have to make

16   reports, correct?

17       A    Correct.

18       Q    All right.

19            MR. BUSTAMANTE:  I have nothing else.

20            THE COURT:  Thank you, sir.  You may step

21       down.

22            May this witness be excused, or do you

23       want him to remain subject to recall?

24            MR. BUSTAMANTE:  The State not -- he can

25       be excused.

```
 1            MR. RUPERT:  Excused.

 2            THE COURT:  All right.  Thank you, sir.

 3       You can go about your day.

 4            Next witness?

 5            MR. BUSTAMANTE:  Yes, Deputy Dalton

 6       Sumner.

 7            THE COURT:  Will you raise your right

 8       hand?  Do you swear or affirm any testimony you

 9       give the jury today will be the truth, the

10       whole truth and nothing but the truth, so help

11       you God?

12            DEPUTY SUMNER:  Yes, sir.

13            THE COURT:  Thank you, please be seated.

14       Deputy, you may remove your mask while you're

15       testifying, if you'd like.

16            THE WITNESS:  Yes, sir.  Thank you.

17                 DIRECT EXAMINATION

18  BY MR. BUSTAMANTE:

19       Q    Good morning, sir.

20       A    Good morning.

21       Q    Will you please tell us your name and

22  spell the last name, for the record?

23       A    Deputy Dalton Sumner, S-u-m-n-e-r.

24       Q    And what do you do for a living, sir?

25       A    I'm a sheriff deputy for the Bradford
```

1    County Sheriff's Office.

2        Q    And how long have you been employed in

3    that capacity?

4        A    Approximately, four years.

5        Q    Do you have any previous law enforcement

6    experience?

7        A    Yes, sir, with the Department of

8    Corrections.

9        Q    And how long were you employed with the

10    Department of Corrections?

11        A    Approximately, three years.

12        Q    Three years.  What kind of training do

13    you receive in order to become a deputy sheriff?

14        A    We go through the police academy, as well

15    as tactical training, legal training within the

16    police academy.

17        Q    And then you also continue having like,

18    continuing education as- -- the learning doesn't

19    stop when you become a deputy, correct?

20        A    That is correct, yes, sir.

21        Q    So there's in-service training and things

22    of that nature, correct?

23        A    Correct.

24        Q    Okay.  Let me bring you back to May 12th

25    of 2018, were you employed as a Bradford County

1    sheriff's deputy at that -- on that particular day?

2        A    I was.

3        Q    All right.  And do you recall what type

4    of shift you were assigned to?

5        A    I believe I was on the night shift, from

6    5:00 p.m. to 5:00 a.m.

7        Q    All right.  And did there come a time in

8    which you answered a call to an area called Lost

9    Valley, which is around the Starke area?

10       A    Yes, sir.

11       Q    All right.  And tell us what is it

12   that -- when you got there, what is it that you saw?

13       A    I responded to that Lost Valley

14   Campground in reference to a battery that already

15   occurred with a baseball bat.

16       Q    Okay.  And when you got there, did you

17   see anybody, or who did -- who did you meet up with?

18       A    I believe -- I don't remember meeting up

19   with anyone at the scene.

20       Q    Okay.  So -- and I guess to explain to

21   the jury, when you answer a call, what is it that

22   you do?

23       A    We go to the area where we're being

24   called to and figure out what's going on.

25       Q    All right.  So sometimes, you have a

1    general idea of what's going on, and you kind of

2    have to figure it out?

3         A    That's correct.

4         Q    Okay.  Approximately, what time was it

5    when you got to the scene?

6         A    I believe it was around 8:00 in the

7    afternoon.

8         Q    Okay.  Was it light out, was it dark, how

9    was it?

10        A    I think it was kind of dusk-ish, getting

11   dark.

12        Q    Kind of like -- and that was in May, it's

13   about the same?

14        A    Right.

15        Q    Okay.  And did you at any point -- who

16   were you looking for; did you --

17        A    I was looking for a gentleman named

18   Timothy Malone.

19        Q    And when you got there, what -- what did

20   you do in order to try to locate him?

21        A    I searched the immediate area.  The call

22   we received was that someone had been hit in the

23   head by Timothy Malone from a baseball bat.

24        Q    Okay.  So that's -- so you're kind of

25   looking for him just to investigate?

```
 1        A    That's correct.

 2        Q    All right.  And approximately, how long

 3   did you look for him?

 4        A    I would say approximately 30 minutes or

 5   so.

 6        Q    Okay.  And when you were looking for him,

 7   what exactly are you doing?

 8        A    Walking around the immediate area --

 9        Q    You're ask --

10        A    -- asking -- asking people if they've

11   seen him, looking around.

12        Q    And at some point, did you meet up, or

13   you saw a probation officer?

14        A    Yes, I did.

15        Q    Okay.  And were you guys searching the

16   same area, or was -- what was she doing there, as

17   far as you knew?

18        A    I had actually left, and then responded

19   back to the campground where Ms. Sapp, which was the

20   probation officer, had responded to help look for

21   Timothy, because he had cut his ankle monitor off of

22   his leg.

23        Q    All right.  So just to make it clear for

24   the jury, so you got there --

25        A    Uh-huh.
```

1        Q    -- there's no Ms. Sapp?

2        A    No.

3        Q    You searched for about half an hour?

4        A    Uh-huh.

5        Q    And then -- but Ms. Sapp is not there?

6        A    That is correct.

7        Q    And then you leave?

8        A    That is correct.

9        Q    Why did you leave?

10       A    I left to go make contact with the

11   victim, as -- also, my sergeant, that was at the

12   hospital.

13       Q    Okay.  So you just went out to -- you did

14   what you could at the scene at the time, and you

15   went to meet up with the victim?

16       A    That's correct.

17       Q    Are you considered, at this point, the

18   lead investigator or lead investigator or lead

19   deputy of the case?

20       A    Yes, sir, that is correct.

21       Q    Okay.  And at the time as you were

22   searching for Mr. Malone for the half hour, had you

23   seen any items of evidentiary value at that point,

24   or were you even looking for those?

25       A    During the first moment, no, I did not.

1        Q     Okay.  So at that point, did you know

2    like, if you were looking for weapons or anything

3    like that at that point?

4        A     We -- we had the call saying a bat was

5    involved, but I don't recall looking for them at the

6    first moment.

7        Q     Okay.  So when you went over to the

8    hospital, what did you see?

9        A     I met with Sergeant Williams to obtain a

10   witness statement from the victim.

11       Q     Okay.  And were you able to obtain that?

12       A     I was.

13             MR. BUSTAMANTE:  All right.  And we would

14       introduce into evidence numbers -- what's been

15       already introduced as Numbers 1, 2, 3, 4.

16             (Photographs tendered from the Clerk and

17       then tendered to the witness.)

18             THE WITNESS:  (Witness perusing

19       photographs.)

20   BY MR. BUSTAMANTE:

21       Q     Is that the picture of Mr. Pardekooper as

22   you saw him on that particular evening?

23       A     That is correct.  I don't recall if I'd

24   seen him out front, or if it was after everything

25   was said and done.

████████          But the injuries that are portrayed there

2   are consistent with what you would have seen before

3   the pictures were taken?

4        A    That is correct.

5        Q    Okay.  And when you went and saw him, it

6   would have been around, maybe 8:30, maybe a little

7   later than that, and would it be fair to say that

8   lighting might he have gotten --

9             MR. RUPERT:  Objection as to the constant

10        leading, Your Honor.

11             THE COURT:  Overruled.

12             THE WITNESS:  That is correct, it was

13        getting darker.

14   BY MR. BUSTAMANTE:

15        Q    Okay.  So how long did you stay there at

16   the -- at the scene with Mr. Pardekooper?

17        A    Probably, just a few minutes.

18        Q    Okay.  And you were able to talk to him?

19        A    I was.

20        Q    And he was able to recite some facts to

21   you that way when you went back to the scene, you

22   can have more information about what happened?

23        A    That is correct, as well as a witness

24   statement.

25        Q    Okay.  When you went back, around what

```
 1   time did you go back to -- and I'm talking about
 2   Lost Valley.
 3        A    It would have probably been around 9:45
 4   or so -- I'm sorry -- 8:45 or so.
 5        Q    When you went back, who did you -- did
 6   you see anybody there?
 7        A    I met with Ms. Sapp.
 8        Q    Okay.  So at that point, she was there?
 9        A    That is correct.
10        Q    All right.  What did you do once you got
11   back to the -- got back to the scene?
12        A    Myself and Ms. Sapp continued to search
13   the area for Mr. Malone, because she said he had an
14   ankle monitor on, which should be tracking him,
15   until we found out that he cut that off.
16        Q    Okay.  And did you see when the ankle
17   monitor was found?
18        A    No, I did not.
19        Q    Okay.  So would it be fair to say that
20   you guys searched the same area, or you guys divided
21   and conquered?
22        A    Searched the same area, around the same
23   immediate area.
24        Q    Now, how's the lighting at that point?
25        A    It's -- it's still getting darker, I
```

1    believe.

2         Q    Okay.  And how long were you searching

3    for Mr. Malone?

4         A    We was there probably another 20, 30 more

5    minutes.

6         Q    Okay.  At some point, you went to locate

7    any type items that were of evidentiary value?

8         A    Yes.  I located a baseball bat.

9         Q    Okay.  Can I show you what's already been

10   admitted as State's Number 5 and Number 6?  Can you

11   please look at those.

12             (Photographs tendered from the Clerk and

13        then tendered to the witness.)

14        A    (Witness perusing photographs.)

15        Q    Do you recognize those?

16        A    I do.

17        Q    Okay.  Do you recognize those are the

18   pictures of -- at least, there's one in which it is

19   a bat, and the other one is a bat and an axe,

20   correct?

21        A    One is a bat, and one is an axe, that is

22   correct.

23        Q    Okay.  And according to your

24   investigation, at least the bat was something that

25   you looked at, that had some evidentiary value to

1    it?

2         A    That is correct, due to the nature of the

3    caller and the complainant stating that he had been

4    hit with -- by a bat.

5              MR. RUPERT:  Objection to the hearsay

6         that's being received.

7              THE COURT:  With that response, that

8         objection is overruled.

9    BY MR. BUSTAMANTE:

10        Q    So at -- at that point, it is kind of

11   dark there; did you see anything in regards to that

12   bat, that makes it further of evidentiary value?

13        A    Yes.  If I recall correctly, I believe

14   there was some blood on the baseball bat.

15        Q    I'm now showing you what's been marked as

16   State's Exhibit E, F and G for identification

17   purposes; can you please look at those?

18             (Photographs tended to the witness.)

19        A    (Witness perusing photographs.)

20        Q    Do you recognize those?

21        A    I do.

22        Q    Are they true and accurate pictures of --

23   true and accurate pictures of the items it purports

24   to be?

25        A    They would be.

```
1          Q      Did you take those photographs?

2          A      I believe I did, yes, sir.

3          Q      And where were those photographs taken?

4          A      Those appear to be taken in the office.

5          Q      Okay.  So it would be -- the lighting

6    condition there would be a lot different?

7          A      That is correct.  We have LED lights

8    within our office.

9          Q      Okay.

10               MR. BUSTAMANTE:  The State would move

11         Exhibits E, F and G into the next numericals.

12               THE COURT:  Any objection?

13               MR. RUPERT:  No, sir, no objection.

14               THE COURT:  All right.  They'll be

15         received into evidence as 7 through 9.

16               (The photographs last-above referred to

17         were marked for evidence as State's Exhibit

18         Numbers 7-9.)

19   BY MR. BUSTAMANTE:

20         Q      And what's now been already admitted into

21   evidence as 7, 8 and 9, why did you take those

22   photographs?

23         A      I took those photographs because it was

24   showing the blood on the baseball bat.

25         Q      Okay.
```

1           MR. BUSTAMANTE:  And, Your Honor, may we

2      publish this out to the jury?

3           THE COURT:  You may.

4   BY MR. BUSTAMANTE:

5      Q    On one of the pictures I just showed you

6   from the scene, there is a picture of the bat and

7   the axe --

8      A    Uh-huh.

9      Q    -- is that how you found them at the

10  scene?

11     A    I believe so.

12     Q    Was that axe seized?

13     A    No, it was not.

14     Q    Why not?

15     A    The axe was not seized, due to at the

16  time, we had no idea that it would have any

17  evidentiary value, and also, the information that we

18  had was that the victim was hit with the bat.

19     Q    Okay.  And at that point, was there any

20  indications that that axe was used as some type of

21  aggressive weapon?

22     A    Not at that point, to my knowledge, no.

23     Q    Okay.  When you saw the axe at that

24  scene, did you see any blood on it, like the bat?

25     A    I don't recall seeing any blood on the

```
 1   bat, no, sir -- or --

 2        Q    Had it --

 3        A    -- I'm sorry, on the axe.

 4        Q    On the axe?

 5        A    Yes, sir.

 6        Q    Had you seen any blood on that particular

 7   weapon, is that something you would have considered

 8   in taking an item into evidence?

 9        A    Absolutely.  I definitely would have

10   taken a closer look at it.

11        Q    Okay.  However, you did take a picture of

12   it?

13        A    I did.

14        Q    All right.  As somebody who is

15   investigating these types of scenarios, do you have

16   discretion as to what kind of things you can take

17   into evidence, and what things you do not?

18        A    Yes.  If it has evidentiary value,

19   usually, we do take it into evidence.

20        Q    Okay.  And again, that was not taken into

21   evidence?

22        A    No, sir, it was not.

23        Q    Okay.  How long were you -- again, and I

24   may have already asked you that question -- how long

25   were you, at this time, around searching for Mr.
```

137

```
 1    Malone at --
 2         A    At --
 3         Q    -- Lost Valley?
 4         A    -- this point, it was probably another 20
 5    or 30 minutes, while Ms. Sapp was there.
 6         Q    Okay.  And were you able to find Mr.
 7    Malone?
 8         A    No, sir.
 9         Q    Did you see the cut anklet?
10         A    No, sir.
11         Q    No, okay.  At some point, you left?
12         A    That is correct.
13         Q    And where did you go?
14         A    I went to the Sheriff's Office to begin a
15    warrant affidavit for Mr. Malone.
16         Q    Is that the usual process when you're
17    looking for somebody, and they're not at the
18    scene --
19         A    You --
20         Q    -- and had not been immediately arrested?
21         A    That would be correct.
22         Q    All right.  Did you get to the -- to the
23    office?
24         A    I did.
25         Q    And how long were you at the office?
```

1          A      I would recall, just a few minutes --

2          Q      Okay.

3          A      -- maybe five to ten.

4          Q      Just kind of like, turn on the computer

5     and --

6          A      Yes, sir.

7          Q      And at some point, why did you stop?

8          A      I stopped because we had another

9     complainant call into the Sheriff's Office stating

10    that they knew the whereabouts of Mr. Malone.

11         Q      Based on that information, where did you

12    go?

13         A      I went back to the Lost Valley

14    Campground.

15         Q      And how long did it take you to get

16    there?

17         A      From the Sheriff's Office to Lost Valley

18    is probably seven-to-eight minutes --

19         Q      Okay.

20         A      -- if not a little shorter.

21         Q      Did you go like, full-lights on; do you

22    remember that much?

23         A      I don't recall running code with lights

24    and sirens, no, sir.

25         Q      Is that what's it's called when --

1    A    Running code, yes, sir.

2    Q    And when you got there, did -- where

3    did -- Lost Valley is -- it's an area?

4    A    Yes, sir.

5    Q    Where did you park your car in reference

6    to where you needed to go?

7    A    Fairly close to it, probably 20-feet

8    away, if that.

9    Q    Did you have a general idea as to which

10   part of Lost Valley you needed to go it?

11   A    I did.

12   Q    Okay.  And that information was relayed

13   to you?

14   A    Yes, that is correct.

15   Q    When you got there, were you the --

16   you're the only law enforcement officer there?

17   A    I believe so.  I was the only one there

18   at first, yes, sir.

19   Q    And when you're getting to a scene like

20   that, what type of preparation do you have to do as

21   a law enforcement officer?

22   A    What do you mean as far as preparation,

23   because I'm already prepared, I'm working.

24   Q    No, I understand that, but you know, if

25   you're going to look for a missing cat --

```
 1        A    Okay.

 2        Q    -- there's a different way that you

 3   approach the scene as opposed to if you have

 4   somebody who may have committed a violent act --

 5        A    Right.

 6        Q    -- and so that's kind of --

 7        A    So -- so I'm going to be cautious.

 8        Q    Okay.  All right.  And so based on what

 9   you know about this --

10        A    Yes, sir, that is correct.

11        Q    So as you're being cautious, what do you

12   do?

13        A    I approach the camper that the suspect

14   was supposed to be in --

15        Q    Okay.

16        A    -- which I located him.

17        Q    And when you say you approached the

18   camper, was there anybody outside?

19        A    There was the complainant, which I

20   believe his name was Scott Mathews --

21        Q    Okay.

22        A    -- that called in saying where Mr. Malone

23   was.

24        Q    Okay.  And once you got the information

25   that he may be inside --
```

```
 1         A     Uh-huh.

 2         Q     -- now, this particular camper is a home?

 3         A     That's correct.

 4         Q     People live there?

 5         A     That's correct.

 6         Q     All right.  There's -- and that would be

 7   the entrance to the home, that door?

 8         A     Correct.

 9         Q     Okay.  You opened the door?

10         A     I believe, though, there was a blanket in

11   front of the door.

12         Q     A blanket?

13         A     A blanket --

14         Q     Okay.

15         A     -- as -- as the doorway, yes, sir.

16         Q     Okay.  And then, so you --

17         A     Slide the blanket to the side, yes, sir.

18         Q     And what did you see?

19         A     I seen Mr. Malone sitting on a small

20   couch within the camper.

21         Q     Okay.  Was there anybody else in there?

22         A     No, sir.

23         Q     And when you see him, what is it that you

24   see?

25         A     I see him just sitting there.  I then
```

1    order him to the ground on his stomach.

2        Q    Do you point anything to him at that

3    point?

4        A    I pointed my Taser at him, yes, sir.

5        Q    Why did you point a Taser at him?

6        A    Because of the situation that was going

7    on with a baseball bat.  It was a violent act; I

8    wanted to be prepared just in case he tried to come

9    at me violently.

10        Q    That's the reason you approached with

11    caution?

12        A    That's correct.

13        Q    Okay.  When he -- he complied with your

14    request?

15        A    He did.

16        Q    All right.  On him, did you see anything?

17        A    I did.  As he laid down on the ground, I

18    could see a large knife within -- about his back,

19    within his waistband.

20            MR. BUSTAMANTE:  Your Honor, may I

21        approach the witness?

22            THE COURT:  (Nods his in the

23        affirmative.)

24    BY MR. BUSTAMANTE:

25        Q    I'm now showing you what's been marked as

1    State's Exhibit P for identification purposes.

2    Would you please look at this?

3              (Tendered to the witness.)

4        Q    Do you recognize it?

5        A    I do.

6        Q    And how do you recognize it?

7        A    I recognize it as recalling the knife,

8    the Bowie knife named Jungle Boy that I would have

9    confiscated on that day.

10       Q    And that -- when you confiscate it, that

11   is something that -- it means that you took into

12   evidence?

13       A    That is correct.

14       Q    And then it's put into a nice little

15   evidentiary box like the one right there?

16       A    That is correct.

17       Q    And then it's locked away until whenever

18   it's needed?

19       A    That is correct.

20       Q    Is that the same Bowie knife that you

21   took into evidence back on May 12th, 2018?

22       A    It appears so, yes, sir.  I also see my

23   initials within the box.

24       Q    Okay.  And that would be the procedure

25   that you use in order to record that you're the

1    person who took it, and that this is the evidence

2    that was seized?

3         A    That is correct.

4              MR. BUSTAMANTE:  Your Honor, the State

5         would move into evidence the next numerical.

6              THE COURT:  Any objection?

7              MR. RUPERT:  No, sir.

8              THE COURT:  All right.  It will be

9         received in evidence as State's 10.

10             (The knife last-above referred to was

11        marked for evidence as State's Exhibit Number

12        10.)

13   BY MR. BUSTAMANTE:

14        Q    Now, if you open up that box, and I don't

15   want you to hurt yourself now, is that a sharp

16   knife?

17        A    It appears fairly sharp.

18        Q    Razor sharp?

19        A    Yeah, you could say that.  It has a

20   jagged edge on the top, as well.

21        Q    Okay.  Now, when you said that it was

22   underneath him, explain to the jury how it was --

23   because I'm having a hard time, you know, picturing

24   it.

25        A    So it was, as he laid down on his belly,

```
 1   the knife was stuck about his back area, underneath
 2   his shirt within his belt line.
 3        Q    So if he would have gotten up and turned
 4   around, you would not have been able to see it?
 5        A    That -- no, sir, that is correct.
 6        Q    Okay.
 7             MR. BUSTAMANTE:  And at this time, the
 8        State will move to publish to the jury.  I'm
 9        just going to move it around at this time, with
10        the Court's permission.
11   BY MR. BUSTAMANTE:
12        Q    Do you know what a Bowie knife is used
13   for?
14        A    It's usually used for hunting, from my
15   experience.
16        Q    Not for cutting steak?
17        A    Not sure, not at all.
18        Q    And your statement is, is that he,
19   Defendant, had that concealed underneath his
20   clothing?
21        A    That is correct.
22        Q    Now, that looks kind of sharp; isn't that
23   kind of dangerous to have that around, on your back?
24        A    I would think so.
25        Q    When -- at some point, you were -- you
```

1    seized the knife?

2        A    That's correct.

3        Q    All right.  Did you seize anything else

4    on him?

5        A    Yes.  There was a USB drive, as well as a

6    tablet.

7        Q    Now, the tablet, was that on him?

8        A    It was within his -- his person, yes,

9    sir.  I believe it was on -- on the couch underneath

10   his leg, if I recall correctly.

11       Q    So he was sitting down?

12       A    Uh-huh.

13       Q    When he got up, there's a tablet?

14       A    That's correct.

15       Q    Okay.  And where did you find a -- the

16   thumb drive?

17       A    The USB drive would have been in his

18   right pocket.

19       Q    Inside of his pocket?

20       A    Yes, sir, inside of his pocket.

21       Q    I'm now showing you what's been marked as

22   State's Exhibit Q for identification purposes.  Can

23   you please look at it?

24       A    (Complies.)

25       Q    Do you recognize it?

```
1        A     I do.

2        Q     And how do you recognize it?

3        A     I recognize it from my initials that I

4   entered into evidence.

5        Q     All right.  And so, would that be the

6   same jump drive that you were talking -- I'm

7   sorry -- thumb drive that you were talking about?

8        A     It appears to be.

9        Q     And is that the type that computer

10  materials or files would be kept in?

11       A     Yes, sir.

12       Q     All right.

13             MR. BUSTAMANTE:  The State would move

14       into evidence as the next one.

15             THE COURT:  Any objection?

16             MR. RUPERT:  No objection.

17             THE COURT:  All right.  It will be

18       received as 11 into evidence.

19             (The flash drive last-above referred to

20       was marked for evidence as State's Exhibit

21       Number 11.)

22  BY MR. BUSTAMANTE:

23       Q     I'm now showing you what's been marked as

24  State's Exhibit K -- State Exhibit L and K for

25  identification purposes.  Can you please look at
```

1    these?

2              (Photograph tendered to the witness.)

3        A    (Witness perusing photographs.)

4        Q    Do you recognize them?

5        A    Yes.  That appears to be the tablet that

6    Mr. Malone had within his immediate area and his

7    person.

8        Q    Okay.  Is it a true and accurate picture

9    of what the tablet -- at least a couple of portions

10   of it?

11       A    That is correct.

12       Q    Can you describe to the jury

13   approximately how big it is?

14       A    If I recall correctly, it's not very

15   large.  It's kind of -- about that big, in a

16   square -- square shape.

17       Q    And in a -- it's a computer-type

18   equipment?

19       A    That is correct.

20       Q    All right.  And that, again, he was

21   sitting on top of that?

22       A    That is correct.

23       Q    And was that something that was, at some

24   point, returned to Mr. Pardekooper?

25       A    It was.

1          MR. BUSTAMANTE:  The State would move it

2     into evidence as the numericals, your Honor.

3          THE COURT:  Any objection.

4          MR. RUPERT:  No, sir.

5          THE COURT:  It would be received as

6     State's 12 and 13 in evidence.

7          (The photographs last-above referred to

8     were marked for evidence as State's Exhibit

9     Numbers 12 and 13.)

10          MR. BUSTAMANTE:  May we publish to the

11     jury?

12          THE COURT:  You may.

13   BY MR. BUSTAMANTE:

14     Q    You said that you seized the bat that

15   night, right?

16     A    That is correct.

17     Q    I'm now showing you what's been marked as

18   State's Exhibit O for identification purposes.  Can

19   you please look inside?

20     A    (Complies.)

21     Q    Is that the same bat that you saw that

22   night and you seized that night?

23     A    That is correct.

24     Q    Okay.

25          MR. BUSTAMANTE:  Your Honor, the State

1      will move it into evidence as the next

2      numerical.

3            THE COURT:  Any objection?

4            MR. RUPERT:  No, sir.

5            THE COURT:  All right.  It will be

6      received as State's 14 in evidence.

7            (The bat last-above referred to was

8      marked for evidence as State's Exhibit Number

9      14.)

10  BY MR. BUSTAMANTE:

11      Q    Can you -- there is evidence that is in

12  here, and it's wrapped; can you please take that off

13  and --

14      A    Yeah, absolutely.

15            MR. BUSTAMANTE:  Your Honor, may I

16      publish to the jury?

17            THE COURT:  You may.

18            Ladies and gentlemen of the jury, so you

19      know, I should have explained this earlier, but

20      every time you hear an exhibit has been

21      received into evidence, all of those will be

22      back in the jury room with you when you

23      deliberate.  You will have access to all of

24      those items with you in the jury room during

25      deliberations.  I don't want you to think this

1          is the one and only time that you get to see

2          them.

3     BY MR. BUSTAMANTE:

4          Q     Based on what you saw at the -- saw at

5     the hospital when you saw of the -- Mr. Pardekooper,

6     is this consistent with the type of weapon that

7     would make the type of injury that the victim

8     suffered?

9          A     It would be.

10         Q     When Mr. -- when you arrested Mr.

11    Malone --

12         A     Uh-huh.

13         Q     -- did he have any physical injuries on

14    him?

15         A     Not that I recall, no, sir.

16         Q     And if you would have seen any type of

17    injuries, is there a procedure in which you do

18    something?

19         A     Photographs would have been taken of him.

20         Q     But if there's no injuries, then there's

21    no need to photograph?

22         A     That is correct.

23         Q     What about if there's bleeding going on,

24    do you call EMS maybe?

25         A     If he requests EMS, or if it's bad

1    enough.  If it's a small scratch that can be treated

2    within the -- within the jail or on-scene, then no.

3        Q    Bodycams --

4        A    Yes, sir.

5        Q    -- did you use, or record this incident

6    on bodycam?

7        A    From what I recall, I did.

8        Q    Okay.  And what is the procedure once

9    things are recorded on the bodycam?

10        A    That we record an incident.  But then, I

11    believe we first got them, so there was kind of

12    officer discretion.  Nowadays, it pretty much any

13    incident we go to, or if we make an arrest, our body

14    camera is to be on.

15        Q    Okay.  Do you recall if you would have

16    recorded the incident?  And I'm talking about --

17    explain to me, you've been -- you went to the scene

18    three times?

19        A    Yes, sir.

20        Q    All right.

21        A    The incident that I would have possibly

22    recorded would have been when he was being arrested.

23        Q    Okay.  So you would have -- have you --

24    would you have recorded when the first time you went

25    to the scene?

1         A    It's possible, yes, sir, but I don't

2    recall if there was a recording or not.

3         Q    And when you went to the hospital to see

4    Mr. Pardekooper?

5         A    No, sir.

6         Q    All right.  When you went back and met up

7    with the probation agent?

8         A    No, sir.

9         Q    And when you came back after you left?

10        A    Yes, sir.

11        Q    That's the one that you would have

12   recorded?

13        A    Yes, sir, that is correct.

14        Q    Okay.  Do you know where that

15   recording --

16        A    I do not.  Usually, we download them when

17   we get to the office, and then onto a DVD and enter

18   into evidence, enter into the case file; however,

19   for some reason, that was not completed.

20        Q    Okay.  Now, you said that this was the

21   only time in which bodycams come into being used?

22        A    That is correct.

23        Q    Did you experience during those

24   particular time bumps in the system, for lack of a

25   better word?

```
 1        A    Sure, yeah.  We had to -- the department
 2   definitely had some -- some fixes to do.
 3        Q    Okay.  If this video was nonexistent
 4   anymore, is that something that you did on purpose?
 5        A    No, sir.
 6        Q    All right.  Do you see the Defendant that
 7   you arrested that night in the courtroom today?
 8        A    I do.
 9        Q    And can you please point him out and
10   describe an item of clothing he's wearing?
11        A    Straight in front of me to the right
12   would be Mr. Malone, with a gray jacket on, with
13   glasses.
14        Q    All right.
15             MR. BUSTAMANTE:  Your Honor, may the
16        record reflect he's identified the Defendant?
17             THE COURT:  The record would so reflect.
18   BY MR. BUSTAMANTE:
19        Q    And all of this happened in Bradford
20   County?
21        A    That is correct.
22        Q    All right.  Thank you.
23             MR. BUSTAMANTE:  Nothing further.
24             THE COURT:  Cross?
25             MR. RUPERT:  Thank you, Your Honor.
```

```
1                    CROSS EXAMINATION
2     BY MR. RUPERT:
3          Q    Good morning.
4          A    Good morning.
5          Q    So during this investigation, is it fair
6     to say that Mr. Williams was your supervisor that
7     night?
8          A    That's correct.
9          Q    All right.  He would be the one -- he'd
10    be the boss?
11         A    That would be right.
12         Q    All right.  So did he tell you to take
13    the picture of the axe, or did you decide to take
14    the picture of the axe?
15         A    I believe I did.
16         Q    Okay.  And you took the picture of the
17    axe, because it was evidence?
18         A    No.  I took the picture -- the axe was in
19    the picture, because the baseball bat was evidence.
20         Q    All right.  So you're saying there is no
21    picture just of the axe?
22         A    Not that I recall, no, sir.
23              MR. RUPERT:  May I have a moment, Your
24         Honor?
25              THE COURT:  You may.
```

```
 1    BY MR. RUPERT:
 2         Q    You interviewed Mr. Pardekooper?
 3         A    I believe Sergeant Williams interviewed
 4    Mr. Pardekooper.
 5         Q    Did you interview anybody?
 6         A    I remember speaking with Mr. Pardekooper,
 7    with him kind of telling me a story after I received
 8    his -- his statement, but I don't recall inter- --
 9    interviewing anyone, no.
10         Q    You read Pardekooper's statement?
11         A    Yeah, I did.
12         MR. RUPERT:  Can I have a moment, Your
13         Honor?
14         THE COURT:  You may.
15         MR. BUSTAMANTE:  Your Honor, I'm going to
16         object that he is going to have him -- have Mr.
17         Pardekooper read whatever the statement is
18         and -- as hearsay.
19         MR. RUPERT:  It's untimely -- it's
20         untimely at this point, right?
21         THE COURT:  It is at this point.
22    BY MR. RUPERT:
23         Q    All right.  So you had your bodycam on
24    that whole night; is that correct?
25         A    Not the whole night, no, sir.
```

```
 1          Q    All right.  Do you remember specifically
 2    when you put your bodycam on?
 3          A    When Mr. Malone was arrested.
 4          Q    So -- so prior to going out, what, the
 5    third time --
 6          A    Uh-huh.
 7          Q    -- you just -- you left the station and
 8    decided to put on your bodycam?
 9          A    When I got there, yes, sir, for the third
10    time.
11          Q    Okay.  You're wearing it the whole time,
12    though?
13          A    That's correct.
14          Q    All right.  That's what I'm asking about.
15          A    Okay.
16          Q    So when you -- let's go through the
17    events.  The first time you responded where?
18          A    To the campsite --
19          Q    All right.
20          A    -- campground.
21          Q    All right.  And did you go to the
22    McCaullie trailer?
23          A    That I recall, yes, sir.
24          Q    Okay.  And did you interview anybody?
25          A    Not that I recall, no, sir.
```

1    Q    All right.  So what did you see when you

2    got there the first time?

3    A    I was just looking for Mr. Malone at that

4    point.

5    Q    All right.  And so you didn't go directly

6    to the McCaullie incident, where the -- the --

7    A    Yes, I believe I did.

8    Q    Okay.  So you -- is that where you saw

9    the bat?

10    A    The -- when I returned the second time,

11    yes.

12    Q    All right.  You didn't see the bat the

13    first time?

14    A    No, sir, not that I recall.

15    Q    Was Sergeant Williams there, or anybody

16    else?

17    A    No, sir, not at that time.

18    Q    Was there anybody that was from the

19    McCaullie trailer there?

20    A    Not that I recall.

21    Q    So it was just an empty trailer when you

22    went there?

23    A    Yes, sir.

24    Q    All right.  So how long did you spend at

25    the empty trailer?

1      A      In the immediate area, approximately,

2   30 minutes.

3      Q      Walking around, not seeing anybody?

4      A      Looking for Mr. Malone, yes, sir.

5      Q      All right.  So then after the 30 minutes,

6   was there a second time that you went?

7      A      Yes.

8      Q      All right.  And where did you go?

9      A      I returned back to the campground area to

10   meet Ms. Sapp.

11      Q      All right.  And did you see anyone, any

12   witnesses to the incident the second time?

13      A      I don't recall if I did or not.

14      Q      All right.  Did you go to the McCaullie

15   residence?

16      A      Yes.  We was in the immediate area.

17      Q      All right.  And still nobody there?

18      A      Not that I recall.

19      Q      Of course, you didn't have your bodycam

20   on, either the first time or second time you went to

21   the (indiscernible)?

22      A      That is correct.

23      Q      All right.  So how long did you spend at

24   the empty McCaullie trailer the second time?

25      A      Approximately another 20 or 30 minutes.

```
 1    I wasn't actually at the McCaullie trailer.  As I

 2    stated, it was in the immediate area as we was

 3    looking for Mr. Malone.

 4         Q    So what did you do next?

 5         A    I left and went to the Sheriff's Office.

 6         Q    All right.  And then what did you do?

 7         A    I began to start a warrant affidavit for

 8    Mr. Malone.

 9         Q    Well, you hadn't talked to anybody?

10         A    No, sir, but I have Mr. Pardekooper's

11    statement.

12         Q    So you talked to him?

13         A    I have his statement.

14         Q    Did you talk to detective -- Deputy

15    Williams?

16         A    I did.

17         Q    All right.  So after taking Pardekooper's

18    statement --

19         A    Uh-huh.

20         Q    -- that you took to be true, correct,

21    right?

22         A    That's correct.

23         Q    And after speaking to your supervisor,

24    it's your sworn testimony that you had no idea that

25    the axe was evidence?
```

1      A      Not that I recall, not at that time, no,
2   sir.
3      Q      All right.  Because if Mr. Pardekooper
4   was truthful and told you about the axe, you would
5   have collected it?
6      A      Not necessarily.
7      Q      No?
8      A      Huh-uh.
9      Q      Approaching with State's Exhibit 6.
10          (Photograph tendered to the witness.)
11          Your testimony under oath is that you had
12   no information that that axe that was in the picture
13   had any relevance?
14      A      Not that I recall.
15      Q      And that was after speaking with Mr.
16   Pardekooper?
17      A      From what I recall of the statement, yes,
18   sir.
19      Q      And then it was after talking to your
20   supervisor, Williams, after he talked to
21   Pardekooper?
22      A      That's correct.
23      Q      Okay.  At some point, did you ever know
24   that the axe was -- was important?
25      A      Sure, now.

1        Q    Just three-years later?

2        A    Just three-years later.

3        Q    Yeah, and this is the first time you know

4    and have seen that the axe is even important?

5        A    Looking back onto the report, yeah.

6        Q    And you're the lead investigator?

7        A    Sure.

8        Q    All right.  So you're responsible for

9    full accountability and collection of all of the

10   relevant and proper evidence?

11       A    Sure.

12       Q    Okay.  And based on your activities of

13   that day and subsequent, all of the way up for three

14   years, not until now is the first time that you

15   heard that that axe had any relevance?

16       A    I can see how it can be of relevance now.

17       Q    Interesting little tidbit.  Answering

18   Bustamante's question, I believe you said there was

19   no blood on the axe?

20       A    Not that I recall.

21       Q    Okay, but you had no idea that the axe

22   was even relevant, correct?

23       A    Sure.

24       Q    All right.  Yet you looked down closely

25   and you scrutinized, to see whether there's any

1    blood on the -- on the axe?

2        A    Sure.

3        Q    Okay.  Now, you did take the baseball

4    bat; is that correct?

5        A    That's correct.

6        Q    All right.  And you testified that

7    there's blood on the handle?

8        A    That's correct.

9        Q    All right.  Do you know if it's blood for

10   sure?

11       A    It appears to be blood.

12       Q    Yeah, okay.  Well, did you -- do you know

13   what law enforcement officers do in cases where, if

14   there's a question of whether or not the substance

15   on a particular item is blood or not?

16       A    No, sir.

17       Q    No.  Do you do any kind of chemical

18   analysis to determine what kind of blood it is?

19       A    I do not.

20       Q    And you've been a law enforcement officer

21   how long?

22       A    Approximately, four years.

23       Q    Are you aware that routinely samples of

24   blood or blood-like items are sent to FDLE in

25   Jacksonville to determine whether or not in fact it

1    is blood, or if it's some other substance?

2        A    Sure.

3        Q    And you chose not to do that in this

4    case?

5        A    That is correct.

6        Q    All right.  So certainly you don't know

7    for a fact that it's blood?

8        A    I don't.

9        Q    All right.  And if it's blood, you don't

10   know whose blood it is?

11       A    Sure, why not.

12       Q    You wouldn't know how long the blood

13   would have been on that particular item, if it was

14   indeed blood?

15       A    At the time, it appeared to be fresh

16   blood.

17       Q    Did you touch it?

18       A    No.  Why would I touch blood?

19       Q    You -- so you just saw it with your

20   sight?

21       A    That's correct.

22       Q    Okay.  And you made a decision based that

23   on a visual?

24       A    A visual and the circumstances of the

25   case.

1          Q    You never saw the altercation between

2    Timothy Malone and Matthew Pardekooper?

3          A    I did not.

4          Q    Yet you referred to Matthew Pardekooper

5    as the victim?

6          A    That's correct.

7          Q    And you based on what Matthew Pardekooper

8    told you?

9          A    That's correct.

10         Q    Okay.  And Matthew Pardekooper never told

11   you that he picked up that axe and tried to take off

12   my client's head?

13              MR. BUSTAMANTE:  Objection, calls for

14         hearsay.

15              MR. RUPERT:  It's impeachment.

16              THE COURT:  Sustained.

17   BY MR. RUPERT:

18         Q    All right.  So the third time that you

19   went out to Lost Valley --

20         A    Uh-huh.

21         Q    -- after you understood that Timothy

22   Malone was at a particular place --

23         A    Uh-huh.

24         Q    -- did you activate your lights?

25         A    Not that I recall.

1      Q    All right.  So when you activate your

2  lights, does your bodycam come on?

3      A    It does.

4      Q    Okay.  So it would -- your bodycam would

5  not come on automatically for you, because you

6  didn't turn on your lights and sirens?

7      A    I can manually turn it on myself.

8      Q    Push a button, right?

9      A    That's correct.

10     Q    All right.  And you did that in this

11  case?

12     A    That's correct.

13     Q    All right.  Because you understood that

14  it's important to record and preserve what would be

15  on that footage?

16     A    That would be correct.

17          THE REPORTER:  I'm sorry?

18          THE WITNESS:  That would be correct.

19  BY MR. RUPERT:

20     Q    And you're saying that you went there,

21  that Timothy Malone, the recording would show that

22  Timothy Malone's just sitting there on the couch?

23     A    Yes, sir.

24     Q    And do you remember walking up to that

25  particular residence?

```
 1        A    I do.
 2        Q    All right.  And at what point, what's the
 3   first time that you saw Timothy Malone?
 4        A    When I pulled the blanket to the side.
 5        Q    And as you're looking in, was the couch
 6   straight ahead, to your left or to your right?
 7        A    To my right.
 8        Q    Okay.  So your point of view would have
 9   been, Timothy Malone's left knee would be closer to
10   you than his right knee?
11        A    No.  His right knee would have been
12   closer to me.
13        Q    And what kind of couch was it?
14        A    I -- just a small camper couch, it
15   appeared.
16        Q    Was there a TV in there?
17        A    I didn't look around.
18        Q    What was Timothy Malone wearing?
19        A    I don't recall.
20        Q    If you had your footage, we could look at
21   it, though?
22        A    Sure.
23        Q    So he's sitting there, and how big is
24   this camper trailer?
25        A    It's probably 16 or so foot, I would just
```

1    assume.

2         Q    All right.  So from me to you?

3         A    A little bit larger.

4         Q    All right.  So when you went to the door,

5    and you pulled the blanket apart or to the side, and

6    you saw Timothy Malone sitting to your right?

7         A    Uh-huh.

8         Q    His right knee was closer to you?

9         A    That would have been correct.

10        Q    So he's facing towards you?

11        A    That is correct.

12        Q    So how far away from him were you?

13        A    Probably, four or five foot.

14        Q    All right.  So tell me -- I'm going to

15   walk up to you, just tell me when I get about four

16   or five feet?

17        A    Probably about right there.

18        Q    Okay.  And the whole time, you have your

19   Taser gun out?

20        A    I do.

21        Q    Do you have your Taser gun with you

22   today?

23        A    I do.

24        Q    Can you pull it out and show the jury

25   what it looks like?

```
1          A    I can.

2          Q    And how would you hold it as you come

3    through?

4          A    As a normal firearm, like such

5    (demonstrating.)

6          Q    And were you pointing it?  I know you're

7    pointing down.

8          A    Uh-huh.

9          Q    All right.  Is that for safety reasons?

10         A    Correct.

11         Q    All right.  I don't --

12         A    Correct, I don't want -- I don't want to

13   tase a juror.

14         Q    All right.  Is it on safe mode?

15         A    It is --

16         Q    All right.

17         A    -- it's turned off.

18         Q    All right.  So if -- if you hold it

19   out --

20         A    Uh-huh.

21         Q    -- can -- can you do this safely --

22         A    I can.

23         Q    -- can you hold it out?  Let's assume I'm

24   Timothy Malone.

25         A    Can I turn towards the back wall?
```

170

1       Q    Sure.  Do it the safest way possible.

2       A    (Demonstrating.)

3       Q    All right, fair enough.  So it's pretty

4   close to what looks like a firearm; do you agree?

5       A    Sure.

6       Q    All right.  Did you say anything before

7   you pulled the blanket?

8       A    If I did, it would have been, Sheriff's

9   Office.

10      Q    You don't know?

11      A    I'm not sure.

12      Q    All right.  So as coming through, would

13  you have said anything?

14      A    Sure.

15      Q    Do you remember specifically what you

16  said?

17      A    No.

18      Q    All right.  So did you just come in and

19  go straight towards Mr. Malone, or did you stop and

20  say something?

21      A    I believe I told him to get on the

22  ground, in some fashion.

23      Q    Do you remember pointing that Taser to

24  Mr. Malone's head?

25      A    Not necessarily his head, but his body.

1    Q    Do you remember placing it on his

2    forehead?

3    A    I do not.

4    Q    You don't remember that?

5    A    No, sir.

6    Q    All right.  Are you saying that it didn't

7    happen, or you don't remember?

8    A    I would never point someone's -- my Taser

9    to someone's forehead, no, sir.

10    Q    So it didn't happen?

11    A    No, sir.

12    Q    All right.  Okay, when you were coming

13    in, would the bodycam have shown all of this?

14    A    It would have.

15    Q    You turned on your Taser?

16    A    That is correct.

17    Q    So that's off the safe mode?

18    A    That's correct.  Off of that safe mode,

19    it either shows a flashlight and a laser or just a

20    laser.

21    Q    All right.  So it's your testimony that

22    Mr. Malone was compliant and got on the ground?

23    A    Absolutely.

24    Q    All right.  So he came and just got on

25    his knees and then laid down; is that what you're

```
 1    saying?
 2         A    That's correct.
 3         Q    All right.  And that's when you saw the
 4    knife?
 5         A    That's correct.
 6         Q    And it was in his waistband, at his back?
 7         A    That's correct.
 8         Q    All right.  So towards like his back
 9    pocket; is that right?
10         A    Yes, sir, under the belt line.
11         Q    And he was sitting on that tablet?
12         A    It -- from what I recall, yes.  It was
13    kind of under his leg, either left leg or right leg.
14         Q    And then he had the -- the flash drive,
15    too?
16         A    In his right pocket, that is correct.
17         Q    So he had all of that on his right side?
18         A    That's correct.
19         Q    What were the cushions like on this
20    couch; do you remember?
21         A    Normal couch cushions.
22         Q    All right.  So it's your testimony, for
23    the jury, he was sitting on this Bowie knife, in his
24    back pocket?
25         A    Sure -- not in his back pocket, within
```

```
 1    his waistband.
 2         Q    How long after this event did you go back
 3    to look at what you thought would be the downloaded
 4    footage?
 5         A    I don't recall.
 6         Q    Did you do that?
 7         A    I believe I did.
 8         Q    Did you ever do a supplemental report?
 9         A    No, sir --
10         Q    All right.
11         A    -- it would have been during the arrest
12    report.
13         Q    All right.  So you would have went back
14    and -- and looked at it?
15         A    Sure.
16         Q    And if it wasn't there, you would have
17    wrote a report that it wasn't there?
18         A    No, sir.  I put in my report that it was
19    going to be downloaded --
20         Q    Right.
21         A    -- however, it was not.  Why that is, I
22    do not know.
23         Q    I thought you said you just went back
24    and -- and you reviewed?
25         A    As I recall, I did.
```

1          Q     Okay.  After it was downloaded?

2          A     As I recall -- downloaded onto the

3     server --

4          Q     Okay.

5          A     -- not onto a disk.

6          Q     I got you, okay.  So you downloaded it --

7     did you ever download it to a disk?

8          A     I do not recall if I did or not.

9          Q     Okay.  And if you downloaded it to a

10    disk, where would you put it?

11         A     It should have went in evidence, if I

12    downloaded it to a disk.

13         Q     Did you make any supplemental report to

14    document that in any way, so --

15         A     I put it in my report that it would be

16    downloaded and entered into evidence; however, it

17    was not.

18         Q     Oh.  I mean, how do you know; when you

19    went back to review it, why wouldn't you do a

20    supplemental report, so it --

21         A     Why do I need to when I already put in my

22    report that it was going to be downloaded?

23         Q     Well, it's not there, right?

24         A     That's correct.

25         Q     That's why you'd need to do it.

```
 1            MR. BUSTAMANTE:  Objection, this is
 2        argumentative.
 3            THE COURT:  Sustained.
 4    BY MR. RUPERT:
 5        Q    Who was the sheriff back then for
 6    Bradford County?
 7        A    It would have been Gordon Smith.
 8        Q    Is he still the sheriff?
 9        A    He is.
10        Q    All right.  Were you ever sanctioned
11    because of this?
12        A    What do you mean, sanctioned?
13        Q    Is there anything written in your
14    personnel file about the failure to download
15    critical evidence?
16            MR. BUSTAMANTE:  How is this relevant,
17        Your Honor?
18            MR. RUPERT:  It's critical evidence.
19            THE COURT:  Sustained.
20    BY MR. RUPERT:
21        Q    Is there any supervisory mechanism in
22    place to ensure that the bodycam evidence is
23    preserved?
24        A    What do you mean, mechanism?
25        Q    Well, is there any policy in place,
```

1    anything, any kind of rules that -- that you're

2    supposed to follow, steps of procedure, SOP,

3    Standard --

4        A    Sure.

5        Q    -- Operating Procedure?

6        A    Sure, we have a policy.

7        Q    All right.  And what is that policy?

8        A    I am not sure, right off the top of my

9    head.

10        Q    You don't know what it is?

11        A    No, sir.  I cannot recite it.

12        Q    Can you -- can you give me a gist of what

13    it is?

14        A    I cannot.  I can -- if I had my computer,

15    I could look it up and tell you it word for word.

16        Q    Well, you would agree that the policies

17    there, the SOPs, are there for a reason, because

18    it's important to maintain bodycam footage?

19        A    Sure.

20        Q    You took the thumb drive into evidence?

21        A    I did.

22        Q    Did you ever look to see what was on it?

23        A    I did not.

24        Q    And do you know whose thumb drive it was?

25        A    It was in Mr. Malone's pocket, so I would

1    assume it was his.

2        Q    So is there anything in particular that's

3    incriminating about a thumb drive that you would

4    keep in evidence for three years?

5        A    Other than the argument was according to

6    some kind of computer device.

7        Q    All right.  Well, you didn't know that

8    the axe was important, so I can't -- I can't

9    really --

10            MR. BUSTAMANTE:  Objection, again, this

11        is not necessary.

12            THE COURT:  Sustained.

13    BY MR. RUPERT:

14        Q    You did not take the tablet into

15    evidence?

16        A    No, sir.

17        Q    And I saw you on direct give an

18    approximation about the size of the tablet --

19        A    Uh-huh.

20        Q    -- is that correct?

21        A    That's correct.

22        Q    All right.  You've got to answer yes or

23    no for the court reporter, because she's got to take

24    down what you say?

25        A    What's that?

1        Q    You've got to say yes or no for the court

2    reporter.  When you go, uh-huh, huh-uh, it's hard to

3    transcribe.

4        A    I said, that's correct.

5        Q    I meant before that when you went,

6    uh-huh.

7        A    Yes.

8        Q    Okay, thank you.  So I think we left it

9    before that little interview was, you did not put

10    the tablet into evidence?

11        A    I did not.

12        Q    Okay.  Did you look at what was in the

13    tablet?

14        A    No, sir.

15        Q    Did you know whether or not that tablet

16    was even working?

17        A    I do not recall.

18        Q    And you don't know the exact size of that

19    tablet?

20        A    No, sir, not exactly, if you're wanting

21    me to guess by inches or centimeters.

22        Q    Who returned that tablet to Pardekooper?

23        A    I believe I did.

24        Q    You don't remember?

25        A    No, sir.  I believe I did, but again,

1     this was three-years ago, and I cannot say if it --
2     that it went from my hand to his hand.
3          Q     You didn't put that in your report?
4          A     I put in my report that the tablet was
5     returned to Mr. Pardekooper.
6               MR. RUPERT:  Can I have a moment, Your
7          Honor?
8               THE COURT:  You may.
9               MR. RUPERT:  Thank you, Your Honor.  No
10         further questions.
11              THE COURT:  Redirect?
12              MR. BUSTAMANTE:  Very briefly.
13                    REDIRECT EXAMINATION
14    BY MR. BUSTAMANTE:
15         Q     You know how to operate a Taser, correct?
16         A     I do.
17         Q     When you operate a Taser, do you have to
18    have some distance between you and the person you're
19    attempting to Taser?
20         A     For it to work properly, yes.
21         Q     If you put a Taser up to somebody's head,
22    would that work?
23         A     It'll give them a brief shock.
24         Q     Is it more effective it you are
25    further --

1        A    That is correct.

2        Q    Why is that?

3        A    Because the -- the further apart the

4   prongs are spread, is the -- where the shock travels

5   from.  If it's this far, it'll only travel from here

6   to here.  If it's this far, it will travel from here

7   to here.

8        Q    In your career as -- five years in law

9   enforcement, have you ever had to put your Taser to

10  somebody's forehead or neck or skin?

11       A    To their head or neck, no.

12       Q    Okay.

13            MR. BUSTAMANTE:  I have nothing further.

14            THE COURT:  All right.  Thank you,

15  Deputy.  You may step down.

16            THE WITNESS:  Thank you, Your Honor.

17            THE COURT:  Ladies and gentlemen, your

18  lunch is here, so we're going to take a lunch

19  recess.  Please go back (indiscernible.)

20  Remember, don't start discussing the case yet

21  amongst yourselves.  We'll be in a lunch

22  recess.

23            Let the record reflect the ladies and

24  gentlemen of the jury are out of the courtroom

25  on their lunch recess.  It takes a minute for

1    the deputy to get back, to deal with Mr.

2    Malone.  So let me just cover a few things with

3    you that might save some time, if you all can

4    correct it over the lunch break.  I'm just

5    going through the jury instructions.  Under

6    Count I, remove the italicized (indiscernible)

7    applicable, because I think that last

8    definition about object is applicable.

9         MR. BUSTAMANTE:  Yes, sir, okay.

10        THE COURT:  Under Battery, I don't think

11   any of that applicable language is applicable,

12   so remove it.  And I'm going to skip ahead to

13   Count II, I think you've left out an important

14   definition that you have in the lesser included

15   instruction, but not on the main one which is

16   the concealed -- a concealed weapon.

17        MR. BUSTAMANTE:  Okay.  So --

18        THE COURT:  Under Count II --

19        MR. BUSTAMANTE:  Yeah.

20        THE COURT:  -- one of the -- one of the

21   definitions right after, convicted "on or about

22   a person" should be a concealed weapon means --

23        MR. BUSTAMANTE:  Okay.

24        THE COURT:  -- because that's where the

25   "ordinary sight of another person," and that

```
1        language is used in the concealed weapon

2        deposition and that's why that is defined.

3             MR. BUSTAMANTE:  So definition of

4        concealed, okay.  I got it.

5             THE COURT:  Yeah, and if you look down at

6        your lesser included --

7             MR. BUSTAMANTE:  It's there.

8             THE COURT:  -- it's there.

9             MR. BUSTAMANTE:  Okay.  I'll make sure

10       we -- that is there, okay.  And anything in

11       regards to -- I put, give the following

12       paragraph only if applicable.

13            THE COURT:  No, deadly weapon is not

14       applicable --

15            MR. BUSTAMANTE:  Okay.

16            THE COURT:  -- and object is not

17       applicable, right.  It's -- the issue is

18       it's --

19            MR. RUPERT:  Is Deputy Sumner, I think --

20       is he allowed to leave?

21            THE COURT:  He is.

22            MR. RUPERT:  Oh, he's got, to the Deputy,

23       I'm sorry.

24            MR. BUSTAMANTE:  Yeah.

25            MR. RUPERT:  Okay.  Sorry, Your Honor.
```

```
 1            THE COURT:  Yeah, that's all right.  None
 2      of this affects anything.
 3            Yeah, Mr. Rupert, do you think there's
 4      any reason to define deadly weapon, or the
 5      object can be a deadly weapon under Count II?
 6      There's nothing about deadly weapon, right?
 7            MR. RUPERT:  Correct, yes, sir.  Thank
 8      you.
 9            THE COURT:  Okay.  So that can be
10      removed.
11            MR. BUSTAMANTE:  Deadly weapon and
12      then...
13            THE COURT:  Object -- the next definition
14      right under it, which is tied to it.
15            MR. BUSTAMANTE:  An object, and that
16      would go it?
17            THE COURT:  That would be out.
18            MR. BUSTAMANTE:  That would be out.
19            THE COURT:  Yeah, and the same -- those
20      same two would be removed under your lesser --
21            MR. BUSTAMANTE:  Okay.  All right.
22            THE COURT:  -- as well as great bodily
23      harm should be removed --
24            MR. BUSTAMANTE:  Got you.
25            THE COURT:  -- as definition of the
```

```
1          lesser --

2              MR. BUSTAMANTE:  So --

3              THE COURT:  -- as not -- not applicable.

4              MR. BUSTAMANTE:  -- so for the term, "on

5      or about a person," and "ordinary sight of

6      another person," that stays in?

7              THE COURT:  Yes.  I'm trying to do some

8      quick things, because quick things that you can

9      clean up now, it saves us time, because I'm

10     assuming we're behind schedule.  But I don't

11     know, it just feels like it.  So grand theft, I

12     would intend to define, obtains or uses as

13     taking or exercising control of the property,

14     or conduct previously known as stealing or

15     larceny and get rid of all the other language.

16             MR. BUSTAMANTE:  Okay.

17             THE COURT:  I mean, I'm not going

18     (indiscernible.)

19             MR. BUSTAMANTE:  So --

20             THE COURT:  -- abstracting, embezzlement,

21     none of that's really applicable.

22             MR. BUSTAMANTE:  All right.

23             THE COURT:  (Indiscernible) from taking

24     or using.  I also think property definition

25     could just be reduced to anything of value.
```

1          MR. BUSTAMANTE:  Okay.

2          THE COURT:  I mean, the other thing,

3     tangible and intangible rights, we're talking

4     about a tablet, that's the only thing alleged,

5     right?

6          MR. BUSTAMANTE:  Yes.

7          THE COURT:  So anything of value.  I

8     don't -- you have it as a lesser included

9     offense of grand theft as petit theft.

10          MR. BUSTAMANTE:  Yes.

11          THE COURT:  I think you should just --

12     all of that should be gone --

13          MR. BUSTAMANTE:  Okay.

14          THE COURT:  -- and you should just be

15     discussing value under theft.  And let them

16     determine, it's either 300 or more, or 1 to 300

17     or under 100.

18          MR. BUSTAMANTE:  Okay.

19          THE COURT:  And then their verdict as to

20     value would then dictate the degree or level.

21          MR. BUSTAMANTE:  Okay.  All right, so

22     when -- I'll put everything under just the

23     grand theft, okay, got you.  So we'll get rid

24     of the petit theft.

25          THE COURT:  Yeah.  So Count IV, Armed

```
 1          Trespass, you have Element 4.  The Number 4 is
 2          bolded, just unbold it, so it doesn't look like
 3          we're drawing attention to it.
 4                 MR. BUSTAMANTE:  Okay.
 5                 THE COURT:  And then, I don't think --
 6          just remove the italicized portions, everything
 7          looks applicable.  And the same in the lesser.
 8          And Rules for Deliberation, I'm jump ahead to
 9          that, just get out -- take out Number 7.  Make
10          8, 7, and it should be the standard.  And then
11          the 3.13, you can take out the italicized
12          portions.  I don't -- it doesn't seem like
13          it -- I'm anticipating anything that can't go
14          back on that.
15                 MR. BUSTAMANTE:  Okay.
16                 THE COURT:  So just on those sections
17          about those (indiscernible) are going to be
18          sent back with them.  All right, that's just
19          some quick things I thought we could clean up.
20                 MR. BUSTAMANTE:  All right.
21                 THE COURT:  See you at 1:00.
22                 MR. RUPERT:  Thank you.
23                 THE COURT:  We'll be in lunch recess.
24                 (Court recessed to be reconvened at one
25          o'clock p.m. of the same day.)
```

AFTERNOON SESSION

5/19/21                                          1:00 p.m.

1      THE COURT:  All right.  We'll go back on
2  the record in the State of Florida versus
3  Timothy Malone, 2018-CF-246.  Let the record
4  reflect Mr. Malone is present in the courtroom
5  with Counsel.  State is present with Counsel.
6  Ladies and gentlemen of the jury's here and
7  ready to go.

8      Is State and Defense ready?

9      MR. RUPERT:  Yes, Your Honor.

10      MR. BUSTAMANTE:  State's ready.

11      THE COURT:  All right.  Let's go ahead
12  and bring them in.

13      If you want to go ahead and have your
14  next witness start making their way, you can do
15  that.

16      MR. BUSTAMANTE:  All right.

17      (Jury enters the courtroom.)

18      THE COURT:  All right.  Let the record
19  reflect that the ladies and gentlemen of the
20  jury are back and present in the courtroom.  I
21  thought you-all told me that you like salad
22  without any dressing?  Ladies and gentlemen, my
23  apologies.  That never happens, so I don't know

```
1        what occurred there, so I -- I hope your lunch
2        was still good.  Okay.  Let me ask before we
3        get started, did anything happen over your
4        lunch recess that has in any way affected any
5        of you-all's ability to serve as a juror?  All
6        right.  I see all negative responses.  All
7        right.
8             So, State, you may call your next
9        witness.
10            MR. BUSTAMANTE:  Matthew Pardekooper.
11            THE COURT:  All right.  Mr. Pardekooper,
12       if you would come on up here to the witness
13       stand.  Good afternoon.  If you would raise
14       your right hand for me.  Do you swear or affirm
15       any testimony you give this jury today will be
16       the truth, the whole truth and nothing but the
17       truth, so help you God?
18            THE WITNESS:  Yes, sir, I do.
19            THE COURT:  Thank you.  Please be seated.
20                    DIRECT EXAMINATION
21   BY MR. BUSTAMANTE:
22       Q    Good afternoon, sir.
23       A    Hi.
24       Q    Can you please tell us your name and
25   spell your last name, for the record?
```

```
 1        A     Matthew Pardekooper, P- --
 2              THE REPORTER:  If you can get up just a
 3        little closer.
 4              THE WITNESS:  Matthew Pardekooper,
 5        P-a-r-d-e-k-o-o-p-e-r.
 6  BY MR. BUSTAMANTE:
 7        Q     And, sir, in what county are you
 8  currently living?
 9        A     Bradford.
10        Q     And have you lived in Bradford County for
11  a while?
12        A     Yeah, off and on, yes.
13        Q     Okay.  And what do you do for a living,
14  sir?
15        A     I'm an 18-wheeler mechanic, mechanic on
16  cars, and I do yard work.
17        Q     And where do you currently work?
18        A     I'm self-employed.
19        Q     Self-employed --
20        A     Yeah.
21        Q     -- so whatever comes, you kind of do that
22  kind of stuff?
23        A     Yes.
24        Q     And do you live in a house currently?
25        A     Currently, I stay with a friend, yes.
```

1      Q      Okay.  And you're not a rich man?

2      A      No.

3      Q      Let me bring you back to May 12th of 2018,

4  three years and one week ago, okay, where were you

5  living?

6      A      I was living in the Lost Valley

7  Campground, behind Lost Valley Campground.  I don't

8  exactly recall the address.

9      Q      Okay.  And when you say behind Lost

10  Valley Campground, can you explain to the jury

11  what's the difference, or you know, what's going on?

12      A      The campground, the back road goes to

13  another property.  It's -- it had a house on it.

14  It's like five or six acres, a pond.

15      Q      And so -- but it's within walking

16  distance of the Lost Valley Campground?

17      A      Yes.

18      Q      That's no longer there?

19      A      Yeah.

20      Q      Yeah.  And -- and can you explain to the

21  jury what the Lost Valley Campground was like?

22      A      It was supposed to be a place for people

23  to rehabilitate, I believe.

24      Q      But when -- and in talking about that, I

25  just -- it's basically like tents and campers and

1  things of that nature?

2       A    Yeah.

3       Q    Okay.  This is not a wealthy area?

4       A    No.

5       Q    No.  And as far as you knew, are people

6  hooked up with electricity?

7       A    Yeah.  There's electricity, and they pay

8  lot rent.

9       Q    And did -- some lots do not have

10  electricity?

11       A    Right.

12       Q    And when somebody needs something, you

13  know, let's say that you do not have electricity in

14  your particular lot, how do you go about getting

15  electricity?

16       A    You borrow it.  There's a -- oh, what do

17  you call that -- a recreation spot where you go

18  charge your phone and things, where people eat.

19       Q    So sometimes it can be a challenge living

20  in that area?

21       A    Yeah.

22       Q    And you kind of have to adapt to it?

23       A    Yeah.

24       Q    Now, back in May of 2018, were you living

25  under those kind of circumstances?

1        A    Yeah.  I wasn't in the best

2    circumstances, but I was making it, yes.

3        Q    Did you own a truck at the time, or some

4    type of vehicle?

5        A    Yes.

6        Q    And can you explain to the jury what type

7    of vehicle you had?

8        A    It was a Mazda B2200, white,

9    four-cylinder, five speed.

10       Q    Is that a pickup truck?

11       A    Yes.

12       Q    And can you describe to the jury, that

13   particular pickup truck, is it like really high up,

14   is it like a car, or what is it?

15       A    It was a mid-size low profile.  It had

16   nice rims on it.

17       Q    Okay.  And how old was that pickup truck?

18       A    A '98.

19       Q    A '98, so it's a -- it was a much older

20   car?

21       A    Yes.

22       Q    When you had to get into your pickup

23   truck, do you kind of have to do a step, or just

24   kind of step in?

25       A    I just get in it.

1          Q     Okay.  What kind of things did you keep

2     in your pickup truck at that -- during that time?

3          A     At that time, I kept tools and whatever

4     was given to me, and whatever I had to -- I had to

5     lock up.  That was the only form of locking up that

6     I had.

7          Q     And when you say things that are dear to

8     you, such as what?

9          A     Tools, tablets, phones, books, music.

10         Q     Did you have a tablet back then?

11         A     Yeah.

12         Q     And what type of tablet was it?

13         A     It was a Toro 2.5, I believe.

14         Q     And do you recall how much you paid for

15     that tablet?

16         A     Back in this day, it was 200-ish.

17         Q     Okay.  And when you -- that particular

18     tablet, where did you get it; did you get it brand

19     new, or you bought it used from somebody?

20         A     I got it from a lady.  It was given to me

21     as a Christmas present.

22              THE REPORTER:  I can't hear you.

23              THE WITNESS:  A Christmas present for

24         doing work for her.

25     BY MR. BUSTAMANTE:

1    Q    Okay.  One of the things you may want to

2    do, because this is really unnatural circumstances,

3    and you know, this here, and sometimes, and I'm --

4    I'm guilty about moving around, but I'm loud, right?

5    A    Right.

6    Q    And so, they just want to make sure that

7    she takes everything, because if she doesn't take

8    it --

9    A    Right.

10   Q    All right.  When -- approximately, before

11   May of 2018, when had you gotten that tablet?

12   A    It was -- I had it for about a year.

13   Q    A year, okay.  And what could you do with

14   that tablet?

15   A    At the time, I used it to look up videos.

16   I was doing four-wheeler work at the time and

17   logging all of my stuff and work (indiscernible.)

18   Q    Is that tablet one that had access to the

19   internet?

20   A    Yes.  You can go -- if you had WiFi on

21   your phone, you'd be able to hook up, go to

22   McDonald's, hook up.

23   Q    So if you had to download something, or

24   get into your email address or something to that

25   effect, you'd just go to McDonald's or get a

1    Hotspot?

2         A    Yes.

3         Q    And that would be one of the ways in

4    which you were able to get into the internet?

5         A    Yes.

6         Q    Okay.  And you said that's one of the

7    items that you prized, and you kept in a certain

8    place?

9         A    Yes.

10        Q    Where in that -- where in the pickup

11   truck do you remember having that particular item?

12        A    In the glovebox.

13        Q    Is the glovebox one that you have a lock

14   for it, or you can just open it up, or how did that

15   work?

16        A    Yes.  It did have a lock, but I don't

17   think I locked it, but the truck was locked.

18        Q    Right.  Let me go ahead and bring you

19   back around that time, maybe April, May of 2018.

20   Did you know a person who later became known to you

21   as Timothy Malone?

22        A    Yes.

23        Q    Can you tell us when is it that you would

24   have met him?

25        A    Through Roger and Carrie.  He was new to

1    the campground, I didn't really know him.

2        Q    Let's go ahead and just -- we can make

3    sure the record is -- is complete.  Through Roger

4    and Carrie, who -- do you know what their last names

5    are?

6        A    McCaullie.

7        Q    McCaullie.  And how do you know the

8    McCaullies?

9        A    I knew the McCaullies through my

10   girlfriend, Tracy Wakes (phonetic.)  They were

11   friends.  I had known them through Anthony Chase.

12   They were -- they've been in the park a long time.

13       Q    And so you had known them for quite a

14   while?

15       A    Yes.

16       Q    A year, two years, more?

17       A    About three years.

18       Q    Three years.  And at some point, you met

19   Mr. Malone through them?

20       A    Yes.

21       Q    Now, would you consider yourself friends

22   with the McCaullies?

23       A    Yes.

24       Q    Okay.  And as friends, what kind of

25   things would you do with them?

1          A      We used to go -- go to the lake.  We used

2     to go out to eat.

3          Q      Just things that friends do?

4          A      Yeah, all that stuff.

5          Q      Would you watch television with them?

6          A      Yes.

7          Q      Okay.  And if you were visiting, like

8     you're visiting each other, did you go to their

9     place, or would they go to yours, or go to some- --

10    go somewhere else?  Explain that to them.

11         A      This time, we -- they had a camper in the

12    back that ran off of the battery and the battery

13    inverters and stuff like that.

14         Q      Okay.  And ran off the battery inverters,

15    explain that to me, because I'm not understanding.

16         A      You take a battery, put an inverter on

17    it, and you could watch TV, a DVD player.  You know,

18    it lasts for about an-hour-and-a-half, and then it

19    does.  And then you have to charge the battery, but

20    the more batteries the better.

21         Q      All right.  And so you kind of have to

22    rig things in order to have as easy -- a normal life

23    as possible?

24         A      Right.

25         Q      Okay.  And you said that you met Mr.

1    Malone through them?

2         A    Yes.

3         Q    When -- did you consider him a friend?

4         A    Acquaintance, yeah.  He's -- I didn't

5    have a problem with him, no.

6         Q    Okay.  Did you -- you didn't have any

7    beef with him?

8         A    No, never.

9         Q    And before this particular incident that

10   we're going to be talking about in a few minutes,

11   did you have any disagreements with him?

12        A    Nope.

13        Q    And approximately how many times would

14   you have been in his presence?

15        A    10 or 20 times throughout the span of two

16   or three weeks.

17        Q    10 or 20 times, that sounds like a lot,

18   can --

19        A    Yeah.

20        Q    -- can you tell me, I'm -- you know, just

21   about those --

22        A    Well, he -- he stayed in the campground;

23   he stayed behind the campground.  So he was Roger's

24   friend, and he was always back there helping do

25   things.

```
 1          Q    Okay.  So when you're saying that, it's

 2   not like you have 10-to-20 conversations, it's just

 3   that you would have seen him 10 or 20 times?

 4          A    (No audible response.)

 5          Q    And nothing during that time that you

 6   found to be threatening -- for you have guys to have

 7   any conflicts or any fights or anything like that?

 8          A    (No audible response.)

 9          Q    Okay.  Let me bring you now to the day of

10   the incident -- or the evening of the incident,

11   May 12th of 2018, sometime in the early afternoon;

12   can you tell us what you were doing, what do you

13   recall doing?

14          A    My girlfriend went -- went to work.  I

15   took her to work, came back --

16          Q    And where did she work at the time?

17          A    She worked at Greystone old folks home.

18   I don't think it's called that anymore, but...

19          Q    Is it kind of some place in which elderly

20   people are taken care of?

21          A    Yes.

22          Q    And what did she do there?

23          A    Cooked.

24          Q    And so you took her there?

25          A    Yep.
```

200

```
1        Q     And then what did -- then what did you
2   do; where did you go after that, that you took her
3   there?
4        A     Came back to the park, took care of my
5   dogs and things around the house.
6        Q     Okay.  And how many dogs did you have at
7   the time?
8        A     Two -- three.
9        Q     Two or three, okay.  And what were their
10  names?
11       A     Lexis, Misty and Fat Boy.
12       Q     And when you say you took care of them,
13  what -- what kind of things do you have to do in
14  order to take care of your dogs?
15       A     Feed them, walk them, make sure they had
16  water.
17       Q     When they're not there, where are they
18  at -- when you're not there?
19       A     In my trailer.
20       Q     In your trailer, okay.  So you, kind of,
21  have to take them around and do things?
22       A     Yeah.
23       Q     After you came back and walked the dogs,
24  what did you do?
25       A     I was with Roger, and we were -- it's --
```

```
 1    they're trying to set up the, I guess, campground or
 2    whatever, a little spot that they can stay, and we
 3    can all subside at the moment --
 4        Q    Okay.
 5        A    -- and that's what we were doing.
 6        Q    And so you went to go see Roger, the
 7    McCaullies?
 8        A    Yes.
 9        Q    And in relation to where you were living,
10    where were the McCaullies?  And I want this in
11    distance.
12        A    500 feet.
13        Q    I guess it takes you a couple of minutes
14    to get from Point A to Point B?
15        A    No.  It's probably about from here to the
16    bathroom.
17        Q    The bathroom.  You're talking the
18    bathroom that's outside over there (indicating)?
19        A    Yeah.
20        Q    I got you.  And did you walk over
21    there -- were you invited, or how did that --
22        A    I walked over there.
23        Q    Okay.  And was that something that you
24    would do normally?
25        A    Yeah.
```

```
1          Q    So when you got there, what was -- what
2     do you remember the McCaullies or Roger doing?
3          A    They were there watching TV.
4          Q    Okay.  And when you say, "they," who was
5     they at this --
6          A    Roger and Tim and --
7          Q    And when you say, "Tim," do you mean Mr.
8     Malone?
9          A    Malone.
10         Q    Okay.  Do you recall if anything specific
11    was playing on the TV, or what was going on?
12         A    I really can't tell you.
13         Q    Okay.  It wasn't that important to you?
14         A    No.
15         Q    All right.  So how long did you sit and
16    join this TV watching?
17         A    About 15, 20 minutes.
18         Q    Okay.  At some point, did -- you're no
19    longer sitting and watching television?
20         A    Right.
21         Q    What happened?
22         A    My phone was at a half percent, and I
23    wanted to charge it.
24              THE REPORTER:  Say it again.
25              THE WITNESS:  My phone was at a half
```

```
 1         percent, and I wanted to charge it before it

 2         went dead.

 3    BY MR. BUSTAMANTE:

 4         Q     Okay.  So when you're seeing your

 5    phone -- now, let me ask you this, you said that

 6    your phone is one of the precious things that you

 7    owned?

 8         A     Yeah.

 9         Q     Along with your tablet and other things

10    that you keep in your pickup truck, how do you

11    charge your phone?

12         A     The battery and the inverter.

13         Q     And the --

14               THE REPORTER:  What -- what do you call

15         it again?

16               THE WITNESS:  Electric inverter/power

17         inverter.

18    BY MR. BUSTAMANTE:

19         Q     So this inverter, where do -- if you had

20    to charge your phone, where do you take it?

21         A     Take it to -- well, there's -- the

22    batteries and then the batteries run off the solar

23    power, which is the floor panel.  And it charges

24    with the batteries, but the inverter is bolted to

25    the battery, which runs AC/DC -- or turns DC into AC
```

```
1    current --
2          Q     All right.
3          A     -- I think.
4          Q     So where is this inverter that you have
5    to --
6          A     At Roger's house.
7          Q     At Roger's house.  So when you need to
8    take your phone --
9          A     Right.
10         Q     -- to be charged, you took it there?
11         A     Right --
12         Q     Okay.  At this point --
13         A     -- or -- or I put it in the truck,
14   because Roger's truck always had the -- the power's
15   always on in the truck even if the key wasn't on.
16         Q     Okay.  So on this particular day, where
17   did you take your phone to get charged?
18         A     I put it on his truck.
19         Q     Roger's truck, okay.  And what is Roger's
20   truck, what type of truck is that?
21         A     It was a Dodge F-150 -- or a Dodge --
22   Dodge 1500.
23         Q     And how big is that truck?
24         A     Huh?
25         Q     How big is that truck?
```

```
 1          A     It's a crew-cab, four-door.

 2          Q     And assume I don't know anything about

 3    pickup trucks --

 4          A     Okay.

 5          Q     -- so you have to explain it to me.  Is

 6    that one in which you have to step up really big, or

 7    is it kind of like a car?

 8          A     It's kind of like a medium step up.

 9          Q     Okay.  A medium step up, so it's not one

10    in which you have to have some type of like -- you

11    know, some of them have like a step, and you have to

12    go in --

13          A     It had stepping rails, yes, but...

14          Q     But it's not too bad?

15          A     No.

16          Q     So when you took your cell phone to be

17    charged, and those would be at Roger's pickup

18    truck --

19          A     Yes.

20          Q     -- did you take anybody else's electronic

21    equipment?

22          A     Yes.  Tim wanted me to charge his phone.

23          Q     When you're talking about Tim, you're

24    talking about Mr. Malone?

25          A     Yeah.
```

```
 1          Q    So he's the one who offered it to you?

 2          A    Yeah.

 3          Q    You did not ask?

 4          A    (No audible response.)

 5          Q    Okay.  And when he did that, how did he

 6     do that with you?

 7          A    He said, Are you putting yours on charge,

 8     please put mine on charge, too.

 9          Q    Okay.  Did you think anything unusual

10     about that request?

11          A    No.

12          Q    And so what did you do after that?

13          A    I put them on charge and started walking

14     back to the camper.

15          Q    So where was -- when you were in the

16     TV-viewing area, where was Roger's truck in relation

17     to that TV-viewing area?

18          A    Right outside the door.

19          Q    Okay.  And then, I'm going to go and

20     approach to see exactly how far it is, that way the

21     jury has some idea; is it this close or this far?

22          A    Probably, yeah, from me to -- from me to

23     you.

24          Q    Like right here?

25          A    Not back as far as that.
```

1        Q     Like, here?

2        A     Yeah.

3        Q     Okay.  And so in order to get out of the

4   TV-viewing area, is that like an area that's

5   enclosed that you have to like --

6        A     Well, it's inside the trailer, yeah.

7        Q     Okay.  So you had to go out some type of

8   door or some type of whatnot?

9        A     Go out of the door, go down the steps,

10  go --

11       Q     Into -- into this area, around this way

12  (indicating)?

13       A     -- to the car, plug the phone in.

14       Q     Now, is Roger's truck unlocked?

15       A     Yes.

16       Q     Okay.  And when you put a telephone to

17  get charged, how do you -- is it on; how does that

18  work?

19       A     The -- the key is not non-accessory, so

20  all the --

21       Q     Okay.

22       A     -- inside --

23       Q     So you don't have to --

24       A     -- it's not on, but it's on accessory to

25  charge phones and play the radio or...

1          Q     Right.  So you don't have to turn it on

2     in order to -- so you can just plug it in.  Now, are

3     there more than one plugging stations that can

4     facilitate the charging of more than one --

5          A     Yes.  There was about three or four.

6          Q     Three or four.  And at that time, how

7     many other items, if any, were being charged?

8          A     Roger's phone, and I believe Carrie's

9     phone, my phone and Tim's phone.

10         Q     Okay.  Mr. Malone, okay.  So how long did

11    it take you to go from taking the phones, taking

12    them over to the truck, plugging them in; after you

13    plugged them in, how long did that take you to do?

14         A     Maybe a minute, two minutes.

15         Q     Okay.  Not -- very fast, would -- there

16    was not any delays going from --

17         A     No.

18         Q     -- there to here?  Okay.  And after you

19    plugged them in, what do you do?

20         A     I walked back to the trailer.

21         Q     Did it take you that long to get back to

22    the trailer?

23         A     No.

24         Q     Did anything -- were you the -- did you

25    go back to the trailer?

```
 1          A    Yeah.

 2          Q    Okay.  And at some point, did anything

 3     unusual, after you went back, happen?

 4          A    Well, Tim passed me on the way to the

 5     trailer.

 6          Q    Okay.  So you --

 7          A    When I got to the trailer, with Roger --

 8          Q    Yeah.

 9          A    -- and Tim goes, Where is my SD card, you

10     stole my shit.

11          Q    So --

12               THE REPORTER:  Say it again.

13               THE WITNESS:  He said, Where's my SD

14          card?  You steal my -- you steal my SD card.

15     BY MR. BUSTAMANTE:

16          Q    Okay, but he used the word, shit?

17          A    But --

18          Q    Yeah?

19          A    Yeah.

20          Q    And then --

21          A    But --

22          Q    So as you're coming back from plugging in

23     the cell phones --

24          A    Right.

25          Q    -- he is coming from there (indicating)
```

```
 1    to where the truck is?

 2         A    Right.

 3         Q    Okay.  Then you get back inside --

 4              MR. RUPERT:  Objection, Your Honor.  This

 5         is -- all State's testimony is leading.

 6              THE COURT:  Overruled.  He's just

 7         restating previous testimony.

 8    BY MR. BUSTAMANTE:

 9         Q    So you get back in there, and how long

10    did it take him to come back to you and tell you

11    what he said?

12         A    It all happened within a matter of

13    seconds, just --

14         Q    So at this point, you've been accused of

15    taking his SD card?

16         A    Yes.

17         Q    Okay.  What is an SD card?

18         A    It's a place where you download movies,

19    games, videos, pictures, music.

20         Q    Okay.  And is that something that -- you

21    know what those things are based on the --

22         A    Yeah.

23         Q    -- apparatus that you already own?

24         A    Yes.

25         Q    Okay.  So when he tells you that, how did
```

1    you respond?

2          A    I tell him, I don't have your SD card.  I

3    have two of my own.  Why am I going to steal yours?

4    Here's mine.

5          Q    Okay.  And when you say that to him, what

6    do you mean you have two other SD cards?

7          A    I had two of my own.

8          Q    Okay.  And where do those come from?

9          A    They're in my phone, I bought them.

10         Q    And you said, two, you have a phone, and

11   where is the other SD cards at?

12         A    Oh, I have two phones.

13         Q    You have two phones, okay.  And so those

14   two phones had the SD card.  Did you have a phone --

15         A    Actually, I think that one was in the

16   tablet, and one was in my phone, that's what it was.

17         Q    Okay.  So after you told him, you denied

18   that you took it?

19         A    Right.

20         Q    And you told him, because I have two SD

21   cards, why do I need that?

22         A    Yes.

23         Q    Did you have any other apparatus that

24   needs an extra -- at the time, another SD card?

25         A    Yeah, a flash drive.

```
1          Q    No, no, I'm talking about at the time

2     when you had the tablet, and you have the phone, did

3     you need an additional SD card for anything else?

4          A    No.

5          Q    Okay.  So you denied that you took it,

6     and so what happens?

7          A    He gets angry and searches all through

8     the truck and --

9          Q    And which truck is he searching?

10         A    Roger McCaullies.

11         Q    Okay.  And did you help him search?

12         A    I didn't really help him search, no.

13         Q    Okay.  So as he's in search, he's -- so

14    he's kind of like in this area of the truck, where

15    are you at when he's searching?

16         A    I'm at the front of the truck talking to

17    Roger.

18         Q    Okay.  So everybody came outside?

19         A    Yeah.

20         Q    At some point, did you offer for him to

21    either search you or search any of your property?

22         A    I said, If you think I have it, I have

23    nothing to hide.

24         Q    And --

25         A    I showed him my SD card, and he said,
```

```
 1    That's not it, and he still accused of me taking
 2    his.
 3         Q    Now, let me ask this, is it easy to take
 4    an SD card out of a phone?
 5         A    No.
 6         Q    How long -- what do you need to do in
 7    order to do that?
 8         A    The phone I have in my back pocket, if --
 9    you have to take the case off, you have to get this
10    little metal piece, you have to push it in there and
11    pop the thing.  It's -- it's like a five-minute
12    ordeal.
13         Q    Okay.  So it takes a little bit of time?
14         A    Yeah.
15         Q    All right.  At the time, did you have any
16    of those little tools in order to do that
17    efficiently?
18         A    No.
19         Q    So how is -- how is Mr. Malone reacting
20    as he's looking for the SD card?
21         A    He's getting madder and madder.
22         Q    All right.
23         A    I'm really not paying attention, because
24    it doesn't have anything to do with me, because I
25    didn't do it, so...
```

1          Q     Did he tell you anything in regards to

2    what was contained in that SD card?

3          A     He said he -- he couldn't lose it.

4          Q     And did he explain any- -- anything in

5    regards to what was inside or --

6          A     He didn't explain what was inside of it.

7    He just said that he didn't want what was on it to

8    get out in public.

9          Q     Okay.  And did he say anything in regards

10   to, it would affect his life?

11         A     Yeah.

12         Q     Okay.  Do you recall what he would have

13   said at that time?

14         A     He said there was things on there that

15   would put him in prison.

16         Q     And that would put him in prison for

17   life?

18         A     Yeah.

19         Q     How long was he looking for -- and you're

20   not paying attention, but how long was this all

21   going on before something else happened?

22         A     A minute, two minutes maybe, not even.

23         Q     Okay.  So it's kind of quickly?

24         A     Yeah.

25         Q     Let me ask you this, sir, how tall are

1    you?

2         A    I'm 5'10".

3         Q    And going back to 2018, how much did you

4    weigh back then?

5         A    230, 240.

6         Q    A big guy, right.  At that point before

7    any of this happened, were you ever in fear of Mr.

8    Malone?

9         A    (No audible response.)

10        Q    After this two minutes of searching, Mr.

11   Malone getting madder and madder, what happened?

12        A    While he was searching around in the back

13   of the truck, he found a baseball bat.

14        Q    The search of whose truck?

15        A    Mr. McCaullie's truck.

16        Q    Okay.  Was it -- did you say in the

17   truck, itself, like in the bed?

18        A    In the back cab.

19        Q    In the back cab, okay.

20        A    It was a four-door.

21        Q    And did you see this happening?

22        A    Out of my peripheral, yes, I did.

23        Q    Okay.  And when you say out of your

24   peripheral, can you explain for the jury as to,

25   where was Mr. Malone, and where were you?

1          A     The truck was right here, passenger's

2     side's here, he's on the driver's side.  I'm looking

3     at Roger facing this way, and Roger's looking this

4     way.  We're talking back and forth.  I'm paying

5     attention to him, and not paying attention -- and

6     all of a sudden, he comes around the side and...

7          Q     So he comes around the side, and did --

8     when he was coming around the side, did, I guess,

9     you see him coming?

10         A     Yeah.

11         Q     But when you say, peripheral, were you

12    looking at him going like this (demonstrating,) or

13    how is it that you were seeing him?

14         A     I was looking at Roger.

15         Q     So you were kind of distracted, and what

16    happens?

17         A     He came around the truck and squared off

18    with me and hit me in the face.

19         Q     When you say squared off, what does that

20    mean?

21         A     Squared off, like you would in T-ball, I

22    guess.

23              THE REPORTER:  Say it again.

24              THE WITNESS:  T-ball.

25    BY MR. BUSTAMANTE:

1       Q    Did it take you by surprise?

2       A    Yeah.  I was -- I was at a -- like, you

3  know, why -- why are you trying -- why are you doing

4  this?  Is he really going to do this?  Is he

5  thinking about doing this?  And then he did this.

6       Q    And what did he do?

7       A    He hit me in the face with a bat.

8       Q    Now, I'm going to ask you this, did it

9  hurt?

10      A    Yeah, at the moment.

11      Q    Did -- was it a tap?

12      A    It pissed me off more than anything.

13      Q    Yeah.  Well, I mean, was it a tap, or was

14  it a whack?

15      A    It was a pretty big whack.

16      Q    Okay.

17      A    It didn't knock me out, but I saw little

18  stars.

19      Q    When you are -- were you able to put up

20  your hands and --

21      A    No.

22      Q    As you're -- how long did it take you to

23  come back to your senses?

24      A    About a minute or so.  I mean, but I --

25  but I never really came back to my senses, because

```
 1   there at -- it put me in the survival mode.

 2       Q    Okay.

 3       A    And everybody knows what happens when

 4   that happens.

 5       Q    All right.  So what happened when you

 6   said that you went into survival mode?

 7       A    I had to stop him before he hurt me.

 8       Q    So what did you do when you went into

 9   survival mode?

10       A    Well, there was an axe laying down there.

11       Q    And whose axe was that?

12       A    It was Roger's axe.

13       Q    Okay.  And is that an axe that you've

14   seen Roger use in the past?

15       A    Yeah.  We use it to chop wood.

16       Q    Okay.  Is that something that is needed

17   in the campground?

18       A    Yes, sir.

19       Q    Okay.  So you grab the axe?

20       A    Yes.

21       Q    What did you do with it?

22       A    I -- I didn't have time to do anything

23   with it.  Roger stopped me before I could make that

24   big of a mistake.

25       Q    Okay, so Roger stopped you.  Were you
```

1    able to swing this axe at Mr. Malone?

2        A    (No audible response.)

3        Q    What happened after he stopped you from

4    using the axe?

5        A    I went to, one, walking around in a daze

6    trying to keep the blood out of my face and --

7        Q    When you said, "to keep the blood out of

8    my face," was it dripping (demonstrating)?

9        A    Oh, yeah.  It was -- don't we have a

10   picture in here somewhere?

11       Q    We'll do that in a moment.  So -- but --

12   so you're trying to get that off your face?

13       A    Yes.

14       Q    At some point, did you go to the

15   hospital?

16       A    Yes, right after that.

17       Q    Okay.  Who took you to the hospital?

18       A    Roger.

19       Q    How far is it, the ride from Lost Valley

20   to the hospital?

21       A    Not even five minutes, ten minutes.

22       Q    And did he take you in what vehicle?

23       A    The Dodge truck.

24       Q    The truck that had -- that you orig- --

25   that -- where the SD and all of that stuff would

1    have been at -- or the cell phones.  I'm now showing

2    you what's been marked as State Exhibits 2, 3, and

3    4.

4                MR. BUSTAMANTE:  Is 1 in there?

5                THE CLERK:  I'm trying to find it.

6                MR. BUSTAMANTE:  I think we can do with

7         these here.

8                (Photographs tendered from the clerk and

9         then tendered to the witness.)

10   BY MR. BUSTAMANTE:

11        Q    Can you look at those?

12        A    (Witness perusing photographs.)

13        Q    I also want to show you State's Exhibit

14   Number 1.

15                (Photograph tendered to the witness.)

16        A    (Witness perusing photograph.)

17        Q    And it looks like, since we're looking at

18   that, you have blood in a lot of different places.

19   And on one of your eyes is -- actually, there's

20   almost like a mark around it, how did that happen to

21   your eye?

22        A    I think it came across, like...

23        Q    Almost like somebody grabbing, and not

24   like this, but almost like this (demonstrating)?

25        A    Yeah.

1        Q     How long were you in the hospital?

2        A     An hour-and-a-half, two hours.

3        Q     Okay.  They had to clean you up and do

4   whatever they needed to do?

5        A     And wanted to make sure everything was

6   all right.

7        Q     Okay.  You don't have any visible scars

8   from this?

9        A     No.  Thank God.

10       Q     All right.  And did it take some time for

11  it to heal?

12       A     Yeah, it did.

13       Q     When do you get back to -- to your place?

14       A     An hour-and-a-half, two hours, I guess.

15       Q     Okay.  Who drove you back?

16       A     My girlfriend at the time, Tracy Wakes.

17       Q     Okay.  So Mr. McCaullie had dropped you

18  off, you (indiscernible,) and then she came back and

19  picked you up; when you went back to Lost Valley to

20  your place, were you -- did you see Mr. Malone there

21  at all?

22       A     (No audible response.)

23       Q     Now, where was your truck when all of

24  this happened?

25       A     It was right next to my camper --

```
 1          Q     Okay.

 2          A     -- probably 500-feet away from there.

 3          Q     So your truck was not anywhere near where

 4     the McCaullies were?

 5          A     No.

 6          Q     Right.  When you say 500 feet, if you go

 7     outside this courtroom, outside somewhere over there

 8     (indicating)?

 9          A     (No audible response.)

10          Q     Did you leave it locked?

11          A     Yes.

12          Q     All right.

13                MR. BUSTAMANTE:  Your Honor, may I

14          approach?

15                THE COURT:  You may.

16     BY MR. BUSTAMANTE:

17          Q     I'm now showing you what's been marked as

18     State's Exhibit 12 and 13 for identification

19     purposes; can you please look at that?

20                (Photographs tendered to the witness.)

21          A     (Witness perusing photographs.)

22          Q     Do you recognize that?

23          A     Uh-huh.

24          Q     And what is it?

25          A     My tablet.
```

1        Q    On that particular evening, did you bring

2   the tablet with you to the McCaullies?

3        A    No.  It was in the truck, in the

4   glovebox.

5        Q    In your truck?

6        A    Yes.

7        Q    Did you give permission to anybody to

8   have it?

9        A    Never.

10        Q    Did you give it over to the Matthew for

11   them to have?

12        A    No.

13        Q    And that's the one you said that it was

14   $200 at the time?

15        A    Right.

16        Q    Okay.  Who gave it back to you?

17        A    I got it back from the police, maybe.

18        Q    Okay.  So it was not in your car -- or in

19   your truck?

20        A    (No audible response.)

21        Q    On May 12th, 2018, did you -- did you

22   attack Timothy Malone?

23        A    (No audible response.)

24        Q    Did you grab an axe and try to attack him

25   before he attacked you?

```
 1          A     No.
 2          Q     I'm now showing you what's marked as
 3    State's Exhibit Number 6 for identification
 4    purposes; can you please look at that?
 5                (Photograph tendered to the witness.)
 6          A     (Witness perusing photograph.)
 7          Q     Do you recognize that?
 8          A     Uh-huh.
 9          Q     Do you know what both -- what is it that
10    you recognize from that photograph?
11          A     There's an axe laying amongst a bunch of
12    other things, car brakes, another bat, tires.
13          Q     And would that be the axe that you would
14    have picked up that evening after you were attacked?
15          A     Yeah.
16          Q     Okay.  Now, you said there's other stuff,
17    did you recognize the bat at all?
18          A     No.
19          Q     And what is this?  It looks like some
20    type of tire or whatnot?
21          A     Well, that was what fifth wheel is --
22          Q     Uh-huh.
23          A     -- and there's a bunch of stuff under it.
24    That's what that (indiscernible) --
25          Q     Okay.  So that general area was around
```

1    where the McCaullies were at?

2        A    Yeah.

3        Q    Okay.  Did you tell, at some point, Mr.

4    Malone when there was that dispute about whether you

5    stole the SD card or not, to just call the police?

6        A    Yeah.  I said, If I have it, call the

7    police, and we'll settle it this way --

8        Q    Okay.

9        A    -- but he had other plans, I guess.

10       Q    All right.  The flash drive -- now

11   approaching with State's Exhibit Number 11; do you

12   recognize that, sir?

13       A    Yep.

14       Q    Okay.  And what is it, sir?

15       A    It's a flash drive.  Where is the top

16   piece?

17            THE REPORTER:  What?

18            THE WITNESS:  There wasn't a top piece

19   when you got it?

20       Q    Well, I don't -- that's how I got it,

21   there.

22       A    Okay.

23       Q    But do you recognize -- did you have a

24   flash drive in your truck, also?

25       A    Yes.

1          Q    Okay.  And where did you get that flash

2     drive?

3          A    From a clean out in Keystone.

4          Q    Okay.  Explain to the jury what a clean

5     out is.

6          A    It's when you don't pay your rent, and

7     the landlord evicts you, and you have so many days

8     to get out.  And whatever's left is --

9          Q    And so --

10         A    It has to get moved to the curb and gets

11    ready for a re-rental.

12         Q    And when you're -- when you're talking

13    about a clean out, is that one of the many side jobs

14    that you have?

15         A    Yes.

16         Q    So you take property that's inside of an

17    evicted place, and you take it out to the curb.

18    What about property that's in there; what happens

19    with it, it's abandoned?

20         A    It's abandoned.

21         Q    Okay.  And from that clean out, you took

22    that?

23         A    Yep.

24         Q    And why do you need a flash drive?

25         A    I'll have pictures.  I have all kinds of

227

```
1    stuff.

2         Q    So it will be something that would be

3    useful to you?

4         A    Yes.

5         Q    Okay.  You did not steal that, right?

6         A    No.

7         Q    And do you know any reasons as to why

8    that would be in one of the pockets of Mr. Malone?

9         A    Because it was inside my truck in the

10   glovebox.

11        Q    Along with your --

12        A    Tablet.

13        Q    -- tablet?  Okay.

14        A    A pair of sunglasses and a couple of

15   knives.

16        Q    Okay.  Knives, what kind of knives?

17        A    I have raylon knives.

18        Q    Okay.  Any Bowie knives?

19        A    No --

20        Q    Okay.

21        A    -- just raylon knives.

22        Q    Okay.  Sir, have you been convicted of a

23   felony?

24        A    Yes.

25        Q    About how many times, sir?
```

```
 1          A     Five.

 2          Q     And any crimes involving dishonesty?

 3          A     No.

 4          Q     All right.  Is there one in your record,

 5     sir, of theft?

 6          A     A theft, yes.

 7          Q     Okay.  So that would be considered

 8     dishonesty.

 9          A     Got you.

10          Q     All right.  Is it fair to say you're not

11     a wealthy man?

12          A     No.

13          Q     And what happened to you was unprovoked?

14          A     Yes.

15          Q     All right.  Do you see the person who did

16     that to you in the courtroom today?

17          A     Yes.

18          Q     Can you please point him out and describe

19     an item of clothing he's wearing?

20          A     (No audible response.)

21                MR. BUSTAMANTE:  Your Honor, the -- may

22          the record reflect the victim has identified

23          the Defendant?

24                THE COURT:  The record will so reflect.

25                MR. BUSTAMANTE:  Your Honor, one minute.
```

```
 1              I have nothing further.
 2                    THE COURT:  Any cross?
 3                    MR. RUPERT:  May it please the Court?
 4                        CROSS EXAMINATION
 5    BY MR. RUPERT:
 6         Q     Good afternoon, Mr. Pardekooper.
 7         A     How are you doing?
 8         Q     Good.  So you've been convicted of a
 9    felony five times; is that correct?
10         A     Yes, sir.
11         Q     One crime for dishonesty, is that also
12    correct?
13         A     (No audible response.)
14         Q     So you would agree that you have a
15    reputation for being dishonest in the community?
16                    MR. BUSTAMANTE:  Objection, that -- that
17           calls for a legal conclusion.
18                    THE COURT:  (Nods head in the
19           affirmative.)
20    BY MR. RUPERT:
21         Q     Are you aware of your reputation in the
22    community?
23         A     Yep.
24         Q     Yep.  And would you agree that that
25    reputation is that --
```

1          MR. BUSTAMANTE:  Objection, this is

2     not --

3          THE COURT:  Would Counsel approach.

4          THE REPORTER:  Sorry.

5          MR. RUPERT:  That's all right.  I was

6     going to be going at, he can certainly testify

7     to his own reputation as being a thief in the

8     community.

9          THE COURT:  I don't think (indiscernible)

10    before you ask (indiscernible) this is not

11    appropriate --

12         MR. RUPERT:  Yes, sir --

13         THE COURT:  -- at this point.

14         MR. RUPERT:  I'll move on, thank you.

15         THE REPORTER:  I'm sorry, I forget that

16    you're behind me.

17  BY MR. RUPERT:

18    Q    Well, did you tell the police about the

19  axe; what you did with the axe?

20    A    I don't believe so.

21    Q    So you kept that from them?

22    A    No, I -- it never came up.

23    Q    It never came up.  All right.  Did any of

24  the law enforcement officers talk to you?

25    A    Yeah.

1    Q    All right.  Did they start with, tell me

2    what happened?

3    A    Yes.

4    Q    All right.  So you chose not to bring up

5    the fact --

6    A    Actually, no, wait a minute.  Actually, I

7    believe I did.  I said, if Roger didn't stop me,

8    then I would have committed something.  I was beyond

9    his end (indiscernible) --

10    Q    All right.  So --

11    A    -- if I did.

12    Q    All right.  So we went back a couple of

13    times.  Let's just make sure that I know what

14    position you're taking.  You remember speaking to

15    the police officers about what happened?

16    A    Yeah.

17    Q    All right.  Do you remember which officer

18    it was?

19    A    No, sir.

20    Q    Okay.  Can you tell me if he was a white

21    officer, a male or --

22    A    He was white --

23    Q    He was white.

24    A    -- but I don't remember his name, no,

25    sir.

```
 1          Q    Okay, but he was a -- a deputy?

 2          A    Yeah.

 3          Q    In a green uniform?

 4          A    Yes, sir.

 5          Q    All right.  And he was a white male?

 6          A    Yes, sir.

 7          Q    All right.  Do you remember if his name

 8   was Deputy Sumner?

 9          A    Yeah.

10          Q    All right.  So Deputy Sumner did

11   interview you?

12          A    Yes, sir.

13          Q    All right.  And he wanted to know what

14   happened; is that correct?

15          A    Yes, sir.

16          Q    All right.  Did you tell him the truth?

17          A    Yes.

18          Q    Did he say -- put you under oath, and

19   say, tell the truth, the whole truth and nothing but

20   the truth?

21          A    Yes.

22          Q    All right.  Did you do that?

23          A    Yes.

24          Q    Did you tell him about the axe?

25          A    Yep.
```

233

```
 1          Q    You did tell him about the axe?

 2          A    Yeah.

 3          Q    All right.  So Deputy Sumner knew about

 4     the axe.  And he knew the axe was part of the

 5     (indiscernible)?

 6               MR. BUSTAMANTE:  Objection, calls for

 7          speculation.

 8               THE WITNESS:  It wasn't -- it wasn't part

 9          of the --

10               THE COURT:  The objection -- hold on, Mr.

11          Pardekooper.  When they object, let me rule.

12          As phrase, sustained.

13     BY MR. RUPERT:

14          Q    Did you make it clear to Mr. Sumner, when

15     you told him that you picked up the axe --

16          A    To defend myself, yes, I did.

17          Q    But you made that clear to him?

18          A    Yes.

19          Q    All right.  Can you -- did you see Mr. --

20     Deputy Sumner record your statement?

21          A    On bodycam, I mean --

22          Q    Okay.  So the bodycam was on?

23          A    It had to be.  They're always on.

24          Q    Always on?

25          A    Yes.
```

```
 1          Q     All right.  You saw the light?

 2          A     I didn't --

 3          Q     Did you see an indication of it being on?

 4          A     (No audible response.)

 5          Q     Okay.  Do you know if it had a light?

 6          A     It may have been.

 7          Q     Okay.  Where were you when the deputy

 8    interviewed you?

 9          A     At the hospital.

10          Q     All right.  So Deputy Sumner went to the

11    hospital for the sole purpose of finding out what

12    happened?

13          A     Yes.

14                MR. BUSTAMANTE:  Objection, it calls for

15          speculation.

16                THE COURT:  As phrase, sustained.

17    BY MR. RUPERT:

18          Q     All right.  So he wanted from you, your

19    version of events; is that correct?

20          A     I guess so, yes.

21          Q     Okay.  Do you remember the version of

22    events that you told Deputy Sumner that day?

23          A     Yeah.

24          Q     And what were they?

25          A     The same as I told you.
```

```
 1            Q    You just testified that Roger McCaullie

 2    was out there during the whole time?

 3            A    Yeah.

 4            Q    And saw what happened?

 5            A    Yes.

 6            Q    Do you remember saying something

 7    different, that he wasn't out there on May 12$^{th}$ of

 8    this year?

 9            A    He was out there.

10            Q    Do you remember saying something

11    different, though, on May 12$^{th}$?

12            A    (No audible response.)

13            Q    Do you remember on May 12$^{th}$, saying that

14    Carrie McCaullie was out there?

15            A    (No audible response.)

16            Q    Was she out there?

17            A    No, she wasn't.

18            Q    So your testimony today is Carrie wasn't

19    out there, but Roger was?

20            A    Well, when everything happened, everybody

21    came out there.  So I mean, the initial, Roger was

22    out there, and Carrie wasn't out there.  It was me

23    and Tim out there.  But when the initial problem

24    happened, then everybody came out of the trailer to

25    find out what's going on.
```

1          Q    Well, let's break that down a little bit.

2     When you say the initial problem happened and then

3     people came out, was that after the altercation

4     between you and Tim?

5          A    Yes.

6          Q    Okay.  So your testimony today is, nobody

7     actually saw the interaction between you and Tim?

8          A    Yeah.

9          Q    You said on direct, you don't remember

10    any prior problems with Tim?

11         A    I didn't have any problems with Tim.

12         Q    You knew him for about...

13         A    A month or so.

14         Q    About a month, yeah.  When Tim accused

15    you of stealing his SD card and persisted, that made

16    you mad, didn't it?

17         A    No.  I was kind of shocked that he would

18    actually think that I would do that to him,

19    honestly.  We never had any bad blood anyway --

20         Q    Isn't it true --

21         A    -- I never had any problem with him.

22         Q    -- isn't it true that, not only were you

23    mad at him, you were mad enough to pick up the axe

24    and go after him?

25         A    No, not until he hit me in the face with

```
 1    the bat.  And I believe everybody would stand to say
 2    that if you get hit in the face with a bat, then
 3    you're going to react in some way.
 4          Q     Do you remember telling the law
 5    enforcement officer that you would have chopped his
 6    hat off?
 7          A     His head off, yes.
 8          Q     Okay.  He put -- he put hat, but --
 9          A     It's a typo.
10          Q     Okay.  So you said you'd cut his head
11    off?
12          A     Yeah.
13          Q     All right.  Do you remember that axe?
14          A     Yeah.
15          Q     All right.  Was it a standard big,
16    wood-chopping axe?
17          A     Yeah.
18          Q     In fact, that's what it was used for,
19    right?
20          A     Yeah.
21          Q     Did you use it yourself?
22          A     A couple of times.
23          Q     All right.  So you -- and you were over
24    at the McCaullies a lot, correct?
25          A     Yes.
```

1       Q     I mean, he was your friend?

2       A     We stayed together, yeah.

3       Q     Helped him clean out the yard, just in

4    fact, that day, right?

5       A     Yeah.

6       Q     Right.  And so you knew where that axe

7    was; is that correct?

8       A     Yeah.

9       Q     And it's the same axe that you knew to

10   pick up, and you chopped wood with it before?

11      A     Right.

12      Q     So you -- you knew -- you would know what

13   an axe would do if, in fact, it hit a live person?

14      A     Yes.  But also -- let me rephrase this,

15   where it happened at, was in front of the trailer

16   right there beside the axe, so in my disorience, and

17   just getting hit in the head with the bat, I'm

18   looking on the ground and the first thing I see is

19   what, an axe.

20      Q     You got mad, you saw the axe, and you

21   picked it up?

22      A     Yeah.

23      Q     And you went after my client, Tim?

24      A     No.  Roger -- Roger stopped me before all

25   that happened.

1          Q     Did Deputy Sumner take pictures of you

2     after you came out of the hospital?

3          A     I believe so.

4          Q     Okay.  All right, those pictures were a

5     lot better, right?

6          A     Not really.

7          Q     Well, I mean, as far as your injury?

8          A     Not really, maybe a little worse.

9          Q     They didn't need stitches, they glued it

10    together?

11         A     They stitched and glued, yeah.

12         Q     Stitched and glued, okay.  Let's talk

13    about the tablet, all right.  The tablet has an SD

14    card, right?

15         A     Yes.

16         Q     All right.  And your phone had an SD

17    card, right?

18         A     Yes.

19         Q     All right.  And during this time that --

20    that Tim was making you mad, asking -- as he kept

21    asking you about the SD cards, did you get to the

22    point where you said, I don't have the SD cards, and

23    you can even look for yourself?

24         A     Yeah.  I gave him the opportunity.

25         Q     All right.  Do you remember opening up

1    your phone and showing him your SD card?

2        A    Yes.

3        Q    All right.  And also on your tablet, you

4    opened up that and showed him the SD card?

5        A    Yeah, because you just hit the -- and it

6    ejects out the side.

7        Q    Say it again.

8        A    You hit it and it ejects --

9        Q    Okay.

10       A    -- and you can pull it out and look at

11   it.

12       Q    All right.  So you showed him the SD card

13   from your tablet; is that correct?

14       A    (No audible response.)

15       Q    Okay.  And you said, Here, you can even

16   look for yourself?

17       A    Yes.

18       Q    And you handed him the tablet?

19       A    Yes.

20       Q    Okay.  And that's the last time you saw

21   the tablet?

22       A    No.  He handed it back to me when he

23   found out it wasn't his, and I took it to my truck,

24   and I locked my truck.

25       Q    You never bought that tablet?

```
1          A      Yeah, I bought it.

2          Q      I thought it was a Christmas gift?

3          A      (Indiscernible.)

4          Q      Okay.  So you bought it, and then it was

5    a Christmas gift?

6          A      My grandma bought it for me as a

7    Christmas gift.

8          Q      Right, right.  So you didn't buy it --

9          A      No, I didn't buy it.

10         Q      -- I guess is what I'm saying.  It was

11   bought --

12         A      It was bought and handed to me, yes.

13         Q      Okay.  I'm not accusing you of stealing

14   it.

15         A      No, sir.

16         Q      Okay.  All right, so do you know exactly

17   what the -- your grandmother paid for the tablet?

18         A      Not exactly, no.

19         Q      All right.  To be fair and to be honest,

20   you're guessing as to what it was worth?

21         A      At least about, no more than $200.

22         Q      Right.

23         A      I don't -- I don't want to --

24         Q      Well, I'm saying that you're just

25   guessing.
```

1          A    It's an off brand.  You know, it's not a

2    Samsung.  It's not an LG.

3          Q    And that tablet can't get directly onto

4    the internet --

5          A    No.

6          Q    -- by itself --

7          A    Through WiFi.

8          Q    -- without help?

9          A    No, through WiFi.

10         Q    Okay.  Do you have WiFi at your place?

11         A    On my phone.

12         Q    Okay.

13              MR. RUPERT:  May I have a moment, Your

14    Honor?

15              THE COURT:  All right.

16    BY MR. RUPERT:

17         Q    Isn't it true that you never got any

18    stitches in your head?

19         A    Look man, that was three-years ago.

20    Whether it was staples or stitches and glue, it --

21    it was nasty, yeah.

22         Q    Isn't it true that they just merely glued

23    it back together?

24         A    I guess if -- I was out the whole time,

25    so --

```
1        Q    But you just told this jury for sure that
2   there was stitches?
3        A    Well, no, I didn't get any stitches
4   removed, okay.
5        Q    All right.
6        A    It healed really fine the way it was.  I
7   didn't really have to do much to it.
8        Q    Good deal.  All right, thank you.
9             THE COURT:  Any redirect?
10            MR. BUSTAMANTE:  No, Your Honor.
11            THE COURT:  All right.  Mr. Pardekooper,
12        thank you.  You may step down and have a seat
13        outside.
14            MR. BUSTAMANTE:  Scott Mathews.
15            THE COURT:  Good afternoon, sir.  If you
16        would raise your right hand for me.  Do you
17        swear or affirm any testimony you give this
18        jury today will be the truth, the whole truth
19        and nothing but the truth, so help you God?
20            THE WITNESS:  Yes, sir.
21            THE COURT:  How was Little Ceasars?
22            THE WITNESS:  Oh, it was awesome.
23            THE COURT:  It was good --
24            THE WITNESS:  It was awesome.
25            THE COURT:  -- all right.
```

```
 1                    DIRECT EXAMINATION
 2   BY MR. BUSTAMANTE:
 3        Q    Good afternoon, sir.
 4        A     Good afternoon, sir.  How are you doing
 5   this afternoon?
 6        Q    I'm doing good, thank you.  Can you
 7   please tell us your name and spell your last, for
 8   the record?
 9        A    Scott Allan Matthew, II, M-a-t-h-e-w-s,
10   Numeral I, Numeral I.
11        Q    Okay.  And, sir, what do you do for a
12   living?
13        A    I am working for a company right now
14   that's called, All About Events out of Jacksonville,
15   Florida.
16        Q    Okay.
17             THE REPORTER:  Called what again?
18             THE WITNESS:   All About Events.
19   BY MR. BUSTAMANTE:
20        Q    And how long have you been employed with
21   them?
22        A    Like a week --
23        Q    A week --
24        A    -- maybe two.
25        Q    -- okay.
```

```
 1        A     Yes, sir.

 2        Q     And, sir, are you married?

 3        A     Yes, sir.

 4        Q     And who are you married to?

 5        A     Lisa Mathews.

 6        Q     Okay.  And how long have you been married

 7   to her?

 8        A     Five years.

 9        Q     Do you have any children?

10        A     Yes, sir.

11        Q     And how many?

12        A     One.

13        Q     And what is the age and name of the

14   child?

15        A     Four, and his name is Isaiah.

16        Q     Did there come a time in which you used

17   to live in the Lost Valley Campground?

18        A     Yes, sir.

19        Q     Okay.  And can you explain to the jury

20   your home, what it consisted of?

21        A     My home consisted of a camper, and it was

22   a one bedroom.  My wife and I just recently got

23   married around that point in time, and we were going

24   and looking for a house for our four-year-old son

25   and myself.  And that was only a pit stop until we
```

1    could go and get the money up to be able to get us a

2    house, to be able to call that home for our son.

3         Q    Lost Valley's an area in which people,

4    maybe people who are -- I'm not saying -- who don't

5    have a lot of money --

6         A    Yes.

7         Q    -- that's what -- a place where you

8    could --

9         A    It was a low incoming -- a low-income

10   campground for families or for certain people that

11   had got released from jail or prison and stuff like

12   that.

13        Q    That kind of stuff, and so --

14        A    Yes, sir.

15        Q    All right.  And so at that point, because

16   of your finances, you were living in this area?

17        A    Yes.

18        Q    Okay.  And when you say this camper was a

19   one bedroom --

20        A    Yes.

21        Q    -- how big was it, so we --

22        A    I want to estimate, it was about, maybe a

23   normal size, so about 300, 250 feet.  I don't know

24   the average size.

25        Q    But like the square feet of the whole

```
 1   place?
 2        A    It was -- it was a normal size, a
 3   guesstimation.
 4        Q    One bedroom?
 5        A    Yes.
 6        Q    Did it have a kitchen?
 7        A    Yes.
 8        Q    A bathroom?
 9        A    Yes.
10        Q    A living room?
11        A    Yes.
12        Q    Okay.  If you went from one side of the
13   camper to the other --
14        A    Yes, sir.
15        Q    -- would it be from, let's say, where
16   you're sitting at to where I'm at?
17        A    I would say from right where I'm sitting
18   at, maybe to right where the other two are sitting
19   right there.
20        Q    Like right over here (demonstrating)?
21        A    Yes --
22        Q    Okay.
23        A    -- yes.
24        Q    So not a huge place?
25        A    No, sir.
```

```
 1          Q    But it was your home?

 2          A    Yes.

 3          Q    Okay.  And again, who lived in -- in your

 4     home?

 5          A    My son, my wife and I.

 6          Q    Okay.  Did you have any relations that

 7     lived close by?

 8          A    I had adopted family.

 9          Q    Okay.  And who was your adopted family?

10          A    My adopted family would consist of Roger

11     McCaullie, Carrie McCaullie and Matthew Pardekooper,

12     which was like a brother to me, that I've known

13     since I've been a child.

14          Q    Okay.  So you knew him?

15          A    Yes.

16          Q    All right.  And back on May 12th of

17     2018 --

18          A    Yes, sir.

19          Q    -- did you do -- did you know Mr.

20     Pardekooper, at that point?

21          A    Yes.

22          Q    And did you know a guy named, Timothy

23     Malone?

24          A    Never until through passing.  Like my

25     adopted father told me that's Tim, he's a friend of
```

```
 1   mine.  I was like, Okay, because I really didn't pay

 2   attention --

 3       Q    Okay.

 4       A    -- to who his friends were --

 5       Q    So --

 6       A    -- because I had my own life.

 7       Q    -- so let's -- let's go ahead and ask, I

 8   just want to go ahead and flush that out a little

 9   bit, okay.  Mr. Malone knew somebody from -- like,

10   that's Malone?

11       A    Yes.

12       Q    Had you had a conversation with him,

13   previous to that?

14       A    No, sir.

15       Q    All right.  So you knew who he was?

16       A    Yes.  I knew who he was, yes.

17       Q    Had you ever gone out to dinner with him?

18       A    No.

19       Q    Have you ever went to church with him?

20       A    No.

21       Q    Have you ever went to school with him?

22       A    No.

23       Q    All right.  On May 12th, 2018 --

24       A    Yes, sir.

25       Q    -- around the evening time, where were
```

1    you?

2         A    I was actually just coming back from a --

3    from picking up a friend of mine and going out with

4    my wife and my son to dinner, and we just got back

5    home.  And --

6         Q    And where did you guys go out to dinner

7    to?

8         A    I don't even remember that, sir,

9    honestly.

10        Q    A long time ago?

11        A    Yes, sir.

12        Q    And so you all came back?

13        A    Yes.

14        Q    And where did you guys go back to?

15        A    We went back to our camper --

16        Q    Okay.

17        A    -- straight to our house where we were

18   living at.

19        Q    All right.  Was there any type of

20   commotion that happened while you were away?

21        A    Yes.  My father had gave me a call, said

22   that he was taking Mr. Pardekooper to the hospital.

23   And then that's when I came back, I was like, Okay,

24   because I didn't pay no mind do it.

25        Q    Okay.  So there was something unusual

```
 1   that had happened and --

 2        A    Yes.

 3        Q    -- you were aware of that?

 4        A    Yes.

 5        Q    Okay.  Did you know anything in regards

 6   to Mr. Malone being involved in that?

 7        A    No.

 8        Q    Okay.  All right, is the community there,

 9   like a small community?

10        A    Very small, everybody knew everybody.

11   Like, if our kids were playing, they would play

12   together.  Like, everybody knew each other.

13        Q    So would it be fair to say that news,

14   especially of an unusual sort, runs like wild fire?

15        A    Very fast.

16        Q    Okay.  Were you aware of anything,

17   besides Mr. Pardekooper being injured, of anybody

18   looking out for somebody?

19        A    No.

20        Q    All right.  So you get back home --

21        A    Yes.

22        Q    -- and you said your wife, yourself,

23   them --

24        A    Right.

25        Q    -- and your son are --
```

252

```
 1        A    Yes.

 2        Q    What, if anything, unusual happened?

 3        A    What do you mean by that?

 4        Q    Did -- did somebody come in?

 5        A    Yes.

 6        Q    All right.

 7        A    Actually, Mr. Malone had went and knocked

 8   on the door.  And I told my wife, I said, We do not

 9   need to let him in, because my father just told me

10   that there was an incident that just happened.

11        Q    Okay.  So you were aware before that --

12        A    Yes.

13        Q    -- there was an incident involving Mr.

14   Malone?

15        A    Yes.

16        Q    Okay.  And when -- when you're talking

17   about a door, is that an actual, physical door?

18        A    It was a door -- it's camper-sized

19   door --

20        Q    Okay.

21        A    -- so it would be like a regular door

22   that you could open up, through like a flap.

23        Q    All right.

24        A    Like, you would go in, the doorknob,

25   itself, was metal --
```

```
 1          Q    Okay.

 2          A    -- and you could go ahead and push it to

 3    one side, and it would open up our door.

 4          Q    So it's not like a wood, metal, but it's

 5    some type of like cloth --

 6          A    Yes.

 7          Q    -- type of thing, the way you push it

 8    in --

 9          A    Yes.

10          Q    -- almost like an accordion, you'd just

11    (demonstrating)?

12               MR. RUPERT:  Objection, this is --

13          A    You'd go ahead and go like --

14               MR. RUPERT:  -- this is leading.

15               THE COURT:  Overruled.

16               THE WITNESS:  You can go and grab the

17          doorknob, itself.  It's like a regular-sized

18          camper door.

19    BY MR. BUSTAMANTE:

20          Q    All right.  And so, at -- had Mr. Malone

21    ever been inside your home?

22          A    No, sir, not until that day.

23          Q    So what is it -- explain to us, when --

24    you saw somebody knocked on the door?

25          A    Yes.
```

1    Q    And then once somebody knocked, what

2    happened?

3    A    That's when he had pushed passed my wife,

4    while she had my 18- -- 18-month-old child in his

5    arm -- or in her arms.

6    Q    Right.

7    A    And that's when I had told my wife, Look,

8    I don't know what he's going to do.  I don't know if

9    he has anything on him.  You and our child needs to

10   get to safety, get out of here as soon as possible.

11   Q    Okay.  And when that -- where were you in

12   relation to your wife when you were talking to her

13   about that?

14   A    We were outside.  When you looked at our

15   camper, like I said, it sat like this.  Our front

16   door was to the street, and we pulled on the other

17   side right where we parked at.  And I told her,

18   Look, you and our son needs to get away from here,

19   because I don't know what's going to happen.

20   Q    All right.  And where did Mr. Malone go?

21   A    He went inside the house.  And at that

22   point in time, that's when I seen my wife drive up,

23   and that's when law enforcement had got there.

24   Q    And did -- at that point, did you spend

25   any time with him inside your house?

```
1         A     Yes.

2         Q     Okay.  Did you -- did you talk to him?

3         A     Yes.

4         Q     Okay.  And what did you-all talk about?

5         A     We had talked about that he -- he said

6    that he had a Bowie knife about 16-to-18 inches

7    behind his back.  And he said he was going to stab

8    Matt with that and that that is what he had used to

9    cut his bracelet off.

10        Q     Okay.  Did he mention anything about an

11   SD card?

12        A     No.  He mentioned something about a

13   tablet.

14        Q     Okay.  What did he mention about the

15   tablet?

16        A     He just said that the argument started

17   over some tablet, and I didn't even know nothing

18   about that until he said that that's what the

19   argument started over.

20        Q     Okay.  So your recollection was that it

21   was -- there was something about a tablet?

22        A     Yes.

23        Q     Now, there was a tablet that was found in

24   your home --

25        A     Yes, sir.
```

1       Q     -- did that tablet belong to you?

2       A     No, sir.

3       Q     Had you see --

4       A     I had never seen that tablet a day in my

5  life until Mr. Malone -- when the police asked me

6  anything about it, and I told them, I don't know

7  whose it is, get it out of my house, because it

8  don't need to be there.

9       Q     Did he ever show you this knife?

10      A     Yes.

11            MR. BUSTAMANTE:  Your Honor, may I

12      approach?

13            THE COURT:  You may.

14  BY MR. BUSTAMANTE:

15      Q     I'm now showing you what's been marked as

16  State's Exhibit 10; can you look at it?

17      A     Yes, sir.  Yes, sir, that's the one that

18  he had behind his back and that he said he was going

19  to stab Matt with.

20      Q     When you say, "behind his back," explain

21  to me how -- how did that go?

22      A     Okay, he went -- like, you know how you

23  have your spine, he had it right there in between

24  his spine, but up underneath his shirt.  And that's

25  when he went just behind his shirt by his spine, and

```
 1    that's when he grabbed it behind, and he said, I was
 2    going to stab Matt with this, and I cut my bracelet
 3    off.
 4          Q     Okay.  When he first came and entered
 5    your home --
 6          A     Yes, sir.
 7          Q     -- had you seen the knife?
 8          A     No, sir.
 9          Q     Was he invited to stay in your home?
10          A     No, sir.
11          Q     Did you tell him to get out?
12          A     Yes, sir.
13          Q     What did he -- how did he respond?
14          A     He just sat there and said, Please,
15    please, please, and that's when I told my wife to go
16    to safety and that's when I had waited for myself
17    and for her to do what she had to do with law
18    enforcement, and I stayed outside --
19          Q     Okay.
20          A     -- during the time.
21          Q     Do you see the person who went into your
22    home uninvited that day in the courtroom?
23          A     I cannot really tell, because of the --
24    because he had longer hair, and he was wearing
25    makeup and stuff like that.
```

```
 1        Q    So the -- the person who would have

 2    been -- was that person the one person who was

 3    arrested?

 4        A    Yes.

 5        Q    Okay.

 6             MR. BUSTAMANTE:  I have nothing further.

 7             THE COURT:  Cross?

 8             MR. RUPERT:  May it please the Court?

 9                  CROSS EXAMINATION

10    BY MR. RUPERT:

11        Q    So as you testified, this was a small

12    community?

13        A    Very small, yes, sir.

14        Q    Okay.  Everybody knew everybody?

15        A    Yes, sir.

16        Q    All right.  And you knew that Tim and

17    Roger McCaullie --

18        A    Were friends --

19        Q    -- were friends?

20        A    -- yes.

21        Q    Right.  And Roger McCaullie's your

22    stepdad?

23        A    Adopted father.

24        Q    Adopted father?

25        A    Yes.
```

```
 1        Q    Okay.  So obviously, you guys are close?

 2        A    Yes.

 3        Q    All right.  And you would agree that Tim

 4   and your -- and Mr. McCaullie were...

 5        A    Good friends --

 6        Q    Good friends.

 7        A    -- very good friends.

 8        Q    Very good friends, okay.  All right.

 9   Now, we've heard it both ways, and you would

10   probably know.  It is McCaullie --

11        A    McCaullie.

12        Q    -- with a G, or with a C?

13        A    McCaullie, C.

14        Q    McCaullie, got you.  Okay.  And when Tim

15   entered your home --

16        A    Yes.

17        Q    -- it looked like he was in a hurry?

18        A    Yes.

19        Q    Okay.

20        A    It looked like he was trying to run away

21   from a forest fire, like there was a fire going on.

22        Q    He never threatened you?

23        A    No.

24        Q    Right.  He never threatened your wife?

25        A    No.
```

1    Q    Certainly never threatened your child?

2    A    No.

3    Q    All right.

4    A    But at the same time, if somebody went

5    and threatened your -- like went and hit one of your

6    brothers in the face and told you that you [sic]

7    were going to stab your daughter or your -- or

8    something like that or your brother, what would you

9    do?  You would want to get your family to safety, as

10   well.

11   Q    You didn't see the incident?

12   A    No.

13   Q    Okay.  So you're just going on what Matt

14   would have told somebody?

15   A    What my father would have told me and

16   what came out of Mr. Malone's mouth, himself.

17   Q    Okay, but you didn't know anything about

18   what Mr. Malone said as he was coming in?

19   A    No --

20   Q    All right.

21   A    -- because I was too shaken up, because

22   he was forced himself passed my wife and my

23   18-month-old child.

24   Q    And sat down?

25   A    Huh?

```
 1          Q     And sat down?

 2          A     Yes.

 3          Q     All right.  Did he sit on the couch

 4   across from the door?

 5          A     Yes.

 6          Q     And did he stay there until the police

 7   arrived?

 8          A     Yes.

 9          Q     All right.  When was the first time you

10   saw the tablet?

11          A     The first time I seen the tablet is when

12   he forced in -- he forced his way into the house,

13   and he sat down, and he had pulled it out from in

14   the front of his pants and sat there.

15          Q     You initially first told your wife to

16   leave?

17          A     Yes.

18          Q     All right.  Now, you did that before you

19   asked Tim to leave?

20          A     I did that right after I got my wife

21   loaded up in the vehicle, and then I had asked him

22   to leave very calmly.  And then he was like, No, and

23   I said, Okay, so you don't want to leave, then I'll

24   go ahead and stay outside -- that's when I told

25   myself I'm going to sit outside until law
```

```
1    enforcement got there to be able to properly take
2    care of the situation that was at hand.
3         Q    All right.  You look like a big guy?
4         A    Yes.
5         Q    All right.  You could have taken care of
6    him if you wanted to?
7         A    Yes.
8         Q    All right.  Mr. Malone never threatened
9    you, though?
10        A    No.
11        Q    All right.  He just begged you to stay?
12        A    Yes.
13        Q    All right.  First, he said, No?
14        A    Yes.
15        Q    Then you said, Okay, I'm just going to
16   let you stay --
17        A    Stayed outside and -- stay outside so law
18   enforcement could properly take care of the
19   situation instead of myself --
20        Q    Right, right.
21        A    -- because I just got released from
22   county jail probably a year before that; so
23   therefore, instead of going and getting myself into
24   even more trouble -- because I had been doing good,
25   see what I'm saying, at that point.
```

```
 1           Q      Right.
 2           A      And I wasn't about to go and get back
 3     into any trouble, because I vowed to myself and my
 4     son that I would not get into no more trouble.
 5           Q      Okay.  So then you went out, and you made
 6     sure your wife and son were okay?
 7           A      Yes.
 8           Q      All right.  And they were?
 9           A      They were --
10           Q      All right.
11           A      -- they had left.  They had pulled down
12     the road, and that's when law enforcement came up
13     there with my wife.
14           Q      Well, not right away, because isn't it
15     true --
16           A      Yes.
17           Q      -- that for five, ten minutes --
18           A      Yes.
19           Q      -- you went back in the home --
20           A      No, I did not go back into that house.
21           Q      -- and chatted -- and chatted with Tim?
22           A      No.  I sat outside and -- until law
23     enforcement got there.
24           Q      It's an old case, so let me make sure.
25                  (Perusing documents.)
```

```
 1              Okay.  So you chatted with him for

 2      five-to-ten minutes before you went out?

 3          A    Yes.

 4          Q    Okay.  And during that time, the five,

 5      ten minutes, that was after -- that was after Tim

 6      asked to say, you said, No, and then you finally

 7      said, Okay?

 8          A    And that's when I had walked outside, and

 9      I stayed there until law enforcement got there --

10          Q    Okay.

11          A    -- to take control of the situation

12      properly.

13          Q    Okay.  And you never told the police

14      and -- and said that I want Tim arrested for armed

15      trespassing?

16          A    No, sir.

17          Q    Okay, thank you.

18              THE COURT:  Any redirect?

19              MR. BUSTAMANTE:  No, Your Honor.  Lisa

20          Mathews.  And, Your Honor, he may be excused.

21              THE COURT:  All right.  Mr. Matthew --

22          any objection, Mr. Rupert --

23              MR. RUPERT:  Yes, sir.

24              THE COURT:  -- to him being excused?

25              MR. RUPERT:  Yes.
```

```
 1              THE COURT:  All right.  So you're free to
 2        go about your day.
 3              MR. RUPERT:  No, no, no.  He needs to
 4        stay.
 5              THE COURT:  Okay.  All right, tell Mr.
 6        Mathews that he needs to stay.  Yeah, all
 7        right, just tell him.
 8              While Mrs. Mathews is coming in, can I
 9        see Counsel at sidebar?  This can be off the
10        record.
11              (An off-the-record discussion was had
12        outside the hearing of the jury.)
13              All right.  Can you raise your right
14        hand?  Do you swear or affirm any testimony you
15        give the jury today will be the truth, the
16        whole truth and nothing but the truth, so help
17        you God?
18              THE WITNESS:  I do.
19              THE COURT:  Thank you, please be seated.
20                      DIRECT EXAMINATION
21    BY MR. BUSTAMANTE:
22        Q    Good afternoon.
23        A    Hello.
24        Q    Can you please tell us your name?
25        A    My name is Lisa Mathews.
```

```
1          Q     And what do you do for a living?

2          A     What do I do for a living?

3          Q     Yes.

4          A     I'm a manager, slash, driver at Domino's

5    in Keystone.

6          Q     And how long have you been employed in

7    that capacity?

8          A     Almost, five years now.

9          Q     Okay.  Do you enjoy the job there?

10         A     Yeah.

11         Q     Yeah.  Do you have a child?

12         A     I do --

13         Q     Okay.

14         A     -- he's four.

15         Q     He's four, okay.  And what year was he

16   born?

17         A     2017.

18         Q     Okay.  Give me the date of birth.

19         A     March 15$^{th}$.

20         Q     Of 2017?

21         A     Yes, sir.

22         Q     Let me bring you back to May 12$^{th}$, 2018,

23   okay.  Where were you living?

24         A     The Lost Valley Campground in Starke.

25         Q     Were you living there long?
```

```
1            A     No.

2            Q     No.  And who were you living there with?

3            A     My husband, Scott Mathews, and my child,

4     Isaiah.

5            Q     Okay.  It was a small place?

6            A     Yeah.

7            Q     And did anything unusual happen in that

8     evening?

9            A     We were just getting home.  Like, we

10    weren't home for like two minutes --

11           Q     Okay.

12           A     -- from eating dinner with my parents.

13           Q     And when you say, "we," who is we?

14           A     Oh, me, Scott and Isaiah.

15           Q     Okay.  And let me ask you this, where did

16    you go to dinner to?

17           A     We went to their house in Keystone.

18           Q     That's where you had dinner at?

19           A     Yes.

20           Q     Okay.  And so, you said you were only

21    there for a short period of time; you were going

22    from your car to -- to your place?

23           A     Yes.  I parked behind the camper --

24           Q     Okay.

25           A     -- so I walked around and went in the
```

1    door, that was it.

2        Q    So that's a very short distance?

3        A    Yes.

4        Q    Right.  And you opened your door and went

5    inside?

6        A    Yes.

7        Q    Where did you have Isaiah at the time?

8        A    He was in my right hand.

9        Q    So I'm doing the math, 13 months or so,

10   14 months?

11       A    Yes, something like that.

12       Q    Something like that --

13       A    Uh-huh.

14       Q    -- okay, because March of 2017 to May of

15   2018, and that's 12 -- 14 months?

16       A    Yeah.

17       Q    Something like that.  Was he already

18   walking and everything like that?

19       A    A little bit, he was trying.

20       Q    And would you be carrying him around,

21   that's something that's normal at the time?

22       A    Yes.  Oh, yes.

23       Q    Okay.  So once you -- you're now into

24   the -- into your place, what happened?

25       A    I had just closed the door, and I set the

1    keys down on the counter right beside the door, and

2    I went to turn around to take Isaiah to the couch,

3    and someone knocked on the door --

4         Q    Okay.

5         A    So I turned around to open the door and

6    that's when I seen Timothy.  Well, I didn't see him

7    at first, I thought it was my stepdad, so I opened

8    the door --

9         Q    Okay.

10        A    -- because I just thought it was him.

11        Q    You called him Timothy, did you know who

12   he was?

13        A    I had no idea who he was.

14        Q    Okay.  And then, what happened; did you

15   say, hey, who are you, and what do you want, kind of

16   thing, or what happened?

17        A    I -- I told him, Hold on, because I had

18   no idea who he was, and I went to turn around to get

19   Scott, but the guy said, No, let me in, and that's

20   when Scott came running from the kitchen area,

21   because he was in the bathroom.

22        Q    Yeah.

23        A    And he came running in there, and that's

24   when he said, That's that guy.  And he just pushed

25   himself in as I'm trying to talk to Scott, so I just

1    grabbed my keys and took Isaiah out the door, so

2    that -- I didn't want to be around any of that.

3        Q    Did it seem like a dangerous situation

4    for you?

5        A    I mean, since I was pretty much kind of

6    shoved out of the way to get out -- or get -- or for

7    him to get in, it kind of worried me, because my

8    child was more important than anything else.

9        Q    Okay.  And when you went outside, what

10    did you do?

11        A    I went around the camper, got in my car,

12    and I backed up and was driving.  And I called my

13    stepdad to see where he was at, because he was

14    already coming that way.  He was bringing us the

15    rest of our clothes, because we washed our clothes

16    at his house, and that's when I told him what

17    happened.  And I guess, he handed the phone to my

18    mom, which is Joyce Davis, and I was talking to her,

19    and he -- I heard him on the phone already calling

20    the cops, so I just didn't do it --

21        Q    Okay.  So --

22        A    -- because he had already done it.

23        Q    All right.  Did that kind of freak you

24    out?

25        A    I mean, yeah, because I had no idea who

1  it was, and he just came in my house, and after I

2  said, No.

3      Q    Do you see that person in the courtroom

4  today?

5      A    No, I haven't, because I recognize -- I

6  didn't even have a chance to look at who it was.

7      Q    Okay.  Did the person who went into your

8  home, is -- that person was arrested?

9      A    I -- I guess so.  I didn't see him

10  arrested.  I didn't see any of that, so --

11      Q    Were you keeping Isaiah away from

12  everything?

13      A    Yeah, I was keeping Isaiah from all of

14  it.

15          MR. BUSTAMANTE:  I have nothing further.

16          THE COURT:  Cross?

17                CROSS EXAMINATION

18  BY MR. RUPERT:

19      Q    Good afternoon.

20      A    Hello.

21      Q    The door of your camper, which way does

22  that door open?

23      A    Outward.

24      Q    So you heard a knock on the door?

25      A    Yes, sir.

```
1          Q    All right.  And you opened the door to

2     let whoever was out there to come in?

3          A    Yeah.

4          Q    All right, but you were mistaken on who

5     it was?

6          A    Yeah.  I just had thought it was my

7     stepdad.

8          Q    All right.  And it opened, and the person

9     came in?

10         A    No.  He didn't come in yet.  I said, Hold

11    on.

12         Q    Okay.

13         A    He hadn't had come -- he didn't come in

14    yet until I turned around to talk to Scott --

15         Q    All right.

16         A    -- to see, because I didn't know who it

17    was.

18         Q    All right.  And which hand did you have

19    Isaiah?

20         A    I had Isaiah in my right hand.

21         Q    All right.  And Scott was to your right

22    or to your left?

23         A    Like toward this way.  He was like this

24    way.

25         Q    So he turned like this, away from the
```

```
 1   door (demonstrating)?
 2        A    Yeah.
 3        Q    All right.  And you said, Hold on, is
 4   that when the individual came in?
 5        A    Yeah, he just came in anyways.
 6        Q    Okay.  And how long was it before Scott
 7   said, go ahead and go outside?
 8        A    Like right away, as soon as he came in.
 9   Like, he was coming in the door, and Scott just told
10   me to take Isaiah and go.
11        Q    Okay.  And I think you described the --
12   the brush by as -- and said, No, he just nudged me a
13   little bit, that was all?
14        A    Yeah, my hand was on the door, and he
15   just pretty much nudged my hand.  But instead of him
16   hurting me or my child, I just moved my hand out of
17   the way.
18        Q    Right.  He was walking by, and he -- as
19   he was walking by, he nudged you?
20        A    Uh-huh.
21        Q    Is that -- you've got to say, yes or
22   no --
23        A    Oh, yes.
24        Q    -- for the court reporter.
25        A    Yes.  I'm sorry.
```

274

```
 1         Q     All right.  So your husband remained
 2    inside?
 3         A     Yes.
 4         Q     All right.  For about five-to-ten
 5    minutes; is that right?
 6         A     Yes, sir.
 7         Q     Okay.  And he was talking to Mr.
 8    Malone --
 9         A     Yes --
10         Q     -- Tim?
11         A     -- I would assume so, yes.
12         Q     To Tim, right?
13         A     Yeah.
14         Q     Now, your husband looked like he was a --
15    a pretty big dude, right?
16         A     Yes.
17         Q     You agree with that?
18         A     Yeah.
19         Q     And much bigger than Tim; is that right?
20         A     Yeah.
21         Q     All right.  And you know your husband, if
22    he wanted him out of the camper, he would have
23    thrown him out?
24         A     Yeah.
25         Q     All right.  And you couldn't hear any
```

```
 1    conversation inside of the camper at the time?

 2         A    No.  I wasn't -- I had gotten in the car

 3    and left, so...

 4         Q    All right.  Is the -- on the knock, is

 5    that the knock on the door, or did he knock to the

 6    side; do you know where the knock came from?

 7         A    I don't know.

 8         Q    All right.  So is your door solid all of

 9    the way through?

10         A    Yes.

11         Q    All right.  So it's not just a situation

12    where the door's just a curtain that you'd rip open?

13         A    No, it's an actual door.

14         Q    All right, with hinges?

15         A    Yes.

16         Q    All right.  And it opens outward, like

17    all campers?

18         A    Yes.

19         Q    All right.

20              MR. RUPERT:  May I have a moment, Your

21         Honor?

22              THE COURT:  Yes.

23    BY MR. RUPERT:

24         Q    Okay.  You never asked the police that

25    day to have Tim, that individual that -- that nudged
```

1    passed you, to be arrested for armed trespass?

2        A    I just didn't want to be in anything --

3        Q    Right.

4        A    -- that's why I never said anything.

5        Q    Right.

6        A    I'm pretty -- I was -- from what Scott

7    told me, he was in enough trouble and whatever, that

8    I didn't need to.

9        Q    Yeah.  And you'd leave that to -- to

10   Scott anyway; you'd leave that decision up to Scott

11   anyway?

12       A    Yeah --

13       Q    Yeah.

14       A    -- I left whatever up to Scott.

15       Q    Right.  All right, thank you.

16            THE COURT:  Any redirect?

17            MR. BUSTAMANTE:  Just briefly.

18                 REDIRECT EXAMINATION

19   BY MR. BUSTAMANTE:

20       Q    Your husband, he's tall and thin --

21       A    Yeah.

22       Q    -- right?  And did you ever see this,

23   (indicating)?

24       A    No.

25       Q    No.  Do you think that you -- you know

1    husband, if somebody had this kind of thing, do you

2    think he would be afraid?

3          A     I mean, I'm sure he would.

4                MR. RUPERT:  Your Honor, I'd object to

5          this -- this kind of speculation.

6                THE COURT:  Overruled.

7                MR. BUSTAMANTE:  Nothing further.

8                THE COURT:  (Indiscernible.)

9                THE WITNESS:  Thank you.

10               THE COURT:  Next witness?

11               MR. BUSTAMANTE:  At this time, the State

12         will announce rest.

13               THE COURT:  So ladies and gentlemen, if

14         you will, with the State having announced rest,

15         I need to take up some matters briefly outside

16         of your presence, so let's make this your

17         mid-afternoon break.  Let's leave all of the

18         pads sitting down.  Remember, don't start

19         discussing the case among yourselves, and this

20         will be at least a 15-minute break, okay.

21               (Jury exits the courtroom.)

22               All right.  Let the record reflect the

23         ladies and gentlemen of the jury are out of the

24         courtroom on a break and a recess.  Everyone

25         may be seated.  The State having announced

1    rest, Mr. Rupert.

2        MR. RUPERT:  Your Honor, I would, at this

3    time, renew all prior objections.  I would -- I

4    would move to have the allegations dismissed as

5    a result of Brady violation, Giglio violation,

6    in that Deputy Sumner failed to preserve the

7    bodycam evidence that potentially had

8    exculpatory information.  I believe the

9    testimony from him was that -- that he just --

10   he really had no information on how it

11   happened, and given the fact that there was the

12   incident with the tase gun and the arrest, that

13   it would show that it was purposeful.

14       As to the armed trespass count, I would

15   submit to the Court, respectfully, that he was

16   never -- there was no trespass warning for him.

17   There was no sign at the door, that he was

18   allowed in.  He came in when -- when the door

19   was opened for the individual at the door to

20   come in.  He did come in, and he nudged passed

21   Lisa Mathews.  At that time, Scott Mathews

22   asked him to leave.  He -- my client, Tim

23   Malone, said can I stay.  Scott Mathews

24   after -- after that, said on the record, under

25   oath, that he gave consent and allowed Timothy

1          Malone to stay, so he had consent to stay, so

2          it can't be any trespass on that.

3               I'd also move for a judgment of acquittal

4          as to the grand-theft charge.  Clearly, from

5          the testimony of the victim, it was indicated

6          that he would have some knowledge, the value of

7          that tablet is less than $300; therefore, I

8          would believe the Court would find that it was

9          insufficient evidence to sustain a felony

10         conviction on that.  And I would submit to the

11         Court on the remaining counts that the State

12         has failed to meet their burden even in the

13         light most favorable to the State.

14              THE COURT:  The State may respond.

15              MR. BUSTAMANTE:  In regards to the theft,

16         it is clear that the Defense -- the witness

17         said it was $200, and so the grand-theft count,

18         I think that the State will agree, that has not

19         been proven up to the satisfaction, up to --

20         even the light most favorable to the State,

21         will agree that at least they can consider a

22         petit-theft count, which is between $100 and

23         $300 or less if the jury has deemed that that

24         wasn't necessary, and they were only -- it was

25         less than 100.

1            However, the State, in the other counts,

2      has clearly shown, at least to the light

3      most -- most favorable to the State, that at

4      least each one of the elements of the offenses

5      have been proven.  And we request that the

6      motion in those counts be denied.

7            THE COURT:  All right.  Due to the

8      evidence and the light most favorable to the

9      State, the motion is denied as it -- as it

10     relates to 1, 2, and 4.  As to 3, on the issue

11     of the grand-theft amount, as you have

12     indicated for the record, and everyone concurs,

13     that will be granted as to the amount of $300

14     or more being put to the jury.  The theft

15     instruction would afford them still the

16     opportunity, so the grand theft is granted, and

17     it will be reduced down to a petit-theft

18     consideration for them to determine a value.

19     If they can't, which would be either under 100

20     or between 100 and 300.

21            MR. RUPERT:  Under 300 and over 100?

22            THE COURT:  Under 100, which would be an

23     M2, or between 100 and 300, which would be an

24     M.

25            MR. RUPERT:  Okay.

1          THE COURT:  The fel- -- there's no option

2     for a felony conviction --

3          MR. RUPERT:  Yes, sir.

4          THE COURT:  -- based on the evidence

5     represented as it relates to the theft of the

6     tablet.

7          MR. RUPERT:  Yes, sir.

8          THE COURT:  I -- I know you-all told me

9     you already made the decision.  Do you want to

10    go ahead and do the colloquy of Mr. Malone at

11    this time?

12         MR. RUPERT:  Yes.

13         THE COURT:  All right.  Mr. Malone, if

14    you will raise you right hand for me.  Do you

15    swear or affirm any testimony you give the

16    Court will be the truth?

17         MR. MALONE:  Yes, I do.

18         THE COURT:  You may put your hand down.

19    So, Mr. Malone, this is one of those times in a

20    trial where I have agreed to discuss with you

21    about some matters.  With the State having

22    announced rest, Mr. Rupert's indicated that in

23    his discussions with you, you had made a

24    decision to testify, so I just want to ask you

25    some questions about that.  I want to make sure

```
 1          that most of the decisions that get made during

 2          the course of a trial, they're considered

 3          strategic or tactical decisions.  And in all

 4          decisions that are strategical or tactical, Mr.

 5          Rupert gets the final say on it; you understand

 6          that?

 7                  MR. MALONE:  Yes, sir.

 8                  THE COURT:  The decision to testify or

 9          not is not strategic or tactical decision; it's

10          one that rests exclusively with you; do you

11          understand that?

12                  MR. MALONE:  Yes, sir.

13                  THE COURT:  So do you feel like you've

14          had sufficient time to talk to Mr. Rupert and

15          consider the decision about whether or not you

16          are going to testify in this trial?

17                  MR. MALONE:  Yes, sir.

18                  THE COURT:  Do you need any additional

19          time?

20                  MR. MALONE:  No, sir.

21                  THE COURT:  And what is the decision

22          you've made in that regard?

23                  MR. MALONE:  To testify.

24                  THE COURT:  You are going to testify?

25                  MR. MALONE:  Yes, sir.
```

```
1              THE COURT:  And is that a decision that
2         is of your own free will?
3              MR. MALONE:  Yes, sir.
4              THE COURT:  Has anyone threatened you or
5         coerced you in any way to make that particular
6         decision?
7              MR. MALONE:  No, sir.
8              THE COURT:  Has anyone promised you
9         anything in particular to get you to make that
10        particular decision?
11             MR. MALONE:  No, sir.
12             THE COURT:  And you -- you do understand,
13        as you have seen play out with some of the
14        other witnesses and has been a part of some of
15        the motions and things we've discussed, you do
16        understand that by taking the stand, the jury
17        will get to know the same information that they
18        were entitled to know about other witnesses,
19        and that is how many felony convictions and/or
20        whether there were in addition to and where
21        there were any crimes of dishonesty; you
22        understand that by testifying, they'll get to
23        know those numbers?
24             MR. MALONE:  Yes, sir.
25             THE COURT:  Okay.  And you also
```

1    understand that I'll give them an instruction

2    that tell them that they'll have to weigh your

3    testimony in the same manner that I'll describe

4    to them that they're supposed to weigh every

5    other witness's testimony; you understand

6    that's -- that's one of the consequences by

7    taking the stand?

8         MR. MALONE:  Yes, sir.

9         THE COURT:  Okay.  And again, this is

10   your decision ad no one else's?

11        MR. MALONE:  Yes, sir.

12        THE COURT:  All right.  And, Mr. Rupert,

13   I think you indicated on Tuesday, other than

14   Mr. Malone, you don't have anyone else you

15   intend to call?

16        MR. RUPERT:  Correct.

17        THE COURT:  All right.  Mr. Malone, are

18   there any other witnesses you wanted Mr. Rupert

19   to call, that -- that you understand now aren't

20   going to be called?

21        MR. MALONE:  I would have liked a couple

22   of witnesses, but it is what it is.

23        THE COURT:  Okay.  Are you satisfied to

24   this point with the services of Mr. Rupert in

25   your case?

```
1              MR. MALONE:  We're butting heads here,
2        because he's not -- the -- the witnesses that
3        are on the stand are totally testifying to
4        something totally different to the depositions,
5        and I'm trying to get him to confront them with
6        the depositions for impeachment purposes, and
7        he's telling me there is no impeachment when
8        they're clearly saying different from what they
9        testified to under oath.  And -- which is why I
10       asked Mr. Scott -- the State, because there was
11       another individual there at that -- they're
12       completely omitting that from the jury.  My --
13       my thing -- my point is, if I forced my way
14       into somebody's home, and I pushed a lady
15       that's holding an infant child, and there's two
16       adult men in his home that have me by height
17       well over four or five inches and outweighs me
18       by 40 pounds, why would you-all not intervene.
19       And these are the things that I -- that I'm
20       trying to get my counsel to ask, that are --
21       and I can't -- it's just -- I don't understand
22       it.  It -- like I said, the testimony from
23       several of the witnesses so far has gave direct
24       and opposite answers in their depositions, and
25       I -- I just -- for the record, I -- we're
```

286

```
 1          butting heads on that issue.
 2                THE COURT:  All right.
 3                MR. MALONE:  I mean, other than that,
 4          he's doing a good job up here arguing.
 5                THE COURT:  But that -- that's the only
 6          complaint or issue you want to bring to my
 7          attention to at this time?
 8                THE WITNESS:  Well, I had another Brady
 9          issue that I wanted to bring to the Court's
10          attention.  It's clear that the witnesses
11          already stated that -- that there was pictures
12          taken of him after the fact.  I told my counsel
13          prior and -- and months prior about these
14          pictures.  These pictures were taken with the
15          same camera that all of the evidence was taken
16          with, because I seen it.
17                Now, these pictures now that has
18          testified that has -- that has come out, it's
19          not in the evidence.  It's not there.
20                THE COURT:  Pictures of what?
21                MR. MALONE:  Of Mr. Pardekooper, after
22          the fact.  It was taken -- those pictures were
23          taken behind the police car as I sat in the
24          police car.
25                THE COURT:  Okay.  What do you think they
```

1      would show?

2           MR. MALONE:  They -- they would show his

3      wound, a total different -- in a total

4      different light.  On top of that, the question,

5      why are they omitted and the rest of the

6      pictures not and the missing video on top of

7      that, and it's the same officer.  And --

8           THE COURT:  So I don't want to get too

9      far off -- out of the lane in what I'm really

10     asking you about.  You understand that Mr.

11     Rupert has no control over whatever happened to

12     a bodycam --

13          MR. MALONE:  I understand.

14          THE COURT:  -- video, or if one existed

15     or didn't exist, or if it didn't get uploaded,

16     or -- or whatever happened; you understand that

17     he can't do anything about it?

18          MR. MALONE:  I understand that --

19          THE COURT:  Or argue for its production.

20          MR. MALONE:  -- but now I can't call Mr.

21     Sumner back up and rebut his testimony about

22     these pictures that were on the same disk that

23     were supposed to be as the rest of the

24     evidence.

25          THE COURT:  I don't -- I guess what

```
 1        I'm -- I'm lost on, Mr. Malone, is what do you
 2        think it's going to show --
 3             MR. MALONE:  Because I --
 4             THE COURT:  -- that's in a different
 5        light --
 6             MR. MALONE:  -- seen Mr. Pardekooper.  He
 7        come up to the window, and I seen him,
 8        personally, and -- and after it was glued back
 9        together, with glue, not stitches or none of
10        that.  It was glued.  You could barely even
11        tell that he had -- and --
12             THE COURT:  But he wasn't glued, that's
13        not what these pictures would show; you're
14        saying they're at the scene.
15             MR. MALONE:  At -- at the scene of my
16        arrest.
17             THE COURT:  Right.
18             MR. MALONE:  Yes, so what I'm saying
19        is -- is, I'm being prejudiced, because the
20        pictures that -- that you're showing the jury
21        of him opened up versus what it looks like
22        two-hours later, is --
23             MR. RUPERT:  This was after he came back
24        from the hospital.
25             MR. MALONE:  And --
```

```
1              THE COURT:  So you want to put pictures
2        in of his injury, post-treatment, by
3        (indiscernible) --
4              MR. MALONE:  And it was already -- it
5        was -- and it's estab- -- I seen the pictures
6        being taken, as he took pictures of the laptop,
7        as the --
8              THE COURT:  I hear you.  But that's your
9        point, you --
10             MR. MALONE:  And the witness testified
11       that the pictures were taken, but we don't have
12       the pictures.
13             THE COURT:  Right, right.  And you're
14       upset that the jury can't see what the --
15             MR. MALONE:  I feel --
16             THE COURT:  -- what his injury looked
17       like that night, post-medical treatment?
18             MR. MALONE:  -- I feel like that is a
19       deliberate Brady violation.  That is a
20       deliberate, intentional -- if it's on the same
21       camera, it's in the same camera, why would you
22       not submit that to the Court with everything
23       else.  And the same officer, the evidence just
24       keeps coming up missing, the axe, the video,
25       now the pictures.  And -- and for the record,
```

```
1      that's -- I mean, it's got -- why can't the

2      jury be presented with that?  Why can't they be

3      presented with that argument?

4           THE COURT:  Well -- okay.  I mean, I'll

5      defer to Mr. Rupert on what arguments he can

6      and can't make as it relates to the fact that

7      there's no video.  But any other issues, or

8      does that pretty much sum up --

9           MR. MALONE:  That --

10          THE COURT:  -- where you're at here; does

11     that sum it up?

12          MR. MALONE:  That sums it up.

13          THE COURT:  Okay.  Anything you want to

14     put on the record, anything further about any

15     of this, Mr. Rupert?

16          MR. RUPERT:  No, Your Honor.

17          THE COURT:  State, anything further?

18          MR. BUSTAMANTE:  No, Your Honor.

19          THE COURT:  So a short break until we

20     bring them back in in a few minutes and do Mr.

21     Malone's testimony?

22          MR. RUPERT:  Yes, sir.

23          MR. BUSTAMANTE:  That's fine.

24          THE COURT:  All right.  Just a very short

25     break.
```

1          MR. RUPERT:  Yes, sir.

2          (Short recess.)

3          THE COURT:  We're back on the record in

4    the State versus Timothy Malone, 18-CF-246.

5    Mr. Malone is present with Counsel.  State's

6    present with Counsel.

7          Mr. Rupert, did you want to put something

8    on the record?

9          MR. RUPERT:  Yes, Your Honor, thank you.

10   Number one, my client has voiced concerns over

11   information not -- not gleaned from the Mathews

12   on cross-examination due to the fact Ben

13   Cribes, who was at their residence.

14         THE REPORTER:  Who was?

15         MR. RUPERT:  Ben Cribes, C-r-i-b-e-s.

16   Was at the residence at the time that Mr.

17   Malone was charged with the armed trespassing.

18   For the record, I asked Mr. Bustamante to come

19   with me.  We spoke to each -- each of those

20   witnesses separately, told them not to talk to

21   each other afterwards about what it is we were

22   asking them.  We asked them both if Ben Cribes

23   was there.  Scott Mathews said, Yes, he was

24   there, but he wasn't inside, and he was outside

25   smoking a cigarette at the time, and he

1    wouldn't know if he saw anything.  So -- and

2    there's nothing in his deposition that -- that

3    I saw that would impeach that.  So my

4    recommendation to my client is, we don't need

5    to call Scott Mathews.

6         I relayed the same information to my

7    client about Lisa Mathews.  I -- I spoke to

8    Lisa Mathews.  She knows -- she knows Ben

9    Cribes.  She's got no idea if Ben Cribes was

10   there.  She remembers he was there earlier in

11   the day, but she just got back from dinner.

12   She went right in the house.  Shortly

13   thereafter, very quickly, is when Mr. Malone

14   came in, so she couldn't tell you if Mr. Ben

15   Cribes was inside or outside at that point.

16        THE COURT:  Sure.

17        MR. RUPERT:  So we were looking through

18   depositions.  My client indicated to me there

19   was some -- either refreshing or impeachment

20   information, and we were just looking through

21   the second deposition, which is shorter, to see

22   whether or not there's anything in there that

23   would necessitate calling her back as a witness

24   in our case.  And if not, then we can release

25   them, so I was just -- we were just right at

1    the cusp of that when the Court walked in, but

2    that's something that we're trying to cure.

3         THE COURT:  Well, yeah, I -- I don't know

4    that I will delay the proceedings any longer

5    for that.  I don't know whether Mr. Malone is

6    prepared to testify now --

7         MR. RUPERT:  Yes, sir.

8         THE COURT:  -- and I don't know whether

9    the State wants these folks to remain as

10   potential rebuttal or not.  So maybe it is that

11   we just address it when his testimony is over.

12        MR. RUPERT:  Yes, sir.

13        THE COURT:  Okay.  So let's bring them

14   in.

15             (Jury enters the courtroom.)

16        Let the record reflect that the ladies

17   and gentlemen of the jury are all making their

18   way into the courtroom.  Everyone may be

19   seated.  With the State having announced the

20   rest of their case.

21        Mr. Rupert?

22        MR. RUPERT:  Yes, Your Honor.  The

23   Defense will call Timothy Malone to the stand.

24        THE COURT:  Mr. Malone, if you can make

25   your way to the witness stand, please.  If you

```
 1        will raise your right hand for me.  Do you

 2        swear or affirm any testimony you give this

 3        jury today will be the truth, the whole truth

 4        and nothing but the truth, so help you God?

 5              THE WITNESS:  Yes, sir.

 6                    DIRECT EXAMINATION

 7   BY MR. RUPERT:

 8        Q    Please tell the jury your full name.

 9        A    Timothy Gene Malone.

10        Q    How old are you, sir?

11        A    42 years old.

12        Q    Do you know Mr. Pardekooper?

13        A    Yes, sir.

14        Q    How do you know him?

15        A    I -- I know him, we used to live

16   together.  I lived in Lost Valley Campground, and he

17   lived in a camper behind Lost Valley Campground.

18        Q    And when was this?

19        A    This was in 2018, the early part of 2018.

20        Q    Early part, February, March?

21        A    About -- around then, end of April and

22   the first of May.

23        Q    All right.  So tell me about how you knew

24   him.

25        A    A friend of mine, Leroy McCaullie, he was
```

```
 1    the only person I knew in this county.  I'm not from
 2    here.  He asked me to go with him to pick Matthew
 3    Pardekooper and his girlfriend up, because they were
 4    stranded on the side of the road.  We went -- I -- I
 5    believe it was -- it's called Griffis Loop.  There's
 6    a Circle K right there, if anybody's familiar with
 7    Bradford County.  They were right there at that
 8    four-way stuck in the road.  Their Mazda -- they had
 9    a white Mazda and three dogs in it -- and Matthew
10    Pardekooper and Tracy, and their truck was broke
11    down.
12         Q    Tracy was the girlfriend?
13         A    Tracy was his girlfriend.
14         Q    Tracy Wakes?
15         A    Tracy Wakes, yes, sir.  And so we towed
16    them back to the campground --
17         Q    And that's the first time you met him?
18         A    That's the very first time I met him,
19    yes, yes, sir.
20         Q    All right.
21         A    And when we got them back to the
22    campground, there was some concern immediately from
23    the lady at the campground, that -- that owns the
24    campground.  She said she didn't want him in there,
25    because he -- she had trespassing warrants on him.
```

```
 1    He wasn't supposed to be there, and she had told me
 2    that he --
 3              MR. BUSTAMANTE:  Objection, hearsay.
 4              THE COURT:  Sustained.
 5              THE WITNESS:  Acts of violence.
 6    BY MR. RUPERT:
 7         Q    All right.  So are you aware of any
 8    specific prior acts of violence?
 9         A    Yes, sir.
10         Q    All right.  Tell me about that.
11         A    The lady at the campground told me that
12    she didn't want him at the campground, because he
13    had threatened to --
14              MR. BUSTAMANTE:  Objection.  Again, this
15         calls for hearsay, unless he has personal
16         knowledge of this other than hearsay.
17              THE COURT:  Can Counsel briefly approach
18         on the matter?
19              THE REPORTER:  Sorry.
20              THE COURT:  (Indiscernible.)
21              MR. BUSTAMANTE:  (Indiscernible.)
22              MR. RUPERT:  Yes, sir.
23              THE COURT:  So the objection's overruled.
24              MR. RUPERT:  Thank you, Your Honor.
25    BY MR. RUPERT:
```

1            Q    So you may answer the question.

2            A    Okay.  Ms. -- Ms. Harper told us that she

3     didn't want him in the campground, because she had

4     trespassing warrants on him, because prior to that,

5     he had become real violent and had threatened some

6     people or some residents in Lost Valley and tore up

7     one of her campers there.  And then after that, he

8     had threatened to kill her, so she called the

9     sheriff's department and had -- had him trespassed

10    from there.  She did tell us that she would allow

11    him to take a shower in the shower area, but she

12    didn't want him in the campground interacting with

13    nobody, and if anybody seen him, that he would be

14    arrested for that.  So that was my introduction of

15    Matthew Pardekooper.

16           Q    Day one?

17           A    Day one.  But, you know, I -- I'm the

18    type of person that I've had my own rocky roads, so

19    I don't -- you know, everybody's subject to a second

20    chance, so to speak.  Kind of in a way, Mr. Ruby

21    Harper was giving him a second --

22                THE COURT:  There wasn't a question

23           there.  Mr. Rupert, you can ask your next

24           question.

25                MR. RUPERT:  Yes, sir.

```
 1              THE COURT:  There's no question pending
 2       at the moment.
 3              MR. RUPERT:  All right.
 4   BY MR. RUPERT:
 5       Q    So what happened next?
 6       A    So what happened next is -- is, we -- we
 7   just started -- we became friends, and we tried to
 8   get the area back there together.  We were going to
 9   turn that area into a pond for like an animal
10   sanctuary, that was our plan.
11       Q    Now, you're talking about -- where is
12   Lost Valley?
13       A    Lost Valley is -- I think, it's on 144th
14   Avenue, right at the end before it turns into a dirt
15   road.
16       Q    And as you're driving it -- to it from
17   Starke, it would be on the right side of the road?
18       A    Yes, sir.
19       Q    All right.  And then on the right side of
20   the road, you have certain -- you've got Ruby
21   Harper's home, and then you've got some campers out
22   front; is that correct?
23       A    Yes, sir.
24       Q    All right.  Did you -- where did you stay
25   at?
```

```
 1        A    I stayed in a tent out front, on the
 2   first row.  I was in, actually a tent.  I was
 3   homeless, so I -- I lived in a tent.
 4        Q    Tent Number 4?
 5        A    Number 4, at Lot Number 4.
 6        Q    And where was this in relationship to
 7   where Mr. Pardekooper lived?
 8        A    They were directly behind us, probably a
 9   good 150-, 200-yards behind us.  There was a pond
10   back there.  The McCaullies were actually paying
11   the -- the taxes on -- on that property.  They
12   didn't own it, but they paid the taxes on it, so
13   they, I guess, were entitled to stay there.  They
14   had been for years, and --
15        Q    And that's where Mr. Pardekooper --
16        A    That's where --
17        Q    -- was squatting at?
18        A    Right.  That's where he was at.
19        Q    All right.  Now, tell the jury your
20   relationship with the McCaullies.
21        A    Roger was like my best friend.  I'm
22   down -- new down here.  I don't know nobody.  I have
23   no family.  I was -- stayed -- raised in Kentucky,
24   so he was like, to me, I considered him a brother, a
25   brother of mine, so I done -- I would do anything
```

1   for him, and he was the type of friend that didn't

2   have a negative influence on me.  He wasn't trying

3   to give me anything negative, so I -- I viewed that

4   in a positive manner, and I looked up to him.

5        Q    And did you know Scott Mathews?

6        A    Briefly, briefly.

7        Q    Okay.

8        A    I was introduced to him.

9        Q    By who?

10        A    Roger.  Roger and Carrie.  Carrie is --

11   is Roger -- Roger is Leroy.  I know him -- I called

12   him Roger.  His real name is Leroy McCaullie.  I

13   call him Roger, but Carrie was his wife -- is his

14   wife --

15        Q    All right.

16        A    -- so --

17        Q    And she lived there to?

18        A    Who, Carrie, yes, yes, sir.

19        Q    All right.  So it was just the three of

20   them in that one home?

21        A    Yes, sir.

22        Q    All right.

23        A    Or no, it's actually -- excuse me, I need

24   to verify.  It's Roger and Carrie in his camper.

25   There's a pop-up camper that has Matt and Tracy a

1    few yards over.

2         Q    Down by the pond?

3         A    Right, by the pond.

4         Q    All right.  All right, so what happens

5    next; is there any other prior, specific instances

6    of violence that caused you concern?

7         A    Yeah, there was several.  There was

8    several.

9         Q    Well, let's go in chronological order, so

10   we --

11        A    In chronological order, like I said, we

12   had pulled Matthew out of the road.  He was in a

13   white Mazda; his truck was broke down.  He

14   determined that the -- the truck problem was a fuel

15   pump, so we had went to the auto parts store, which

16   is on 301.  I think it's kind of somewhere around

17   the area of -- I'm not from here, excuse me, but I'm

18   wanting to say around McDonald's, around that

19   general area right there is an auto parts store.

20   And it was me Leroy and Carrie and -- and

21   Pardekooper, and I stayed out in the truck with

22   Carrie and -- and Leroy, and Pardekooper went into

23   the store.  But prior to this -- I -- I thought the

24   microphone went off -- prior to this, he had bought

25   a fuel pump, and he pulled his old fuel pump out and

1   put it in the box that the new one was in.  And when

2   we went down there, I thought he was trying to get

3   another fuel pump, turns out he's trying to return

4   this old fuel pump and get his money back, while he

5   put the new one in his truck.  The manager, or

6   whoever the store person was there, caught on to

7   that, and it -- there was an argument in the store

8   where Pardekooper got to tossing stuff around and --

9   and pushing stuff over in that store.

10         Leroy comes out and says, Tim, you've got

11  to help me get him in the truck, they're going to

12  call the police on us.  And then Matthew comes

13  barreling out, literally -- literally kicks the door

14  open with his foot and cussing back and towards the

15  store.  And then the employee comes out, and he's

16  mad.  He is hot, and he's ready to fight, and he's

17  got his phone.

18         I'm on State probation, and I can't have

19  that, and I'm upset.  And I -- quite frankly, Get

20  your dumb ass in the car and let's go.  I can't

21  handle this, that's what I said to him, and

22  that's -- and we loaded up, and we took out of

23  there.

24      Q    And you were concerned because, being on

25  State probation.  If law enforcement shows up, then

1    it gets directed to you?

2         A    It's -- it's over.  You get no -- if

3    you're right or wrong, if you're on probation and

4    law enforcement shows up, regardless of what the

5    State may tell you, you are going to jail.  You're

6    going for a while --

7         Q    Yeah.

8         A    -- until you try to sort it out.  It's --

9    you have no win there.

10        Q    All right.  So you do leave the auto

11   parts store?

12        A    Yes.

13        Q    All right.

14        A    At that point, I start advocating to get

15   rid of Pardekooper; I don't want him there.

16        Q    All right.  So who are you advocating to?

17        A    To Roger.

18        Q    All right.  And what are you telling

19   Roger?

20        A    I'm telling Roger, Look, man, this dude

21   ain't really fitting with our program.  We're not

22   trying to cause any waves or any ruckus.  We're to

23   do this.  You know, we have a really -- wanting to

24   do an animal sanctuary.

25             I was working, volunteering with -- with

1    the animal rescue here in Starke.  We were -- we had

2    a lot of ducks.  We were getting a lot of ducks, so

3    it was kind of like a duck sanctuary at that time.

4    But that was our goal, that was something for us to

5    look forward to, put our energy in and something to

6    do, something positive.

7            And this guy just was not -- and on top

8    of that, the -- the whole vibe that he brought with

9    us, nobody wanted him around, as far as in Lost

10   Valley.  Everybody was, hey, you've got to get that

11   dude out of here.  Y'all -- he needs, you know what

12   I'm saying.

13       Q    Did Pardekooper know that you were

14   advocating for him being removed?

15       A    I -- I didn't hide it.  I didn't hide it.

16   I give in.  At the end of the day, I -- you know

17   what I'm saying, all right, well -- you know what

18   I'm saying, but I -- whenever I voiced my concern, I

19   voiced my concern, and -- so I didn't hide it.  I

20   didn't hide the fact that I -- that I didn't like

21   his actions or attitudes at times.

22       Q    All right.  So what happened next?

23       A    Well, the -- the next time -- let's see

24   in chronological order -- I believe we were cleaning

25   out a house.  It -- it was rented by a Mandy Parker.

1    All of her furniture was left in there, and a lady

2    by the name of Ms. Margaret Barkham (phonetic) that

3    lived on the same property -- or adjoining property,

4    I should say, had paid us to move the furniture from

5    the house up to her part of the property, which was

6    a barn, like an antique -- and she paid us $100 to

7    split.  So -- so Pardekooper and I, we worked good

8    together.

9          We act- -- when we worked, we worked

10   really good together.  Were a good team when it

11   comes to moving furniture and doing things that

12   needed to be done, so we got the job done in about

13   two hours.  And when the job was done, he said, Hey,

14   I've got to go pick up Tracy, so we left out of

15   there.  He went and picked his girlfriend up from

16   the nursing home.

17         And then we left from there, he asked me

18   if I needed to go home right away.  And I'm like,

19   Well, I've got to be in by curfew, but it's -- it's

20   like six o'clock, you know what I'm saying, so

21   really -- I said, I would like to, you know, get me

22   a case of beer and go back to the -- to the back and

23   build a bonfire.  I have a little bit of time before

24   curfew.  If you can get me home before then, I'm

25   fine.

1          He's like, Oh, yeah, we'll do that.  So

2     he wanted to go purchase some marijuana.  And so we

3     left from the nursing home, and he drove to a

4     trailer park that -- it's kind of by Winn-Dixie here

5     in Starke.  I'm not for sure of the name.  It's just

6     that area, it's a little mobile home park over

7     there.

8          And he pulls in, and he gets out of the

9     truck and goes into a trailer to the left.  And to

10    the right, there's this great big guy.  He's -- he's

11    got real long hair, and there's somebody there with

12    him, and he says to me, Hey, are y'all here to

13    scrap.  And I wasn't comprehending what he was

14    telling me, because for the whole month or

15    month-and-a-half, me and Roger and Matthew and

16    everybody else that -- that I associate with, which

17    wasn't many, a couple of guys, would scrap -- would

18    get scrap metal, and that's what we referred to as

19    scrap.  Are you here -- so when he said, Are you

20    here to scrap, I'm -- Yeah, you've got some metal,

21    and I -- I didn't realize the seriousness of the

22    situation, because I wasn't -- it caught me off

23    guard.

24          Apparently, this was Matthew's

25    ex-roommates that he had had problems with, and he

1    had brought me over there to dangle in front of them

2    as -- I don't know, some type of intimidation

3    method.  Matthew come back and got in the truck and

4    didn't want to leave, and I'm telling him, Look man,

5    I -- these people are getting so agitated and

6    violent with his presence and with me being there

7    with him that they're starting to come in the truck,

8    like reaching towards the truck, and I have to grab

9    a -- a pipe wrench and literally swinging at this

10   guy.  And this guy's a pretty good size, and he

11   could have been a wrestler.  He was a good-sized

12   boy, a good -- good big country boy.

13          And he backed up, and I told Matthew,

14   Man, start the truck, get me out of here now.  I

15   can't -- I can't afford this, and I argued with him

16   all the way back home.  And he begs me, Please don't

17   tell Roger, please don't tell Roger what happened,

18   please don't tell Roger.  Of course, I tell Roger.

19   It was later on that night, and we had a bonfire

20   going.  And I'm upset about what happened, and I

21   tell Roger, so that was the second incident.

22        Q    Okay.

23        A    The third incident which was more

24   alarming probably than anything.  Matthew asked me

25   if I would go with him to pick up a -- a chainsaw

1    and a lawnmower that he had, and it was in a storage

2    at the beginning of 144th Street.  And I -- sure, I

3    ain't got no problem with it, so I get in the truck,

4    and we go pick up his -- his belongings out of the

5    storage, and Tracy is with us.  She's in the front

6    seat, and I'm in the backseat, and he's driving.

7         He's driving McCaullie's truck, and we're

8    coming back down 144th going back towards Lost

9    Valley.  And there's a man by the name of

10   Christopher Patterson that's pulling out of Last

11   Valley.  You can see him in the distance.  And for

12   some reason, at -- at that time that I didn't know,

13   Matthew just -- when -- when Chris got up on him, he

14   just jerked the steering wheel head on, head on, and

15   jerked really violently back and ran Chris nearly

16   off the road.

17        Q    They were going in the opposite

18   directions?

19        A    Opposite directions.  It was like -- and

20   it throwed me across the street.  And I -- you know,

21   being upset, I cursed a little bit, What the -- what

22   the F you got going on, man, what the -- and I

23   talked to Chris later on, and he -- Chris revealed

24   to me that the night of the trespass --

25        MR. BUSTAMANTE:  Objection, this is

1    hearsay.

2            THE WITNESS:  Well, Chris was --

3            THE COURT:  Mr. Malone, when there's an

4    objection, you need to wait for me to rule.  I

5    need to see Counsel at sidebar, please.

6            (The following side-bar conference was

7    had out of the hearing of the jury:)

8            THE COURT:  I don't even know what's

9    coming next.  I don't even know what it is,

10   because (indiscernible) you didn't have a

11   question pending.  It's a really long story,

12   series of narrative responses.

13           MR. RUPERT:  Yes, sir.

14           THE COURT:  (Indiscernible) response to

15   questions.  (Indiscernible) the second incident

16   had nothing to do with violence.

17   (Indiscernible) he's entitled to perhaps bring

18   up specific acts of violence, if and only if,

19   testifying he's (indiscernible.)

20           MR. RUPERT:  (Indiscernible.)

21           THE COURT:  (Indiscernible.)

22           MR. RUPERT:  I'll -- I'll narrow the

23   questions, Your Honor.

24           THE COURT:  (Indiscernible.)

25           MR. RUPERT:  Right.

1          THE COURT:  I don't know what the answer
2     is to be able to rule, whether it's about
3     (indiscernible) Mr. Pardekooper not doing
4     anything, and I'm getting tired of it.
5          MR. RUPERT:  He was Pardekooper's
6     roommate.  He was --
7          THE COURT:  I don't know if he
8     (indiscernible.)
9          MR. RUPERT:  Yeah.
10          THE COURT:  (Indiscernible.)
11          MR. RUPERT:  Yes, sir.
12          THE COURT:  So at this time, the
13     objection's sustained.
14     BY MR. RUPERT:
15          Q    Mr. Malone, if you could narrow your
16     answer to specific instances of violence by Mr.
17     Pardekooper, that would have been in your mind at
18     the time that he came at you with the axe.
19          A    Well, to be honest with you, at the time
20     that he came at me with an axe, sir, the only thing
21     in my mind was grab, turn around and spin and --
22     there wasn't no time to think.  There -- I mean,
23     there wasn't -- now, the predicate as leading on,
24     these are the things that happened before.
25          Q    Right.  These -- these are things that

```
 1    you had already known --
 2         A    Yes.
 3         Q    -- about Mr. Pardekooper and assessed Mr.
 4    Pardekooper --
 5         A    Yes.
 6         Q    -- to the reason why you needed to defend
 7    yourself?
 8         A    Yes, yes.
 9         Q    Okay.  Is there any other specific acts
10    of violence by Mr. Pardekooper, that would have been
11    part of your decision-making process?
12         A    At that time, no, I don't believe so.
13         Q    All right.  So that takes us to May 12th
14    of 2018 --
15         A    Yes.
16         Q    -- tell the jury how that day started
17    out.
18         A    Well, I woke up, went back to Leroy's
19    as -- as normal, as Roger and Carrie, and it was a
20    weekend, so I didn't have to work.  I worked in a
21    strawberry field, so I didn't have to work that day,
22    and the truck's gone.  I asked Roger, Where's the
23    truck, and he said, Well, Matt's got it.  He's
24    got -- he had to take Tracy to work, which is his
25    girlfriend.
```

1          I said, All right.  He said, Hey, when he

2     gets back, we're going to go to the pawn shop, do

3     you want to come with us; we're going to get a power

4     inverter.  I said, Sure, why not.

5          So we leave, we go into the pawn shop,

6     and as they're buying a power inverter, I see a

7     movie called Man on Fire, Denzel Washington.  And I

8     know this to be a great movie, the McCaullies hadn't

9     seen it, so I figured that I would just buy it, and

10    we'll watch it, because I could watch it 100 times.

11    So they bought the power inverter, I bought the

12    movie.  Matt, he didn't go with us, he stayed back.

13          When we came back, we hooked the power

14    inverter up, got the batteries and everything going,

15    so that the TV could operate, and we started to

16    watch the Man on Fire, and we being, both Carrie and

17    Roger McCaullie and Matthew and myself.  And we got

18    the door open, the truck -- the camper's like this,

19    the truck's parked parallel to the camper as such.

20    And towards the end of the movie, towards the -- the

21    latter part where it's getting good, where all the

22    action is taking place at, Matthew gets up and says,

23    Hey, I've got to go charge my phone, does anybody

24    need their phone charged.  And Carrie said, yeah,

25    take mine, and everybody wanted their phone charged,

1    Roger, take mine.  And he leaves, and he goes to the

2    truck to plug the phones in; I give him my phone, as

3    well.

4         I had a -- a phone.  It wasn't activated.

5    It's like an MP3 player to me.  It had an SD card.

6    Carrie used to download me movies when she can find

7    them, and I had about 600 songs on there and

8    roughly, probably 100 pictures of work that I took

9    in the strawberry fields or cleaning out houses,

10   stuff that I can show people the type of work that I

11   do.

12        And -- and he took that, he took my phone

13   out there, and I got -- I stood up, because I -- I

14   was using dip, and the door was open in the camper.

15   And I was going back and forth from my seat to the

16   door to spit, because I didn't want to spit in the

17   can, and some- -- it just dawned on me that this guy

18   has been gone for a few minutes, longer than what it

19   takes to plug in an SD card, so I -- I merely look

20   over there to tell him, Hey, man you're missing

21   the -- you're missing the best part, you're missing

22   the best part of the movie.  But when I look over

23   there, and -- and if I may -- I'm standing in the

24   door, like I said, the truck's there, and he's at

25   the -- the driver's side with the driver's side

1    open.  And I can see him with my phone, and I know

2    it's my phone, because it's the only one that's

3    shaped like that in that unique -- and he's got the

4    back off it, and he's trying to get the back back on

5    it.

6            So I -- I look at him and what we've got

7    going on, and so I -- I come down the stairs, and I

8    go to the passenger's side to the window, and I

9    looked through the window.  By the time I get to the

10   window, he's got the back on it.  He's done figured

11   out the right combination and got it on there.  And

12   I said, Matt, what you doing, and he said, Oh, I'm

13   just trying to figure out how to plug this thing in.

14   And he plugs the phone in, and then he leaves, but

15   instead of going back into the camper to watch the

16   movie that he just sat through an hour and

17   something, he goes the opposite direction.  And I

18   already know what time it is.  I already, you know

19   what I'm saying.  I pick my phone up and take --

20   take the thing --

21       Q    What's in the direction to where he's

22   walking?

23       A    Walking towards his camper, towards his

24   truck.

25       Q    And how far was that?

1       A       Probably a little further than them

2   doors.  His acc- -- his direction's probably

3   accurate on that, not -- it ain't too far.  It -- it

4   don't take you, but -- less than a minute to get

5   there, you know.  So he's walking that way, and I

6   take my back off the phone and low and behold, the

7   SD card's not there.  And I'm saying, what a creep,

8   what a creep.

9           So I said, Matt, you've got to give that

10  back.  Hold on, Matt, you've got to give that back.

11  And Matt, he's steady walking.  So I walk up to him,

12  and I said, Matt, give me my SD card back.  Well, I

13  ain't got your SD card, why would I steal your SD

14  card.

15          I said, Matt, bro, SD cards don't just

16  jump out of the back of the phone.  You know what

17  I'm saying, it takes some effort to get them out of

18  there, bro, give me my SD card back.  I ain't got

19  it.  I said, Matt, look, here's the deal, if you

20  just give me my SD card back right now, we'll just

21  forget that it ever happened.  We'll just go on

22  about the day, and I literally said it like that.

23          And then he went to go pulling out his

24  pockets.  Well, you can search me if you want to,

25  you can search me.  And the SD card is the size of

```
1    your fingernail.  He could put it in his mouth.
2    There's numerous places you can put it, so it was
3    fruitless; it was just a show.
4            So I said, You know what, here's how I'm
5    going to deal with this, I walked, I went over to
6    Leroy McCaullie, and I said, Roger, I said, Look,
7    the dude's stealing from us now.  I said, We already
8    knows he steals, but now, he's stealing from us.
9    He's stealing from us.  And when I say us, because
10   we considered ourself as family, that's what we were
11   supposed to be, is family.  He's stealing.
12       Q    Now, Lost Valley was a small community?
13       A    Very small.
14       Q    All right.  And -- and you talked to
15   those people in Lost Valley?
16       A    Yes.
17       Q    All right.  And did Mr. Pardekooper have
18   a reputation for stealing in that community?
19            MR. BUSTAMANTE:  I'm going to object --
20            THE WITNESS:  Yes.
21            MR. BUSTAMANTE:  -- in regards to the
22       foundation.
23            THE WITNESS:  But I can give my own
24       account on things I've seen him steal.
25            MR. BUSTAMANTE:  Objection again.
```

```
 1              THE COURT:  Sustained.
 2   BY MR. RUPERT:
 3        Q    All right.  Go ahead and finish.
 4        A    Okay, but -- so I go to Roger, and I tell
 5   him, Hey, look, dude's stealing, and Carrie's like,
 6   Man, this is bullshit, and -- and Carrie's mad.
 7   Carrie really doesn't like him.
 8              MR. BUSTAMANTE:  Objection, this is
 9         hearsay.
10              THE COURT:  Sustained.
11              THE WITNESS:  Oh, my goodness.  Am I
12         going to be able to testify to what happened?
13              THE COURT:  You can testify to things
14         that are legal for you to testify to, Mr.
15         Malone, not things that are improper.  So when
16         you hear an objection made, I need you to pause
17         to allow me to rule, and if I rule sustained,
18         then no, you cannot testify to that part.
19   BY MR. RUPERT:
20        Q    You saw Carrie McCaullie there?
21        A    Yes.
22        Q    All right.  And describe her reaction to
23   what you saw.
24        A    She -- she was pretty upset, because she
25   didn't like him anyways.  She was ready to get rid
```

```
 1    of him as much as I was, and her words was, this
 2    is --
 3              MR. BUSTAMANTE:  Objection.
 4              THE COURT:  Sustained.
 5    BY MR. RUPERT:
 6         Q    You can't say what she said --
 7         A    Okay.
 8         Q    -- because that would be hearsay, but you
 9    can testify as to what you said and the reaction on
10    the other people.
11         A    Okay.  Well, I told them that the card
12    was still stealing -- I don't even know how to
13    testify to this, because if they tell me
14    something --
15              THE COURT:  Mr. Malone, so look, it's --
16         it's -- we're not just having this open
17         dialogue.  So Mr. Rupert will ask you
18         questions --
19              THE WITNESS:  Okay.
20              THE COURT:  -- answer the questions.
21    BY MR. RUPERT:
22         Q    So after confronting Mr. Pardekooper, you
23    went back to the McCaullies?
24         A    Yes.
25         Q    All right.  And you voiced to them your
```

```
 1    concerns?

 2         A    Yes.

 3         Q    All right.  They showed by their demeanor

 4    the same outrage that you had?

 5         A    Yes.

 6         Q    All right.  So after that, did you have

 7    any more contact with Mr. Pardekooper?

 8         A    I went to the -- to the truck, and I -- I

 9    was --

10         Q    Whose truck?

11         A    To Roger McCaullie's truck.

12         Q    All right.  Describe that truck for the

13    jury.

14         A    It's a Dodge Ram 2500.  It's actually --

15    he described it as a 15- -- it's a 2500.  It's a

16    bigger truck than what he described.

17         Q    Did it have four doors?

18         A    Four doors.

19         Q    Was it raised up?

20         A    King cab, it -- it was high, yeah.  It

21    wasn't -- it wasn't lifted.  It didn't have a lift

22    kit on it or nothing, but it was -- it had big

23    tires.  It was a good-sized truck; it was high.

24         Q    You had to step up to get to it?

25         A    Yes.
```

1          Q      Okay.

2          A      So I'm thinking, well, because of how I

3     seen him in the passenger, and he seen me come down,

4     maybe he just threw my SD card in the backseat.

5          Q      You're looking for your SD card?

6          A      I'm just -- all I'm interested -- because

7     this SD card is -- it's got my movies on it.  It's

8     got my music.  It's got what I entertain myself with

9     when I'm in -- in the camp in my tent at ten o'clock

10    at night and have nothing else to do, because that's

11    at curfew.

12         Q      It had your life on it?

13         A      Pretty much, pretty much.  It --

14    everything that I -- I need music.  I like music,

15    and I think it even had a couple of video games on

16    it, but -- so I'm looking -- the back of the truck,

17    it has a bunch of clothes back there from where I

18    paid to get everybody's laundry done that -- that --

19    the day before that.  There's a bunch of tools over

20    on the passenger's side.  And I'm in the driver's

21    side in the passenger door, with the door open.

22    The -- the door's right here, and -- and there's

23    some tools over on the other side, and over here,

24    there's a -- like a crowbar, a cross iron, a couple

25    of baseball bats.  And I'm just digging around

1    trying to find it, and they're arguing in the

2    distance.

3        Q    Who's arguing?

4        A    Leroy McCaullie and Matt, they're

5    arguing.  It's becoming apparent Matt's worn out his

6    welcome.  He draws close to me as they're arguing,

7    and I can hear his voice, kind of like behind me.

8    And he says pretty loudly, pretty sharply, I didn't

9    steal his fucking SD card, and he he if he fucking

10   thinks I did, then we just need to do something

11   about it.  And that threw a radar up, and I looked

12   over my shoulder -- it would have been this

13   shoulder -- and I seen him with that axe in his

14   hand, like so.

15       Q    Stand up so the jury can see you.

16       A    He had the axe, just like so.

17       Q    On your left hand, what are you imagining

18   yourself holding?

19       A    It would be the head.

20       Q    On your right hand?

21       A    This would be as if you were fixing to

22   swing.

23       Q    You've used an axe?

24       A    Yes.

25       Q    You've seen people use axes?

1      A    Yes, yes.

2      Q    All right.  So --

3      A    And I --

4      Q    Let me -- let me stop you there.  When

5  he's holding the axe like that, is he still coming

6  at you?

7      A    He -- when I look over my shoulder, he

8  had just made the comment, and his face is all red,

9  beat red, and it's balled up, and he's approaching.

10     Q    And based on all of those prior, specific

11  acts of violence --

12     A    Right.

13     Q    -- and knowing Mr. Pardekooper, what did

14  you do?

15     A    It's my -- my heart rate went up that

16  quick, and it was a matter of just literally --

17  because the bat's right here, and grab it, and I

18  spun around, and I took one step, just one step

19  distance and swung, and that was it.

20     Q    When you swung at Mr. Pardekooper --

21     A    Excuse me.

22     Q    -- how far away from you was he?

23     A    Just with contact that -- with the bat,

24  about a bat's distance.

25     Q    All right.  And what was Mr. Pardekooper

1    doing with the bat at that split second when you had

2    to defend yourself?

3        A    He flinched.  He had the axe, and he

4    flinched.  And he come up, and the lower end of the

5    bat, which I thought was the lower end, but the

6    lower end of the bat towards my handle, like -- like

7    if you got the handle, made contact with the axe,

8    made contact with that axe handle.  It made a loud

9    crisp clunk sound, but it was a -- a force.  It was

10   a forceful blow.  I wasn't playing with it.  It

11   was -- like I said, my adrenaline just shot up in

12   a -- in a split second, and --

13       Q    At the time that you defended yourself,

14   were you in fear --

15       A    Oh, yeah.

16       Q    -- of your life?

17       A    My -- yes, yes.  That -- no doubt about

18   it, my -- my heart rate was -- I don't even know how

19   to explain it, but --

20       Q    Did you have any time to contemplate any

21   other avenues of defending yourself?

22       A    There -- that was a split second -- I

23   mean, literally a split second, grab, turn, spend,

24   over --

25       Q    Did you --

1     A    -- that quick.

2     Q    -- did you see the bat in evidence today?

3     A    Yes.

4     Q    All right.  Was -- was that the bat, as

5 far as you remember?

6     A    I didn't really get a good look at it.  I

7 wasn't paying attention to it, but as far as I

8 remember, I would say that that's the bat.

9     Q    Okay.  Well, let -- let's be sure.

10     MR. RUPERT:  If I may approach the

11 witness, Your Honor?

12     THE COURT:  You may.

13     THE WITNESS:  Yeah, I would say that's

14 the bat.

15 BY MR. RUPERT:

16     Q    Okay.  And then the blood-like material

17 would be on the handle?

18     A    On the handle.

19     Q    So did you hit Mr. Pardekooper with the

20 handle of the bat?

21     A    I guess, I did.

22     Q    Does that mean you were holding the

23 barrel then?

24     A    Obviously so, because there's no way

25 blood got on that end if I didn't.

1      Q      All right.  So in the rush to defend

2   yourself, you just grabbed --

3      A      I just grabbed.

4      Q      Right.

5      A      Just grabbed.

6      Q      So after defending yourself, what

7   happened next?

8      A      He -- well, the momentum, I want to go

9   into -- the momentum did make contact with him.  I'm

10  not denying that that -- that happened.  I'm not

11  denying that at all.  He dropped the axe, and when

12  he did that, I went that way.  I got up from between

13  them, and Roger -- and I heard Carrie --

14     Q      Did anybody see it, besides you and Mr.

15  Pardekooper?

16     A      Carrie McCaullie seen it.

17     Q      All right.  And you know that, because

18  she was out there?

19     A      Her position in the camper, you -- it was

20  like a straight line shot where -- where she was

21  sitting, watching TV.

22     Q      Okay.  She wasn't outside, she was

23  inside?

24     A      No, she was inside.

25     Q      All right.  So was there any time to

1    reflect on -- on running away, or -- or handling the

2    situation any other way?

3         A    There was nowhere to run.  There's a

4    truck here full of clothes, a door here and an exit

5    here.

6         Q    From the time you saw, for the very split

7    second that you saw Mr. Pardekooper, through the

8    time that you grabbed the bat until the time that

9    you defended yourself, how much time are we talking

10   about?

11        A    We're talking about just enough time to

12   grab, spin and swing.  I -- literally, one -- one

13   step.  It was really, really quick.  It happened

14   really fast.

15        Q    All right.  And what did you do next?

16        A    Well, he dropped the bat and --

17        Q    Dropped the...

18        A    I mean, dropped the axe, excuse me.  And

19   he's got his head, and he's, Oh.  And I'm over here,

20   and Roger's coming down here.  It's like -- because

21   Carrie had told him to separate us, and he picks the

22   axe back up, and he comes back again, and Roger

23   grabs him.

24             His shirt's ripped all to pieces, because

25   of this.  In the pictures, you see that his shirt's

1    ripped up.  It's because Roger's grabbing him,

2    keeping him from coming back, and he's telling him

3    to -- Matt, you look -- Man, you're bleeding, dude,

4    and -- and Carrie's telling him to get his dumb ass

5    in the truck, and he throws the axe.  He throws --

6    he throws it.

7            And Leroy comes over there and grab --

8    and gets the bat.  You know, I'm -- but I'm at a

9    distance.  I -- after that contact, I went that way.

10   I didn't want to hurt the guy.  I -- most

11   definitely, if I was to hit him as he said I hit

12   him --

13           MR. RUPERT:  Objection, this is

14       nonresponsive to the questions.

15           THE COURT:  Sustained.

16   BY MR. RUPERT:

17       Q    All right.  I'm sure Mr. Bustamante is

18   going to ask you, why didn't you just stay and call

19   the cops.  So I'm going to ask you, why didn't you

20   just stay and call the cops?

21       A    I can honestly tell you, at that moment,

22   I wasn't -- at that moment, my rational thinking

23   was -- as obscured.  I -- I'm on probation, this

24   just happened, there had been other incidences with

25   my probation officer, but this had just happened,

1    and to be honest with you, I -- I really wanted to

2    run.  The straight up honest answer that I can give

3    you today, right now is, I wanted to just run away,

4    because that's what I do.

5         Q    All right, that's honest.  So you -- you

6    ran?

7         A    (No audible response.)

8         Q    Okay.  Cut off your ankle bracelet?

9         A    I think so.

10        Q    Okay.

11        A    I regret it now.

12        Q    You don't -- you don't deny that you did

13   it?

14        A    (No audible response.)

15        Q    And you -- and you got that Bowie knife?

16        A    Yeah, I -- I made a conscious decision

17   that I can't run from it.  I've got to go back and

18   deal with this.  I know I'm going to go back to

19   jail.  I know I'm going to go back to prison, but at

20   the same time, I don't know what I'm walking into.

21   Excuse me.  There's -- as testified, as Scott

22   Mathews, he claims --

23            MR. BUSTAMANTE:  Objection in regards to

24        commenting on other witness's testimony.

25   BY MR. RUPERT:

329

```
1        Q    All right.  So when --
2             THE COURT:  As phrased --
3             MR. RUPERT:  Yes.
4             THE COURT:  -- sustained.
5             MR. BUSTAMANTE:  All right.
6    BY MR. RUPERT:
7        Q    So you could have just ran down by the
8    pond --
9        A    Right.
10       Q    -- and then around the pond --
11       A    I went --
12       Q    -- and then to the other direction,
13   correct?
14       A    Or I could have got on the railroad
15   tracks and just been gone.
16       Q    Right.  Or there was a dirt road there,
17   right, over the bridge, you could have been gone
18   down there?
19       A    Yeah, I went to the creek.
20       Q    Okay.  What happened at the creek?
21       A    I made a decision that, well, I've got to
22   go deal with this.  I know I'm going to jail, and I
23   did a lot time already, but I've got to deal with
24   it.  But I don't know when I walk back -- and this
25   is on the same property.  I haven't left the
```

1    property.  The creek is in a wooded area in Lost

2    Valley.  It's just kind of secluded a little bit.

3    And I don't know now who all is mad and who all

4    isn't, because --

5        Q    A small community, people talk?

6        A      People talk, small community.  You know,

7    there were people that didn't like him, there were

8    people that liked him.  A lot of people shared the

9    same tattoo that he had.

10        MR. BUSTAMANTE:  Objection, again, this

11        is nonresponsive.

12        THE COURT:  Sustained.

13   BY MR. RUPERT:

14        Q    All right.  So -- so you got the knife to

15    defend yourself?

16        A    I really -- not really to defend myself,

17    that was kind of like a hands-off.  I -- I purposely

18    put it in a position to be seen, to be viewed,

19    because I didn't want nobody to jump on me.  When I

20    came back, I really just wanted to call Leroy

21    McCaullie and have him and Carrie there so when the

22    law got there, everything would go down all right.

23    It was dark when I got back.  I seen Scott and Lisa

24    and a guy named Ben.

25             I didn't know Ben at the time, but there

1    was another male there.  They had entered into the

2    camper, and their camper was in my backyard.  Like

3    I'm in Lot 4, and they're in Lot 12.  Lot 12 is

4    connected to Lot 4, so it's like literally from here

5    to the little jury wall right there, is -- is where

6    their camper is.

7        Q    That half wall right there (indicating)?

8        A    Yeah.  So when I seen them pull them up

9    and go home, I said, Okay, I know them, because I've

10   been introduced to them.  I've talked to them a

11   couple of times.  I'm -- Roger said, This is my

12   stepson, is what he called them.  Okay, this is

13   friendly people, I can go here.

14          So I go, and I knock on the door, and

15   Scott answers the door.  And it was Scott, and he

16   looks at me kind of strange, like he was surprised

17   to see me.  And I say, Scott, man, I'm in trouble, I

18   need to call Roger.  At that time, there was a -- a

19   car that had pulled into the second lane, which is

20   where he lived at, and the headlights had hit me on

21   the face.

22          I didn't know if it was law enforcement.

23   I didn't know if it was Matthew.  I didn't know who

24   it was, so I said, Man, I really don't need to be

25   out here, can I come in.

1              And he says, Oh, yeah, you don't got

2    nothing to worry about, man.  Come on, man, I

3    already know what happened.  I already know

4    everything that happened, man.  You -- and we go

5    inside, and he goes to pulling his blinds down on

6    the -- on his windows and telling me that -- that

7    the police needed a search warrant to come in there,

8    that I was safe, that you don't need -- you ain't

9    got nothing to worry about, you're safe, you're

10   safe, man, and tell me what happened, tell me what

11   happened.

12              And so I'm -- I'm talking to him.  And

13   then he says, Hey, there's another kid here.  He's

14   wearing a McDonald's uniform.  I didn't know his

15   name at the time.  And he says, Hey, man, do y'all

16   want to smoke a bowl of weed, and I'm like --

17              MR. BUSTAMANTE:  Objection, again, this

18        is all hearsay.

19              MR. RUPERT:  You can't testify as to --

20              THE COURT:  Sustained.

21              MR. RUPERT:  -- what other people say.

22   BY MR. RUPERT:

23        Q    Where was he --

24        A    He offered some marijuana.

25              MR. BUSTAMANTE:  Objection again.

```
1   BY MR. RUPERT:
2        Q    All right.  So you're -- you're at the
3   Mathews' home; is that correct?
4        A    Yes.
5        Q    Where -- you're inside at this point?
6        A    Yes.
7        Q    You're inside, who else is there?
8        A    Scott and the kid in the McDonald's
9   uniform.
10       Q    Okay.  And did you know that guy to be
11  Ben Cribes?
12       A    I didn't know it at the time.
13       Q    All right.  So the -- the three of you,
14  and only the three of you, are in the home?
15       A    No.  Lisa, when I had first come in, she
16  came from the back.  She had her baby with her, and
17  she came to Scott, and she said, Scott, I'm going to
18  go to the pavilion until this all calms down.  And I
19  tell Lisa, That's a good idea.  That's a good idea,
20  and I'm sorry for the intrusion, I just need to get
21  a hold of Roger and then I'm out of there.  So when
22  she leaves and she goes -- the pavilion is right
23  down at the end of the little road, the little dirt
24  road there, and she goes there.  And I was sitting
25  there, and I -- I talked to Scott and Ben for a
```

334

1    little while and smoked a bowl of weed.

2         Q    Okay.  About how long is a little while?

3         A    I'd say about ten minutes.

4         Q    Then what happened?

5         A    Then there was a horn honk.  Scott looked

6    out the window.  I said, What is she doing?  Like,

7    it was Lisa, he said, Hang on a minute, I -- I've

8    got to go check on this, and he went outside.

9              And then he came back in, and he said,

10   Hey, Ben, hey, come here, I need to talk to you for

11   a minute, and I knew the gig was up.  I knew right

12   then that we were surrounded, I knew that.  So there

13   was a point in -- in the camper that the knife was

14   discussed, because I had the knife.  He'd seen the

15   knife, and I told him -- what I told him about the

16   knife was I'm glad things went down the way they

17   did, and I didn't have this in my hands, that's what

18   I told him.  That's exactly what I told him, and

19   that was pretty much it.  I was arrested.

20        Q    Well, let's talk about that.  Who else

21   was in that residence when Deputy Sumner showed up?

22        A    Just -- when Deputy Sumner showed up, it

23   was just me, and another officer followed in behind

24   him, but it was just me at the time.

25        Q    Okay.  You're talking about when you

 1    first saw Sergeant Sumner, tell me about that.

 2        A    Like I said, I knew the gig was up, so I

 3    just sat there, and I waited, because I -- I was

 4    literally counting it down, five, four, three,

 5    two -- I just kind of figured it was going to

 6    happen.

 7        Q    Were you on the couch?

 8        A    Sitting down on the couch.

 9        Q    Okay.  Were you concealing a knife?

10        A    No.  I -- I had the knife.  It was on my

11    right hip.  I had it under my belt.  I was wearing

12    black shorts at the time.  I had a black shirt that

13    was tucked into my pants, and the knife was on my

14    belt, so that when I did sit down, I could take the

15    hilt and push it, so that it would move with my leg,

16    and I didn't cut myself or -- or harm myself.

17        Q    Is there any way possible that you could

18    have had it towards your back right pocket, a knife

19    of that size without cutting yourself?

20        A    No, no.  There -- I challenge anybody to

21    do that.

22        Q    Yeah.  All right.  So did you put your

23    shirt over it to conceal?

24        A    No.  I had my shirt tucked into my

25    shorts.

1        Q    So it was clearly visible?

2        A    Clearly visible.  I wanted it visible,

3    that was the whole point.  That was the whole point

4    of it.

5        Q    Okay.  And why is that the point?  I know

6    you -- just to be clear with the jury.

7        A    Just so -- in case somebody did want to

8    retaliate for this situation, so they -- I didn't

9    know nobody there, that it would make them think

10   twice, that -- and that was the sole purpose.

11       Q    All right.  So are you sitting in the

12   couch directly in front of the door that -- of the

13   front entrance?

14       A    Yes.

15       Q    All right.  So you're sitting there, what

16   happens next when law enforcement comes?

17       A    Deputy Sumner pops in, and he's got -- I

18   thought it was his gun, honestly.  There -- the room

19   is still a little bit smoky, and you could see the

20   red beam.  And it started at my chest, and it went

21   up to my forehead, and we're just looking at each

22   other.  And he says, On the floor, and all right,

23   I'm -- I get on the floor, and I lay face down.

24            The couch is to my right, the door's to

25   my left, and I'm laying face down in front of the

1    couch.  I've got my head turned looking towards the

2    door as he comes in.  Another officer follows in

3    behind him, and I thought he had a flashlight.  But

4    when they cuffed, and I stood up -- he took the

5    knife off of me and everything, and I stood up --

6    what he had was a little camera.  It was a little

7    red camera, and he was pointing it at me, the other

8    officer.  And it had a light on, so -- I don't know

9    if you ever had a device like that, but it -- they

10   have a really bright light, a really bright light

11   that allows you to film when it's dark.

12        Q    You're talking about a video camera?

13        A    It's like a video camera that can take

14   digital pictures, as well, like a combination of

15   both.  A kind of cheap one, maybe a little Nikon or

16   something.

17        Q    That would be in addition to the bodycam?

18        A    Yes.

19        Q    And do you know what officer had that?

20        A    I don't know.  There were a lot of

21   officers out there that night.

22        Q    How many officers?

23        A    When I came out that camper that -- I

24   want to estimate, there was at least six, seven

25   officers right there.  One of them had an assault

1    rifle.  I believe that was Terrell Williams had an

2    assault rifle with him.  There was a female officer

3    with blonde hair, two or three more officers, then

4    Sumner and then one that came in.  So I can't really

5    identify who all was there, but there was -- it

6    seemed like half the police force was there that

7    night.

8         Q    All right.  Then what happened?

9         A    Well, we -- I was escorted -- before I --

10   can I make a point before --

11        Q    Well, just answer the question.

12        A    I was escorted to the police car, and I

13   was put in a police car.

14        Q    How long did you sit there?

15        A    I sat there for a little while.  He was

16   talking to -- at first, talking to Scott Mathews.

17   Leroy McCaullie and Matthew Pardekooper showed up in

18   Lost Valley and had pulled up, and Mr. Sumner was

19   taking pictures of evidence on the back of the car,

20   the tablet, the -- the baseball bat, the -- not the

21   baseball bat -- excuse me -- the -- the knife, the

22   SD card.  I had some pocket change, he took pictures

23   of that.  And when they showed up, he got in a

24   conversation --

25        Q    When you say, "they," you mean

1   McCaullie --

2        A    Mr. McCaullie and Mr. Pardekooper,

3   they -- they talked, and he took pictures of Mr.

4   Pardekooper with the same camera that was taking --

5   that had took pictures of the rest of the evidence,

6   and this was after -- after he was glued back

7   together.

8        Q    So you were in the back of the police

9   car, but could see what was going on?

10       A    Yes, yes, I could see clearly.

11       Q    All right.  So how far away was Mr.

12  Pardekooper with his newly glued head and -- and the

13  law enforcement?

14       A    Well, at -- at first, he was just --

15  like, I'm sitting in the backseat, and I'm looking,

16  and he's right at -- right at the back of the trunk.

17  I mean, they're right there at the corner of the

18  trunk, so just that distance of -- of a car trunk,

19  and --

20       Q    Could you tell if Mr. Pardekooper was

21  being interviewed?

22       A    It appeared that he was being

23  interviewed.  He had a -- the bright light after the

24  flashes, after the pictures, because when it's in

25  camera mode it takes a flash, and you can see it.  I

1    could see the flash, but then the bright light came

2    back on, and he was talking.  He was talking to the

3    officer as he was giving an interview.  The same

4    thing with Leroy McCaullie.  As Leroy McCaullie is

5    giving his statement --

6            MR. BUSTAMANTE:  Objection, again, this

7        is all nonresponsive.  He's going to

8        narratives.

9    BY MR. RUPERT:

10       Q    What happened --

11           THE COURT:  Sustained.

12   BY MR. RUPERT:

13       Q    -- what happened at the time -- did

14   anything else happen at the time that Mr. McCaullie

15   was being interviewed?

16       A    Matthew Pardekooper came to the window of

17   the backseat, and he takes his hand down, and he --

18   first he shows me his head, points at his head.  And

19   then he takes his hand down, and he shows me my 64

20   gigabyte SD card, and he takes his middle finger,

21   points it up and me, and he says, You're fucked, and

22   he started laughing.  That was the end of my rodeo.

23       Q    Got you.  All right.  Now, you had -- you

24   are a convicted felon; is that correct?

25       A    Yes, sir.

```
 1        Q    All right.  How many times?
 2        A    Five times.
 3        Q    All right.  Notwithstanding that, have
 4   you told the jury the full truth?
 5        A    Yes, sir.
 6             MR. RUPERT:  All right.  Your Honor, I
 7        would tender the witness.
 8             THE COURT:  Cross?
 9                  CROSS EXAMINATION
10   BY MR. BUSTAMANTE:
11        Q    When Mr. Pardekooper came really close to
12   you as you were in the back of that particular car,
13   he looked almost normal, correct; I mean, he was
14   glued, and he looked almost like he was cured, like
15   almost nothing had happened, right?
16        A    Yes.
17        Q    There was no sign of him actually having
18   any type of -- you know, like your eye has, you
19   know, some kind of trauma -- and then you make --
20   the start of a black eye, right?
21        A    Very little.
22        Q    He looked like he was not injured,
23   correct?
24        A    Yeah.
25        Q    And of course, you -- what do you know
```

1   about medicine, sir?

2       A    Very little.

3       Q    All right.  Let me show you what's

4   already been established as State Exhibit 2 for

5   identification purposes.

6            (Photograph tendered to the witness.)

7   Can you please look at it?

8       A    (Witness perusing photograph.)

9            Yes, sir.

10      Q    All right.  And you can clearly see that

11  his eye actually has been injured.  And as you've

12  experienced it, when somebody has an eye injury like

13  that, it just kind of cures over a couple of hours?

14      A    I said very little.

15      Q    You see very little of this?

16      A    With that head wound sewed up, that eye

17  doesn't look near that bad.

18           MR. BUSTAMANTE:  Your Honor, may I pass

19      this to the jury so they can look at it?

20           THE COURT:  Go ahead.

21           MR. BUSTAMANTE:  (Photograph tendered to

22      the jury, and then photograph is tendered back

23      to Mr. Bustamante.)

24  BY MR. BUSTAMANTE:

25      Q    So based on the testimony and this

1    (indicating,) that -- your testimony is, is that, by

2    the time you saw him a couple of hours later, you

3    didn't see any of these injuries?

4         A    I didn't say I didn't see any of these

5    injuries; I said very little.

6         Q    Very little, okay.  Now, let's go back to

7    what you know about Mr. Pardekooper; you testified

8    about three specific incidents in which, the first

9    one in fact, the first day you met him, it was, as

10   you said, you and Roger McCaullie went to pick him

11   up, him and his girlfriend, because they had --

12   their truck had broken down, correct?

13        A    Yes, sir.

14        Q    And then the truck needed something

15   replaced, right?

16        A    Yes, sir.

17        Q    And at that time, you went with him to

18   the auto part store somewhere in Starke, correct?

19        A    Yes.

20        Q    And at that point, according to what

21   you're saying, Mr. Pardekooper goes inside the store

22   and tries to replace the used part to get his money

23   back, correct?

24        A    Yes, sir.

25        Q    And as you said, he became very violent,

1    or at least, he was very angry, and he almost

2    started something with the manager or whoever the

3    salesperson was from that store, right?

4         A    Yes, sir.

5         Q    And so at that point, you understood this

6    person has a temper?

7         A    Yes, sir.

8         Q    Right.  And in fact, I think you said

9    during your testimony, maybe that's somebody I do

10   not want to hang around --

11        A    Yes, sir.

12        Q    -- because you are on probation and

13   having people around us who are violent, or maybe

14   committing something illegal, it's not a good thing,

15   correct?

16        A    Correct.

17        Q    Because you are making sure that you stay

18   in the straight and narrow --

19        A    Yes, sir.

20        Q    -- right?  You did not want to violate

21   your probation, because you know that you have a

22   tight leash, correct?

23        A    Yes, sir.

24        Q    So -- and you've only known him, at this

25   point, maybe a day or so, correct, and he already

1    has shown these types of behaviors in which --

2         A    It was about a week.

3         Q    About a week --

4         A    About a week.

5         Q    -- correct?  And after that, there's a

6    second incident, correct?

7         A    Yes, sir.

8         Q    This is the one in which you go with him,

9    and it's by Winn-Dixie, and there's some type of

10   apartment complex in the back as according to what

11   you testified to, correct?

12        A    Charlie (phonetic) Court.

13        Q    And at that point, there was some

14   argument with -- that he had an argument with

15   somebody there, whether it's his former roommate or

16   whatnot, right?

17        A    Yes, sir.

18        Q    And it looked like it was going to be a

19   physical conversation -- confrontation, right?

20        A    Yes, sir.

21        Q    And, of course, at that point, you also

22   knew, or you thought that -- that he was going to go

23   buy some marijuana, correct?

24        A    Yes, sir.

25        Q    All right.  So you know as part of your

```
1    probation, you're not supposed to be around drugs,

2    correct?

3         A    Yes, sir.

4         Q    All right.  So you're start -- you're

5    still trying to be in the straight and narrow,

6    right?

7         A    It's him buying marijuana, not me.

8         Q    Well -- but you went with him, right?

9         A    I was coming home from work.

10        Q    And so, you cannot walk away, tell him,

11   hey, dude, just drop me back off, why are you taking

12   me there?

13        A    I could have; it was on the way --

14        Q    But you chose not to, correct?

15        A    Correct.

16        Q    Right.  Or you could have stepped out at

17   some point and say, hey, can you drop me off here,

18   I'm on probation.  I should not be going to a place

19   to go buy marijuana, correct?

20        A    I wasn't buying marijuana.

21        Q    Well, he was --

22        A    Okay.  That's --

23        Q    -- and you knew he was going to do that,

24   right?

25        A    (No audible response.)
```

```
 1          Q    So at this point, there is going to be
 2    some physical confrontation, right?
 3          A    Yes, sir.
 4          Q    And in fact, you were so concerned, you
 5    grabbed a pipe to protect yourself or whatever,
 6    correct?
 7          A    Yes, sir.
 8          Q    So this is the second time, and how long
 9    have you known him at this point?
10          A    It was probably about 20, 30 days.
11          Q    20 or 30 days.  So this is the second
12    time, and the other one would have been a week after
13    you've known him, correct?
14          A    Yes, sir.
15          Q    So it would have been about two or three
16    weeks afterwards --
17          A    Yes, sir.
18          Q    -- right?  And so this is the second time
19    in which he's doing something illegal, whether it is
20    buying drugs or trying to steal, and also there's
21    violence involved?
22          A    Yes.
23          Q    And at this point, you still choose to
24    hang around with him, correct?
25          A    Not as you're putting it.
```

1      Q    Okay.  Well, let's go onto the third

2   incident that you talked about, that somebody was --

3   you were with him in the car --

4      A    Yes.

5      Q    -- and you mentioned that because Mr.

6   Pardekooper, at that point was angry at somebody,

7   and he tried to run him off the road, correct?

8      A    Yes, sir.

9      Q    Right, obviously he has a temper?

10     A    Yes.

11     Q    But at that point, did anybody force you

12  to be in that car with him?

13     A    No, sir.

14     Q    All right.  So you chose to be in that

15  car with him, after not only once or twice almost

16  becoming violent, right?

17     A    Yes.

18     Q    And also, in the first incident, there

19  was theft, or at least attempt of theft.  The second

20  time, there is somebody who is try- -- or he's

21  buying of narcotics, right.  On this third incident,

22  there's actually -- somebody's trying to be run off

23  the road, which is another violent act, correct?

24     A    Yes, sir.

25     Q    And, of course, after this third time,

```
 1    not the first, second or third, you still choose to
 2    hang around with him?
 3         A    No, sir.
 4         Q    All right.  And so, when did this happen
 5    in relation to May 12th?
 6         A    The road incident?
 7         Q    Uh-huh.
 8         A    It was like, maybe two-days before that.
 9         Q    So this was still fresh on your mind,
10    correct?
11         A    Yes, sir.
12         Q    All right.  So after these three
13    incidences in which, only one from two-days ago, in
14    which he almost ran somebody over, a violent act, in
15    which you were concerned, right, you decide that
16    you're going to go watch a movie --
17         A    At the McCaullies.
18         Q    -- yeah, but Mr. Pardekooper's invited,
19    right?
20         A    Yes, sir.
21         Q    And you choose just to stay there?
22         A    Yes, sir.
23         Q    All right.  And at some point, in fact,
24    it was Man on Fire, and it was really getting to a
25    good part, right?
```

1      A    Yes.

2      Q    And then you went outside to look for him

3 and say, You're missing the best part, that's when

4 you saw him doing that, right?

5      A    No, sir.

6      Q    Because you wanted him to actually view

7 or see that part of the movie that you so enjoyed,

8 and you didn't want him to miss that?

9      A    As I stepped to the door, as I have been

10 through the whole movie, and I spit out the door.

11      Q    And you --

12      A    I didn't go outside looking for him.

13      Q    -- and you were concerned that he was

14 so -- that he was going to miss that critical part

15 of the movie, correct?

16      A    I looked over, and I said, Hey -- I was

17 getting -- that's when I looked over, you're taking

18 that all out of context.

19      Q    And -- well, tell me exactly what context

20 that is.  This is a person that you say you're

21 scared to -- because of the three prior incidents,

22 and in fact, you -- he has a bad reputation.  You're

23 trying to tell everybody, hey, stay away from him,

24 and yet, you're sitting there watching a movie.  And

25 also, that he's missing the movie, you actually

1    went, hey, you're missing the best part of the

2    movie.  I don't understand exactly how is it that

3    you're afraid of him?

4          A    I don't think I ever said I was afraid of

5    him.

6          Q    So you were not afraid of him?

7          A    At that given moment with that axe I was.

8    At -- at a regular instance, I -- just like anybody

9    else.  I never said that I feared being around him,

10   or that I feared that this person is going to beat

11   me up or get me in an instance every time I get

12   around him.  But when he's got an axe in his hand,

13   yeah, yeah.

14         Q    So only when he actually becomes armed do

15   you become concerned about your safety?

16         A    Armed and angry at me, yes.

17         Q    Now, how tall are you sir?

18         A    5-foot 8.

19         Q    And how much do you weigh?

20         A    I weighed 129 pounds at the time.

21         Q    129 pounds, and he weighed about -- well,

22   you saw him here, about 230 pounds, right?

23         A    Uh-huh.

24         Q    He's got about 100 pounds on you, and

25   he's violent, right; why would he need an axe to

1    beat you up?

2        A    I think maybe he might have just been

3    trying to scare me.

4        Q    Let's talk a little bit about when you

5    went to the Mathews.  The Mathews didn't really know

6    you, did they?

7        A    Yes, sir.

8        Q    You were friends with them?

9        A    I mean, we didn't hang out, but we've

10   talked a couple of times.  They've been back at the

11   pond a few times.  They gave us some scrap metal

12   when they moved into that camper.

13       Q    And based on those limited meetings,

14   which they don't seem to remember, you go to their

15   house, correct?

16       A    Yes.

17       Q    And you bring this (indicating) to their

18   house?

19       A    Yes.

20       Q    Were you afraid of them?

21       A    I didn't know who in that trailer park

22   was angry at me, and I didn't know that I was going

23   there when I came back.  They were just the first

24   familiar people that I did think I halfway knew, so

25   I did not make a plan to go there.

1          Q    And, of course, when you went in, I'm

2     sure you showed them the knife, here, I -- I have

3     this knife I want to come in?

4          A    It was on -- it was on display.

5          Q    It was on display.  And then you think

6     that when you have a young mother with a

7     14-month-old that's on her hip, you just go inside

8     the house with a knife?

9          A    At this time, I wasn't thinking clearly,

10    but you took that out of context, too.  It's not

11    like I posed a threat, and they said I didn't pose a

12    threat.

13         Q    Well, let me ask you again about the

14    incident with the axe when you were allegedly

15    attacked.  Of course, you have stated that you were

16    the victim of somebody stealing your SD card, right?

17         A    Yes.

18         Q    You have pictures, you have songs, you

19    have some movies and things of that nature --

20         A    Yes.

21         Q    -- right?  And very precious to you, you

22    never told the probation officer you had that SD

23    card, correct?

24         A    I wasn't required to.

25         Q    All right, but you didn't tell her

1  anyway, right, because there's nothing to hide from

2  that, correct?

3      A    There's nothing to gain from it either.

4      Q    And -- and also, the fact is, that you

5  had a cell phone that you had not told the probation

6  agency about it, correct?

7      A    I wasn't required to.  She could have

8  come and searched at any given time without a

9  warrant and took any device that I had in my

10 possession and searched and seen if I had access to

11 internet at any given time, and I would have readily

12 allowed her, but I'm not required to, as you're

13 trying to put it out, tell her that I've have a

14 smart TV, that I've got a smartphone, that I've got

15 a GPS, that I've got -- I'm not required to do that.

16     Q    And -- but, of course, you are required

17 to keep that anklet on, aren't you?

18     A    Yes.

19     Q    All right.  And after you were the victim

20 of somebody stealing your precious SD card, right,

21 and somebody physically attacking you with an axe,

22 right, at that point, you chose to call the police,

23 correct?

24     A    No.

25     Q    To report the crime?

```
 1          A     No.

 2          Q     You did not call the police, did you?

 3          A     No.

 4          Q     And, in fact, your first instinct was to

 5     go ahead and run away?

 6          A     Correct.

 7          Q     And cut your anklet?

 8          A     Correct.

 9          Q     You know that they could track you with

10     that anklet, don't you?

11          A     Correct.

12          Q     And so you didn't want to be found at

13     that point; isn't it true?

14          A     At that instant, in that moment, I was

15     not thinking clearly, and I made a bad decision of

16     doing that.

17          Q     So you made a bad decision at that point,

18     and you just cut your anklet, so the probation

19     officer could not find you?

20          A     Right, but I never left.  I stayed in the

21     same address.

22          Q     Stayed in the same area, correct, and so

23     you had, not only a probation officer and a law

24     enforcement officer who looked for you for

25     45 minutes in the area, that's not all that big, and
```

1    they still couldn't find you?

2        A    No.

3        Q    All right.  You could see the -- if you

4    were that close, you could have seen the police

5    lights on --

6        A    No, no.

7        Q    You could not see it?

8        A    No.  There's a wooded area where the

9    creek is, and it's secluded off.  You couldn't --

10   you can't see nothing back there.

11       Q    So during this time in which you're

12   actually the victim of two crimes, theft and being

13   attacked, you decide that you're going to take the

14   property of Mr. Pardekooper?

15       A    No.  I ain't never took that property --

16       Q    You never --

17       A    -- of Mr. Pardekooper.

18       Q    -- you never -- you did not take the --

19   let me ask you this, where is the -- oh, right here.

20   You did not take this (indicating,) did you?

21       A    No.

22       Q    You didn't?

23       A    No.

24       Q    Okay.  Well, let me ask you this, how did

25   this get into the Mathews' residence?

1          A     You should have asked Scott Mathews that.

2          Q     Did he steal it?

3          A     Somebody did.

4          Q     And you were sitting right on top of

5     this?

6          A      No, I wasn't.  According to your deputy

7     or -- or according to your witness, I had been

8     sitting on that and a knife.

9          Q     So that just happens to be -- Scott

10    Mathews just happens to have that in the same place

11    you were sitting?

12         A     No.  It wasn't in the same place I was

13    sitting.

14         Q     Okay.  So the deputy who came and

15    testified and saw that, he's not telling the truth;

16    is he?

17         A     Absolutely not.

18         Q     Okay.  And let me ask you about this --

19    the other, was this not found in your doc- -- in

20    your pocket (indicating)?

21         A     Yes.

22         Q     It was found in your pocket?

23         A     Yes.

24         Q     And how did that enter your pocket?

25         A     That was on the coffee outside under the

1    trailer hatch of the camper.

2         Q    And you just happened to have that -- you

3    put it into your pocket as you are fleeing from the

4    police, as you cut your -- your anklet and trying to

5    figure out what you're going to do with your --

6         A    No.  I actually had that from earlier

7    that day.

8         Q    You have an awful lot of explanations for

9    everything, don't you?

10        A    You're asking the questions, do you not

11   want me to answer them?  I don't understand.

12             MR. BUSTAMANTE:  I don't have nothing

13        further.

14             THE COURT:  Any redirect?

15                  REDIRECT EXAMINATION

16   BY MR. RUPERT:

17        Q    You told Mr. Bustamante that perhaps Mr.

18   Pardekooper was trying to scare you with the axe?

19        A    Possibly.

20        Q    All right.  Is that --  is that what you

21   came to after the fact, upon reflection?

22        A    That's over the past three years of

23   looking at this; that's where I'm trying to rest it

24   at in my mind.

25        Q    On May 12th, 2018, when Matthew

1    Pardekooper came at you with that axe, were you

2    thinking he was just trying to scare you?

3         A    No.  At that given time, no.  Not at that

4    given time, I wasn't.

5         Q    Did you pick up that bat and defend

6    yourself, because that was the only option you had?

7         A    Yes, sir.

8         Q    Did you have a lot of options to hang out

9    with different people?

10        A    No, sir.

11        Q    All right.  Is it true that you and Mr.

12   McCaullie were friends?

13        A    Yes, sir.

14        Q    All right.  You had a great deal of

15   respect for that man?

16        A    Yes, sir.

17        Q    All right.  Was it more that you were

18   hanging out with Mr. McCaullie, and Pardekooper just

19   happened to be there?

20        A    That's -- that was the gist of it, yes.

21        Q    So when Mr. Bustamante asked you those

22   questions about hanging out with Pardekooper, is it

23   more you were just hanging out with Mr. McCaullie?

24        A    McCaullie, yes.

25        Q    Would you ever even have known

1    Pardekooper, if it wasn't for Mr. McCaullie?

2         A    No, sir.

3              MR. RUPERT:  No further questions.  Thank

4    you.

5              THE COURT:  You may take your seat and

6    sit with your Counsel.

7              Mr. Rupert, you may call your next

8    witness.

9              MR. RUPERT:  May it be a good time for a

10   break?

11             THE COURT:  Counsel, approach.  All

12   right.

13             (The following side-bar conference was

14   had out of the hearing of the jury:)

15             MR. RUPERT:  There's still --

16             THE COURT:  The break is your call.

17             MR. RUPERT:  I just want to get my

18   client's consent for the 3.85 Ruling, that's

19   all.

20             THE COURT:  So do you intend then to

21   rest?

22             MR. RUPERT:  Yes.

23             THE COURT:  Do you intend to present

24   rebuttal?  So this is going to be our last

25   break.  I'm going to inform the jury, without

1          objection, to give them an idea of the

2          scheduling.

3               MR. RUPERT:  That's fine.

4               THE COURT:  And my intention would be

5          that I'll give this break, and then hear

6          closing and give the instructions, so they can

7          use this break to notify the families, because

8          there won't be another break to do that.

9          They'll be deliberating and their phones will

10         be held; any objections to that?

11              MR. RUPERT:  No, sir.

12              MR. BUSTAMANTE:  No, Your Honor.

13              THE COURT:  All right.  So ladies and

14         gentlemen, I want to give you an update to

15         where we are in scheduling, so you can use this

16         break.  This is probably going to be your last

17         break before you get the case, all right.  So

18         this break might be 10, it might be 15 minutes,

19         but my expectation will be that we return from

20         this break, you're going to hear the arguments

21         of the lawyers, and then you're going to be

22         given the law by me, and then you'll have the

23         case.  And so I don't know how long all of that

24         will take, but since -- if you recall, I made

25         you aware that you don't -- you're not allowed

1      to have your phones and things with you when

2      you go to deliberate.

3          Now will be the perfect time to use this

4      break to notify your family and whatnot of

5      where we're at in the process.  Let them know

6      my expectation is, I mean, you're -- you're

7      going to be here past 5:00.  How long past 5:00

8      is really -- you know, I can't predict.  All I

9      can tell you is, after this 10-to-15-minute

10     break, you'll have arguments of the lawyers,

11     I'll instruct you on the law, and the case will

12     be yours.

13         Okay.  So it will be yours, and you will

14     be afforded however much time you need to

15     deliberate.  There's no time limit on that,

16     okay, so I just wanted to give you the best

17     information I have at the moment.  If you'll

18     leave your notepads face down, don't start

19     discussing the case yet amongst yourselves.  We

20     will be in a short recess.

21         (Jury exits the courtroom.)

22         Let the record reflect that the ladies

23     and gentlemen of the jury are out of the

24     courtroom on that recess.  Any objection to

25     that explanation to --

```
1              MR. RUPERT:  No objection.

2              MR. BUSTAMANTE:  No, Your Honor.

3              THE COURT:  All right.  So, Mr. Rupert,

4       this --

5              MR. RUPERT:  Can I have a minute?

6              THE COURT:  Well, it's -- how much time

7       do you need for this, because there's a lot

8       we've got to cover on this break?  We've got to

9       cover renewed motions.  We've got to do our

10      charge conference.

11             MR. RUPERT:  Okay, 30 seconds.

12             THE COURT:  I mean, if this -- yeah, I'm

13      only going to give a minute.

14             MR. RUPERT:  A minute at the most.

15             MR. BUSTAMANTE:  I've got to go to the

16      restroom.

17             THE COURT:  I'm not talking about that.

18      I'm saying, I'll give you a minute or two --

19             MR. RUPERT:  I finally agree with Mr.

20      Bustamante, Your Honor.

21             THE COURT:  I'll give you a minute or two

22      to talk to Mr. Malone about the decision.

23             MR. RUPERT:  Yes.

24             THE COURT:  The only thing I understand

25      you're still wanting to talk to him about is
```

1          the issue of recalling Scott Mathews and Lisa

2     Mathews?

3               MR. RUPERT:  About not calling them.

4               THE COURT:  Right, about the decision as

5     to whether you will or not.

6               MR. RUPERT:  Correct.

7               THE COURT:  Okay.  So we'll take a very

8     brief recess.

9               (Brief recess.)

10              THE COURT:  All right.  We're back on the

11    record in the State of Florida versus Timothy

12    Malone, 2018-CF-246.  We do need to get Mr.

13    Malone back out here, but the attorneys are in

14    agreements, we can release the witnesses?

15              MR. BUSTAMANTE:  Yes, Your Honor.

16              THE COURT:  All right.  Let's release the

17    witnesses.  All right, so Mr. Malone is now

18    present in court with Counsel.

19              Mr. Rupert, you've had a moment to speak

20    Mr. Malone as you-all discussed, sort of,

21    whether or not you intended to recall either of

22    the Mathews.

23              MR. RUPERT:  That's correct, Your Honor.

24    We did have a -- a discussion.  We choose not

25    to call any other witnesses, and at this time,

1    we announce rest.

2         THE COURT:  All right.  And, Mr. Malone,

3    just so I give you the chance to be on the

4    record; are you in agreement with that

5    decision, in light of where things currently

6    are in the case and not recall the Mathews?

7    And some of that would be based on, I think,

8    what Mr. Rupert put on the record earlier,

9    based on his and Mr. Bustamante's conversations

10   with each of them individually, separated from

11   the other in the hallway.  You were privy to

12   that information.

13        MR. MALONE:  I would just like the jury

14   to know that there was two adult men there when

15   that -- that is the only thing I --

16        THE COURT:  Well, I think you just

17   testified to that --

18        MR. MALONE:  Okay.

19        THE COURT:  -- right.  I think Mr. Rupert

20   said that neither of the Mathews would

21   corroborate that.  So you could recall them,

22   but it sounds like --

23        MR. RUPERT:  It would not help us.

24        THE COURT:  -- they would tell -- they

25   would tell the jury something different than

1    what you've told them.

2              MR. MALONE:  Okay.

3              THE COURT:  And so -- so the question

4    becomes, if you want -- if you and Mr.

5    Rupert -- ultimately, it's his call, right --

6              MR. MALONE:  Right.

7              THE COURT:  -- to do that, but he's

8    bending over backwards it sounds like to you --

9    to talk to you about --

10             MR. MALONE:  Can -- can we at least make

11   the jury know that that charge was not charged

12   until 13-months later; can we at least -- that

13   wasn't alleged until 13-months later.  I can't

14   get that?

15             THE COURT:  No, sir, that's not relevant.

16             MR. MALONE:  So you don't -- you don't

17   charge me that night, when the police are

18   there.  13-months later, after your brother,

19   who is your gang brother --

20             THE COURT:  Mr. Malone, the issue is --

21   and I'm not -- I'm not here to give you legal

22   advice.  This is really a conversation probably

23   better for you and Mr. Rupert to have it.

24   Generally speaking, the State has the power of

25   the pen, so to speak, in charging, and they can

1    make decisions based upon their review of a

2    factual situation and scenario that add all

3    sorts of charges.

4         MR. MALONE:  Well, they --

5         THE COURT:  If they fell --

6         MR. MALONE:  (Indiscernible) process, I

7    don't --

8         THE COURT:  Let me finish.  I mean, I

9    didn't interrupt you.  I'm just trying to

10   explain it to you.  They can at all sorts of

11   charges anytime they wanted.  You know, as long

12   as it isn't prejudicing you in your trial

13   preparation, but they can add these charges if

14   they think they have the factuals -- and it

15   doesn't matter whether the Mathews said, I want

16   you charged.  It doesn't matter whether the

17   Sheriff's Office wrote that up as one of their

18   charges.  If the State, in reviewing the case,

19   believed that the evidence supported and armed

20   trespass, then they can add that count to the

21   information, and it can proceed to a jury.  And

22   you cannot present to the jury, right, that

23   they added it, and they did it 13-months later,

24   because there's no relevance to that, other

25   than to try to improperly create an impression

```
1         that the evidence doesn't support it.
2              And -- and that may not be the case.
3         There may be a myriad of reasons as to why law
4         enforcement didn't do it, or the Mathews didn't
5         say it.  That's really not up to --
6              MR. MALONE:  Well, the prejudice is due
7         processing it all, because nobody seems to have
8         a memory now.  We forgot, we don't remember,
9         and -- and everybody has told total different
10        things.  They weren't -- the State was not
11        interested in that charge until they found
12        Matthew Pardekooper, because he was missing.
13        There's a lot of thing you don't know, Judge.
14        This case is three-years old, because of the
15        stuff they've done --
16             THE COURT:  Well --
17             MR. MALONE:  -- and it's prejudice --
18             THE COURT:  -- Mr. Malone, I don't know
19        why --
20             MR. MALONE:  -- and that's part of it --
21             THE COURT:  -- all right.
22             MR. MALONE:  -- for these reasons.
23             THE COURT:  Well --
24             MR. MALONE:  You wait -- you wait
25        13 months to file a charge, because you don't
```

```
1        have a victim.
2             THE COURT:  I got you.  Mr. Malone, I
3        don't know what to tell you, but no, that's not
4        an appropriate factor, and I wouldn't know how
5        you'd present it -- try to present it anyway at
6        this point.
7             All right.  So anything else?
8             MR. RUPERT:  Your Honor, at this time, I
9        would renew all prior objections, and I would
10       renew all prior motions.
11            THE COURT:  All right.  It would be the
12       same rulings from the Court --
13            MR. RUPERT:  Yes, sir.
14            THE COURT:  -- for the same reasons
15       articulated.
16            MR. RUPERT:  Yes, sir.
17            THE COURT:  Do you have your jury
18       instructions?
19            MR. RUPERT:  Yes, sir.
20            THE COURT:  I'm just going to walk
21       through them page by page.  The first page is
22       the title page, any objection?
23            MR. RUPERT:  No, sir.
24            THE COURT:  Then we have on Page 2, Intro
25       to Final Instructions and the Statement of the
```

1      Charge, any objection, other than we do need to

2      change Number 3 to just theft.

3            MR. BUSTAMANTE:  We've done that.

4            THE COURT:  All right.  You've already

5      done that?

6            MR. BUSTAMANTE:  Yes.

7            MR. RUPERT:  Your Honor, my client

8      pointed this out, to be honest with you.

9      The -- my client seems to indicate that the

10     Statement of Charge 2, Possession of a

11     Concealed Weapon by a Convicted Felon is

12     improperly stated that its case law and point,

13     that it should be carrying of a concealed

14     weapon by a convicted felon, so...

15           THE COURT:  All right, I'll note that.  I

16     don't know that it -- the -- whether it's

17     titled possession or carrying, the only

18     evidence in the case is carrying --

19           MR. RUPERT:  Right.

20           THE COURT:  -- and I think it's going to

21     become pretty clear in the elements that's what

22     Element 2 is --

23           MR. RUPERT:  Yes, sir.

24           THE COURT:  -- so I don't know that the

25     title matters.

```
 1              MR. RUPERT:  My client --

 2              THE COURT:  We'll leave it as is, other

 3       than removing grand.  Any other objections

 4       there, other than that, Mr. Rupert?

 5              MR. RUPERT:  No, Your Honor.

 6              THE COURT:  Count I on Page 3, any

 7       objection to the Aggravated Battery

 8       instruction?

 9              MR. BUSTAMANTE:  We will give -- the part

10       that says, Gives as applicable, we're going to

11       take that large portion off.  Did you already?

12              MR. RUPERT:  I'm sorry, which portion?

13              THE COURT:  So -- so deadly weapon still

14       needs to be in here.  It looks like you guys

15       removed the deadly weapon.

16              MR. RUPERT:  Can I get a fresh copy,

17       because mine does have --

18              MR. BUSTAMANTE:  Deadly weapon, okay.  We

19       will add that back on, Your Honor.

20              THE COURT:  Yeah, the deadly weapon needs

21       to remain and so does the object.

22              MR. BUSTAMANTE:  Yes.

23              THE COURT:  Your original instruction was

24       fine.

25              MR. BUSTAMANTE:  Yes, I think that when I
```

```
1    went and did it, I took that out and was not

2    supposed to, but --

3         THE COURT:  So -- do you have your

4    original instruction, Mr. Rupert?  It has the

5    same two elements --

6         MR. RUPERT:  I only got one.

7         MR. BUSTAMANTE:  I gave you two.

8         MR. RUPERT:  All right.  Well --

9         MR. BUSTAMANTE:  I gave you the first one

10   and then that one.

11        MR. RUPERT:  All right.  Mine says,

12   Aggravated Battery with a Deadly Weapon, Count

13   I, so is that the first one or the second one?

14        THE COURT:  No, that's right.  They all

15   say that.

16        MR. RUPERT:  Okay.

17        THE COURT:  We're just talking -- you

18   have the two elements, right?

19        MR. RUPERT:  Okay.  You're on the other

20   page.

21        THE COURT:  Just look at the Ag Bat, you

22   have the two elements, right?

23        MR. RUPERT:  Yes, sir.

24        THE COURT:  Any objection?

25        MR. RUPERT:  No, sir.
```

```
1           THE COURT:  And then it should have two

2      definitions, a paragraph that defines deadly

3      weapon, and a paragraph that defines an object

4      not designed to inflict --

5           MR. RUPERT:  Yes.

6           THE COURT:  -- and then nonetheless be a

7      deadly weapon.

8           MR. RUPERT:  Yes.

9           THE COURT:  You have both of them?

10          MR. RUPERT:  Yes.

11          THE COURT:  Any objection to that

12     instruction?

13          MR. RUPERT:  No, sir.

14          THE COURT:  Okay.  And then we have the

15     lesser-included instruction that lists battery

16     as the lesser, any objection?

17          MR. RUPERT:  No, sir.

18          THE COURT:  Are you requesting batter as

19     a lesser?

20          MR. RUPERT:  Yes.

21          THE COURT:  All right.  And then any

22     objection to the battery instruction, the

23     single element?

24          MR. RUPERT:  No, sir.

25          THE COURT:  All right.  The -- I'm going
```

```
1      to skip 3.6, the two self-defenses to the act,

2      because they become a little more involved.

3           MR. RUPERT:  Yes, sir.

4           THE COURT:  I'm just going to set them

5      out just for a second.  That would take us to

6      Page 15.

7           MR. RUPERT:  This is the first set of

8      instructions, because I already made marks on

9      these.  Let me see if I somehow -- you didn't

10     grab them, did you?

11          MR. BUSTAMANTE:  I'll give you another

12     copy.

13          MR. RUPERT:  Thank you.  And I'm sure

14     it's in here somewhere, I'm not --

15          MR. BUSTAMANTE:  That's okay, I make

16     extra copies for a reason.

17          THE COURT:  Go to Page 15.  Any objection

18     to that Count II instruction?

19          MR. RUPERT:  No, sir.

20          THE COURT:  As you see, Mr. Rupert,

21     Element 2 is, Requires proof beyond a

22     reasonable doubt that the Defendant knowingly

23     carried a concealed weapon.

24          MR. RUPERT:  Yes, sir, and that would be

25     consistent with the evidence as I know it.
```

```
1           THE COURT:  Correct.  Yep, so 3.4,

2      there's another standard lesser included in

3      which would be just possession of a concealed

4      weapon, if they were to believe or choose to

5      find that he's not a convicted felon at the

6      time.  Are you guys requesting that?

7           MR. RUPERT:  Yes, sir.

8           THE COURT:  All right.  Any objection to

9      that?

10          MR. RUPERT:  No, sir.

11          THE COURT:  And that lesser, any

12     objection on Page 18?

13          MR. RUPERT:  No objection.

14          THE COURT:  All right, that takes us to,

15     Theft.

16          MR. BUSTAMANTE:  And what we're going to

17     do on that one, Your Honor, we're -- we already

18     have taken a. --

19          THE COURT:  Is gone.

20          MR. BUSTAMANTE:  -- is gone, then b. and

21     c. have been named --

22          THE COURT:  a. and b.

23          MR. BUSTAMANTE:  -- a. and b.

24          THE COURT:  All right.  Other than that,

25     any objection to the Theft instruction, Mr.
```

1    Rupert?

2            MR. RUPERT:  No, sir.

3            THE COURT:  So the only two options will

4    be the petit thefts.

5            MR. RUPERT:  Correct, no objection.

6            THE COURT:  And then Count IV is on Page

7    21, Armed Trespass; any objection to that

8    instruction?

9            MR. RUPERT:  No, sir.

10           THE COURT:  All right.  And then the

11   lesser included is...

12           MR. BUSTAMANTE:  Yeah, Armed Trespass,

13   Trespass in a Structure, that way that it's --

14   the only thing is armed.

15           THE COURT:  So any objection to that,

16   Pages 23 and 24, no objection, correct?

17           MR. RUPERT:  Correct.

18           THE COURT:  That takes us to 3.7, Pleas

19   of Not Guilty; Reasonable Doubt, any objection?

20   It looks like it's standard.

21           MR. RUPERT:  Standard, no objection.

22           THE COURT:  All right.  That takes us to

23   3.9, Weighing the Evidence.  The first two

24   paragraphs is 1, 2 -- 1 through 5 always come

25   in; any objection to that -- those, Mr. Rupert?

1          MR. RUPERT:  No, sir.

2          THE COURT:  Number 6, (indiscernible)

3     preferred treatment, should that be in?

4          MR. RUPERT:  No.

5          THE COURT:  All right, so 6 is out.

6     Defense, what about Number 7, Convicted of a

7     felony, that remains.

8          MR. RUPERT:  Yes, Judge.

9          THE COURT:  General reputation for

10    dishonesty?

11         MR. BUSTAMANTE:  I don't think that it

12    has been proven.  It was mentioned, but there's

13    no reputation of it that's survived an

14    objections.

15         MR. RUPERT:  It can be sustained.

16         THE COURT:  Yeah, so out?

17         MR. RUPERT:  Out.

18         THE COURT:  So there's two others that

19    were already removed.  Let's just make the

20    record clear, that would have been pressure or

21    threat that affected testimony; any evidence of

22    that?

23         MR. RUPERT:  No, sir.

24         THE COURT:  A statement inconsistent at

25    some other time, I think that would remain, so

1      that needs to go back in.

2            MR. RUPERT:  It would go back there, all

3      right.

4            THE COURT:  Did the witness, at some

5      other time, make a statement that was

6      inconsistent with the testimony that he or she

7      gave --

8            MR. RUPERT:  Correct.

9            THE COURT:  -- all right, that needs to

10     be added in.

11           MR. RUPERT:  Well, add it in, yeah.

12           THE COURT:  So go to the sent- -- to the

13     last part of 3.9, Mr. Rupert.  Any objection to

14     any of those paragraphs?

15           MR. RUPERT:  It will take a second here,

16     Judge.

17           THE COURT:  They all do apply.

18           MR. RUPERT:  I have no objection.

19           THE COURT:  All right.  So 3.9, we agree

20     that that gets removed 3.9.  3.9, the Defendant

21     statements?

22           MR. BUSTAMANTE:  Not in the way that's --

23     there's statements from witnesses, but not the

24     ones that law enforcement got --

25           THE COURT:  Yeah.

1          MR. BUSTAMANTE:  -- so we can take that

2     off, too.

3          THE COURT:  Do you agree that that comes

4     off?

5          MR. RUPERT:  I do.

6          THE COURT:  Okay.  3.10, Rules for

7     Deliberation, any objection?

8          MR. RUPERT:  No objection.

9          THE COURT:  Cautionary Instruction, 3.11,

10    any objection?

11         MR. RUPERT:  No objection.

12         THE COURT:  3.12, Verdict, any objection?

13         MR. RUPERT:  No objection.

14         THE COURT:  3.12(a,) Single Defendant,

15    Multiple Counts, any objection?

16         MR. RUPERT:  No objection.

17         THE COURT:  3.13, Submitting Case to the

18    Jury, any objection?

19         MR. RUPERT:  No objection.

20         THE COURT:  All right.  Now, let's go to

21    3.16, Self-defense Instruction.  Well, I'm just

22    going to let you look at it, Mr. Rupert, and

23    tell me what you think of the proposed

24    instruction.

25         MR. RUPERT:  I think the State has

1    already delineated Page 7 in that the Defendant

2    was engaged in criminal activity, and that

3    should come out.

4        THE COURT:  Okay.  You think the last

5    paragraph on Page 7 comes out?

6        MR. BUSTAMANTE:  Page 7.

7        THE COURT:  You guys are going to have to

8    look at this, I can't -- I can't make any sense

9    out it.  You guys got ag bat defined three

10   times in here.

11       MR. BUSTAMANTE:  Well, that's because

12   they -- they asked in the instructions to do

13   it, and so I did it out of the abundance of

14   caution.

15       MR. RUPERT:  Give the instruction and

16   give the paragraph below when there's evidence

17   that Defendant was engaged in criminal activity

18   and was not in a place where he or she had a

19   right to be.  That means there is a duty to

20   retreat; there was no -- that doesn't apply

21   here.

22       MR. BUSTAMANTE:  Okay.  Now, which one --

23   I agree with you, but which ones are -- Number

24   7, right, and so --

25       MR. RUPERT:  Yeah.

```
 1              MR. BUSTAMANTE:  So you have the part
 2         where it says, Give this paragraph below, so
 3         all that part is going to go.  Okay, I agree
 4         with that.  Now, why don't we start with Page
 5         6, and whatever -- and why it's going to be
 6         there, all right.  It says -- the first
 7         paragraph, I think that is pretty standard.
 8              MR. RUPERT:  Okay.
 9              MR. BUSTAMANTE:  Okay.  And then you
10         have, Give the applicable 782, and that's -- I
11         think that that probably should go in.
12              MR. RUPERT:  No objection.
13              MR. BUSTAMANTE:  So I think that what
14         we'll do is give applicable that section
15         that -- that part that is italics, we need to
16         get that off, okay.  Now, there's -- after it
17         says, Any attempt to commit aggravated battery
18         upon -- and then it says, Give the elements of
19         the applicable felony the Defendant alleges
20         victim to commit, but omit any reference to the
21         of proof.  So I think that what your client was
22         asking is that he was -- there was an attempted
23         aggravated battery, because it was --
24              MR. RUPERT:  Yes, right.
25              MR. BUSTAMANTE:  He was trying -- and so,
```

1    of course, then the -- to prove the crime

2    against aggravated battery, the following two

3    elements be proven, and that is if Matthew

4    Pardekooper was the one who actually had -- if

5    they believe that he tried to attempt to commit

6    a battery.  Those are the two elements, and I

7    took out the standard of proof beyond a

8    reasonable doubt, because that's what the

9    instruction asks.

10        MR. RUPERT:  Okay.

11        MR. BUSTAMANTE:  Okay, does that make

12    sense?

13        MR. RUPERT:  Yeah.

14        MR. BUSTAMANTE:  All right.  So what I'll

15    do is, if you -- the -- the italicized portion

16    that says, Give elements, we can take that out,

17    okay.  Now, at the bottom of Page 6 is,

18    Defendant is not in a dwelling or residence, or

19    Defendant was in a dwelling or residence, but

20    had no right to be there.  More appropriate,

21    the Court should state in the final applicable

22    activity that the Defendant may have been

23    engaged in.  I put that in, I think that what

24    happened -- that the first one actually

25    applies, but I put that in as the abundance of

```
1      caution.  I think it's confusing, but if you
2      want it in...
3           MR. RUPERT:  All right, give me a second
4      here.
5           MR. BUSTAMANTE:  Okay.
6           THE REPORTER:  You -- I'm sorry?
7           MR. BUSTAMANTE:  He said, Give me a
8      second, that's what he said.
9           MR. RUPERT:  All right, yeah, I agree.
10          MR. BUSTAMANTE:  All right.  So we'll
11     take that, Give applicable, that's the bottom
12     of Page 6, and...
13          MR. RUPERT:  Leave the no duty to
14     retreat.
15          MR. BUSTAMANTE:  Yeah, and so -- I think
16     that basically takes care of the whole Page 7.
17          MR. RUPERT:  Right.
18          MR. BUSTAMANTE:  All you're going to have
19     here so far is this part here.
20          THE COURT:  So this is almost an
21     impossible record.
22          MR. BUSTAMANTE:  Yeah.
23          THE COURT:  It's all leading back to why
24     I said, If you want self-defense, you have to
25     come to court and give me substantive
```

1     instruction as to what portions of it you

2     believe are appropriate for this; otherwise, we

3     end up in this situation, which is not a good

4     one.  And I don't think it's anyone's fault.

5          MR. BUSTAMANTE:  I --

6          THE COURT:  I don't -- no one's following

7     anything.  There's not -- there's not really a

8     record of what we're doing.

9          MR. BUSTAMANTE:  Okay.

10         THE COURT:  So Page 6, you're taking out

11    the italicized stuff, you're going to unbold

12    the ag bat -- battery stuff and making it

13    unitalicized --

14         MR. BUSTAMANTE:  Yes.

15         THE COURT:  -- right?  Other than that,

16    everything except the last italicized

17    paragraph, that's all staying in on Page 6,

18    right?

19         MR. BUSTAMANTE:  Yes.  On Page 6, we're

20    going to have the first paragraph.  Just to

21    make it clear, it says, It's a defense, and

22    that paragraph ends with bruises.

23         THE COURT:  Right.

24         MR. BUSTAMANTE:  The next one, it's going

25    to be, give applicable, that's going to be

```
1        taken out.  Then --

2            THE COURT:  Why?

3            MR. BUSTAMANTE:  Because it says, Give if

4        applicable, on that Section 780 --

5            THE COURT:  Is that not the entire

6        defense in the case?

7            MR. BUSTAMANTE:  No, I'm saying that --

8        that italicized sentence --

9            THE COURT:  Correct, the italicized --

10           MR. BUSTAMANTE:  Yes, that's all I'm

11       saying.

12           THE COURT:  But it remains --

13           MR. BUSTAMANTE:  It --

14           THE COURT:  -- the information remains?

15           MR. BUSTAMANTE:  The use of force

16       justifiable, yes, that remains.

17           THE COURT:  The elements italicized come

18       out --

19           MR. BUSTAMANTE:  Yes.

20           THE COURT:  -- but the elements remain.

21           MR. BUSTAMANTE:  Yes.

22           THE COURT:  Right.  And then we get to

23       the last italicized portion --

24           MR. BUSTAMANTE:  Will give if

25       applicable --
```

```
 1              THE COURT:  At the bottom of 6 --

 2              MR. BUSTAMANTE:  Yes.

 3              THE COURT:  -- right?

 4              MR. BUSTAMANTE:  That's going to come out

 5         according to --

 6              THE COURT:  Everything under it?

 7              MR. BUSTAMANTE:  Yes.  And so --

 8              THE COURT:  Is that what you're asking

 9         for, Mr. Rupert, that that's out?

10              MR. RUPERT:  So when you say, "it," --

11              THE COURT:  The bottom of Page 6.

12              MR. RUPERT:  To give if applicable.

13              THE COURT:  Yes --

14              MR. RUPERT:  That's out.

15              THE COURT:  -- the last, Give if

16         applicable, you're saying that's all out?

17              MR. RUPERT:  I've got a different Page 6

18         than you do.

19              MR. BUSTAMANTE:  That's the same one

20         (indicating.)

21              MR. RUPERT:  Yeah, the -- the bottom of

22         Page 6, where it's italicized, it says, Give if

23         applicable --

24              THE COURT:  Yeah, are you having all of

25         that out; are you saying none of that?  Are you
```

1    guys telling me you're in agreement and none of

2    that's applicable?  So that italicized portion

3    and everything that flows after it, you're

4    saying is out?

5        MR. BUSTAMANTE:  I don't think it's

6    relevant, but I think if the Defense wants it,

7    that's why I put it in there, just in case.

8        MR. RUPERT:  All right.  So we're clear

9    on the record, Defendant not in a dwelling or

10   residence; where Defendant was in a dwelling or

11   residence, but that had no right to be there;

12   where appropriate the Court should state and

13   define the applicable criminal activity that

14   the Defendant may have been engaged in.  I

15   think all that comes out.

16       MR. BUSTAMANTE:  What that means is, is

17   then on Page 7, essentially that whole page is

18   going to come out.

19       MR. RUPERT:  Okay.  Well, at the -- Give

20   if applicable is -- is very misleading to

21   the -- the following non-scripted paragraph

22   that starts with, Timothy Gene Malone was

23   justified in using deadly force.  If you

24   reasonably believe that such force was

25   necessary to prevent in the death or great

1    bodily harm to himself, or the imminent

2    commission of an attempted aggravated battery

3    against himself.  If Timothy Gene Malone was

4    not otherwise engaged in criminal activity and

5    he was in a place he had a right to be, then he

6    had no duty to retreat and had the right to

7    stand his ground.  I don't see where

8    italicized, Give if applicable, that comes out

9    would -- would have that paragraph flowing

10   logically, but I want that paragraph in.  If it

11   requires leaving the above italicized

12   paragraph --

13        THE COURT:  No, no, the italicized stuff

14   comes out all the time.

15        MR. RUPERT:  Okay.

16        THE COURT:  The italicized stuff never is

17   staying in the instructions.  That's -- that's

18   for us, right --

19        MR. RUPERT:  Right.

20        THE COURT:  -- that's for our benefit,

21   not their's.

22        MR. RUPERT:  I thought somebody said that

23   that's --

24        THE COURT:  All of the italicized stuff

25   is coming out one way or another.

```
1            MR. RUPERT:  All right.
2            THE COURT:  The -- the question is, is
3     giving us this road map saying, you give what
4     follows me, if applicable --
5            MR. RUPERT:  Right.
6            THE COURT:  -- right, and it's trying to
7     give us clues as to what the paragraphs that
8     follow that are applicable.
9            MR. RUPERT:  Right.
10           THE COURT:  We're not going to give them
11    the italicized stuff.  We're just giving them
12    the paragraphs, if you believe it's applicable.
13           MR. RUPERT:  Right.
14           THE COURT:  Do you believe it's
15    applicable?
16           MR. RUPERT:  The paragraph that follows
17    that, what I just read, yes, sir.
18           THE COURT:  Okay.  So then we'll leave it
19    in.
20           MR. RUPERT:  Thank you.
21           THE COURT:  And then the last full
22    paragraph on the bottom of Page 7, that comes
23    in?
24           MR. RUPERT:  I had it as out, but let me
25    just read it real quick, because it is
```

```
 1        convoluted.  Yeah, that comes out.
 2              THE COURT:  What?
 3              MR. RUPERT:  I don't see where that
 4        applies, because there's no evidence that
 5        Timothy Gene Malone was otherwise engaged in
 6        criminal activity.
 7              THE COURT:  Well, it's -- the whole
 8        State's case is.  The whole State's case is
 9        that he was engaged in the criminal activity.
10        Why would it not be applicable; isn't it?
11        Isn't it that -- Mr. Malone is saying the other
12        guy's the one coming at me with an axe, and I
13        defend myself.  The State's case is, no, it was
14        Mr. Malone who was the one engaged in criminal
15        activity; am I -- am I -- you tell me.  You
16        state if it comes out; what's the State's
17        position, you want it out?
18              MR. BUSTAMANTE:  Your Honor, which page
19        are we on?
20              THE COURT:  The bottom of Page 7.
21              MR. BUSTAMANTE:  I think it needs to stay
22        in.
23              THE COURT:  And Defense, you're saying it
24        comes out?
25              MR. RUPERT:  Well, it -- Mr. Malone never
```

1    had a duty to retreat --

2        THE COURT:  All right.

3        MR. RUPERT:  -- that's the problem I

4    have.

5        THE COURT:  Defense wants it out, it's

6    out.  Let's go to Page 8, you would agree the

7    big paragraph in the middle of the page stays

8    in, right, got to judge you based on the

9    circumstances of surrender, right?

10        MR. BUSTAMANTE:  That stays there?

11        MR. RUPERT:  Yes, sir.

12        MR. BUSTAMANTE:  Yes, Your Honor.

13        THE COURT:  So you think that stays in,

14    all right.  And then --

15        THE REPORTER:  Out or in?

16        THE COURT:  In.  And the paragraph about,

17    However, the use of -- the use of

18    (indiscernible) force is not justified if you

19    find Defendant was attempting to commit,

20    that -- that stays in, correct; the State's

21    case is Mr. Malone --

22        MR. BUSTAMANTE:  Yes.

23        THE COURT:  -- was the aggressor?

24        MR. BUSTAMANTE:  Uh-huh, that's correct.

25        MR. RUPERT:  Hold on.  Yes, sir.

```
1              MR. BUSTAMANTE:  Yes.

2              THE COURT:  So Page 9 -- 9 and 10 should

3         become very easy for us.  So let's just go to

4         prior threats; do you agree the paragraph about

5         prior threats is applicable?  There's no

6         evidence of specific prior threats by

7         Pardekooper towards Malone; do we agree?

8              MR. BUSTAMANTE:  We agree.

9              THE COURT:  Mr. Rupert?

10             MR. RUPERT:  Correct.

11             THE COURT:  All right, so that's out.

12        Specific act of victim known by the Defendant,

13        that stays?

14             MR. RUPERT:  Yes, sir.

15             THE COURT:  Reputation of victim known by

16        the Defendant, that stays, correct?

17             MR. RUPERT:  Yes.

18             THE COURT:  Reputation of the victim not

19        necessarily known by Defendant; we'll keep it

20        in, right, based upon --

21             MR. RUPERT:  Yes.

22             THE COURT:  -- outside of the testimony,

23        you want to leave that in?

24             MR. RUPERT:  Yes, sir.

25             THE COURT:  Physical abilities, all cases
```

1    stays in, the last two paragraphs in all cases

2    stay in?

3         MR. RUPERT:  Yes.

4         THE COURT:  So you agree to that

5    instruction with those changes?

6         MR. RUPERT:  Yes, sir.

7         THE COURT:  Okay, let's go to non-deadly

8    force.  So it seems to me, consistent with what

9    we just did that the only thing that comes out

10    is the first paragraph on the top of Page 13.

11    Everything else would come in that you have in

12    this instruction?

13         MR. RUPERT:  Yes, sir.

14         THE COURT:  Does the State agree?

15         MR. BUSTAMANTE:  Yes, Your Honor.

16         THE COURT:  So any other requests as it

17    relates to the two self-defense instructions?

18         MR. RUPERT:  No, sir.

19         THE COURT:  Okay.  So the State will work

20    on these.  If we've got to take another break

21    after your arguments, we will, but we've got to

22    get the arguments going.  Let's get ladies and

23    gentlemen of the jury.

24         (Jury enters the courtroom.)

25         All right.  Let the record reflect that

1    the ladies and gentlemen of the jury are back

2    and present in the courtroom, and you-all may

3    be seated.  Ladies and gentlemen, I should have

4    mentioned this to you before, as well.  I'm

5    also willing to defer to you-all, so if you-all

6    feel like you don't want to keep going and

7    finish, and you want to go home and come back

8    tomorrow, I'm willing to consider that for you,

9    as well.  That would be something that I'd ask

10   you-all -- if you think you want to do that or

11   want to discuss that, I'll let you step back

12   out and discuss that; otherwise, we are where I

13   told you we'd be at in the beginning, which is,

14   does Defense wish to call any other witness or

15   present any other evidence.

16        MR. RUPERT:  The Defense rests.

17        THE COURT:  Does the State wish to

18   present any rebuttal case?

19        MR. BUSTAMANTE:  No, Your Honor.

20        THE COURT:  So where we're at, ladies and

21   gentlemen, is both the State and Defense have

22   now rested their case.  So we're at the point

23   and time in the trial where the attorneys are

24   now going to make to you their final arguments.

25   So I'll let the attorneys say it, and if you

1    recall, it is not evidence, but you should

2    listen closely to their arguments, because

3    they're intended to aid you in your

4    understanding of the case.  Each side has equal

5    time to make their arguments, but the State's

6    entitled to divide their time between an

7    opening apartment and rebuttal argument after

8    the Defense has spoken, so that's where we're

9    at; do you all want to keep going?

10        UNKNOWN MALE:  I'm good if we come back

11    tomorrow.

12        THE COURT:  All right.  I've got one

13    tomorrow.

14        UNKNOWN MALE:  How long do you think

15    we've got?

16        THE COURT:  I -- I think -- the

17    arguments, you should expect maybe a total of

18    an hour or so, and my instructions take about

19    15 minutes or so, and then it will be yours.

20    And, you know, if it -- if you deliberate, and

21    you go, I'm going to -- I'm going to get dinner

22    for you.  I'm going to take care of you in that

23    way, if that matters.

24        UNKNOWN FEMALE:  I mean, I'm thinking

25    about her -- the guy right here that doesn't --

1    I say we just stay and go, then --

2         UNKNOWN MALE:  I don't get paid for being

3    here, so I don't get nothing.

4         THE COURT:  Well, that's -- that's -- I

5    understand, and that's part of the reason why I

6    ask is because, I've got to be here tomorrow

7    anyway, right, and so does everyone else really

8    involved.  They're going to be here tomorrow

9    working one way or another, but you all aren't.

10   You're -- you're having to pull away from your

11   lives to serve, so I -- it doesn't matter to

12   me, I'm going to accommodate people, and I

13   should have told you that before, because that

14   break lasted a little longer than I thought.

15   So is everyone good, do you want to keep going?

16        UNKNOWN MALE:  Yep.

17        UNKNOWN FEMALE:  Yeah.

18        THE COURT:  Okay.  All right, then with

19   that instruction that I gave, State, you may

20   proceed with their closing argument.

21        MR. BUSTAMANTE:  Good afternoon.  It's

22   been a long day, and as long as (indiscernible)

23   I think about something that my grandmother

24   told me when I was a younger prosecutor.  I

25   talked to her about a case, talked about some

1    of the difficulties in cases, and -- and she

2    told me something, and I'll translate it to you

3    in Spanish.  When a crime is committed, do not

4    expect your witnesses or your victims to be

5    little angels.

6        And one of the things that I learned from

7    her is that people are complicated.  People are

8    flawed, but they're people.  And when they come

9    here, you see everything.  You see their

10   faults.

11       Are they scripted, they say things

12   sometimes off the cuff.  They're not perfect,

13   but they're human beings.  And human beings

14   sometimes make terrible decisions, bad

15   decisions, but human beings don't deserve to be

16   hit with a bat like this (indicating,) not when

17   what we're dealing with is the possible missing

18   of an SD card that has some movies, that have

19   some songs, that have some pictures.  Five-time

20   convicted felon and one with dishonesty, he

21   doesn't deserve this.

22       And then you have the Mathews, they're

23   not rich, but they're people.  And this is

24   their home, and it might not be a castle, but

25   it is their castle, and they have the right to

1    tell people who do not belong there, not to

2    come in.  They had a 14-month-old baby, who was

3    still walking -- not walking.  When she was

4    talking about the baby, did you see the gleam

5    in her eye?

6         And as a mother, although, she didn't see

7    this, but this Defendant brought this

8    (indicating) into their home.  Can't a young

9    family, even if they're poor, have the right to

10    tell people they do not want inside their home

11    and bring something like this?  And at this

12    point, nobody's accusing the Mathews of taking

13    anything, stealing anything.  They just went

14    out to dinner, and what did they do, just

15    coming home.

16         Something that happened in their

17    neighborhood, when I asked them about the

18    tablet that happens to have just been on that

19    couch where this Defendant was sitting next to,

20    and his excuse is, it was there when we got

21    there.  What a coincidence, but again, the

22    Mathews are not perfect, they're just a young

23    family who (indiscernible) struggles there are.

24    They still deserve to have a castle.  A castle

25    is their home, they can keep people out.

1          And when somebody just pushes their way

2     through the door, that's not permission.  What

3     did this mother do, protect her child, and she

4     left her home.  He took over, and what did

5     Scott Mathews -- who pointed out he's taller,

6     still very thin -- what did he do, too, he also

7     left his house, because he's there, and he was

8     armed; he didn't know what he was going to do.

9          If it was consistent that the Mathews

10    would have said, hey, come on, have a seat

11    down, let's smoke some weed.  And all of a

12    sudden, five-minutes later, the police get

13    there, that makes absolutely no sense.  Their

14    story makes sense.  Just because you're in a

15    courtroom does not mean that the common sense

16    that you-all have earned through the school of

17    hard knocks stays out there (indicating.)

18         Use your common sense, don't let these

19    people get you confused.  This is very clear,

20    this is a man who's on probation, was angry

21    that his SD card was taken from him, and he

22    resorted to violence.  And he hit a man who has

23    100-pounds over him at the time.  Why would he

24    do that?  Because he knows the other guy's

25    bigger, and when he's angry, he is going to go

1    ahead and hit him, and he hit him right across

2    the face, just like Mr. Pardekooper said, which

3    is consistent to the type of injuries

4    (indicating) that the police officers took that

5    night.

6        Now, was this a perfect investigation,

7    no.  There was no DNA taken.  There was videos

8    that may or may not have been done.  But what

9    you do have is the people who actually were

10   there, who witnessed it.  The people who were

11   hurt, the people who actually saw everything,

12   and they came to testify to expose everything

13   to you-all, for you to make a decision as to

14   their credibility or not.

15       You have four charges to consider.  One

16   charge, aggravated battery with a deadly

17   weapon.  You can take this back there with you.

18   I am sure that they will give you gloves.

19       This can be a deadly weapon.  It's made

20   out of metal.  This is not meant to be hitting

21   somebody's head.  You see there's blood and the

22   other things around it.

23       Did he use -- did the Defendant use that

24   to hit Matthew Pardekooper?  The testimony's

25   pretty clear.  Whether it was self-defense,

1    that is a different story.  I will submit to

2    you, when it comes to those claims of

3    self-defense, that this is a claim that comes

4    three-years after this happened.

5         Did the other witnesses look like they

6    had three years to rehearse their story?  But I

7    submit to you that after three years, all of

8    these facts and circumstances seems to have an

9    explanation with the actions of this Defendant.

10   For every little thing, there's an explanation.

11   Somehow that tablet just happens to appear in

12   somebody's house, happens to be next to him.

13        Even though Mr. Pardekooper seems to have

14   this violent history of three separate

15   incidents in which it looks like the violence

16   is actually getting worse, he still somehow

17   hangs around with him.  Is he really that

18   scared, or he's just going back and fitting

19   some of the facts and circumstance he remembers

20   to fit it into his scenario to say, wait a

21   minute, I need to explain somehow why I hit

22   this man with a bat.  And if I find an excuse

23   which fits neatly as to that, maybe the jury

24   will buy it.  They'll fall for that.  They'll

25   fall for it.

```
 1            He didn't have a single scratch that day,
 2       and according to him, Mr. Pardekooper somehow,
 3       after being hit, and you saw those injuries,
 4       somehow look like he was cured.  Bruises don't
 5       work that way, regardless of whether that would
 6       have been a lot more serious or less serious,
 7       when your eye gets hit -- and again, you can
 8       use your own experience in seeing how these
 9       things work out in the real world -- you're
10       going to have a black eye.  It is going to look
11       worse in the next few days.  You just don't
12       decide that you're going to cure itself.  It
13       just makes absolutely no sense.
14            It's been a long day, I'm not going to
15       belabor the point too much, and I'm going to
16       try to make this real short.  Listen to the
17       jury instructions, and I have one more
18       opportunity after they argue to go ahead and
19       make my final, final closing arguments.  And
20       I'm going to ask you to find him guilty of the
21       charges, the aggravated battery with a weapon,
22       the bat.  The armed trespass for going into the
23       Mathews' place, and the fact that he was a
24       convicted felon at the time, and he was in
25       possession of a weapon, which is that huge
```

1    knife that you all see.  Thank you so much.

2         THE COURT:  Mr. Rupert?

3         MR. RUPERT:  May it please the Court,

4    Counsel.

5         Good evening.  On behalf of my client, I

6    appreciate your attention that you've been

7    giving today, through today's testimony.  This

8    will be my only opportunity to speak to you.  I

9    won't have a chance to rebut what Mr.

10   Bustamante will be saying next.  Remember what

11   the attorneys say is not evidence.

12        You have a tough job.  Your job is to

13   determine where the credible facts are.  The

14   fact has to be credible for you in order to

15   take it as a fact.  It's got to be credible,

16   and then you take those facts, and then you

17   apply it to the law.

18        The elements that will be explained to

19   you have to be proven beyond and to the

20   exclusion of all reasonable doubt.  So unless

21   you, as an individual juror, finds the fact to

22   be credible -- if you don't find it to be

23   credible, you can't use it in your analysis to

24   determine that it's used to prove an element of

25   the offense.  So what I was trying to get to

1    you, and I didn't articulate it very well in

2    the jury selection, but if the witness gets up

3    there and says, A, B, C and D, one -- one juror

4    believes A and B, and the other one believes B

5    and C, the other one believes none, the other

6    one believes all, you don't have a consistent

7    analysis to make those four things to be facts.

8    And if they're not credible facts, then they

9    can't be part of the consideration to prove

10   beyond and to the exclusion of all reasonable

11   doubt as to each and every element.  So your

12   job as jurors is to determine that first.

13        On May 12th, 2018, it was a split-second

14   incident that you are now charged to decide

15   what happened.  The burden on the State is to

16   prove that my client was the one that initiated

17   this altercation.  We submit to you that my

18   client does indeed have a right to

19   self-defense.  In that split second, he did the

20   only thing that he could do to prevent himself

21   from being injured, and that was to grab that

22   bat.

23        Interesting, this is sitting in a truck,

24   and you grab, and a split second you defend

25   yourself.  It it's not like you're going to

1    position yourself and then make sure you've got

2    the handle.  The blood-like substance, and

3    we're not disputing that, but they certainly

4    didn't do a good forensics job on this case.

5    All of the blood was on the handle, which would

6    tell me -- and I submit to you, would tell a

7    reasonable juror that this thing was indeed

8    just laying there -- and in a split second, my

9    client, Timothy Malone, grabbed it by the top

10   and defended himself, like he said, and struck

11   Mr. Pardekooper to prevent serious injury to

12   himself.

13        He had no duty to retreat, had no time to

14   retreat, had no other choice than to take that

15   action.  It makes no sense that my client would

16   be the aggressor.  If he was the aggressor, he

17   would have grabbed that bat from the handle and

18   gone after Mr. Pardekooper.  Clearly, the

19   evidence doesn't show that.

20        If my client was the aggressor and used

21   the bat, he would never allow Mr. Pardekooper

22   to pick up that axe.  Mr. Pardekooper told you

23   he picked up that axe.  He told you he was

24   interviewed by law enforcement, and yet, those

25   interviews at that time were never placed into

evidence, so it's been three years for Mr.
Pardekooper to decide what his testimony was
going to be.

There's a lot of -- a lot of different
factors in here.  My client, after that event,
he did run.  And the State, I anticipate, Mr.
Bustamante, is going to hammer that when he
comes up, and he's going to say, oh, that's
consciousness of guilt.  I think if you weigh
the credibility of -- of Mr. Malone when he's
testifying, and he looked you in the eye and --
and told you that the reason he fled was he
knew it was over.

He's on probation.  He's -- he's going
for the ride, it's over.  He's gone, and he
made a poor choice, and he was honest about
that.  He did some -- some bad things.

He left the scene, he cut off his ankle
bracelet.  He took that knife, and he displayed
it on his hip, because he didn't know what
residents from that place would be mad about
the incident.  So when you deliberate, you
understand he's not charged for cutting off the
bracelet.  He's not charged for leaving the
scene, but the State's going to argue that

1          somehow that implicates and changes the facts
2          of split-second decision to defend himself;
3          that in no way changes that split-second
4          decision that he had to defend himself.
5               That's the aggravated battery with a
6          deadly weapon.  Timothy Malone used justifiable
7          force to defend himself.  He's allowed to do
8          that.  The Judge will tell you that.  When you
9          go back and you review the credible facts on
10         that charge, I would urge you to come back with
11         a verdict of not guilty as to that charge.
12         Weigh the -- the evidence.
13              Count II, Possession of a Concealed
14         Weapon, it was not concealed.  It was on his
15         hip, that's legal.  You can have it on your
16         hip, and it can be displayed.
17              Count III, is the theft.  Well, the State
18         wants to come and tell you, oh, well, that's
19         Mr. Malone, and that's Mr. Malone, because Mr.
20         Pardekooper said that was his laptop, and he
21         must have taken it.  Well, where are the --
22         there's a lot of things you can do.  The State
23         decided through law enforcement not to do
24         anything to really substantiate their claim
25         that my client took that.

1          Take fingerprints, keep the item.  Do we

2    know if it works?  We don't know any of that.

3    We just have to trust Mr. Pardekooper, a

4    five-time convicted felon, a crime of

5    dishonesty, thievery, as the sole basis for

6    that charge.

7          Trespass on Property while Armed, all

8    right, well, I just want to remind you quickly,

9    it seems that Mr. McCaullie was a -- a

10   figurehead out there, that pretty much

11   everybody liked him, and my client did, and so

12   did the other people.  So there was a

13   connection there with Scott and Lisa and that

14   certainly the stepfather, Mr. McCaullie, so

15   it's a small town, small area.  What's the

16   evidence?  Both Mathews, Mr. and Mrs. Mathews,

17   there was a knock (demonstrating,) and there

18   was the door opening, which signified come in.

19   In fact, if you listen -- if you remember what

20   Lisa Mathews said, she said, I opened it up

21   thinking it was somebody I knew.

22         So opening it up would allow that person

23   to come in.  Now, my client came in, and he

24   came in fast, and Lisa Mathews indicated that

25   he did brush by her.  He came in, told to

1    leave, and he said can I stay, so there was

2    that discussion.  After that discussion, Mr.

3    Mathews sat with him for five-to-ten minutes

4    and allowed him to stay.  It's called consent;

5    thus, he could not be trespassing.

6         Yes, he had a knife on him, and the

7    State's going to probably show that knife to

8    you five-more times during their rebuttal

9    argument.  And it's a big knife, and it's

10   scary, but if you ask the Mathews, and they

11   were, at anytime was this displayed as a

12   weapon, were you ever threatened with that, did

13   you ever feel threatened, no.  Did you ever

14   feel that your baby was in danger by that

15   knife, no.

16        Lisa Mathews and the child were -- were

17   out of the home.  She left because -- and I

18   submit to you to use your common sense --

19   she's -- it's a small community, and she heard

20   through that community that there was an

21   incident, and based just on that, she

22   determined in her mind -- and she's got a baby,

23   so she's going to flee the area.  But my client

24   did nothing to threaten that, that was whatever

25   she was told by somebody, and she never saw the

1    event.

2         When you look at the facts to determine

3    whether or not they're credible, the Judge is

4    going to give you certain guidelines called,

5    weighing the evidence.  Did the witness seem to

6    have an opportunity to see and know the things

7    about which the witness testified; did the

8    witness seem to have an accurate memory.  And

9    talking with Pardekooper on my

10   cross-examination, it seems like he flipped

11   back and forth a couple of times.  I was

12   interviewed, no I wasn't interviewed.  Go back,

13   reflect, taking notes and talk about those

14   things.

15        Was this -- was the witness honest and

16   straightforward in answering the questions?

17   I'm questioning Deputy Sumner and Mr.

18   Pardekooper, and you could tell by their

19   demeanor, they weren't straightforward, that

20   they had an agenda, and they wanted to answer

21   the questions in a certain way that would

22   benefit their case, which goes to the next one,

23   weighing the evidence.  Did the witness seem to

24   have something to (indiscernible) on how the

25   case should be decided, and whether or not the

1    witness's testimony agreed with the other

2    testimony and the evidence in the case?

3    Clearly, Mr. Pardekooper and Mr. Sumner were on

4    different pages.

5        I anticipate that Mr. Bustamante's going

6    to talk about this SD card that my client had,

7    and he's going to minimize it.  He's going to

8    say that -- that's just not worth anything, it

9    has to no value, why would you start an

10    argument over that.  I want to remind you that

11    this was an ongoing situation with Mr.

12    Pardekooper.  Mr. Pardekooper had a lot of

13    problems, that Mr. Malone was trying to get him

14    out of the community, that he talked to the

15    figurehead of Lost Valley about Mr. McCaullie

16    and wanted to get him out of there.

17        This was going to be the last straw for

18    Mr. Pardekooper, for stealing this.  You could

19    tell from the argument that was ensuing, but to

20    my client, this was his whole life.  And as Mr.

21    Bustamante went to great lengths to tell you

22    that these people that lived there, they don't

23    have a lot.  So what might not seem like a lot

24    to you, an SD card with movies and those type

25    of things, it would be a lot to my client,

1    Timothy Malone, at that time.  It had his whole

2    life on it.

3        Lieutenant -- or Deputy Sumner had a

4    bodycam, and basically, through the direct with

5    the State, and -- and what I anticipate Mr.

6    Bustamante's going to tell you is that, don't

7    worry about it, they're doing the best they

8    can.  There's a reason why law enforcement are

9    required to have bodycams.  It's important to

10    make sure that what they're telling you is

11    truthful and accurate, and I don't know if this

12    was a mistake, or this was intentional.  I

13    don't think anybody will ever know, but let me

14    make this clear, it doesn't really matter.  It

15    doesn't really matter.

16        It doesn't change anything, and -- and

17    let me submit to you, it shouldn't change in

18    your analysis, that negligence is just as bad.

19    Mr. Bustamante will come up here and say, you

20    know, we had a lot of problems with the -- the

21    bodycams, a lot of problems at first.  Well,

22    these deputies are allowed to go to the traffic

23    room or the patrol room and download their own

24    bodycam, and then it goes into evidence.  Low

25    and behold, when it first starts, there is a

1      lot of problems, they don't get downloaded.

2           Well, what -- use your common sense, are

3      they not getting downloaded, because

4      everybody's making the same mistake, or maybe

5      they don't want those bodycams to be downloaded

6      and preserved for evidence.  So then

7      constraints had to come in to make sure that

8      bodycams are downloaded.  Ask yourself, would

9      you want to see the interview with Mr.

10     Pardekooper by Deputy Sumner.  If you want to

11     see it, and it's not there, that's a lack of

12     evidence.

13          Deputy Sumner had that on when he went to

14     the trailer to -- to go get Timothy Malone.  Do

15     you want to know what happened there?  If you

16     would, if you would want to see that bodycam,

17     and it's not available, that's a lack of

18     evidence.  The Judge will tell you that you can

19     find reasonable doubt solely on the basis of

20     lack of evidence.

21          When Mr. Bustamante gets up here, again,

22     I will not have a chance to address those

23     things that he says.  I will not be able to

24     rebut his rebuttal.  Ask yourself, is that Mr.

25     Bustamante telling you a fact, or is that just

1       what someone said.  And then if that's what

2       someone said, I'm going to do my job as a juror

3       and I'm going to look and say, well, do we know

4       that to be true, is that a credible fact.

5            It's always better to let 100 guilty men

6       go free than is to convict one innocent person.

7       Use that in your analysis.  You had the word of

8       Mr. Pardekooper against the word of Mr. Malone.

9       In order for you to find Mr. Malone guilty, you

10      had to find that Mr. Pardekooper's credibility

11      is at such a position that the State has proven

12      beyond and to the exclusion of all reasonable

13      doubt that my client did, in fact, commit an

14      aggravated battery with a deadly weapon.

15           I submit to you that when you do that,

16      you go through and you determine all the

17      credible facts, and you determine whether or

18      not the State has met its burden that the only

19      true and just verdict in these charges would be

20      to return a verdict of not guilty.  Thank you.

21           THE COURT:  All right.  State?

22           MR. BUSTAMANTE:  **During** voir dire, one of

23      the questions that I asked, threw it out there,

24      were about secrets.  What could drive a person

25      to something to desperate?  What do we know?

1      We know that this Defendant had an SD, had a

2      cell phone that was not registered with the

3      probation officer.

4          We know in unrebutted testimony by Mr.

5      Pardekooper that he was concerned that

6      something in that SD card would put him in for

7      life, motivation, that's secrets.  We know that

8      when after the conflict, instead of staying

9      exactly where he was at and make allegations

10     that Mr. Pardekooper and that he attacked him,

11     what did he do, he fled, he cut his anklet

12     which is how probation would be able to find

13     him and just left, hidden in the forest where

14     nobody could find him.  Where even though you

15     have probation officer and a deputy looking for

16     him for 45 minutes in an area that's not all

17     that big could not find him.  And we know,

18     somehow during that period of time, that the

19     tablet that belonged to Mr. Pardekooper went

20     missing, a tablet by the way that has access to

21     the internet according to the testimony from

22     the owner of it.

23         Why would he not be truthful about that?

24     What do you get from that?  And, in fact, it's

25     one that his grandmother gave him as a present,

1    and one of the few items that a poor person

2    like himself keeps secure in his truck, which

3    is the only place that he feels safe in putting

4    something like that.  He just made it up that

5    his grandmother bought him that, that it's was

6    one of his precious items.  He's not trying to

7    keep a secret.

8         The person who is desperate to keep that

9    secret is that Defendant right there

10   (indicating.)  And all of actions that he took

11   are consistent with that, including going to

12   somebody else's house with a knife.  And I'm

13   not going to show it to you, because you've

14   seen it so many times already, it's huge.  And

15   the Defense Counsel gets up here and makes an

16   argument that because somebody opens the door

17   that means that, oh, well, come on in.  That's

18   just ridiculous.

19        You have the right to say no to people

20   who come in, and if they're there threatening

21   you, you have -- the mother, the first instinct

22   that she has is to take my child out of here.

23   Is that consistent with somebody who decided,

24   come on in, no.  That's just ridiculous.

25        And when they talked about the SD card

1    having no value, it had a lot of value.  A

2    value that he is willing to hit another human

3    being with a bat, whether he grabs it like this

4    (demonstrating,) or whether he grabs it the

5    other way.  It is going to hurt, and it's going

6    to make that point.  You know why, because he

7    is 100 pounds lighter than the def- -- than the

8    victim, and he knows that he's going to have to

9    bring a stick or something bigger in order to

10   win that fight, because he wants that SD card

11   really, really bad.

12        Defense Counsel got up here and talked

13   about the credibility of defenses -- the police

14   officers, the deputies.  He's equating the fact

15   that nefarious, that because the videos are

16   not -- somehow were downloaded, that means this

17   did not happen.  Does this look like it's made

18   up (indicating)?  (Indiscernible,) torn shirt,

19   all of this, does that look like it's made up?

20   Does this look that it's made up (indicating)?

21   Even the tiniest little thing that was in the

22   Defendant's pocket, is this made up

23   (indicating)?

24        When you go back there, use your common

25   sense.  One of the things that I wanted to read

1    to you, when you start talking about reasonable

2    doubt, and it talked about an example about

3    monopoly.  Listen to the instructions as to

4    what the rules of the game are.  One of the

5    things it's going to tell you that a reasonable

6    doubt, is that a mere possible doubt,

7    speculative, imaginary or a force doubt, such a

8    doubt must not influence you to return a

9    verdict of not guilty, if you have an abiding

10    conviction of guilt, and there's more to the

11    definition of that.  Do you have an abiding

12    conviction of guilt, absolutely.

13        And the other thing, the Defendant has

14    become a witness in this case.  You should

15    apply the same rules of consideration for his

16    testimony that you applied to the testimony of

17    other witnesses.  He also gets to be judged by

18    you, and his testimony, also, you should use

19    review and the same type of analysis that you

20    use with everybody else.  And whose story above

21    all made absolutely no sense whatsoever?

22        Which story here had so many different

23    excuses that I think the excuses actually had

24    excuses.  Use your common sense, this Defendant

25    is guilty by himself.  Thanks.

```
1              THE COURT:  Thank you, State.
2              Ladies and gentlemen, the deputy's going
3        to hand out to you a copy of the jury
4        instructions.  You're going to have those
5        copies to take back with you in the jury room.
6        Those are your copies.  If you receive this
7        information I'm about to read better by reading
8        along, I invite you to do that.  If you receive
9        it better by simply listening while I read it,
10       that's fine, too.  I'll leave that decision up
11       to you, individually.
12             All right.  Members of the jury --
13             THE REPORTER:  I'm so Judge --
14             THE COURT:  -- I'd thank you for your
15       attention --
16             THE REPORTER:  I'm so sorry, I'd like a
17       copy.  Thank you.
18             THE COURT:  All right.  Members of the
19       jury, I thank you for your attention during
20       this trial.  Please pay attention to the
21       instructions I'm about to give you.  Timothy
22       Gene Malone, the defendant in this case, has
23       been accused of the following crimes:
24       Aggravated battery with a deadly weapon,
25       possession of a concealed weapon by a convicted
```

1    felon, theft and trespass on property while

2    armed.

3         To prove the crime of Aggravated Battery

4    with a Deadly Weapon, the State must prove the

5    following two elements beyond a reasonable

6    doubt.  One, Timothy Gene Malone actually and

7    intentionally touched or struck Matthew

8    Pardekooper against his will.  And two, Timothy

9    Gene Malone, in committing the Battery, used a

10   deadly weapon.  A "deadly weapon" is any object

11   that will likely cause death or great bodily

12   harm if used of threatened to be used in the

13   ordinary and usual manner contemplated by its

14   design and construction.

15        An object not designed to inflict bodily

16   harm my nonetheless be a "deadly weapon" if it

17   was used or threatened to be used in a manner

18   likely to cause death or great bodily harm.  In

19   considering the evidence, you should consider

20   the possibility that although the evidence may

21   not convince you that the defendant committed

22   the main crimes of which he is accused, there

23   may be evidence that he committed other acts

24   that would constitute a lesser included crime.

25   Therefore, if you decide that the main

1    accusation has not been proven beyond a

2    reasonable doubt, you will next need to decide

3    if the defendant is guilty of any lesser

4    included crime.  The lesser crime indicated in

5    the definition of Aggravated Battery with a

6    Deadly Weapon is Battery.

7         To prove the crime of Battery, the State

8    must prove the following element beyond a

9    reasonable doubt:  Timothy Gene Malone actually

10   and intentionally touched or struck Matthew

11   Pardekooper against his will.  An intentional

12   touching or striking includes situations where

13   a defendant knows that a touch or strike is

14   substantially certain to result from his or her

15   act.  Now, it is a defense to the crime of

16   Aggravated Battery with a Deadly Weapon,

17   including the lesser-included offense of

18   Battery, if the actions of Timothy Gene Malone

19   constituted the justifiable use of deadly

20   force.  "Deadly force" means force likely to

21   cause death or great bodily harm.  "Great

22   bodily harm" means great as distinguished from

23   slight, trivial, minor or moderate harm, and as

24   such does not include mere bruises.

25        The use of deadly force is justifiable if

1    Timothy Gene Malone reasonably believed that

2    the force was necessary to prevent imminent

3    death or great bodily harm to himself while

4    resisting in another's attempt to murder him,

5    or any attempt to commit an Aggravated Battery

6    up him.  Again, to prove the crime of Attempted

7    Aggravated Battery, the following two elements

8    must be proven, that Matthew Pardekooper

9    attempted to actually and intentionally touch

10   or strike Timothy Gene Malone against his will.

11   And two, Matthew Pardekooper, in attempting to

12   commit the Battery, used a deadly weapon.

13       Timothy Gene Malone was justified in the

14   use deadly force if he reasonably believed that

15   such force was necessary to prevent imminent

16   death or great bodily harm to himself or the

17   imminent commission of an Attempted Aggravated

18   Battery against himself.  If Timothy Gene

19   Malone was not otherwise engaged in criminal

20   activity and was in a place he had a right to

21   be, then he had no duty to retreat, and he had

22   the right to stand his ground.

23       To prove the crime of Attempted

24   Aggravated Battery, again, it's the same two

25   elements that must be proven that I just

1    explained to you, which are that Matthew

2    Pardekooper attempted to actually and

3    intentionally touch or strike Timothy Gene

4    Malone against his will.  And Matthew

5    Pardekooper, in attempting to commit the

6    Battery, used a deadly weapon.

7         In deciding whether Timothy Gene Malone

8    was justified in the use of deadly force, you

9    must consider the circumstances by which he was

10   surrounded at the time the force was used.  The

11   danger need not have been actual; however, to

12   justify the use of deadly force -- excuse me,

13   let me start that sentence over -- the danger

14   need not have been actual; however, to justify

15   the use of deadly force, the appearance of

16   danger must have been so real that a reasonably

17   cautious and prudent person under the same

18   circumstance would have believed the danger

19   could only be avoided through the use of that

20   force.  Based upon appearances, Timothy Gene

21   Malone must have actually believed that the

22   danger was real.  However, the defendant had no

23   duty to retreat if he was not otherwise engaged

24   in criminal activity and was in a place where

25   he had a right to be.  However, the use or

1      threatened use of deadly force is not justified

2      if you find that Timothy Gene Malone was

3      attempting to commit, committing, or escaping

4      after the commission of an Aggravated Battery

5      with a Deadly Weapon.

6          To prove the crime of Aggravated Battery

7      with a Deadly Weapon, the State must prove the

8      following two elements:  Timothy Gene Malone

9      actually and intentionally touched or struck

10     Matthew Pardekooper against his will, and

11     Timothy Gene Malone, in committing the Battery,

12     used a deadly weapon.  If you find that at the

13     time of the alleged Aggravated Battery with a

14     Deadly Weapon, Timothy Gene Malone knew that

15     Matthew Pardekooper had committed an act or

16     acts of violence, you may consider that fact in

17     determining whether Matthew Pardekooper -- that

18     should say -- so if you have your pens, cross

19     that out -- that should say, that you may

20     consider that fact in determining whether

21     Timothy Gene Malone reasonably believe it was

22     necessary for him to use deadly force.

23         If you find that Matthew Pardekooper had

24     a reputation of being a violent and

25     dangerous -- and a dangerous person and that

1    his reputation was known to Timothy Gene

2    Malone, then you may consider this fact in

3    determining whether the actions of Timothy Gene

4    Malone were those of a reasonable person in

5    dealing with an individual of that reputation.

6    If you find that Matthew Pardekooper had a

7    reputation of being a violent and dangerous

8    person, you may consider this fact in

9    determining whether he was the initial

10    aggressor.

11        In considering the issue of self-defense,

12    you may take into account the relative physical

13    abilities and capacities of Timothy Gene Malone

14    and Matthew Pardekooper.  If in your

15    consideration of the issue of self-defense you

16    have a reasonable doubt on the question of

17    whether Timothy Gene Malone was justified in

18    the use of deadly force, then you should find

19    him not guilty.  However, if from the evidence

20    you are convinced beyond a reasonable doubt

21    that Timothy Gene Malone was not justified in

22    the use of deadly force, then you should find

23    him guilty if all the elements of the charge

24    have been proved.

25        It is a defense to the crimes of

1          Aggravated Battery with a Deadly Weapon,

2          including the lesser-included offense of

3          Battery if the actions of Timothy Gene Malone

4          constituted the justifiable use of non-deadly

5          force.  "Non-deadly" force means force not

6          likely to cause death or great bodily harm.

7          "Great bodily harm" means great as

8          distinguished from slight, trivial, minor, or

9          moderate harm, and as such does not include

10         mere bruises.  Timothy Gene Malone was

11         justified in using non-deadly force against

12         Matthew Pardekooper and had no duty to retreat

13         if he reasonably believe that such conduct was

14         necessary to defend himself against Matthew

15         Pardekooper's imminent use of unlawful force or

16         the imminent commission of an Attempted

17         Aggravated Battery against himself.

18              To prove the crime of Attempted

19         Aggravated Battery the following two elements

20         must be proven:  Matthew Pardekooper attempted

21         to actually and intentionally touch or strike

22         Timothy Gene Malone against his will.  And

23         Matthew Pardekooper, in attempting to commit

24         the Battery, used a deadly weapon.

25              In deciding whether Timothy Gene Malone

1     was justified in the use of non-deadly force,

2     you must consider the circumstances by which he

3     was surrounded at the time the force was used.

4     The danger need not have been actual; however,

5     to justify the use of non-deadly force, the

6     appearance of danger must have been so real

7     that a reasonably cautious and prudent person

8     under the same circumstances would have

9     believed that the danger could be avoided only

10    through the use of that force, although as I

11    have previously explained, the defendant had no

12    duty to retreat.  Based upon appearances,

13    Timothy Gene Malone must have actually believed

14    that the danger was real.  However, the use of

15    non-deadly force is not justified if you find

16    that Timothy Gene Malone was attempting to

17    commit, committing, or escaping after the

18    commission of an Aggravated Battery with a

19    Dead- -- it should say, Deadly Weapon.

20         To prove the crime of Attemp- -- of

21    Aggravated Battery -- excuse me -- to prove the

22    crime of Aggravated Battery with a Deadly

23    Weapon, the State must prove the following two

24    elements:  Timothy Gene Malone actually and

25    intentionally touched or struck Matthew

1    Pardekooper against his will.  And Timothy Gene

2    Malone, in committing the Battery, used a

3    deadly weapon.

4         If you find at the time of the alleged

5    Aggravated Battery with a --

6         MR. BUSTAMANTE:  Deadly Weapon --

7         THE COURT:  Weapon, Timothy Gene Malone

8    knew that Matthew Pardekooper had committed an

9    act of violence, you may consider that fact in

10   determining whether Timothy Gene Malone

11   reasonably believed it was necessary for him to

12   use-non-deadly force.  If you find that Matthew

13   Pardekooper had a reputation of being a violent

14   and dangerous person and that his reputation

15   was known to Timothy Gene Malone, then you may

16   consider this fact in determining whether the

17   actions of Timothy Gene Malone were those of a

18   reasonable person in dealing with an individual

19   of that reputation.  If you find that Matthew

20   Pardekooper had a reputation of being a violent

21   and dangerous person, you may consider this

22   fact in determining whether he was the initial

23   aggressor.

24        In considering the issue of self-defense,

25   you may take into account the relative physical

1    abilities and capacities of Timothy Gene Malone

2    and Matthew Pardekooper.  If in your

3    consideration of the issue of self-defense you

4    have a reasonable doubt on the question of

5    whether Timothy Gene Malone was justified in

6    the use of non-deadly force, then you should

7    find him not guilty.  However, if from the

8    evidence you are convinced beyond a reasonable

9    doubt that Timothy Gene Malone was not

10   justified in the use of non-deadly force, then

11   you should find him guilty if all the elements

12   of the charge have been proved.

13       As to Count II, to prove the crime of

14   Possession of a Concealed Weapon by a Convicted

15   Felon, the State must prove the following two

16   elements beyond a reasonable doubt:  One,

17   Timothy Gene Malone had been convicted of a

18   felony; and two, after the conviction, Timothy

19   Gene Malone knowingly carried a concealed

20   weapon.

21       "Convicted" means that a judgment has

22   been entered in a criminal proceeding by a

23   court pronouncing the accused guilty.  A

24   "concealed weapon" means any dirk, metallic

25   knuckles, billie, tear gas gun, chemical weapon

1    or device, or other deadly weapon carried on or

2    about a person in a manner so as to conceal the

3    weapon from the ordinary sight of another

4    person.  The term "on or about a person" means

5    physically on the person or readily accessible

6    to -- to him.

7        The term "ordinary sight of another

8    person" means the casual and ordinary

9    observation of another in the normal

10   associations of life.  A weapon need not be

11   completely hidden for you to find that it was

12   concealed.  However, a weapon is not concealed

13   if, although not fully exposed, its status as a

14   weapon is detectable by ordinary observation.

15       "Care" and "custody" mean immediate

16   charge and control exercised by a person over

17   the named object.  The terms care, custody, and

18   control may be used interchangeably.

19   "Knowingly" means with the actual knowledge and

20   understanding of the facts or the truth.

21       In considering the evidence, you should

22   consider the possibility that although the

23   evidence may not convince you that the

24   defendant committed the main crime of which he

25   is accused, there may be evidence that he

1    committed other acts that would constitute a

2    lesser-included crime.  Therefore, if you

3    decide that the main accusation has not been

4    proved beyond a reasonable doubt, you will next

5    need to decide if the defendant is guilty of

6    any lesser-included crime.  The lesser crime

7    indicated in the definition of Possession of a

8    Concealed Weapon by a Convicted Felon is

9    Possession of a Concealed Weapon.

10         To prove that count, the State must prove

11    the following three elements beyond a

12    reasonable doubt:  One, Timothy Gene Malone

13    knowingly carried on or about his person --

14    that should say, carried a weapon on or about

15    his person; two, the weapon was concealed from

16    the ordinary sight of another person; and

17    three, at the time, Timothy Gene Malone was not

18    licensed to carry a concealed weapon.

19         The term "on or about his person" means

20    physically on the person or readily accessible

21    to him.  The term "ordinary sight of another

22    person" means the casual and ordinary

23    observation of another in the normal

24    associations of life.  A weapon need not be

25    completely hidden for you to find that it was

concealed.  However, a weapon is not concealed
if, although not fully exposed, its status as a
weapon is detectable by ordinary observation.

A "concealed weapon" means any dirk,
metallic knuckles, billie, tear gas gun,
chemical weapon or device, or other deadly
weapon carried on or about a person in such
manner as to conceal the weapon from the
ordinary sight of another person.

As to Count III, including crime of -- it
should say Theft.  You can mark out the word
grand.  Include the crime of Theft, the State
must prove the following two elements beyond a
reasonable doubt:  One, Timothy Gene Malone
knowingly and unlawfully obtained or used the
property of Matthew Pardekooper; and two, he
did so with intent, either temporarily or
permanently, to deprive Matthew Pardekooper of
his right to the property or any benefit from
it.

If you find the defendant guilty of
Theft, you must also determine if the State has
proved beyond a reasonable doubt whether the
value of the property taken was $100 or more
but less than $300, or that it was less $100.

1          Proof of possession of recently stolen

2     property, unless satisfactorily explained,

3     gives rise to an interference that the person

4     in possession of the property knew or should

5     have known that the property had been stolen.

6     "Obtains or uses" means any manner of taking or

7     exercising control of the property, or conduct

8     previously known as stealing and larceny and

9     other conduct similar in nature.  "Endeavor"

10    means to attempt or try.  "Property" means

11    anything of value."

12         "Value" means the market value of the

13    property at the time and place of offense, or

14    if that value cannot be satisfactorily

15    ascertained the cost of replacement of the

16    property within a reasonable time after the

17    offense.  If the exact value of the property

18    cannot be ascertained, then you should attempt

19    to determine a minimum value.  If you cannot

20    determine the minimum value, then you must find

21    the value is less than $100.

22         As to Count IV, to prove the crime of

23    Armed Trespass in a Structure, the State must

24    prove the following four elements beyond a

25    reasonable doubt:  One, Timothy Malone

1           willfully entered or remained in the structure.

2           Two, the structure was in the lawful possession

3           of Scott Mathews.  Three, Timothy Gene Malone's

4           entering or remaining in the structure was

5           without authorization, license, or invitation

6           by Scott Mathews or any other person authorized

7           to give that permission.  Four, during the

8           commission of the trespass, Timothy Gene Malone

9           was armed or armed himself with a dangerous

10          weapon.

11              Authority to enter or remain in a

12          structure need not be given in express words.

13          It may be implied from the circumstances.  It's

14          lawful to enter or remain in a structure of

15          another if, under all the circumstances, a

16          reasonably -- a reasonable person would believe

17          that he had the permission of the owner, lawful

18          occupant, or any other person authorized to

19          give that permission.  "Person authorized"

20          means an owner or lessee, or his or her agent,

21          or any law enforcement officer whose department

22          has received written authorization from the

23          owner or lessee, or his or her agent, to

24          communicate an order to depart the property in

25          case of a threat to public safety or welfare.

1        "Willfully" means intentionally,

2    knowingly, and purposely.  "Structure" means

3    any building of any kind, either temporary or

4    permanent, that has a roof over it, and the

5    enclosed space of ground and outbuildings

6    immediately surrounding the structure.  The

7    enclosure need not be continuous as it may have

8    an ungated opening for entering and exiting.

9    If you find the defendant guilty of trespass in

10   a structure, you must then determine whether

11   the State has proved beyond a reasonable doubt

12   that there was a human being in the structure

13   at the time of the trespass.

14        A "dangerous weapon" is any object other

15   than a firearm that will likely cause death or

16   great bodily harm if used in the ordinary and

17   usual manner contemplated by its design and

18   construction.

19        So, In considering the evidence, the

20   paragraph doesn't need to be there twice, so

21   just strike one of those out.  In considering

22   the evidence, you should consider the

23   possibility that although the evidence may not

24   convince you that the defendant committed the

25   main crime of which he is accused, there may be

1     evidence that he committed other acts that

2     would constitute a lesser-included crime.

3     Therefore, if you decide the main accusation

4     has not been proved beyond a reasonable doubt,

5     you will next need to decide if the defendant

6     is guilty of any lesser-included crime.  The

7     lesser-included crime indicated in the

8     definition of Armed Trespass in a Structure is

9     Trespass in a Structure.

10          To prove the crime of Trespass in a

11    Structure, the State must prove the following

12    three elements beyond a reasonable doubt:  That

13    Timothy Malone willfully entered or remained in

14    a structure.  The structure was in the lawful

15    possession of Scott Mathews, and Timothy Gene

16    Malone's entering or remaining in the structure

17    was without authorization, license, or

18    invitation by Scott Mathews or any other person

19    authorized to give that permission.

20          The definitions are the identical

21    definitions I just explained to you of the

22    crime.  They're in your packet.  They apply,

23    and you will have those packets back with you,

24    but I'm not going to read them again to you.

25          The defendant has entered a plea of not

```
 1          guilty.  This means you must presume or believe
 2          the defendant is innocent.  The presumption
 3          stays with the defendant as to each material
 4          allegation in the information through each
 5          stage of the trial unless it's been overcome by
 6          the evidence to the exclusion of and beyond a
 7          reasonable doubt.
 8              To overcome the defendant's presumption
 9          of innocence, the State has the burden of
10          proving the crime with which the defendant is
11          charged was committed and the defendant is the
12          person who committed the crime.  The
13          defendant's not required to present evidence of
14          prove anything.
15              Whenever the words "reasonable doubt" are
16          used, you must consider the following:  A
17          reasonable doubt is not a mere possible doubt,
18          a speculative, imaginary or forced doubt.  Such
19          a doubt must not influence you to return a
20          verdict of not guilty if you have an abiding
21          conviction of guilt.  On the other hand, if,
22          after carefully considering, comparing and
23          weighing all the evidence, there is not an
24          abiding conviction of guilt, or, if, having a
25          conviction, it is one, which is not stable but
```

1    one which wavers and vacillates, then the

2    charge is not proved beyond every reasonable

3    doubt and you must find the defendant not

4    guilty because the doubt is reasonable.

5         It is to the evidence introduced in this

6    trial, and to it alone, that you are to look

7    for that proof.  A reasonable doubt as to the

8    guilt of the defendant may arise from the

9    evidence, conflict in the evidence or the lack

10   of evidence.  If you have a reasonable doubt,

11   then you should find the defendant not guilty.

12   If you have no reasonable doubt, then you

13   should find the defendant guilty.

14        It's up to you to decide what evidence is

15   reliable.  You should use your common sense in

16   deciding which is the best evidence and which

17   evidence should not be relied upon in

18   considering your verdict.  You may find some of

19   the evidence not reliable or less reliable than

20   other evidence.  You should consider how the

21   witness acted, as well as what they said.

22        Some other things you should consider are

23   did the witness seem to have an opportunity to

24   see and know the things about which the witness

25   testified.  Did the witness seem to have an

1    accurate memory?  Was the witness honest and

2    straightforward in answering the attorneys'

3    questions?  Did the witness have some interest

4    in how the case should be decided?

5         Does the witness's testimony agree with

6    the other testimony and other evidence in the

7    case?  Has the witness been convicted of a

8    felony or misdemeanor involving dishonesty?

9    Did the witness at some other time make a

10   statement that is inconsistent with the

11   testimony he or she gave in court?  Whether the

12   State has met its burden of proof does not

13   depend upon the number of witness it has called

14   or upon the number of exhibits it has offered,

15   but instead upon the nature and quality of the

16   evidence presented.

17        The fact that a witness is employed in

18   law enforcement does not mean that his

19   testimony deserves more or less consideration

20   than that of any other witness.  The defendant

21   in this case has become a witness, and you

22   should apply the same rules to the

23   consideration of his testimony that you apply

24   for the testimony of the other witnesses.  It's

25   entirely proper for a lawyer to talk to a

1      witness about what testimony the witness would
2      give if called to the courtroom.  The witness
3      should not be discredited by talking to a
4      lawyer about his or her testimony.  You may
5      rely on your own conclusion about the
6      credibility of any witness.  A juror may
7      believe or disbelieve all of any part of the
8      evidence or the testimony of any witness.

9          There are some general rules that apply
10     to your discussion.  You must follow these
11     rules in order to return a lawful verdict.  You
12     must follow the law as it is set out in these
13     instructions.  If you fail to follow the law,
14     then your verdict will be a miscarriage of
15     justice.  There's no reason for failing to
16     follow the law in this case.  All of us are
17     depending upon you to make a wise and legal
18     decision in this matter.

19         This case must be decided only upon the
20     evidence that you've heard from the testimony
21     of the witnesses and have seen in the form of
22     the exhibits in evidence and these
23     instructions.  This case must not be decided
24     for or against anyone because you feel sorry
25     for anyone, or are angry at anyone.

1          Remember, the lawyers are not on trial,

2     and your feelings about them should not

3     influence your decision in this case.  Your

4     duty is to deter- -- is to determine if the

5     defendant has been proven guilty or not, in

6     accord with the law.  It's my job to determine

7     a proper sentence if the defendant is found

8     guilty.

9          Whatever verdict you render must be

10    unanimous, that is, each juror must agree to

11    the same verdict.  Your verdict should be --

12    should not be influenced by feelings of

13    prejudice, bias or sympathy.  Your verdict must

14    be based on the evidence, and on the law

15    contained in these instructions.  Deciding a

16    verdict is exclusively your job.  I cannot

17    participate in that decision in any way.

18    Please disregard anything I may have said or

19    done to made you think I preferred one verdict

20    over another.

21         You may find the defendant guilty as

22    charged in the information or guilty of such

23    lesser-included crimes as the evidence may

24    justify or not guilty.  If you return a verdict

25    of guilty, it should be for the highest offense

that's been proven beyond a reasonable doubt.
If you find that no offense has been proven
beyond a reasonable doubt, then, of course,
your verdict muse be not guilty.

The verdict must be unanimous, that is,
all of you must agree to the same verdict.
Only one verdict may be returned as to each
crime charged.  The verdict must be in writing
and for your convenience the necessary verdict
for has been prepared for you, and it is as
follows:  So you shouldn't have a verdict form
in your packets, that's because I only sent one
of those back so that there's no confusion
about what your verdict is.  But it will have
the style of the case, and you can see, it's
going to pretty much follow the instructions
I've -- I've given you.

So you have four separate number things
to consider.  The verdict form reads, Number
one, we the jury finds as follows as to Count I
of the charge and you're only to check one of
these.  You have three options, Defendant is
guilty of Aggravate Battery with a Deadly
Weapon as charged, then is Guilty of Battery a
lesser-included offense, the Defendant is not

```
1          guilty.  Each of those three options has a
2          space out to the left of it.  Place a check of
3          X by whatever your unanimous verdict is.
4               As to Number 2, we the jury find as
5          follows as to Count II of the charge.  Again
6          three options, the defendant is guilty of
7          Possession of a Concealed Weapon by a Convicted
8          Felon as charged.  The defendant is guilty of a
9          Concealed Weapon, a lesser-included offense, or
10         the defendant is not guilty.  So again, a space
11         out to the left, whichever is your unanimous
12         verdict.
13              On Number 3 is a little bit different.
14         You have two options initially.  We the jury
15         find as follows as to Count III of the charge.
16         Either the defendant is guilty of Theft, or the
17         defendant is not guilty.  If your unanimous
18         verdict is the defendant is guilty of Theft,
19         then you have to move onto another finding that
20         reads as follows:  If the defendant is found
21         guilty of Theft in Count III, you must check
22         only one of these two options.  The value of
23         the property taken was more than 100 but less
24         than $300 in value or the value of the property
25         taken was less than $100.
```

1          And then you have your fourth option,

2     which again, has three options for your

3     consideration.  It reads, We the jury find as

4     follows as to Count IV of the charge:

5     Defendant is guilty of Armed Trespass of

6     Structure as charged; the defendant is guilty

7     of Trespass in the Structure, a lesser-included

8     offense, or the defendant is not guilty, and

9     again, the space out to the left for your

10    choice.

11         And then there's a space for the

12    foreperson to both date the verdict form and

13    then to sign it.  And then you'll bring that

14    back to the courtroom with you when you return.

15         A separate crime is charged in each count

16    count of the information and although, they

17    have been tried together, each crime and the

18    evidence applicable to it must be considered

19    separately and a separate verdict returned as

20    to each.  A finding of guilty or not guilty as

21    to one crime must not affect your verdict as to

22    the other crimes charged.

23         Now, in just a few moments, you will be

24    taken to the jury room by the deputy.  The

25    first thing you should do is choose a

1        foreperson who preside over your deliberations.
2        The foreperson should see to it that your
3        discussions are carried on in an organized way
4        and that everyone has a fair chance to be
5        heard.  It's also the foreperson's job, as I
6        just mentioned, to sign and date the verdict
7        form and to bring that verdict form back to the
8        verdict form back to the courtroom with you
9        when you return.
10               Through deliberations, you must
11       communicate with -- about the case only with
12       one another and only when all of you are
13       present in the jury room.  You're not to
14       communicate with any person outside the jury
15       about this case.  Until you've reached a
16       verdict, you must not talk about this case in
17       person or through the telephone, writing or
18       electronic communication, such as a blog,
19       twitter, email, text message, or any other
20       means.  Don't contact anyone to assist you
21       during your deliberations.  Again, these
22       communications, rules apply until I discharge
23       you at the end of the case.  If you become
24       aware of any violation of this instruction or
25       any instruction I've given you in this case,

1    you must tell me by giving a note to the

2    deputy.

3        Many of you have cell phones, tablets,

4    laptops, or other electronic devices with you

5    at the courthouse.  The rules no longer allow

6    you to have those items with you in the jury

7    room while you're deliberating.  So I kindly

8    ask you turn those over to the deputy when he

9    takes you back to start your deliberations.

10   He'll guard over them while you deliberate.

11       If you need to communicate with me, you

12   do that by sending a note through the deputy,

13   signed by the foreperson.  If you have voted,

14   do not disclose the actual vote in the note.

15   If you have questions, I'll talk to the

16   attorneys before I get back to you, so it may a

17   little time for me to do that.  You should

18   continue your deliberations while you wait for

19   my answer.  And I'll answer any questions that

20   I can, either in writing back to you or orally

21   here in open court.

22       Now, during the trial, there were items

23   received into evidence as exhibits.  You may

24   examine whatever exhibits you think will help

25   you in your deliberations.  Those exhibits will

1    all be sent back into the jury room with you

2    when you begin to deliberate.

3         In closing, let me remind you that it is

4    important that you follow the law spelled out

5    in these instructions in deciding your verdict.

6    There are no other laws that apply to this

7    case.  Even if you do not like the laws that

8    must be applied, you must use them.  For two

9    centuries we have lived by the constitution and

10   the law.  No juror has the right to violate the

11   rules that we all share.

12        So I'll note for the record that you all

13   have been alert and attentive throughout the

14   entire trial.  Today, you-all appear to be in

15   good physical and mental health to see through

16   your responsibilities as jurors.  With that

17   being said, I believe Juror 4838, Mary Howard,

18   you are our alternate.

19        So does the Sate and Defense agree that

20   Ms. Howard is the alternate?

21        MR. RUPERT:  Yes, Your Honor.

22        MR. BUSTAMANTE:  Yes, Your Honor.

23        THE COURT:  All right.  Do you have any

24   person belongings back in the juror room?

25        MS. HOWARD:  Yes.

```
1              THE COURT:  Okay.  I'm going to ask you
2        to step out with the deputy now and get those.
3              MS. HOWARD:  Okay.
4              THE COURT:  And then, if you wouldn't
5        mind stepping back in, I would -- it would -- I
6        would appreciate it greatly if I could have 20
7        second of your time to thank you.
8              MS. HOWARD:  Okay.
9              THE COURT:  All right.  And ladies and
10       gentlemen of the jury, as soon as Ms. Howard
11       and the deputy return, you-all can now take
12       your notes, take your jury instructions -- and
13       as soon as he returns with Ms. Howard, you-all
14       can retire to begin your deliberations.
15             Okay.  You may go ahead and start making
16       your way out with the jurors.
17             All right.  Let the record reflect that
18       the ladies and gentlemen of the jury are out of
19       the courtroom to begin their deliberations.
20       You-all may be seated.  Any objections to the
21       instructions as given, State?
22             MR. BUSTAMANTE:  No, your Honor.
23             THE COURT:  Defense?
24             MR. RUPERT:  No, Your Honor.
25             THE COURT:  We'll await -- we'll be in
```

1    recess awaiting a question or a verdict.

2         (Short recess.)

3         THE COURT:  All right.  We're back on the

4    record in the State of Florida versus Timothy

5    Malone, 18-CF-246.  Mr. Malone is not present

6    with Counsel.  State is present with Counsel.

7    The jurors have sent out a question.  The

8    questions reads, How did Malone get possession

9    of the tablet?  Was it locked in Pardekooper's

10   truck; was the truck broken into?  So I'll hear

11   from either of you, but I think the only way I

12   can answer the questions is to bring them out

13   and tell them that they have to rely on their

14   individual/collective memories of the evidence

15   and on the instructions I've given them and

16   sent them back.

17        MR. RUPERT:  I agree.

18        MR. BUSTAMANTE:  Yes, Your Honor.

19        THE COURT:  Okay.  Let's bring them in.

20        UNKNOWN FEMALE:  Are we already in

21   trouble:

22        THE COURT:  You're not in trouble.

23        UNKNOWN FEMALE:  Okay.

24        THE COURT:  I just -- as I told you, I'll

25   answer questions if I can, either writing back

1    to you or orally here in open court.  I just

2    generally do it orally in open court.

3        So let the record reflect the ladies and

4    gentlemen of the jury are all back in the court

5    room.  You-all may be seated and be at ease.

6    All right.  So ladies and gentlemen, I received

7    a question through the deputy, and it reads

8    follows:  How did Malone get possession of the

9    tablet?  Was it was locked in Pardekooper's

10   truck; was the truck broken into?  Are those

11   the questions?  All right.  So ladies and

12   gentlemen of the jury, you have to rely on your

13   individual and collective memory of the

14   evidence that's been presented in the trial and

15   on the instructions that I've given to you, and

16   that's the answer, so you may return to your

17   deliberations.

18       All right.  Let the record reflect that

19   the ladies and gentlemen of the jury are out of

20   the courtroom to continue their deliberations.

21   We'll be in recess -- well, first, any

22   objections to the Court's answering of the

23   jurors' question, State?

24       MR. BUSTAMANTE:  No, Your Honor.

25       THE COURT:  Defense?

1          MR. RUPERT:  No, objection.

2          THE COURT:  We'll be in recess.

3          (Short recess.)

4          THE COURT:  All right.  We're back on the

5     record in the case of the State of Florida

6     versus Timothy Malone.  Let the record reflect

7     Mr. Malone's present in the courtroom with

8     Counsel.  State's present with Counsel.  I've

9     been advised that the jury has reached a

10    verdict, so we're going to bring the ladies and

11    gentlemen of the jury in.

12         All right.  Let the record reflect that

13    the ladies and gentlemen of the jury are back

14    and present in the courtroom.  Everyone may be

15    seated.

16         Ladies and gentlemen, I have been advised

17    that you-all have reached a verdict; is that

18    correct?  If you'll just pull the verdict form

19    out and hand that to the deputy, I'd appreciate

20    it.

21         (Document tendered to the deputy and then

22    to the Court.)

23         THE COURT:  All right.  The verdict

24    appears to be in proper form.  Mr. Malone, if

25    you'll stand for the publishing of the verdict,

1    and, Madam Clerk, if you will please publish

2    the jury's verdict.

3         THE CLERK:  In the Circuit Court of the

4    Eighth Judicial Circuit, In and For Bradford

5    County, Florida, State of Florida versus

6    Timothy Gene Malone, in Case Number

7    04-2018-CF-246-A.  We the jury finds as follows

8    as to Count I of the charge, the defendant is

9    not guilty.  We the jury finds as follows as to

10   Count II of the charge, the defendant is guilty

11   of Possession of a Concealed Weapon by a

12   convicted felon as charged.  Number three, we

13   the jury find as follows as to Count III of the

14   charge, the defendant is not guilty.  We the

15   jury finds as follows as to Count IV of the

16   charge, the defendant is not guilty, so say we

17   all dated 5/18/21, by the foreperson.

18        THE COURT:  All right, you may be seated.

19   Does either the State or the Defense wish to

20   have the jury poled?

21        MR. RUPERT:  No, Your Honor.

22        MR. BUSTAMANTE:  No, Your Honor.

23        THE COURT:  All right.  Ladies and

24   gentlemen, I want to thank you for your time

25   and your consideration of this case.  I also

1    want to advise you of some very special

2    privileges enjoyed by jurors.  No juror can

3    ever be required to talk about the discussions

4    that occurred in the jury room, except by court

5    order.  For many centuries our society has

6    relied upon juries for the consideration of

7    difficult cases.

8        We've recognized for hundreds of years

9    that in jurors' deliberations, discussions and

10   votes should remain their private affairs as

11   long as they with is.  Therefore, the law gives

12   you a unique privilege not to speak about the

13   jury's work.  However, at this moment in time

14   you're all discharged from your service, so the

15   converse of that is also now true.  You are now

16   at liberty to speak to anyone and everyone you

17   want to about your deliberations and your

18   verdict, but again, you're also at liberty not

19   to do that.

20       You may get requests from folks who want

21   to discuss your verdict or deliberations.

22   Those requests may come from people who are

23   simply curious, from those who might seek to

24   find fault with you, from the media, the

25   attorneys or elsewhere.  It will be left up to

1    each of you individually on whether to preserve

2    your privacy as a juror or not.  So ladies and

3    gentleman, that concludes your service as

4    jurors.  I appreciate your time and service to

5    your community and you are discharged.

6        All right.  Let the record reflect that

7    the ladies and gentlemen of the jury are out of

8    the courtroom.  Now, that they've been

9    discharged, you all may be seated.  Is there

10   any legal reason not to proceed in sentencing

11   at this time?

12       MR. BUSTAMANTE:  None from the State,

13   Your Honor.

14       MR. RUPERT:  No, Your Honor.

15       THE COURT:  All right.  So I'll hear from

16   the State, and then I'll hear from the Defense.

17       MR. BUSTAMANTE:  Your Honor, now that we

18   knew, I just did the new score sheet.  He

19   scores a minimum of 25 months, so it's

20   25 months up to 15 years.  Based on the fact

21   that the defendant is a sexual offender, has

22   priors including possession of child

23   pornography, two counts of that, burglary of a

24   structure or conveyance, grand theft of the

25   third degree and lewd and lascivious battery on

1    a child under the age of 16.  And the fact that

2    he committed -- he had this crime at the time

3    that he was actually on probation and cut

4    his -- his -- his anklet, and I think that a

5    sentence of 15 years is more than appropriate

6    up to this point, especially with the fact that

7    the defendant was -- he was found not guilty of

8    the things, but I think that the fact that he

9    was in possession of that weapon inside of

10   somebody's home I think is especially

11   egregious.

12          THE COURT:  Okay.  Mr. Rupert?

13          MR. RUPERT:  He's been sentenced already

14   for his probation violations, so I'd ask the

15   Court not to factor into -- any of that into

16   today's sentencing.  I think if -- he was found

17   not guilty for the Armed Trespass, correct?

18          THE COURT:  Correct.

19          MR. RUPERT:  All right.  So then Mr.

20   Bustamante has indicated that you should give

21   him the 15 years, (indiscernible) him bringing

22   that knife into someone's home.  Clearly the

23   testimony was that nobody was ever threatened,

24   that child wasn't threatened, Lisa Mathews was

25   not threatened.  Scott Mathews was not

1      threatened with the knife.  I would ask you not

2      to take any of that into consideration in

3      sentencing Mr. Malone on that knife, on those

4      actions based on the circumstances.

5           He's sentenced to 14 years on the

6      violation of probation, kind of all wrapped up

7      into one.  I understand that the Court probably

8      won't give him any credit for time served on

9      this new offense.  I don't think his actions of

10     possession of a firearm by -- as a convicted

11     felon -- I mean possession of the weapon by a

12     convicted felon warrants the maximum time.  I

13     would ask the Court for a more reasonable

14     disposition than that.

15          THE COURT:  Okay.  Does Mr. Malone wish

16     to be heard before the Court?

17          MR. MALONE:  Yes, sir, please.  Your

18     Honor, I mean you've sat through the case.

19     You've heard the stand your ground.  You've

20     heard the testimony.  I -- had not

21     extraordinary circumstances happen way they

22     did, my decision to put that knife on my person

23     wouldn't have come into play, and I'm telling

24     you right now with the best that I can tell you

25     that I didn't act with a clear state of mind

1    when I did that.  My whole line of thinking is,

2    I don't want to get jumped.  I don't want these

3    people whom was -- as you heard the witness

4    stay that -- that Pardekooper and Leroy, that

5    was his family, that was his brothers.

6         I can't put evidence out that wasn't put

7    on the stand, but there was more to that,

8    gang-related type of stuff, and I didn't want

9    to be jumped on.  I didn't want to -- I didn't

10   want to go into this situation, and two or

11   three people jump on me, because of what

12   happened to Pardekooper.  So my whole

13   intentions was if they know I have this,

14   they're not going to do that, and I didn't want

15   to threaten nobody.  I wasn't trying to

16   threaten nobody.

17        I did make a poor decision of putting

18   that weapon on my person.  I still contest that

19   I didn't conceal the weapon, because that's

20   why -- it wasn't for -- but it wasn't done with

21   malice.  It wasn't done with -- like I'm out

22   here trying to break the law.  I was actually

23   trying to back and get in contact with my

24   friend that would actually -- we would call

25   and -- and have the authorities come in a

1    peaceful manner, that was my intentions.

2         I've done a lot of time.  I've done a

3    whole lot of time, and I wouldn't be in the

4    state of Florida with -- if I hadn't been under

5    these conditions of probation.  I would go back

6    home immediately ASAP.  Probations, CRD, these

7    type of things is keeping me here when I really

8    just -- I don't have nobody here.  I'm by

9    myself, and I just wanted to ask you to take

10   that into consider that -- just the situation

11   had me under distress, under a whole lot of

12   distress as -- as a mitigating factor in your

13   sentence.

14        THE COURT:  All right.  Thank you, Mr.

15   Malone.  Mr. Malone, the jury having found you

16   not guilty of the -- the counts that they found

17   you not guilty by, I did sign an order that

18   adjudges you not guilty of those.  But the

19   jury, I think did find you guilty of possession

20   of a weapon by a convicted felon, I am going to

21   adjudicate you guilty of that offense, impose

22   the standard court cost, fines and fees in the

23   case, and they include $100 State Attorney fee.

24   Were you appointed, Mr. Rupert?

25        MR. RUPERT:  Yes, sir.

1    THE COURT:  And a total of $150 in

2    Defense fees.  Those amounts are assessed

3    against you, and then reduced to a civil

4    judgment.  I am going to run your sentence

5    consecutive to the sentence you received in the

6    Union County case.  Is that the 90201 case; is

7    that the correct case?

8    MR. BUSTAMANTE:  I believe so.

9    MR. RUPERT:  You're talking about the

10   court case number?

11   MR. MALONE:  That sounds correct.

12   THE COURT:  Well, we -- we'll double

13   check the case number.  The intention is, in my

14   sentencing is that I run it -- that I'm running

15   it consecutive to the sentence, you're still

16   having a portion of it remaining that you

17   having to serve.

18   MR. MALONE:  Yes, sir.

19   THE COURT:  So am I correct that the --

20   Mr. Malone was booked simultaneously for this

21   offense that he was convicted of, as well as

22   the VOP?

23   MR. MALONE:  Yes.

24   THE COURT:  He was in jail -- so anytime

25   that he was awarded towards the VOP, he's got

```
 1          credit that -- it's late, so I'm trying to

 2          speak what I'm trying to say is -- I think what

 3          you're eluded to Mr. Rupert, but I'm just

 4          trying to make sure we're clear on the record.

 5          He had the same amount of credit time served

 6          towards the VOP that he would have towards this

 7          case, right?  He didn't have more time on this

 8          than he was given credit to on the VOP?

 9              MR. RUPERT:  I think that's correct, Your

10          Honor.

11              THE COURT:  Okay.

12              MR. BUSTAMANTE:  It is, Your Honor.  The

13          63-2009-CF-201.

14              THE COURT:  201, okay.  All right.  So it

15          will run consecutive to the Union County case,

16          09-CF-201 or any other incarcerative sentences

17          you're servicing on any other cases, but that's

18          the only one I'm aware of, which means you have

19          zero days of credit for time served.  But, Mr.

20          Malone, that is going to be towards a sentence

21          of the 15 years in the Department of

22          Corrections, so that's the sentence of the

23          court.  You do have 30 days to appeal the

24          verdict of the jury, any matters or issues

25          related to your trial, as well as the
```

1    sentencing of the Court.  Good luck to you.

2         MR. BUSTAMANTE:  Your Honor, on the score

3    sheet, I think I by mistake put

4    (indiscernible,) and so -- on the top of it,

5    and I guess it should be trial.

6         THE COURT:  I'll mark that out.

7         MR. BUSTAMANTE:  Okay, thank you.

8         THE COURT:  We'll be in recess.

9         (Conclusion of recording.)

10                    _ _ _

CERTIFICATE OF REPORTER

I, Jami M. Stanley, Florida Professional
Reporter, certify that I was authorized to and did
transcribe the foregoing recording to the best of my
ability, and the transcript is a true and correct
record of my stenographic notes.

The foregoing certification of this
transcript does not apply to any reproduction of the
same by any means unless under the direct control
and/or direction of the certifying court reporter.


Dated this 30th day of July, 2021.


_____
Jami M. Stanley, FPR, Court Reporter

# $

**$100** [7] - 279:22, 305:6, 432:24, 432:25, 433:21, 443:25, 458:23
**$150** [1] - 459:1
**$200** [3] - 223:14, 241:21, 279:17
**$300** [5] - 279:7, 279:23, 280:13, 432:25, 443:24

# '

**'98** [2] - 192:18, 192:19

# 0

**04-2018-CF-246-A** [1] - 452:7
**04-2018-CF-246-FCAM** [1] - 1:3
**09-CF-201** [1] - 460:16

# 1

**1** [11] - 4:7, 92:18, 93:2, 93:9, 129:15, 185:16, 220:4, 220:14, 280:10, 376:24
**1-4** [1] - 93:5
**10** [10] - 4:18, 69:18, 144:9, 144:12, 198:15, 198:17, 199:3, 256:16, 361:18, 392:2
**10-to-15-minute** [1] - 362:9
**10-to-20** [1] - 199:2
**100** [10] - 78:24, 89:3, 89:5, 185:17, 279:25, 280:19, 280:20, 280:21, 280:22, 280:23, 312:10, 313:8, 351:24, 414:5, 417:7, 443:23
**100-pounds** [1] - 399:23
**108** [1] - 3:8
**11** [4] - 4:19, 147:18, 147:21, 225:11
**12** [7] - 4:20, 149:6, 149:9, 222:18,

268:15, 331:3
**121** [1] - 3:9
**123** [1] - 3:12
**129** [2] - 351:20, 351:21
**12th** [24] - 35:15, 45:3, 45:12, 54:15, 70:13, 71:14, 81:24, 87:13, 88:16, 124:24, 143:21, 190:3, 199:11, 223:21, 235:7, 235:11, 235:13, 248:16, 249:23, 266:22, 311:13, 349:5, 358:25, 404:13
**13** [7] - 4:21, 149:6, 149:9, 222:18, 268:9, 368:25, 393:10
**13-months** [4] - 366:12, 366:13, 366:18, 367:23
**134** [3] - 4:14, 4:15, 4:17
**14** [6] - 4:22, 150:6, 150:9, 268:10, 268:15, 456:5
**14-month-old** [2] - 353:7, 398:2
**144** [1] - 4:18
**144th** [3] - 298:13, 308:2, 308:8
**147** [1] - 4:19
**149** [2] - 4:20, 4:21
**15** [12] - 26:16, 69:18, 202:17, 319:15, 361:18, 374:6, 374:17, 395:19, 454:20, 455:5, 455:21, 460:21
**15-minute** [1] - 277:20
**150** [2] - 4:22, 299:9
**1500** [1] - 204:22
**155** [1] - 3:13
**15th** [1] - 266:19
**16** [2] - 167:25, 455:1
**16-to-18** [1] - 255:6
**179** [1] - 3:14
**18** [3] - 1:13, 254:4, 375:12
**18-CF-246** [2] - 291:4, 449:5
**18-month-old** [1] - 254:4, 260:23
**18-wheeler** [1] - 189:15
**188** [1] - 3:16
**1:00** [2] - 186:21, 187:2

**1st** [1] - 1:24

# 2

**2** [12] - 4:8, 92:18, 129:15, 220:2, 280:10, 342:4, 369:24, 370:10, 370:22, 374:21, 376:24, 443:4
**2.5** [1] - 193:13
**20** [10] - 132:4, 137:4, 159:25, 198:15, 198:17, 199:3, 202:17, 347:10, 347:11, 448:6
**20-feet** [1] - 139:7
**200-ish** [1] - 193:16
**200-yards** [1] - 299:9
**201** [1] - 460:14
**2017** [3] - 266:17, 266:20, 268:14
**2018** [28] - 35:15, 45:3, 45:12, 54:15, 55:4, 70:12, 70:13, 71:15, 81:24, 87:13, 124:25, 143:21, 190:3, 191:24, 194:11, 195:19, 199:11, 215:3, 223:21, 248:17, 249:23, 266:22, 268:15, 294:19, 311:14, 358:25, 404:13
**2018-CF-246** [4] - 5:4, 23:21, 187:5, 364:12
**2018-CF0246** [1] - 106:19
**2019** [1] - 16:10
**2020** [2] - 10:2, 10:7
**2021** [2] - 1:13, 462:13
**21** [2] - 58:19, 376:7
**229** [1] - 3:17
**23** [1] - 376:16
**230** [2] - 215:5, 351:22
**24** [2] - 53:19, 376:16
**24-hours** [1] - 67:4
**240** [1] - 215:5
**244** [1] - 3:20
**25** [2] - 454:19, 454:20
**250** [1] - 246:23
**2500** [2] - 319:14, 319:15
**258** [1] - 3:21
**265** [1] - 3:23
**271** [1] - 3:24
**276** [1] - 3:25
**294** [1] - 4:2

# 3

**3** [6] - 4:9, 22:20, 92:19, 129:15, 220:2, 280:10, 370:2, 371:6, 443:13
**3.10** [1] - 379:6
**3.11** [1] - 379:9
**3.12** [1] - 379:12
**3.12(a** [1] - 379:14
**3.13** [2] - 186:11, 379:17
**3.16** [1] - 379:21
**3.4** [1] - 375:1
**3.6** [1] - 374:1
**3.7** [1] - 376:18
**3.85** [1] - 360:18
**3.9** [5] - 376:23, 378:13, 378:19, 378:20
**30** [12] - 40:22, 70:9, 127:4, 132:4, 137:5, 159:2, 159:5, 159:25, 347:10, 347:11, 363:11, 460:23
**30-minutes** [2] - 72:12, 72:13
**300** [6] - 185:16, 246:23, 280:20, 280:21, 280:23
**300-square** [1] - 87:24
**301** [2] - 89:6, 301:16
**305** [1] - 1:24
**30th** [1] - 462:13
**32091** [2] - 1:15, 2:4
**32601** [2] - 1:24, 2:10
**341** [1] - 4:3
**352** [1] - 1:25
**352)373-0337** [1] - 2:11
**358** [1] - 4:4
**373-7778** [1] - 1:25

# 4

**4** [16] - 4:10, 55:14, 56:2, 92:19, 93:2, 93:9, 129:15, 186:1, 220:3, 280:10, 299:4, 299:5, 331:3, 331:4
**40** [4] - 19:17, 21:5, 22:17, 285:18
**40-years** [1] - 19:21
**42** [1] - 294:11
**43** [1] - 76:5
**45** [3] - 73:14, 355:25,

415:16
**4838** [1] - 447:17
**4935** [1] - 105:25

# 5

**5** [6] - 4:11, 88:6, 97:25, 98:3, 132:10, 376:24
**5'10"** [1] - 215:2
**5-foot** [1] - 351:18
**5/18/21** [1] - 452:17
**5/19/21** [1] - 187:2
**50** [1] - 77:8
**500** [3] - 2:10, 201:12, 222:6
**500-feet** [1] - 222:2
**53** [1] - 3:3
**5:00** [10] - 88:6, 88:7, 88:18, 125:6, 362:7
**5th** [1] - 55:4

# 6

**6** [19] - 4:12, 97:25, 98:3, 109:10, 132:10, 161:9, 224:3, 377:2, 377:5, 381:5, 382:17, 383:12, 384:10, 384:17, 384:19, 386:1, 386:11, 386:17, 386:22
**600** [1] - 313:7
**63-2009-CF-201** [1] - 460:13
**64** [1] - 340:19

# 7

**7** [14] - 4:14, 134:15, 134:21, 186:9, 186:10, 377:6, 380:1, 380:5, 380:6, 380:24, 383:16, 387:17, 389:22, 390:20
**7-9** [1] - 134:18
**75** [2] - 78:24, 78:25
**780** [1] - 385:4
**782** [1] - 381:10

# 8

**8** [5] - 4:15, 134:21, 186:10, 351:18, 391:6

**80** [3] - 3:4, 21:4, 22:17
**83** [1] - 3:5
**86** [1] - 3:7
**8:00** [2] - 90:19, 126:6
**8:12** [1] - 73:3
**8:20** [1] - 71:21
**8:30** [1] - 130:6
**8:45** [1] - 131:4

## 9

**9** [5] - 4:17, 134:15, 134:21, 392:2
**90201** [1] - 459:6
**904)966-6208** [1] - 2:4
**93** [4] - 4:7, 4:8, 4:9, 4:10
**945** [2] - 1:15, 2:3
**98** [2] - 4:11, 4:12
**9:00** [1] - 73:13
**9:43** [1] - 76:4
**9:45** [1] - 131:3

## A

**a.m** [2] - 88:18, 125:6
**abandoned** [2] - 226:19, 226:20
**abide** [2] - 54:11, 54:24
**abiding** [4] - 418:9, 418:11, 437:20, 437:24
**abilities** [3] - 392:25, 425:13, 429:1
**ability** [3] - 27:12, 188:5, 462:6
**able** [26] - 14:9, 41:7, 60:23, 62:6, 74:15, 96:2, 99:1, 101:12, 106:23, 117:12, 129:11, 130:18, 130:20, 137:6, 145:4, 194:21, 195:4, 217:19, 219:1, 246:1, 246:2, 262:1, 310:2, 317:12, 413:23, 415:12
**about..** [1] - 236:12
**abrasions** [1] - 112:18
**absolute** [1] - 32:13
**absolutely** [8] - 136:9, 150:14, 171:23, 357:17, 399:13, 402:13, 418:12, 418:21

**abstracting** [1] - 184:20
**abundance** [2] - 380:13, 382:25
**AC** [1] - 203:25
**AC/DC** [1] - 203:25
**academy** [2] - 124:14, 124:16
**acc** [2] - 14:1, 315:2
**accentuate** [1] - 62:5
**access** [28] - 5:20, 9:23, 9:25, 11:20, 12:14, 13:1, 13:8, 13:20, 14:6, 16:23, 37:20, 38:1, 43:18, 58:10, 62:18, 64:5, 64:13, 64:20, 64:23, 70:17, 74:14, 81:4, 81:17, 83:6, 150:23, 194:18, 354:10, 415:20
**accessible** [3] - 58:7, 430:5, 431:20
**accessing** [1] - 58:24
**accessory** [2] - 207:19, 207:24
**accidents** [1] - 112:20
**accommodate** [1] - 396:12
**accommodated** [1] - 27:5
**accord** [1] - 441:6
**according** [11] - 27:21, 64:3, 132:23, 177:5, 343:20, 345:10, 357:6, 357:7, 386:5, 402:2, 415:21
**accordion** [1] - 253:10
**account** [5] - 89:8, 100:6, 316:24, 425:12, 428:25
**accountability** [1] - 162:9
**accurate** [9] - 9:9, 22:23, 133:22, 133:23, 148:8, 315:3, 410:8, 412:11, 439:1
**accurately** [1] - 92:3
**accusation** [3] - 421:1, 431:3, 436:3
**accusations** [1] - 28:11
**accused** [9] - 42:8, 210:14, 213:1, 236:14, 419:23, 420:22, 429:23, 430:25, 435:25
**accusing** [2] - 241:13,

398:12
**acquaintance** [1] - 198:4
**acquittal** [1] - 279:3
**acquitted** [1] - 22:12
**acres** [1] - 190:14
**act** [12] - 17:2, 140:4, 142:7, 305:9, 348:23, 349:14, 374:1, 392:12, 421:15, 424:15, 428:9, 456:25
**acted** [3] - 15:16, 15:20, 438:21
**action** [2] - 312:22, 405:15
**actions** [9] - 304:21, 401:9, 416:10, 421:18, 425:3, 426:3, 428:17, 456:4, 456:9
**activate** [5] - 114:24, 115:15, 115:18, 165:24, 166:1
**activated** [8] - 49:20, 77:16, 114:21, 114:23, 115:23, 313:4
**activation** [1] - 115:14
**active** [3] - 75:11, 81:5, 81:6
**activities** [1] - 162:12
**activity** [10] - 380:2, 380:17, 382:22, 387:13, 388:4, 390:6, 390:9, 390:15, 422:20, 423:24
**acts** [9] - 296:5, 296:8, 309:18, 311:9, 322:11, 420:23, 424:16, 431:1, 436:1
**actual** [7] - 252:17, 275:13, 423:11, 423:14, 427:4, 430:19, 446:14
**ad** [1] - 284:10
**adapt** [1] - 191:22
**add** [5] - 367:2, 367:13, 367:20, 371:19, 378:11
**added** [2] - 367:23, 378:10
**adding** [1] - 59:15
**addition** [2] - 283:20, 337:17
**additional** [2] - 212:3, 282:18
**address** [11] - 5:13, 7:3, 18:1, 106:11,

107:8, 107:17, 190:8, 194:24, 293:11, 355:21, 413:22
**addressed** [2] - 20:24, 21:13
**adjoining** [1] - 305:3
**adjudges** [1] - 458:18
**adjudicate** [1] - 458:21
**adjudicated** [1] - 8:8
**adjudications** [1] - 6:3
**admitted** [2] - 132:10, 134:20
**adopted** [6] - 248:8, 248:9, 248:10, 248:25, 258:23, 258:24
**adrenaline** [1] - 323:11
**adult** [2] - 285:16, 365:14
**Advantage** [1] - 1:23
**adverse** [2] - 6:7, 22:8
**advice** [4] - 20:15, 21:7, 99:1, 366:22
**advise** [3] - 31:5, 107:1, 453:1
**advised** [9] - 5:7, 19:24, 23:2, 25:16, 28:2, 102:14, 106:2, 451:9, 451:16
**advising** [1] - 102:15
**advocating** [3] - 303:14, 303:16, 304:14
**affairs** [1] - 453:10
**affect** [2] - 214:10, 444:21
**affected** [3] - 27:11, 188:4, 377:21
**affects** [1] - 183:2
**affidavit** [2] - 137:15, 160:7
**affirm** [10] - 18:13, 27:18, 52:19, 85:20, 123:8, 188:14, 243:17, 265:14, 281:15, 294:2
**afford** [2] - 280:15, 307:15
**afforded** [1] - 362:14
**afraid** [5] - 277:2, 351:3, 351:4, 351:6, 352:20
**afternoon** [16] - 26:23, 32:2, 126:7, 188:13, 188:22, 199:11, 229:6, 243:15, 244:3, 244:4, 244:5,

265:22, 271:19, 277:17, 396:21
**AFTERNOON** [1] - 187:1
**afterwards** [2] - 291:21, 347:16
**Ag** [1] - 372:21
**ag** [2] - 380:9, 384:12
**age** [2] - 245:13, 455:1
**agencies** [1] - 8:16
**agency** [4] - 57:25, 67:2, 354:6
**agenda** [1] - 410:20
**agent** [4] - 101:19, 153:7, 434:20, 434:23
**Aggravate** [1] - 442:23
**aggravated** [15] - 28:4, 43:22, 371:7, 372:12, 381:17, 381:23, 382:2, 388:2, 400:16, 402:21, 407:5, 414:14, 419:24, 420:3, 421:16
**Aggravated** [15] - 421:5, 422:5, 422:7, 422:17, 422:24, 424:4, 424:6, 424:13, 426:1, 426:17, 426:19, 427:18, 427:21, 427:22, 428:5
**aggressive** [1] - 135:21
**aggressor** [6] - 391:23, 405:16, 405:20, 425:10, 428:23
**agitated** [3] - 15:18, 37:10, 307:5
**agitation** [1] - 37:11
**ago** [12] - 87:14, 94:6, 100:16, 105:6, 116:5, 120:11, 121:22, 179:1, 190:4, 242:19, 250:10, 349:13
**agree** [32] - 10:10, 10:12, 10:17, 107:11, 107:15, 112:22, 113:22, 170:4, 176:16, 229:14, 229:24, 259:3, 274:17, 279:18, 279:21, 363:19, 378:19, 379:3, 380:23, 381:3, 383:9, 391:6, 392:4, 392:7, 392:8,

393:4, 393:14, 439:5, 441:10, 442:6, 447:19, 449:17

**agreed** [3] - 25:3, 281:20, 411:1

**agreement** [5] - 7:11, 7:12, 9:3, 365:4, 387:1

**agreements** [1] - 364:14

**ahead** [28] - 8:22, 36:23, 46:5, 76:3, 103:17, 116:13, 167:6, 181:12, 186:8, 187:13, 187:15, 195:18, 196:2, 249:7, 249:8, 253:2, 253:13, 261:24, 273:7, 281:10, 317:3, 342:20, 355:5, 400:1, 402:18, 448:15

**aid** [1] - 395:3

**aids** [1] - 34:22

**ain't** [7] - 303:21, 308:3, 315:3, 315:13, 315:18, 332:8, 356:15

**alarm** [11] - 39:15, 39:18, 68:19, 69:2, 69:10, 69:14, 69:17, 70:1, 72:2, 72:3

**alarming** [1] - 307:24

**alarms** [1] - 69:6

**alert** [2] - 68:13, 447:13

**alerted** [1] - 71:16

**all's** [2] - 27:12, 188:5

**Allan** [1] - 244:9

**allegation** [1] - 437:4

**allegations** [10] - 18:7, 19:5, 19:18, 20:5, 20:20, 21:18, 21:24, 22:16, 278:4, 415:9

**alleged** [5] - 6:21, 185:4, 366:13, 424:13, 428:4

**allegedly** [1] - 353:14

**alleges** [1] - 381:19

**alleging** [1] - 17:2

**allow** [8] - 16:20, 17:2, 95:20, 297:10, 317:17, 405:21, 408:22, 446:5

**allowed** [27] - 8:17, 11:3, 14:1, 37:19, 37:23, 37:25, 58:16, 60:1, 60:25, 62:17,

64:5, 64:9, 64:18, 66:24, 67:15, 67:23, 67:24, 68:1, 100:14, 182:20, 278:18, 278:25, 354:12, 361:25, 407:7, 409:4, 412:22

**allows** [1] - 337:11

**almost** [17] - 39:11, 40:13, 40:24, 70:7, 76:14, 220:20, 220:23, 220:24, 253:10, 266:8, 341:13, 341:14, 341:15, 344:1, 348:15, 349:14, 383:20

**alone** [2] - 52:4, 438:6

**altercation** [6] - 84:2, 103:5, 113:10, 165:1, 236:3, 404:17

**alternate** [2] - 447:18, 447:20

**alternative** [1] - 15:21

**altogether** [1] - 11:14

**amount** [3] - 280:11, 280:13, 460:5

**amounts** [1] - 459:24

**an-hour-and-a-half** [1] - 197:18

**analysis** [6] - 163:18, 403:23, 404:7, 412:18, 414:7, 418:19

**AND** [1] - 1:1

**and..** [2] - 216:6, 383:12

**angels** [1] - 397:5

**angry** [9] - 39:2, 212:7, 344:1, 348:6, 351:16, 352:22, 399:20, 399:25, 440:25

**animal** [3] - 298:9, 303:24, 304:1

**ankle** [9] - 39:17, 65:9, 65:10, 65:14, 127:21, 131:14, 131:16, 328:8, 406:18

**anklet** [17] - 38:4, 39:16, 39:21, 40:13, 40:19, 65:24, 66:5, 68:23, 75:3, 137:9, 354:17, 355:7, 355:10, 355:18, 358:4, 415:11, 455:4

**anklet/bracelet** [1] - 77:15

**announce** [3] - 84:22,

277:12, 365:1

**announced** [4] - 277:14, 277:25, 281:22, 293:19

**another's** [1] - 422:4

**answer** [18] - 33:6, 46:10, 119:7, 125:21, 177:22, 297:1, 310:1, 310:16, 318:20, 328:2, 338:11, 358:11, 410:20, 446:19, 449:12, 449:25, 450:16

**answered** [1] - 125:8

**answering** [4] - 162:17, 410:16, 439:2, 450:22

**answers** [3] - 12:5, 285:24, 331:15

**Anthony** [1] - 196:11

**anticipate** [3] - 406:6, 411:5, 412:5

**anticipating** [1] - 186:13

**antique** [1] - 305:6

**anytime** [3] - 367:11, 409:11, 459:24

**anyway** [6] - 236:19, 276:10, 276:11, 354:1, 369:5, 396:7

**anyways** [2] - 273:5, 317:25

**apart** [2] - 168:5, 180:3

**apartment** [2] - 345:10, 395:7

**apologies** [2] - 86:7, 187:25

**apologize** [1] - 108:9

**apparatus** [2] - 210:23, 211:23

**apparent** [1] - 321:5

**appeal** [1] - 460:23

**appear** [3] - 134:4, 401:11, 447:14

**appearance** [2] - 423:15, 427:6

**appearances** [2] - 423:20, 427:12

**appeared** [3] - 164:15, 167:15, 339:22

**applicable** [33] - 181:7, 181:8, 181:11, 182:12, 182:14, 182:17, 184:3, 184:21, 186:7, 371:10, 381:10, 381:14, 381:19, 382:21,

383:11, 384:25, 385:4, 385:25, 386:12, 386:16, 386:23, 387:2, 387:13, 387:20, 388:8, 389:4, 389:8, 389:12, 389:15, 390:10, 392:5, 444:18

**applied** [2] - 418:16, 447:8

**applies** [2] - 382:25, 390:4

**apply** [14] - 28:17, 28:20, 29:19, 378:17, 380:20, 403:17, 418:15, 436:22, 439:22, 439:23, 440:9, 445:22, 447:6, 462:9

**appointed** [2] - 5:18, 458:24

**appreciate** [5] - 10:20, 403:6, 448:6, 451:19, 454:4

**approach** [16] - 59:1, 84:21, 91:15, 96:4, 96:5, 109:11, 140:3, 140:13, 142:21, 206:20, 222:14, 230:3, 256:12, 296:17, 324:10, 360:11

**approached** [2] - 140:17, 142:10

**approaching** [4] - 15:19, 161:9, 225:11, 322:9

**appropriate** [6] - 230:11, 369:4, 382:20, 384:2, 387:12, 455:5

**approved** [1] - 38:2

**approximation** [1] - 177:18

**April** [2] - 195:19, 294:21

**area** [57] - 31:4, 35:16, 41:11, 44:14, 69:8, 72:11, 72:19, 73:12, 77:21, 78:8, 88:1, 89:13, 93:24, 112:23, 119:22, 125:8, 125:9, 125:23, 126:21, 127:8, 127:16, 131:13, 131:20, 131:22, 131:23, 139:3, 145:1, 148:6, 159:1, 159:9,

159:16, 160:2, 191:3, 191:20, 206:16, 206:17, 207:4, 207:11, 212:14, 224:25, 246:3, 246:16, 269:20, 297:11, 298:8, 298:9, 301:17, 301:19, 306:6, 330:1, 355:22, 355:25, 356:8, 408:15, 409:23, 415:16

**areas** [4] - 67:15, 67:17, 67:20, 67:21

**argue** [4] - 63:18, 287:19, 402:18, 406:25

**argued** [1] - 307:15

**arguing** [6] - 47:24, 286:4, 321:1, 321:3, 321:5, 321:6

**argument** [19] - 13:11, 16:18, 29:25, 47:20, 47:21, 47:24, 177:5, 255:16, 255:19, 290:3, 302:7, 345:14, 395:7, 396:20, 409:9, 411:10, 411:19, 416:16

**argumentative** [1] - 175:2

**arguments** [13] - 29:17, 29:18, 63:15, 290:5, 361:20, 362:10, 393:21, 393:22, 394:24, 395:2, 395:5, 395:17, 402:19

**arise** [1] - 438:8

**arises** [1] - 108:3

**arm** [1] - 254:5

**armed** [20] - 15:18, 28:6, 44:5, 264:14, 276:1, 278:14, 291:17, 351:14, 351:16, 367:19, 376:7, 376:14, 399:8, 402:22, 408:7, 420:2, 434:9, 444:5, 455:17

**Armed** [4] - 185:25, 376:12, 433:23, 436:8

**arms** [1] - 254:5

**arrest** [6] - 51:14, 104:13, 152:13, 173:11, 278:12, 288:16

**arrested** [14] - 41:17, 44:3, 137:20, 151:10, 152:22, 154:7, 157:3, 258:3, 264:14, 271:8, 271:10, 276:1, 297:14, 334:19
**arrived** [5] - 27:10, 73:13, 74:23, 77:23, 261:7
**articulate** [1] - 404:1
**articulated** [1] - 369:15
**as..** [1] - 114:17
**ASAP** [1] - 458:6
**ascertainable** [1] - 7:8
**ascertained** [2] - 433:15, 433:18
**ass** [2] - 302:20, 327:4
**assault** [2] - 337:25, 338:2
**asserted** [1] - 95:16
**assessed** [2] - 311:3, 459:2
**assigned** [2] - 65:11, 125:4
**assist** [1] - 445:20
**assistance** [1] - 98:21
**assisted** [1] - 98:21
**associate** [1] - 306:16
**associated** [1] - 63:16
**associations** [2] - 430:10, 431:24
**assume** [8] - 111:24, 114:14, 115:8, 168:1, 169:23, 177:1, 205:2, 274:11
**assumed** [1] - 7:11
**assuming** [4] - 105:2, 111:15, 115:21, 184:10
**assumption** [2] - 11:6, 11:18
**assumptions** [1] - 12:1
**at..** [1] - 100:22
**attached** [1] - 66:8
**attachments** [1] - 8:1
**attack** [2] - 223:22, 223:24
**attacked** [6] - 84:3, 223:25, 224:14, 353:15, 356:13, 415:10
**attacking** [1] - 354:21
**Attemp** [1] - 427:20
**attempt** [8] - 117:12, 348:19, 381:17, 382:5, 422:4, 422:5, 433:10, 433:18

**attempted** [6] - 48:20, 381:22, 388:2, 422:9, 423:2, 426:20
**Attempted** [5] - 422:6, 422:17, 422:23, 426:16, 426:18
**attempting** [7] - 179:19, 391:19, 422:11, 423:5, 424:3, 426:23, 427:16
**attempts** [1] - 30:25
**attention** [16] - 27:4, 35:4, 107:7, 186:3, 213:23, 214:20, 216:5, 249:2, 286:7, 286:10, 324:7, 403:6, 419:15, 419:19, 419:20
**attentive** [1] - 447:13
**attitudes** [1] - 304:21
**Attorney** [4] - 2:3, 2:6, 2:12, 458:23
**attorney** [1] - 23:1
**attorneys** [10] - 29:3, 29:5, 29:16, 32:22, 364:13, 394:23, 394:25, 403:11, 446:16, 453:25
**attorneys'** [1] - 439:2
**attributable** [1] - 63:7
**audible** [19] - 65:18, 199:4, 199:8, 206:4, 215:9, 219:2, 221:22, 222:9, 223:20, 223:23, 228:20, 229:13, 234:4, 235:12, 235:15, 240:14, 328:7, 328:14, 346:25
**authorities** [1] - 457:25
**Authority** [1] - 434:11
**authorization** [3] - 434:5, 434:22, 436:17
**authorized** [5] - 434:6, 434:18, 434:19, 436:19, 462:4
**auto** [4] - 301:15, 301:19, 303:10, 343:18
**automatically** [2] - 114:19, 166:5
**available** [1] - 413:17
**avenue** [1] - 298:14
**Avenue** [3] - 1:15, 2:3, 2:10
**avenues** [1] - 323:21

**average** [1] - 246:24
**avoided** [2] - 423:19, 427:9
**await** [1] - 448:25
**awaiting** [2] - 24:6, 449:1
**awarded** [1] - 459:25
**aware** [17] - 11:1, 16:6, 30:16, 31:16, 70:19, 105:24, 111:25, 114:8, 163:23, 229:21, 251:3, 251:16, 252:11, 296:7, 361:25, 445:24, 460:18
**awesome** [2] - 243:22, 243:24
**awful** [1] - 358:8
**axe** [105] - 4:12, 15:18, 17:10, 39:3, 46:12, 46:13, 46:14, 46:18, 46:23, 47:8, 47:10, 47:13, 47:16, 48:3, 48:7, 95:7, 95:10, 95:19, 95:23, 95:24, 96:10, 99:3, 109:20, 109:23, 110:19, 111:1, 111:9, 111:13, 111:19, 112:1, 132:19, 132:21, 135:7, 135:12, 135:15, 135:20, 135:23, 136:3, 136:4, 155:13, 155:14, 155:17, 155:18, 155:21, 160:25, 161:4, 161:12, 161:24, 162:4, 162:15, 162:19, 162:21, 163:1, 165:11, 177:8, 218:10, 218:11, 218:12, 218:13, 218:19, 219:1, 219:4, 223:24, 224:11, 224:13, 230:19, 232:24, 233:1, 233:4, 233:15, 236:23, 237:13, 237:16, 238:6, 238:9, 238:13, 238:16, 238:19, 238:20, 289:24, 310:18, 310:20, 321:13, 321:16, 321:23, 322:5, 323:3, 323:7, 323:8, 325:11,

326:18, 326:22, 327:5, 351:7, 351:12, 351:25, 353:14, 354:21, 358:18, 359:1, 390:12, 405:22, 405:23
**axes** [2] - 111:21, 321:25

## B

**B2200** [1] - 192:8
**baby** [5] - 333:16, 398:2, 398:4, 409:14, 409:22
**backed** [3] - 116:19, 270:12, 307:13
**backseat** [4] - 308:6, 320:4, 339:15, 340:17
**backwards** [1] - 366:8
**backyard** [1] - 331:2
**bad** [11] - 151:25, 205:14, 236:19, 342:17, 350:22, 355:15, 355:17, 397:14, 406:17, 412:18, 417:11
**bag** [1] - 118:15
**ball** [2] - 216:21, 216:24
**balled** [1] - 322:9
**bar** [4] - 59:4, 59:16, 309:6, 360:13
**barely** [1] - 288:10
**Barkham** [1] - 305:2
**barn** [1] - 305:6
**barrel** [1] - 324:23
**barreling** [1] - 302:13
**baseball** [12] - 125:15, 126:23, 132:8, 133:14, 134:24, 142:7, 155:19, 163:3, 215:13, 320:25, 338:20, 338:21
**Based** [1] - 427:12
**based** [28] - 28:12, 45:20, 88:9, 90:10, 93:18, 94:12, 96:12, 138:11, 140:8, 151:4, 162:12, 164:22, 165:7, 210:21, 281:4, 322:10, 342:25, 352:13, 365:7, 365:9, 367:1, 391:8, 392:20, 409:21,

423:20, 441:14, 454:20, 456:4
**basis** [2] - 408:5, 413:19
**Bat** [1] - 372:21
**bat** [84] - 4:11, 4:12, 4:14, 4:15, 4:17, 4:22, 14:10, 16:3, 38:20, 43:23, 46:14, 47:3, 47:13, 78:10, 79:6, 79:7, 79:10, 94:24, 95:4, 95:12, 96:1, 98:9, 109:20, 110:6, 110:14, 110:18, 110:21, 111:13, 125:15, 126:23, 129:4, 132:8, 132:19, 132:21, 132:24, 133:4, 133:12, 133:14, 134:24, 135:6, 135:18, 142:7, 149:14, 149:21, 150:7, 155:19, 158:9, 158:12, 163:4, 215:13, 217:7, 224:12, 224:17, 237:1, 237:2, 238:17, 322:23, 323:1, 323:5, 323:6, 324:2, 324:4, 324:8, 324:14, 324:20, 326:8, 326:16, 327:8, 338:20, 338:21, 359:5, 380:9, 384:12, 397:16, 401:22, 402:22, 404:22, 405:17, 405:21, 417:3
**bat's** [2] - 95:18, 322:17, 322:24
**bathroom** [5] - 201:16, 201:17, 201:18, 247:8, 269:21
**bats** [1] - 320:25
**batter** [1] - 373:18
**batteries** [5] - 197:20, 203:22, 203:24, 312:14
**Battery** [25] - 420:9, 421:5, 421:6, 422:5, 422:7, 422:12, 422:18, 422:24, 423:6, 424:4, 424:6, 424:11, 424:13, 426:1, 426:3,

426:17, 426:19,
426:24, 427:18,
427:21, 427:22,
428:2, 428:5,
442:23, 442:24
**battery** [32] - 28:4,
43:22, 75:12,
125:14, 181:10,
197:12, 197:14,
197:16, 197:19,
203:12, 203:25,
371:7, 372:12,
373:15, 373:22,
381:17, 381:23,
382:2, 382:6,
384:12, 388:2,
400:16, 402:21,
407:5, 414:14,
419:24, 420:3,
421:7, 421:16,
421:18, 454:25
**beam** [1] - 336:20
**beat** [3] - 322:9,
351:10, 352:1
**became** [4] - 48:19,
195:20, 298:7,
343:25
**become** [12] - 30:16,
34:20, 124:13,
124:19, 297:5,
351:15, 370:21,
374:2, 392:3,
418:14, 439:21,
445:23
**becomes** [4] - 37:9,
45:21, 351:14, 366:4
**becoming** [2] - 321:5,
348:16
**bed** [1] - 215:17
**bedroom** [3] - 245:22,
246:19, 247:4
**beef** [1] - 198:7
**beeping** [1] - 75:16
**beer** [1] - 305:22
**began** [1] - 160:7
**begged** [1] - 262:11
**begin** [7] - 26:14,
30:8, 35:6, 137:14,
447:2, 448:14,
448:19
**beginning** [4] - 9:6,
29:2, 308:2, 394:13
**begs** [2] - 13:6, 307:16
**behalf** [1] - 403:5
**behaviors** [1] - 345:1
**behind** [22] - 42:15,
78:19, 78:20, 96:21,
184:10, 190:7,
190:9, 198:23,
230:16, 255:7,

256:18, 256:20,
256:25, 257:1,
267:23, 286:23,
294:17, 299:8,
299:9, 321:7,
334:23, 337:3
**behold** [2] - 315:6,
412:25
**beings** [3] - 397:13,
397:15
**belabor** [1] - 402:15
**believes** [6] - 6:9,
6:10, 404:4, 404:5,
404:6
**belly** [1] - 144:25
**belong** [5] - 44:7,
44:16, 100:10,
256:1, 398:1
**belonged** [4] - 43:15,
44:11, 78:14, 415:19
**belongings** [2] -
308:4, 447:24
**belongs** [1] - 43:17
**below** [3] - 89:4,
380:16, 381:2
**belt** [4] - 145:2,
172:10, 335:11,
335:14
**Ben** [3] - 291:12,
291:15, 292:14
**ben** [8] - 291:22,
292:8, 292:9,
330:24, 330:25,
333:11, 333:25,
334:10
**bending** [1] - 366:8
**benefit** [3] - 388:20,
410:22, 432:19
**beside** [2] - 238:16,
269:1
**best** [11] - 192:1,
299:21, 313:21,
313:22, 350:3,
351:1, 362:16,
412:7, 438:16,
456:24, 462:5
**better** [8] - 68:24,
153:25, 197:20,
239:5, 366:23,
414:5, 419:7, 419:9
**between** [16] - 7:1,
8:16, 27:19, 69:13,
81:25, 113:11,
165:1, 179:18,
236:4, 236:7,
256:23, 279:22,
280:20, 280:23,
325:12, 395:6
**beyond** [26] - 28:11,
51:24, 231:8,

374:21, 382:7,
403:19, 404:10,
414:12, 420:5,
421:1, 421:8,
425:20, 429:8,
429:16, 431:4,
431:11, 432:13,
432:23, 433:24,
435:11, 436:4,
436:12, 437:6,
438:2, 442:1, 442:3
**bias** [1] - 441:13
**big** [25] - 41:25, 43:1,
43:12, 66:7, 87:24,
148:13, 148:15,
167:23, 204:23,
204:25, 205:6,
215:6, 217:15,
218:24, 237:15,
246:21, 262:3,
274:15, 306:10,
307:12, 319:22,
355:25, 391:7,
409:9, 415:17
**bigger** [6] - 110:5,
120:7, 274:19,
319:16, 399:25,
417:9
**billie** [2] - 429:25,
432:5
**bing** [4] - 75:21
**birth** [1] - 266:18
**bit** [16] - 26:12, 76:25,
79:1, 94:11, 168:3,
213:13, 236:1,
249:9, 268:19,
273:13, 305:23,
308:21, 330:2,
336:19, 352:4,
443:13
**black** [6] - 66:6, 79:22,
335:12, 341:20,
402:10
**blank** [1] - 118:1
**blanket** [7] - 141:10,
141:12, 141:13,
141:17, 167:4,
168:5, 170:7
**bleed** [1] - 112:24
**bleeding** [3] - 38:22,
151:23, 327:3
**blinds** [1] - 332:5
**blog** [1] - 445:18
**blogging** [1] - 30:13
**blonde** [1] - 338:3
**blood** [34] - 39:8, 91:1,
91:2, 133:14,
134:24, 135:24,
135:25, 136:6,
162:19, 163:1,

163:7, 163:9,
163:11, 163:15,
163:18, 163:24,
164:1, 164:7, 164:9,
164:10, 164:12,
164:14, 164:16,
164:18, 219:6,
219:7, 220:18,
236:19, 324:16,
324:25, 400:21,
405:2, 405:5
**blood-like** [1] -
163:24, 324:16,
405:2
**blow** [1] - 323:10
**bodily** [12] - 183:22,
388:1, 420:11,
420:15, 420:18,
421:21, 421:22,
422:3, 422:16,
426:6, 426:7, 435:16
**body** [9] - 49:3,
114:13, 114:14,
117:8, 121:21,
121:23, 122:15,
152:13, 170:25
**bodycam** [34] - 49:2,
49:14, 49:18, 50:15,
50:17, 51:6, 51:16,
51:18, 82:10,
114:25, 115:12,
115:18, 115:24,
116:22, 117:20,
152:6, 152:9,
156:23, 157:2,
157:8, 159:19,
166:2, 166:4,
171:13, 175:22,
176:18, 233:21,
233:22, 278:7,
287:12, 337:17,
412:4, 412:24,
413:16
**bodycams** [6] - 152:3,
153:21, 412:9,
412:21, 413:5, 413:8
**bolded** [1] - 186:2
**bolted** [1] - 203:24
**bonfire** [2] - 305:23,
307:19
**booked** [1] - 459:20
**books** [1] - 193:9
**born** [1] - 266:16
**borrow** [1] - 191:16
**boss** [1] - 155:10
**bottom** [8] - 46:23,
382:17, 383:11,
386:1, 386:11,
386:21, 389:22,
390:20

**bought** [12] - 193:19,
211:9, 240:25,
241:1, 241:4, 241:6,
241:11, 241:12,
301:24, 312:11,
416:5
**bound** [1] - 62:9
**Bowie** [10] - 4:18,
42:25, 44:1, 143:8,
143:20, 145:12,
172:23, 227:18,
255:6, 328:15
**bowl** [2] - 332:16,
334:1
**box** [7] - 120:5, 120:8,
121:13, 143:15,
143:23, 144:14,
302:1
**boy** [4] - 143:8,
200:11, 307:12
**bracelet** [18] - 66:1,
66:5, 66:6, 67:1,
67:3, 69:1, 69:2,
69:17, 72:2, 72:3,
72:6, 77:25, 255:9,
257:2, 328:8,
406:19, 406:24
**bracelet-gone** [2] -
69:1, 69:17
**bracelet-strap** [2] -
72:2, 72:3
**BRADFORD** [1] - 1:1
**Bradford** [23] - 1:14,
26:10, 54:16, 68:9,
72:20, 72:21, 77:22,
78:3, 80:5, 87:6,
87:8, 87:15, 87:23,
120:10, 121:22,
123:25, 124:25,
154:19, 175:6,
189:9, 189:10,
295:7, 452:4
**Brady** [3] - 278:5,
286:8, 289:19
**brakes** [1] - 224:12
**brand** [2] - 193:18,
242:1
**break** [32] - 7:3, 26:16,
26:21, 26:24, 27:1,
32:4, 32:10, 105:11,
105:15, 181:4,
236:1, 277:17,
277:20, 277:24,
290:19, 290:25,
360:10, 360:16,
360:25, 361:5,
361:7, 361:8,
361:16, 361:17,
361:18, 361:20,
362:4, 362:10,

363:8, 393:20,
396:14, 457:22
**breaks** [5] - 30:4,
31:12, 34:5, 107:3,
107:23
**bridge** [1] - 329:17
**brief** [4] - 105:23,
179:23, 364:8, 364:9
**briefly** [8] - 83:16,
105:17, 179:12,
276:17, 277:15,
296:17, 300:6
**bright** [4] - 337:10,
339:23, 340:1
**bring** [34] - 9:19,
14:21, 22:15, 24:25,
25:20, 35:14, 35:16,
50:17, 54:14, 71:14,
87:13, 107:17,
107:19, 124:24,
187:14, 190:3,
195:18, 199:9,
223:1, 231:4,
266:22, 286:6,
286:9, 290:20,
293:13, 309:17,
352:17, 398:11,
417:9, 444:13,
445:7, 449:12,
449:19, 451:10
**bringing** [4] - 24:21,
25:21, 270:14,
455:21
**bro** [2] - 315:15,
315:18
**broke** [2] - 295:10,
301:13
**broken** [3] - 343:12,
449:10, 450:10
**brother** [6] - 248:12,
260:8, 299:24,
299:25, 366:18,
366:19
**brothers** [2] - 260:6,
457:5
**brought** [6] - 26:20,
31:7, 46:14, 304:8,
307:1, 398:7
**bruises** [4] - 384:22,
402:4, 421:24,
426:10
**brush** [5] - 76:8,
76:10, 76:20,
273:12, 408:25
**bugs** [1] - 122:1
**build** [1] - 305:23
**building** [1] - 435:3
**bullshit** [1] - 317:6
**bumps** [1] - 153:24
**bunch** [7] - 5:22, 7:25,

11:25, 224:11,
224:23, 320:17,
320:19
**burden** [6] - 51:24,
279:12, 404:15,
414:18, 437:9,
439:12
**burglary** [1] - 454:23
**burn** [1] - 40:21
**burned** [1] - 40:21
**bustamante** [2] -
413:21, 413:25
**BUSTAMANTE** [254] -
5:10, 8:13, 10:12,
11:7, 13:14, 13:23,
16:9, 16:13, 24:12,
24:15, 25:8, 25:18,
35:8, 52:17, 53:4,
54:8, 56:22, 59:24,
60:20, 62:1, 64:2,
71:9, 79:25, 80:4,
80:9, 83:16, 83:18,
84:8, 84:13, 85:15,
86:7, 86:13, 91:14,
91:17, 92:17, 92:25,
93:6, 93:11, 95:15,
95:22, 96:8, 97:23,
98:4, 98:7, 105:7,
107:14, 114:10,
121:17, 121:19,
122:19, 122:24,
123:5, 123:18,
129:13, 129:20,
130:14, 133:9,
134:10, 134:19,
135:1, 135:4,
142:20, 142:24,
144:4, 144:13,
145:7, 145:11,
147:13, 147:22,
149:1, 149:10,
149:13, 149:25,
150:10, 150:15,
151:3, 154:15,
154:18, 154:23,
156:15, 165:13,
175:1, 175:16,
177:10, 179:12,
179:14, 180:13,
181:9, 181:17,
181:19, 181:23,
182:3, 182:7, 182:9,
182:15, 182:24,
183:11, 183:15,
183:18, 183:21,
183:24, 184:2,
184:4, 184:16,
184:19, 184:22,
185:1, 185:6,
185:10, 185:13,

185:18, 185:21,
186:4, 186:15,
186:20, 187:12,
187:18, 188:10,
188:21, 189:6,
193:25, 203:3,
203:18, 209:15,
210:8, 216:25,
220:4, 220:6,
220:10, 222:13,
222:16, 228:21,
228:25, 229:16,
230:1, 233:6,
234:14, 243:10,
243:14, 244:2,
244:19, 253:19,
256:11, 256:14,
258:6, 264:19,
265:21, 271:15,
276:17, 276:19,
277:7, 277:11,
279:15, 290:18,
290:23, 296:3,
296:14, 296:21,
308:25, 316:19,
316:21, 316:25,
317:8, 318:3,
328:23, 329:5,
330:10, 332:17,
332:25, 340:6,
341:10, 342:18,
342:21, 342:24,
358:12, 361:12,
363:2, 363:15,
364:15, 370:3,
370:6, 371:9,
371:18, 371:22,
371:25, 372:7,
372:9, 374:11,
374:15, 375:16,
375:20, 375:23,
376:12, 377:11,
378:22, 379:1,
380:6, 380:11,
380:22, 381:1,
381:9, 381:13,
381:25, 382:11,
382:14, 383:5,
383:7, 383:10,
383:15, 383:18,
383:22, 384:5,
384:9, 384:14,
384:19, 384:24,
385:3, 385:7,
385:10, 385:13,
385:15, 385:19,
385:21, 385:24,
386:2, 386:4, 386:7,
386:19, 387:5,
387:16, 390:18,
390:21, 391:10,

391:12, 391:22,
391:24, 392:1,
392:8, 393:15,
394:19, 396:21,
414:22, 428:6,
447:22, 448:22,
449:18, 450:24,
452:22, 454:12,
454:17, 459:8,
460:12, 461:2, 461:7
**Bustamante** [27] - 2:2,
3:3, 3:5, 3:7, 3:9,
3:12, 3:14, 3:16,
3:20, 3:23, 3:25, 4:3,
6:6, 35:11, 60:11,
60:19, 291:18,
327:17, 342:23,
358:17, 359:21,
363:20, 403:10,
406:7, 411:21,
412:19, 455:20
**bustamante's** [1] -
412:6
**Bustamante's** [3] -
162:18, 365:9, 411:5
**bustamantel@sao8.
org** [1] - 2:5
**busy** [1] - 8:23
**but..** [2] - 199:18,
205:13
**butting** [2] - 285:1,
286:1
**button** [4] - 115:22,
116:9, 116:14, 166:8
**buy** [6] - 241:8, 241:9,
312:9, 345:23,
346:19, 401:24
**buying** [5] - 312:6,
346:7, 346:20,
347:20, 348:21
**buzz** [1] - 75:20
**BY** [92] - 18:19, 21:21,
53:4, 54:8, 56:22,
64:2, 71:9, 80:4,
80:19, 81:22, 83:18,
86:13, 91:17, 93:11,
95:22, 96:8, 98:7,
108:15, 109:13,
114:7, 114:12,
118:14, 121:19,
123:18, 129:20,
130:14, 133:9,
134:19, 135:4,
142:24, 144:13,
145:11, 147:22,
149:13, 150:10,
151:3, 154:18,
155:2, 156:1,
156:22, 165:17,
166:19, 175:4,

175:20, 177:13,
179:14, 188:21,
189:6, 193:25,
203:3, 203:18,
209:15, 210:8,
216:25, 220:10,
222:16, 229:5,
229:20, 230:17,
233:13, 234:17,
242:16, 244:2,
244:19, 253:19,
256:14, 258:10,
265:21, 271:18,
275:23, 276:19,
294:7, 296:6,
296:25, 298:4,
310:14, 317:2,
317:19, 318:5,
318:21, 324:15,
327:16, 328:25,
329:6, 330:13,
332:22, 333:1,
340:9, 340:12,
341:10, 342:24,
358:16

## C

**C-r-i-b-e-s** [1] - 291:15
**cab** [4] - 205:1,
215:18, 215:19,
319:20
**caller** [1] - 133:3
**calmly** [1] - 261:22
**calms** [1] - 333:18
**cam** [1] - 49:3
**camera** [13] - 114:13,
114:15, 121:23,
152:14, 286:15,
289:21, 337:6,
337:7, 337:12,
337:13, 339:4,
339:25
**cameras** [2] - 121:21,
122:15
**camp** [1] - 320:9
**camper** [37] - 78:18,
140:13, 140:18,
141:2, 141:20,
167:14, 167:24,
197:11, 206:14,
221:25, 245:21,
246:18, 247:13,
250:15, 252:18,
253:18, 254:15,
267:23, 270:11,
271:21, 274:22,
275:1, 294:17,
300:24, 300:25,
312:19, 313:14,

314:15, 314:23,
325:19, 331:2,
331:6, 334:13,
337:23, 352:12,
358:1
**camper's** [1] - 312:18
**camper-sized** [1] -
252:18
**campers** [5] - 40:8,
190:25, 275:17,
297:7, 298:21
**campground** [38] -
35:18, 41:20, 41:22,
72:17, 76:9, 76:20,
76:21, 77:4, 78:12,
78:13, 78:19, 78:21,
125:14, 127:19,
138:14, 157:20,
159:9, 190:7,
190:10, 190:12,
190:16, 190:21,
196:1, 198:22,
198:23, 201:1,
218:17, 246:10,
294:16, 294:17,
295:16, 295:22,
295:23, 295:24,
296:11, 296:12,
297:3, 297:12
**Campground** [3] -
190:7, 245:17,
266:24
**campsite** [1] - 157:18
**cannot** [14] - 41:12,
108:21, 176:11,
176:14, 179:1,
257:23, 317:18,
346:10, 367:22,
433:14, 433:18,
433:19, 441:16
**capability** [1] - 81:13
**capacities** [2] -
425:13, 429:1
**capacity** [3] - 53:18,
124:3, 266:7
**car** [29] - 36:15, 36:16,
38:15, 38:16, 73:9,
91:6, 139:5, 192:14,
192:20, 205:7,
207:13, 223:18,
224:12, 267:22,
270:11, 275:2,
286:23, 286:24,
302:20, 331:19,
338:12, 338:13,
338:19, 339:9,
339:18, 341:12,
348:3, 348:12,
348:15
**card** [65] - 11:20, 12:3,

13:1, 13:16, 13:17,
16:22, 37:3, 37:4,
37:6, 37:7, 37:8,
37:9, 38:8, 38:12,
38:17, 43:5, 46:1,
46:3, 95:2, 209:9,
209:14, 210:15,
210:17, 211:2,
211:14, 211:24,
212:3, 212:25,
213:4, 213:20,
214:2, 225:5,
236:15, 239:14,
239:17, 240:1,
240:4, 240:12,
255:11, 313:5,
313:19, 315:12,
315:13, 315:14,
315:18, 315:20,
315:25, 318:11,
320:4, 320:5, 320:7,
321:9, 338:22,
340:20, 353:16,
353:23, 354:20,
397:18, 399:21,
411:6, 411:24,
415:6, 416:25,
417:10
**card's** [1] - 315:7
**cards** [9] - 12:12,
12:19, 70:18, 211:6,
211:11, 211:21,
239:21, 239:22,
315:15
**care** [14] - 32:11,
47:23, 66:22,
199:20, 200:4,
200:12, 200:14,
262:2, 262:5,
262:18, 383:16,
395:22, 430:15,
430:17
**career** [1] - 180:8
**careful** [3] - 60:22,
61:2, 62:2
**carefully** [1] - 437:22
**Carrie** [26] - 56:4,
56:5, 56:12, 195:25,
196:4, 235:14,
235:18, 235:22,
248:11, 300:10,
300:13, 300:18,
300:24, 301:20,
301:22, 311:19,
312:16, 312:24,
313:6, 317:7,
317:20, 325:13,
325:16, 326:21,
330:21
**Carrie's** [4] - 208:8,

317:5, 317:6, 327:4
**carried** [7] - 374:23,
429:19, 430:1,
431:13, 431:14,
432:7, 445:3
**carries** [1] - 19:14
**carry** [1] - 431:18
**carrying** [4] - 268:20,
370:13, 370:17,
370:18
**cars** [1] - 189:16
**CASE** [1] - 1:3
**case** [111] - 7:9, 8:24,
9:25, 11:10, 15:2,
20:11, 27:3, 27:13,
27:16, 27:25, 28:2,
28:17, 28:20, 29:20,
29:24, 30:2, 30:7,
30:11, 30:14, 30:15,
30:18, 30:22, 30:24,
31:1, 31:2, 31:15,
33:18, 34:19, 35:13,
52:10, 52:12, 54:2,
59:14, 77:24, 100:1,
100:14, 100:15,
100:19, 104:17,
105:14, 113:5,
118:23, 119:3,
128:19, 142:8,
153:18, 164:4,
164:25, 166:11,
180:20, 213:9,
263:24, 277:19,
284:25, 292:24,
293:20, 305:22,
336:7, 361:17,
361:23, 362:11,
362:19, 365:6,
367:18, 368:2,
368:14, 370:12,
370:18, 385:6,
387:7, 390:8,
390:13, 391:21,
394:18, 394:22,
395:4, 396:25,
405:4, 410:22,
410:25, 411:2,
418:14, 419:22,
434:25, 439:4,
439:7, 439:21,
440:16, 440:19,
440:23, 441:3,
442:15, 445:11,
445:15, 445:16,
445:23, 445:25,
447:7, 451:5,
452:25, 456:18,
458:23, 459:6,
459:7, 459:10,
459:13, 460:7,

460:15
**Case** [2] - 379:17,
452:6
**cases** [8] - 9:24,
109:1, 163:13,
392:25, 393:1,
397:1, 453:7, 460:17
**castle** [2] - 397:24,
397:25, 398:24
**casual** [2] - 430:8,
431:22
**cat** [1] - 139:25
**caught** [2] - 302:6,
306:22
**caused** [2] - 45:9,
301:6
**causing** [1] - 108:4
**caution** [4] - 99:18,
142:11, 380:14,
383:1
**Cautionary** [1] - 379:9
**cautious** [4] - 140:7,
140:11, 423:17,
427:7
**Ceasars** [1] - 243:21
**cell** [20] - 13:18, 14:2,
15:8, 31:22, 36:10,
36:20, 37:4, 37:7,
37:19, 40:14, 45:15,
66:3, 74:13, 75:19,
205:16, 209:23,
220:1, 354:5, 415:2,
446:3
**center** [3] - 67:8, 69:6,
69:11
**centimeters** [1] -
178:21
**centuries** [2] - 447:9,
453:5
**certain** [21] - 11:3,
37:14, 37:15, 58:9,
60:24, 66:20, 67:15,
67:17, 67:20, 81:5,
94:21, 99:16, 99:17,
100:7, 100:10,
195:7, 246:10,
298:20, 410:4,
410:21, 421:14
**certainly** [15] - 16:17,
30:5, 49:7, 50:22,
51:13, 60:15, 62:10,
80:22, 108:21,
113:1, 164:6, 230:6,
260:1, 405:3, 408:14
**CERTIFICATE** [1] -
462:1
**certification** [1] -
462:8
**certified** [4] - 9:1,
9:11, 24:23, 25:4

**certify** [1] - 462:4
**certifying** [1] - 462:11
**cetera** [1] - 4:12
**chainsaw** [1] - 307:25
**chair** [1] - 34:6
**challenge** [2] -
191:19, 335:20
**chance** [9] - 19:1,
29:5, 29:17, 271:6,
297:20, 365:3,
403:9, 413:22, 445:4
**change** [4] - 338:22,
370:2, 412:16,
412:17
**changes** [3] - 393:5,
407:1, 407:3
**charge** [43] - 17:23,
27:20, 43:24, 44:4,
44:8, 90:7, 119:9,
191:18, 197:19,
202:23, 203:1,
203:11, 203:20,
205:22, 206:7,
206:8, 206:13,
207:25, 279:4,
312:23, 363:10,
366:11, 366:17,
368:11, 368:25,
370:1, 370:10,
400:16, 407:10,
407:11, 408:6,
425:23, 429:12,
430:16, 438:2,
442:21, 443:5,
443:15, 444:4,
452:8, 452:10,
452:14, 452:16
**Charge** [1] - 44:9
**charged** [25] - 28:3,
36:11, 36:15,
204:10, 204:17,
205:17, 207:17,
208:7, 291:17,
312:24, 312:25,
366:11, 367:16,
404:14, 406:23,
406:24, 437:11,
441:22, 442:8,
442:24, 443:8,
444:6, 444:15,
444:22, 452:12
**charges** [10] - 43:21,
44:19, 203:23,
367:3, 367:11,
367:13, 367:18,
400:15, 402:21,
414:19
**charging** [8] - 36:17,
36:23, 37:1, 45:14,
117:10, 208:4,

366:25
**Charlie** [1] - 345:12
**Chase** [1] - 196:11
**chatted** [3] - 263:21, 264:1
**cheap** [1] - 337:15
**check** [13] - 46:5, 46:6, 46:7, 72:8, 72:25, 78:14, 334:8, 442:21, 443:2, 443:21, 459:13
**chemical** [3] - 163:17, 429:25, 432:6
**chest** [2] - 106:5, 336:20
**chief** [1] - 11:10
**child** [21] - 42:11, 42:14, 50:1, 63:3, 245:14, 248:13, 254:4, 254:9, 260:1, 260:23, 266:11, 267:3, 270:8, 273:16, 285:15, 399:3, 409:16, 416:22, 454:22, 455:1, 455:24
**children** [1] - 245:9
**choice** [3] - 405:14, 406:16, 444:10
**choose** [6] - 347:23, 349:1, 349:21, 364:24, 375:4, 444:25
**chop** [1] - 218:15
**chopped** [2] - 237:5, 238:10
**chopping** [1] - 237:16
**chose** [5] - 164:3, 231:4, 346:14, 348:14, 354:22
**Chris** [3] - 308:13, 308:15, 308:23, 309:2
**Christmas** [5] - 193:21, 193:23, 241:2, 241:5, 241:7
**Christopher** [1] - 308:10
**chronological** [3] - 301:9, 301:11, 304:24
**church** [1] - 249:19
**cigarette** [1] - 291:25
**circle** [1] - 295:6
**circuit** [1] - 26:10
**CIRCUIT** [2] - 1:1
**Circuit** [3] - 1:16, 452:3, 452:4
**circumstance** [2] - 401:19, 423:18

**circumstances** [13] - 164:24, 191:25, 192:2, 194:2, 391:9, 401:8, 423:9, 427:2, 427:8, 434:13, 434:15, 456:4, 456:21
**city** [1] - 36:7
**civil** [1] - 459:3
**civilian** [1] - 25:23
**claim** [2] - 401:3, 407:24
**claims** [2] - 328:22, 401:2
**clarify** [1] - 64:3
**clean** [8] - 184:9, 186:19, 221:3, 226:3, 226:4, 226:13, 226:21, 238:3
**cleaning** [2] - 304:24, 313:9
**clear** [19] - 15:7, 18:9, 59:10, 106:6, 127:23, 233:14, 233:17, 279:16, 286:10, 336:6, 370:21, 377:20, 384:21, 387:8, 399:19, 400:25, 412:14, 456:25, 460:4
**clearly** [16] - 11:23, 21:3, 22:7, 50:9, 279:4, 280:2, 285:8, 336:1, 336:2, 339:10, 342:10, 353:9, 355:15, 405:18, 411:3, 455:22
**Clerk** [3] - 129:16, 132:12, 452:1
**CLERK** [4] - 18:12, 27:17, 220:5, 452:3
**clerk** [6] - 6:2, 8:4, 17:12, 18:10, 27:16, 220:8
**client** [54] - 11:19, 13:4, 15:7, 18:4, 18:7, 45:4, 45:5, 45:10, 45:12, 45:21, 46:3, 46:8, 46:20, 48:7, 48:21, 49:21, 50:5, 50:8, 51:3, 51:7, 51:8, 59:8, 59:20, 61:25, 62:17, 62:22, 63:2, 114:2, 114:9, 238:23, 278:22, 291:10, 292:4, 292:7,

292:18, 370:7, 370:9, 371:1, 381:21, 403:5, 404:16, 404:18, 405:9, 405:15, 405:20, 406:5, 407:25, 408:11, 408:23, 409:23, 411:6, 411:20, 411:25, 414:13
**client's** [5] - 51:1, 165:12, 360:18
**clients** [1] - 71:17
**close** [9] - 118:18, 139:7, 170:4, 206:21, 248:7, 259:1, 321:6, 341:11, 356:4
**closed** [1] - 268:25
**closely** [2] - 162:24, 395:2
**closer** [5] - 136:10, 167:9, 167:12, 168:8, 189:3
**closing** [4] - 361:6, 396:20, 402:19, 447:3
**cloth** [1] - 253:5
**clothes** [4] - 270:15, 320:17, 326:4
**clothing** [9] - 25:23, 39:9, 40:1, 41:9, 43:2, 79:21, 145:20, 154:10, 228:19
**cloud** [1] - 12:22
**clue** [1] - 111:20
**clues** [1] - 389:7
**clunk** [1] - 323:9
**code** [2] - 138:23, 139:1
**coerced** [1] - 283:5
**coffee** [1] - 357:25
**coherent** [1] - 93:14
**coincidence** [1] - 398:21
**colaw** [2] - 20:24, 21:3
**Colaw** [2] - 1:16, 26:9
**collect** [5] - 46:15, 46:17, 99:19, 109:1, 109:20
**collected** [3] - 100:2, 118:8, 161:5
**collection** [3] - 98:22, 119:9, 162:9
**collective** [1] - 450:13
**collision** [1] - 47:12
**colloquy** [1] - 281:10
**combination** [2] - 314:11, 337:14
**comfortable** [1] - 86:2

**coming** [24] - 40:17, 80:23, 87:3, 170:12, 171:12, 209:22, 209:25, 216:8, 216:9, 250:2, 260:18, 265:8, 270:14, 273:9, 289:24, 308:8, 309:9, 322:5, 326:20, 327:2, 346:9, 388:25, 390:12, 398:15
**comment** [1] - 322:8
**commenting** [1] - 328:24
**commission** [7] - 24:19, 388:2, 422:17, 424:4, 426:16, 427:18, 434:8
**commit** [11] - 381:17, 381:20, 382:5, 391:19, 414:13, 422:5, 422:12, 423:5, 424:3, 426:23, 427:17
**committed** [14] - 140:4, 231:8, 397:3, 420:21, 420:23, 424:15, 428:8, 430:24, 431:1, 435:24, 436:1, 437:11, 437:12, 455:2
**committing** [8] - 344:14, 420:9, 424:3, 424:11, 427:17, 428:2
**common** [7] - 399:15, 399:18, 409:18, 413:2, 417:24, 418:24, 438:15
**commotion** [1] - 250:20
**communicate** [5] - 30:10, 434:24, 445:11, 445:14, 446:11
**communication** [3] - 30:13, 31:13, 445:18
**communications** [1] - 445:22
**community** [17] - 41:25, 42:1, 48:25, 229:15, 229:22, 230:8, 251:8, 251:9, 258:12, 316:12, 316:18, 330:5, 330:6, 409:19, 409:20, 411:14,

454:5
**company** [2] - 70:3, 244:13
**comparing** [1] - 437:22
**complainant** [3] - 133:3, 138:9, 140:19
**complaint** [1] - 286:6
**complete** [1] - 196:3
**completed** [2] - 10:2, 153:19
**completely** [3] - 285:12, 430:11, 431:25
**complex** [1] - 345:10
**compliance** [1] - 67:12
**compliant** [1] - 171:22
**complicated** [1] - 397:7
**complied** [1] - 142:13
**complies** [2] - 146:24, 149:20
**composite** [1] - 92:23
**comprehending** [1] - 306:13
**computer** [13] - 37:21, 58:6, 60:5, 64:10, 70:14, 70:17, 83:2, 95:1, 138:4, 147:9, 148:17, 176:14, 177:6
**computer-type** [1] - 148:17
**computers** [1] - 64:19
**conceal** [4] - 335:23, 430:2, 432:8, 457:19
**Concealed** [6] - 370:11, 431:8, 431:9, 443:7, 443:9, 452:11
**concealed** [23] - 28:5, 145:19, 181:16, 181:22, 182:1, 182:4, 370:13, 374:23, 375:3, 407:13, 407:14, 419:25, 429:14, 429:19, 429:24, 430:12, 431:15, 431:18, 432:1, 432:4
**concealing** [1] - 335:9
**concept** [1] - 120:8
**concern** [12] - 6:15, 19:6, 19:20, 20:24, 21:14, 45:10, 107:5, 108:4, 295:22, 301:6, 304:18, 304:19
**concerned** [12] - 5:18,

38:10, 42:10, 45:22,
84:14, 118:5,
302:24, 347:4,
349:15, 350:13,
351:15, 415:5
**concerns** [1] - 6:19,
291:10, 319:1
**concludes** [1] - 454:3
**conclusion** [4] -
52:10, 97:18,
229:17, 440:5
**Conclusion** [1] -
461:9
**conclusions** [1] -
63:19
**concurs** [1] - 280:12
**condition** [15] - 55:14,
55:18, 55:19, 56:1,
56:2, 56:8, 57:9,
58:14, 58:18, 58:19,
58:20, 61:23, 64:17,
65:3, 134:6
**conditions** [10] -
53:24, 54:1, 54:11,
54:23, 55:3, 55:10,
55:13, 59:15, 458:5
**conduct** [5] - 45:8,
184:14, 426:13,
433:7, 433:9
**conducted** [2] - 29:2,
33:16
**confer** [1] - 33:9
**conference** [6] -
17:24, 33:13, 59:4,
309:6, 360:13,
363:10
**confiscate** [1] -
143:10
**confiscated** [1] -
143:9
**conflict** [5] - 52:1,
52:4, 81:25, 415:8,
438:9
**conflicts** [1] - 199:7
**confront** [1] - 285:5
**confrontation** [2] -
345:19, 347:2
**confronting** [1] -
318:22
**confused** [1] - 399:19
**confusing** [1] - 383:1
**confusion** [1] - 442:13
**connected** [1] - 331:4
**connection** [1] -
408:13
**connections** [1] -
12:20
**conquered** [1] -
131:21
**conscious** [1] -

328:16
**consciousness** [1] -
406:9
**consecutive** [3] -
459:5, 459:15,
460:15
**consent** [6] - 50:9,
56:6, 278:25, 279:1,
360:18, 409:4
**consequences** [3] -
56:23, 56:25, 284:6
**consider** [26] - 29:9,
29:21, 121:6,
196:21, 198:3,
279:21, 282:15,
394:8, 400:15,
420:19, 423:9,
424:16, 424:20,
425:2, 425:8, 427:2,
428:9, 428:16,
428:21, 430:22,
435:22, 437:16,
438:20, 438:22,
442:19, 458:10
**consideration** [13] -
33:11, 84:5, 280:18,
404:9, 418:15,
425:15, 429:3,
439:19, 439:23,
444:3, 452:25,
453:6, 456:2
**considerations** [1] -
99:21
**considered** [8] -
28:15, 128:17,
136:7, 228:7, 282:2,
299:24, 316:10,
444:18
**considering** [8] -
420:19, 425:11,
428:24, 430:21,
435:19, 435:21,
437:22, 438:18
**consist** [1] - 248:10
**consisted** [2] -
245:20, 245:21
**consistent** [11] - 12:8,
113:7, 130:2, 151:6,
374:25, 393:8,
399:9, 400:3, 404:6,
416:11, 416:23
**constant** [1] - 130:9
**constitute** [3] -
420:24, 431:1, 436:2
**constituted** [2] -
421:19, 426:4
**constitution** [1] -
447:9
**constraints** [1] - 413:7
**construction** [2] -

420:14, 435:18
**consume** [1] - 33:16
**consuming** [1] - 12:22
**contact** [12] - 39:22,
85:4, 85:6, 128:10,
319:7, 322:23,
323:7, 323:8, 325:9,
327:9, 445:20,
457:23
**contained** [2] - 214:2,
441:15
**container** [1] - 120:2
**contemplate** [1] -
323:20
**contemplated** [2] -
420:13, 435:17
**contest** [2] - 20:19,
457:18
**context** [3] - 350:18,
350:19, 353:10
**continue** [6] - 7:10,
9:17, 77:17, 124:17,
446:18, 450:20
**continued** [1] - 131:12
**continuing** [1] -
124:18
**continuous** [1] - 435:7
**contractual** [1] - 8:15
**contradicts** [1] - 13:5
**control** [7] - 184:13,
264:11, 287:11,
430:16, 430:18,
433:7, 462:10
**convenience** [1] -
442:9
**conversation** [9] -
93:16, 95:7, 111:8,
111:10, 249:12,
275:1, 338:24,
345:19, 366:22
**conversations** [2] -
199:2, 365:9
**converse** [1] - 453:15
**convey** [1] - 105:17
**conveyance** [1] -
454:24
**convict** [1] - 414:6
**Convicted** [4] -
370:11, 377:6,
431:8, 443:7
**convicted** [27] - 8:8,
24:18, 24:21, 25:1,
28:6, 43:25, 48:22,
48:23, 181:21,
227:22, 229:8,
340:24, 370:14,
375:5, 397:20,
402:24, 408:4,
419:25, 429:14,
429:17, 429:21,

439:7, 452:12,
456:10, 456:12,
458:20, 459:21
**conviction** [9] - 9:11,
279:10, 281:2,
418:10, 418:12,
429:18, 437:21,
437:24, 437:25
**convictions** [8] - 5:19,
5:25, 9:1, 24:23,
25:4, 25:5, 283:19
**convince** [3] - 420:21,
430:23, 435:24
**convinced** [2] -
425:20, 429:8
**convoluted** [1] - 390:1
**cooked** [1] - 199:23
**copies** [7] - 9:1, 9:11,
24:23, 25:4, 374:16,
419:5, 419:6
**cops** [3] - 270:20,
327:19, 327:20
**copy** [4] - 371:16,
374:12, 419:3,
419:17
**corner** [1] - 339:17
**correct** [211] - 16:5,
19:22, 20:13, 20:21,
21:9, 21:19, 21:25,
22:24, 54:3, 54:7,
55:8, 57:2, 64:6,
64:15, 65:1, 67:5,
68:6, 71:13, 73:5,
73:10, 73:16, 75:23,
76:16, 77:11, 77:13,
79:16, 80:24, 82:2,
82:5, 82:8, 82:12,
83:8, 83:12, 83:22,
88:20, 90:15, 99:2,
101:21, 103:8,
104:2, 108:22,
109:2, 109:3, 109:7,
109:8, 109:20,
109:21, 110:11,
110:12, 113:3,
113:6, 113:9,
115:19, 116:15,
117:4, 117:21,
119:2, 119:12,
119:16, 121:14,
121:24, 122:7,
122:16, 122:17,
124:19, 124:20,
124:22, 124:23,
126:3, 127:1, 128:6,
128:8, 128:16,
128:20, 129:23,
130:4, 130:12,
130:23, 131:9,
132:20, 132:22,

133:2, 134:7,
137:12, 137:21,
139:14, 140:10,
141:3, 141:5, 141:8,
142:12, 143:13,
143:16, 143:19,
144:3, 145:5,
145:21, 146:2,
146:14, 148:11,
148:19, 148:22,
149:16, 149:23,
151:22, 153:13,
153:22, 154:21,
155:8, 156:24,
157:13, 159:22,
160:20, 160:22,
161:22, 162:22,
163:4, 163:5, 163:8,
164:5, 164:21,
165:6, 165:9, 166:9,
166:12, 166:16,
166:18, 168:9,
168:11, 169:10,
169:12, 171:16,
171:18, 172:2,
172:5, 172:7,
172:16, 172:18,
174:24, 177:20,
177:21, 178:4,
179:15, 180:1,
181:4, 183:7, 229:9,
229:12, 232:14,
234:19, 237:24,
238:7, 240:13,
284:16, 298:22,
329:13, 333:3,
340:24, 341:13,
341:23, 343:12,
343:18, 343:23,
344:15, 344:16,
344:22, 344:25,
345:5, 345:6,
345:11, 345:23,
346:2, 346:14,
346:15, 346:19,
347:6, 347:13,
347:24, 348:7,
348:23, 349:10,
350:15, 352:15,
353:23, 354:2,
354:6, 354:23,
355:6, 355:8,
355:11, 355:22,
364:6, 364:23,
375:1, 376:5,
376:16, 376:17,
378:8, 385:9,
391:20, 391:24,
392:10, 392:16,
451:18, 455:17,
455:18, 459:7,

459:11, 459:19, 460:9, 462:6
**correctional/ probational** [1] - 53:11
**Corrections** [12] - 14:14, 37:22, 38:3, 38:6, 39:19, 53:12, 53:16, 57:24, 65:5, 124:8, 124:10, 460:22
**correctly** [4] - 115:21, 133:13, 146:10, 148:14
**corroborate** [1] - 365:21
**corroborates** [1] - 15:22
**cost** [2] - 433:15, 458:22
**couch** [18] - 42:17, 51:4, 141:20, 146:9, 166:22, 167:5, 167:13, 167:14, 172:20, 172:21, 261:3, 269:2, 335:7, 335:8, 336:12, 336:24, 337:1, 398:19
**counsel** [20] - 5:6, 5:7, 23:22, 23:23, 24:17, 35:9, 44:22, 52:15, 106:20, 107:9, 108:9, 121:20, 187:7, 230:3, 285:20, 286:12, 360:11, 364:18, 416:15, 451:8
**Counsel** [15] - 105:9, 105:24, 106:21, 187:7, 265:9, 291:5, 291:6, 296:17, 309:5, 360:6, 403:4, 417:12, 449:6, 451:8
**count** [21] - 181:6, 181:13, 181:18, 278:14, 279:17, 279:22, 367:20, 371:6, 374:18, 376:6, 407:13, 407:17, 431:10, 443:15, 443:21, 444:15, 444:16, 452:8, 452:10, 452:13, 452:15
**Count** [9] - 183:5, 185:25, 372:12, 429:13, 432:10, 433:22, 442:20, 443:5, 444:4

**counter** [1] - 269:1
**counting** [1] - 335:4
**country** [1] - 307:12
**Counts** [1] - 379:15
**counts** [6] - 25:16, 279:11, 280:1, 280:6, 454:23, 458:16
**COUNTY** [1] - 1:1
**county** [28] - 26:11, 54:16, 67:23, 68:9, 72:9, 72:20, 72:21, 77:22, 78:3, 80:6, 87:6, 87:15, 87:23, 88:25, 89:6, 89:17, 120:10, 121:23, 124:25, 154:20, 175:6, 189:7, 262:22, 295:1, 295:7, 459:6, 460:15
**County** [8] - 1:14, 5:25, 8:7, 67:24, 87:8, 124:1, 189:10, 452:5
**couple** [15] - 41:21, 148:9, 201:13, 227:14, 231:12, 237:22, 284:21, 306:17, 320:15, 320:24, 331:11, 342:13, 343:2, 352:10, 410:11
**course** [19] - 8:23, 17:20, 29:7, 30:20, 33:21, 34:13, 41:25, 61:2, 159:19, 282:2, 307:18, 341:25, 345:21, 348:25, 353:1, 353:15, 354:16, 382:1, 442:3
**court** [42] - 5:17, 6:4, 9:24, 10:3, 10:6, 11:3, 18:4, 21:23, 22:3, 23:12, 23:13, 24:1, 32:4, 33:12, 44:23, 49:12, 85:19, 108:12, 177:23, 178:1, 229:3, 273:24, 281:16, 289:22, 364:18, 382:21, 383:25, 429:23, 439:11, 446:21, 450:1, 450:2, 450:4, 453:4, 455:15, 456:13, 456:16, 458:22, 459:10, 460:23, 461:1, 462:11
**COURT** [467] - 1:1, 5:2, 5:11, 5:15, 6:10,

6:12, 7:5, 7:18, 7:23, 8:11, 9:13, 9:22, 10:14, 10:21, 11:11, 12:7, 12:18, 13:10, 13:13, 13:22, 15:3, 15:10, 16:12, 16:15, 17:14, 17:20, 17:23, 18:1, 23:14, 23:19, 24:13, 25:6, 25:9, 25:15, 25:19, 27:23, 44:20, 52:15, 52:18, 52:23, 54:6, 59:2, 60:6, 60:19, 61:4, 61:10, 61:14, 61:21, 62:8, 62:21, 62:25, 63:6, 63:13, 63:24, 71:8, 80:3, 80:11, 80:14, 80:16, 83:15, 84:9, 84:17, 84:22, 84:25, 85:3, 85:7, 85:12, 85:18, 85:25, 86:6, 86:10, 91:16, 92:20, 92:22, 93:1, 93:8, 95:20, 96:5, 97:20, 97:24, 98:6, 105:9, 105:21, 106:14, 106:17, 107:13, 107:16, 107:19, 108:3, 108:8, 108:13, 109:12, 114:6, 114:11, 121:16, 122:20, 122:3, 123:7, 123:13, 130:11, 133:7, 134:12, 134:14, 135:3, 142:22, 144:6, 144:8, 147:15, 147:17, 149:3, 149:5, 149:12, 150:3, 150:5, 150:17, 154:17, 154:24, 155:25, 156:14, 156:21, 165:16, 175:3, 175:19, 177:12, 179:8, 179:11, 180:14, 180:17, 181:10, 181:18, 181:20, 181:24, 182:5, 182:8, 182:13, 182:16, 182:21, 183:1, 183:9, 183:13, 183:17, 183:19, 183:22, 183:25, 184:3, 184:7, 184:17, 184:20, 184:23, 185:2, 185:7, 185:11, 185:14,

185:19, 185:25, 186:5, 186:16, 186:21, 186:23, 187:3, 187:13, 187:20, 188:11, 188:19, 210:6, 222:15, 228:24, 229:2, 229:18, 230:3, 230:9, 230:13, 233:10, 234:16, 242:15, 243:9, 243:11, 243:15, 243:21, 243:23, 243:25, 253:15, 256:13, 258:7, 264:18, 264:21, 264:24, 265:1, 265:5, 265:19, 271:16, 275:22, 276:16, 277:6, 277:8, 277:10, 277:13, 279:14, 280:7, 280:22, 281:1, 281:4, 281:8, 281:13, 281:18, 282:8, 282:13, 282:18, 282:21, 282:24, 283:1, 283:4, 283:8, 283:12, 283:25, 284:9, 284:12, 284:17, 284:23, 286:2, 286:5, 286:20, 286:25, 287:8, 287:14, 287:19, 287:25, 288:4, 288:12, 288:17, 289:1, 289:8, 289:13, 289:16, 290:4, 290:10, 290:13, 290:17, 290:19, 290:24, 291:3, 292:16, 292:3, 293:8, 293:13, 293:24, 296:4, 296:17, 296:20, 296:23, 297:22, 298:1, 309:3, 309:8, 309:14, 309:21, 309:24, 310:1, 310:7, 310:10, 310:12, 317:1, 317:10, 317:13, 318:4, 318:15, 318:20, 324:12, 327:15, 329:2, 329:4, 330:12, 332:20, 340:11, 341:8, 342:20,

358:14, 360:5, 360:11, 360:16, 360:20, 360:23, 361:4, 361:13, 363:3, 363:6, 363:12, 363:17, 363:21, 363:24, 364:4, 364:7, 364:10, 364:16, 365:2, 365:16, 365:19, 365:24, 366:3, 366:7, 366:15, 366:20, 367:5, 367:8, 368:16, 368:18, 368:21, 368:23, 369:2, 369:11, 369:14, 369:17, 369:20, 369:24, 370:4, 370:15, 370:20, 370:24, 371:2, 371:6, 371:13, 371:20, 371:23, 372:3, 372:14, 372:17, 372:21, 372:24, 373:1, 373:6, 373:9, 373:11, 373:14, 373:18, 373:21, 373:25, 374:4, 374:17, 374:20, 375:1, 375:8, 375:11, 375:14, 375:19, 375:22, 375:24, 376:3, 376:6, 376:10, 376:15, 376:18, 376:22, 377:2, 377:5, 377:9, 377:16, 377:18, 377:24, 378:4, 378:9, 378:12, 378:17, 378:19, 378:25, 379:3, 379:6, 379:9, 379:12, 379:14, 379:17, 379:20, 380:4, 380:7, 383:20, 383:23, 384:6, 384:10, 384:15, 384:23, 385:2, 385:5, 385:9, 385:12, 385:14, 385:17, 385:20, 385:22, 386:1, 386:3, 386:6, 386:8, 386:11, 386:13, 386:15, 386:24, 388:13, 388:16, 388:20, 388:24, 389:2, 389:6,

389:10, 389:14,
389:18, 389:21,
390:2, 390:7,
390:20, 390:23,
391:2, 391:5,
391:13, 391:16,
391:23, 392:2,
392:9, 392:11,
392:15, 392:18,
392:22, 392:25,
393:4, 393:7,
393:14, 393:16,
393:19, 394:17,
394:20, 395:12,
395:16, 396:4,
396:18, 403:2,
414:21, 419:1,
419:14, 419:18,
428:7, 447:23,
448:1, 448:4, 448:9,
448:23, 448:25,
449:3, 449:19,
449:22, 449:24,
450:25, 451:2,
451:4, 451:23,
452:18, 452:23,
454:15, 455:12,
455:18, 456:15,
458:14, 459:1,
459:12, 459:19,
459:24, 460:11,
460:14, 461:6, 461:8
**Court** [26] - 1:20, 1:23,
5:14, 10:20, 15:11,
23:22, 28:22, 31:14,
35:8, 61:18, 80:15,
107:12, 186:24,
258:8, 278:15,
279:8, 279:11,
293:1, 345:12,
369:12, 387:12,
403:3, 451:22,
452:3, 456:7, 462:15
**Court's** [2] - 21:12,
145:10
**court's** [3] - 10:25,
286:9, 450:22
**courthouse** [5] -
26:11, 26:20, 27:9,
31:8, 446:5
**Courthouse** [1] - 1:14
**courtroom** [37] - 5:5,
26:2, 31:8, 34:4,
76:24, 77:1, 79:18,
105:1, 105:23,
106:20, 107:22,
154:7, 180:24,
187:6, 187:19,
187:22, 222:7,
228:16, 257:22,

271:3, 277:21,
277:24, 293:15,
293:18, 362:21,
362:24, 393:24,
394:2, 399:15,
440:2, 444:14,
445:8, 448:19,
450:20, 451:7,
451:14, 454:8
**cover** [2] - 181:2,
363:8, 363:9
**CPR** [1] - 112:14
**cradle** [1] - 117:9
**CRD** [1] - 458:6
**create** [1] - 367:25
**creates** [2] - 12:22,
38:22
**creative** [1] - 36:3
**credibility** [5] -
400:14, 406:10,
414:10, 417:13,
440:6
**credible** [10] - 403:13,
403:14, 403:15,
403:22, 403:23,
404:8, 407:9, 410:3,
414:4, 414:17
**credit** [5] - 456:8,
460:1, 460:5, 460:8,
460:19
**creek** [4] - 329:19,
329:20, 330:1, 356:9
**creep** [2] - 315:7,
315:8
**crew** [1] - 205:1
**crew-cab** [1] - 205:1
**Cribes** [7] - 291:13,
291:15, 291:22,
292:9, 292:15,
333:11
**crime** [40] - 48:23,
48:24, 229:11,
354:25, 382:1,
397:3, 408:4, 420:3,
420:24, 421:4,
421:7, 421:15,
422:6, 422:23,
424:6, 426:18,
427:20, 427:22,
429:13, 430:24,
431:2, 431:6,
432:10, 432:12,
433:22, 435:25,
436:2, 436:6, 436:7,
436:10, 436:22,
437:10, 437:12,
442:8, 444:15,
444:17, 444:21,
455:2
**crimes** [10] - 28:4,

28:8, 228:2, 283:21,
356:12, 419:23,
420:22, 425:25,
441:23, 444:22
**criminal** [14] - 8:19,
19:14, 28:2, 32:12,
380:2, 380:17,
387:13, 388:4,
390:6, 390:9,
390:14, 422:19,
423:24, 429:22
**crisp** [1] - 323:9
**critical** [3] - 175:15,
175:18, 350:14
**Crole** [1] - 120:15
**Crole's** [1] - 121:12
**Cross** [6] - 3:4, 3:8,
3:13, 3:21, 3:24, 4:3
**CROSS** [7] - 80:18,
108:14, 155:1,
229:4, 258:9,
271:17, 341:9
**cross** [13] - 3:17,
80:11, 105:10,
108:10, 154:24,
229:2, 258:7,
271:16, 291:12,
320:24, 341:8,
410:10, 424:18
**cross-examination** [2]
- 291:12, 410:10
**crossed** [1] - 29:12
**crowbar** [1] - 320:24
**crucial** [1] - 6:21
**cuff** [1] - 397:12
**cuffed** [1] - 337:4
**curb** [2] - 226:10,
226:17
**cure** [2] - 293:2,
402:12
**cured** [3] - 60:18,
341:14, 402:4
**cures** [1] - 342:13
**curfew** [3] - 305:19,
305:24, 320:11
**curious** [1] - 453:23
**current** [3] - 5:19,
19:18, 204:1
**cursed** [1] - 308:21
**curtain** [1] - 275:12
**curve** [1] - 122:3
**cushions** [2] - 172:19,
172:21
**cusp** [1] - 293:1
**cussing** [1] - 302:14
**custodian** [4] -
119:23, 120:3,
120:10, 120:11
**custodians** [1] -
120:17

**custody** [3] - 82:16,
430:15, 430:17
**cut** [19] - 39:16, 39:21,
40:19, 72:6, 75:3,
127:21, 131:15,
137:9, 237:10,
255:9, 257:2, 328:8,
335:16, 355:7,
355:18, 358:4,
406:18, 415:11,
455:3
**cuts** [2] - 69:22,
112:18
**cutting** [3] - 145:16,
335:19, 406:23
**cylinder** [1] - 192:9

# D

**Dalton** [2] - 123:5,
123:23
**DALTON** [1] - 3:11
**damaged** [1] - 72:6
**damaging** [1] - 14:17
**danger** [10] - 409:14,
423:11, 423:13,
423:16, 423:18,
423:22, 427:4,
427:6, 427:9, 427:14
**dangerous** [10] -
42:13, 145:23,
270:3, 424:25,
425:7, 428:14,
428:21, 434:9,
435:14
**dangle** [1] - 307:1
**dark** [9] - 40:23,
77:10, 90:22, 102:5,
126:8, 126:11,
133:11, 330:23,
337:11
**darker** [2] - 130:13,
131:25
**data** [1] - 83:4
**date** [6] - 55:2, 118:20,
118:22, 266:18,
444:12, 445:6
**DATE** [1] - 1:13
**dated** [3] - 118:9,
452:17, 462:13
**daughter** [1] - 260:7
**Davis** [2] - 26:7,
270:18
**dawned** [1] - 313:17
**days** [9] - 69:19,
226:7, 347:10,
347:11, 349:8,
349:13, 402:11,
460:19, 460:23

**daze** [1] - 219:5
**DC** [1] - 203:25
**de** [1] - 77:16
**de-activated** [1] -
77:16
**Dead** [1] - 427:19
**dead** [2] - 75:12, 203:2
**Deadly** [11] - 372:12,
421:6, 421:20,
424:5, 424:7,
424:14, 426:1,
427:19, 427:22,
428:6, 442:23
**deadly** [51] - 28:4,
46:18, 182:13,
183:4, 183:5, 183:6,
183:11, 371:13,
371:15, 371:18,
371:20, 373:2,
373:7, 387:23,
393:7, 400:16,
400:19, 407:6,
414:14, 419:24,
420:4, 420:10,
420:16, 421:16,
421:19, 421:25,
422:12, 422:14,
423:6, 423:8,
423:12, 423:15,
424:1, 424:12,
424:22, 425:18,
425:22, 426:4,
426:5, 426:11,
426:24, 427:1,
427:5, 427:15,
428:3, 428:12,
429:6, 429:10,
430:1, 432:6
**deal** [10] - 94:15,
107:12, 181:1,
243:8, 315:19,
316:5, 328:18,
329:22, 329:23,
359:14
**dealing** [8] - 36:1,
94:9, 94:13, 94:15,
116:12, 397:17,
425:5, 428:18
**deals** [1] - 14:12
**dealt** [1] - 112:17
**dear** [1] - 193:7
**death** [8] - 387:25,
420:11, 420:18,
421:21, 422:3,
422:16, 426:6,
435:15
**decide** [17] - 28:17,
28:19, 34:18, 51:17,
155:13, 349:15,
356:13, 402:12,

404:14, 406:2,
420:25, 421:2,
431:3, 431:5, 436:3,
436:5, 438:14
**decided** [7] - 157:8,
407:23, 410:25,
416:23, 439:4,
440:19, 440:23
**deciding** [5] - 423:7,
426:25, 438:16,
441:15, 447:5
**decision** [32] - 33:23,
115:17, 116:13,
164:22, 276:10,
281:9, 281:24,
282:8, 282:9,
282:15, 282:21,
283:1, 283:6,
283:10, 284:10,
311:11, 328:16,
329:21, 355:15,
355:17, 363:22,
364:4, 365:5,
400:13, 407:2,
407:4, 419:10,
440:18, 441:3,
441:17, 456:22,
457:17
**decision-making** [1] -
311:11
**decisions** [8] - 90:8,
96:13, 282:1, 282:3,
282:4, 367:1,
397:14, 397:15
**deducing** [1] - 24:22
**deemed** [1] - 279:23
**def** [1] - 417:7
**defend** [15] - 47:6,
83:24, 233:16,
311:6, 323:2, 325:1,
330:15, 330:16,
359:5, 390:13,
404:24, 407:2,
407:4, 407:7, 426:14
**defendant** [82] -
13:20, 14:19, 24:17,
24:18, 24:25, 25:11,
28:11, 32:13, 32:15,
35:22, 36:20, 36:25,
37:12, 38:20, 40:2,
42:3, 42:16, 43:3,
43:10, 64:11, 64:17,
65:9, 72:25, 80:2,
82:16, 83:20,
104:25, 108:22,
145:19, 154:6,
378:20, 379:14,
380:1, 381:19,
382:22, 387:9,
387:10, 387:14,

391:19, 392:12,
392:16, 392:19,
419:22, 420:21,
421:3, 421:13,
423:22, 427:11,
430:24, 431:5,
432:21, 435:9,
435:24, 436:5,
436:25, 437:2,
437:3, 437:10,
437:11, 438:3,
438:8, 438:11,
438:13, 439:20,
441:5, 441:7,
441:21, 443:6,
443:8, 443:10,
443:16, 443:17,
443:18, 443:20,
444:6, 444:8, 452:8,
452:10, 452:14,
452:16, 454:21,
455:7
**Defendant** [26] - 1:9,
2:12, 13:25, 27:20,
28:3, 37:9, 44:18,
60:1, 62:17, 154:16,
228:23, 374:22,
380:17, 382:18,
382:19, 398:7,
398:19, 400:23,
401:9, 415:1, 416:9,
418:13, 418:24,
442:22, 442:25,
444:5
**DEFENDANT'S** [1] -
4:24
**defendant's** [6] -
22:21, 32:16, 38:9,
51:15, 437:8, 437:13
**Defendant's** [2] - 64:4,
417:22
**defended** [4] - 84:3,
323:13, 326:9,
405:10
**defending** [2] -
323:21, 325:6
**defense** [30] - 5:11,
15:16, 24:17, 44:21,
59:7, 121:20,
293:23, 379:21,
383:24, 384:21,
385:6, 387:6,
390:23, 393:17,
394:14, 394:16,
395:8, 400:25,
401:3, 404:19,
421:15, 425:11,
425:15, 425:25,
428:24, 429:3,
450:25, 452:19,

454:16
**Defense** [11] - 8:17,
187:10, 279:16,
377:6, 391:5,
394:21, 416:15,
417:12, 447:19,
448:23, 459:2
**defenses** [2] - 374:1,
417:13
**defer** [2] - 290:5,
394:5
**define** [3] - 183:4,
184:12, 387:13
**defined** [4] - 28:22,
67:17, 182:2, 380:9
**defines** [2] - 373:2,
373:3
**definite** [1] - 29:23
**definitely** [4] - 94:19,
136:9, 154:2, 327:11
**definition** [11] - 28:7,
181:8, 181:14,
182:3, 183:13,
183:25, 184:24,
418:11, 421:5,
431:7, 436:8
**definitions** [4] -
181:21, 373:2,
436:20, 436:21
**degree** [2] - 185:20,
454:25
**delay** [2] - 32:8, 293:4
**delays** [1] - 208:16
**deliberate** [13] - 29:22,
31:24, 34:10, 34:11,
150:23, 289:19,
289:20, 362:2,
362:15, 395:20,
406:22, 446:10,
447:2
**deliberating** [3] - 32:3,
361:9, 446:7
**deliberation** [1] -
186:8
**Deliberation** [1] -
379:7
**deliberations** [17] -
30:9, 31:19, 34:13,
150:25, 445:1,
445:10, 445:21,
446:9, 446:18,
446:25, 448:14,
448:19, 450:17,
450:20, 453:9,
453:17, 453:21
**delineated** [1] - 380:1
**deliver** [2] - 34:15,
119:24
**delivered** [1] - 32:8
**demeanor** [2] - 319:3,

410:19
**demonstrating** [13] -
38:24, 46:25, 47:10,
169:5, 170:2,
216:12, 219:8,
220:24, 247:20,
253:11, 273:1,
408:17, 417:4
**denied** [7] - 24:4,
61:15, 63:21,
211:17, 212:5,
280:6, 280:9
**deny** [1] - 328:12
**denying** [2] - 325:10,
325:11
**Denzel** [2] - 45:18,
312:7
**Dep** [1] - 49:16
**depart** [1] - 434:24
**Department** [12] -
14:14, 37:22, 38:3,
38:5, 39:19, 53:12,
53:15, 57:24, 65:4,
87:2, 124:10, 460:21
**department** [8] -
14:15, 64:25, 86:23,
89:9, 124:7, 154:1,
297:9, 434:21
**deposition** [6] - 14:18,
16:8, 16:10, 182:2,
292:2, 292:21
**depositions** [4] -
285:4, 285:6,
285:24, 292:18
**deprive** [1] - 432:18
**deputies** [7] - 87:20,
88:14, 88:22, 90:1,
90:3, 412:22, 417:14
**DEPUTY** [1] - 123:12
**Deputy** [18] - 4:14,
4:15, 4:17, 43:8,
48:25, 49:19, 51:10,
82:13, 82:20,
121:12, 182:22,
232:8, 278:6,
334:21, 410:17,
412:3, 413:10,
413:13
**deputy** [68] - 30:19,
31:5, 31:23, 32:3,
32:10, 34:7, 34:15,
41:13, 44:2, 46:15,
48:14, 49:2, 50:11,
50:15, 51:2, 51:4,
82:9, 82:15, 82:17,
87:14, 93:25, 94:3,
94:17, 94:20,
101:15, 104:5,
104:11, 106:9,
108:16, 109:18,

116:21, 119:10,
119:13, 120:14,
123:5, 123:14,
123:23, 123:25,
124:13, 124:19,
125:1, 128:19,
160:14, 180:15,
181:1, 182:19,
232:1, 232:10,
233:3, 233:20,
234:7, 234:10,
234:22, 239:1,
334:22, 336:17,
357:6, 357:14,
415:15, 444:24,
446:2, 446:8,
446:12, 448:2,
448:11, 450:7,
451:19, 451:21
**deputy's** [2] - 27:4,
419:2
**describe** [12] - 40:4,
42:2, 76:10, 78:22,
79:20, 148:12,
154:10, 192:12,
228:18, 284:3,
317:22, 319:12
**described** [4] - 40:20,
273:11, 319:15,
319:16
**deserve** [3] - 397:15,
397:21, 398:24
**deserves** [1] - 439:19
**design** [2] - 420:14,
435:17
**designating** [1] -
63:12
**designation** [3] -
60:14, 61:19, 61:24
**designed** [2] - 373:4,
420:15
**desperate** [2] -
414:25, 416:8
**destroyed** [1] - 34:17
**detectable** [2] -
430:14, 432:3
**detective** [1] - 160:14
**deter** [1] - 441:4
**determination** [1] -
119:11
**determine** [18] -
16:24, 28:10,
163:18, 163:25,
185:16, 280:18,
403:13, 403:24,
404:12, 410:2,
414:16, 414:17,
432:22, 433:19,
433:20, 435:10,
441:4, 441:6

**determined** [2] - 301:14, 409:22
**determining** [7] - 424:17, 424:20, 425:3, 425:9, 428:10, 428:16, 428:22
**develops** [1] - 107:4
**device** [17] - 40:12, 65:25, 66:3, 69:3, 75:11, 75:13, 75:14, 75:25, 76:3, 76:4, 78:1, 78:10, 177:6, 337:9, 354:9, 430:1, 432:6
**devices** [6] - 31:11, 31:20, 36:14, 37:21, 60:5, 446:4
**dialogue** [1] - 318:17
**dictate** [1] - 185:20
**difference** [2] - 88:10, 190:11
**different** [31] - 24:22, 39:13, 40:7, 40:8, 54:2, 68:19, 69:21, 87:25, 88:9, 90:11, 98:17, 119:3, 134:6, 140:2, 220:18, 235:7, 235:11, 285:4, 285:8, 287:3, 287:4, 288:4, 359:9, 365:25, 368:9, 386:17, 401:1, 406:4, 411:4, 418:22, 443:13
**differently** [1] - 69:25
**difficult** [2] - 62:3, 453:7
**difficulties** [1] - 397:1
**difficulty** [1] - 107:6
**digging** [1] - 320:25
**digital** [1] - 337:14
**dinner** [9] - 249:17, 250:4, 250:6, 267:12, 267:16, 267:18, 292:11, 395:21, 398:14
**dip** [1] - 313:14
**dire** [1] - 414:22
**DIRECT** [7] - 53:3, 86:12, 123:17, 188:20, 244:1, 265:20, 294:6
**direct** [8] - 3:3, 3:16, 6:4, 177:17, 236:9, 285:23, 412:4, 462:10
**Direct** [5] - 3:7, 3:12, 3:20, 3:23, 4:2
**directed** [1] - 303:1

**direction** [4] - 314:17, 314:21, 329:12, 462:11
**direction's** [1] - 315:2
**directions** [2] - 308:18, 308:19
**directly** [4] - 158:5, 242:3, 299:8, 336:12
**dirk** [2] - 429:24, 432:4
**dirt** [3] - 298:14, 329:16, 333:23
**disagree** [1] - 9:14
**disagreements** [1] - 198:11
**disbelieve** [1] - 440:7
**discarded** [1] - 76:14
**discharge** [1] - 445:22
**discharged** [3] - 453:14, 454:5, 454:9
**disclose** [2] - 8:17, 446:14
**discredited** [1] - 440:3
**discretion** [4] - 99:14, 116:11, 136:16, 152:12
**discuss** [7] - 30:2, 30:22, 33:10, 281:20, 394:11, 394:12, 453:21
**discussed** [4] - 57:9, 283:15, 334:14, 364:20
**discussing** [4] - 180:20, 185:15, 277:19, 362:19
**discussion** [6] - 105:20, 265:11, 364:24, 409:2, 440:10
**discussions** [4] - 281:23, 445:3, 453:3, 453:9
**dishonest** [2] - 48:25, 229:15
**dishonesty** [11] - 6:13, 10:4, 48:24, 228:2, 228:8, 229:11, 283:21, 377:10, 397:20, 408:5, 439:8
**disk** [3] - 116:20, 117:23, 117:24, 118:21, 174:5, 174:7, 174:10, 174:12, 287:22
**disks** [1] - 118:17
**dismissed** [2] - 100:19, 278:4
**disorience** [1] - 238:16

**display** [2] - 353:4, 353:5
**displayed** [3] - 406:19, 407:16, 409:11
**disposition** [1] - 456:14
**dispute** [1] - 225:4
**disputing** [1] - 405:3
**disqualification** [2] - 18:5, 18:23
**disregard** [2] - 61:23, 441:18
**distance** [11] - 76:23, 179:18, 190:16, 201:11, 268:2, 308:11, 321:2, 322:19, 322:24, 327:9, 339:18
**distinguished** [2] - 421:22, 426:8
**distracted** [2] - 34:21, 216:15
**distress** [2] - 458:11, 458:12
**divide** [3] - 88:24, 89:25, 395:6
**divided** [3] - 89:1, 89:2, 131:20
**DIVISION** [1] - 1:3
**divorce** [1] - 62:3
**Dixie** [2] - 306:4, 345:9
**DNA** [1] - 400:7
**doc** [1] - 357:19
**dock** [1] - 117:10
**document** [3] - 18:23, 19:19, 174:14
**Document** [1] - 451:21
**documentation** [1] - 119:18
**documents** [4] - 29:13, 91:22, 97:8, 263:25
**dodge** [3] - 204:21, 219:23
**Dodge** [2] - 204:22, 319:14
**dogs** [5] - 200:5, 200:6, 200:14, 200:23, 295:9
**Domino's** [1] - 266:4
**done** [23] - 76:15, 87:22, 100:19, 117:14, 117:16, 122:11, 129:25, 270:22, 299:25, 305:12, 305:13, 314:10, 320:18, 368:15, 370:3,

370:5, 400:8, 441:19, 457:20, 457:21, 458:2
**door** [62] - 12:24, 13:6, 42:3, 42:4, 141:7, 141:9, 141:11, 168:4, 205:1, 206:18, 207:8, 207:9, 215:20, 252:8, 252:17, 252:18, 252:19, 252:21, 253:3, 253:18, 253:24, 254:16, 261:4, 268:1, 268:4, 268:25, 269:1, 269:3, 269:5, 269:8, 270:1, 271:21, 271:22, 271:24, 272:1, 273:1, 273:9, 273:14, 275:5, 275:8, 275:13, 278:17, 278:18, 278:19, 302:13, 312:18, 313:14, 313:16, 313:24, 320:21, 326:4, 331:14, 331:15, 336:12, 337:2, 350:9, 350:10, 399:2, 408:18, 416:16
**door's** [3] - 275:12, 320:22, 336:24
**doorknob** [2] - 252:24, 253:17
**doors** [3] - 315:2, 319:17, 319:18
**doorway** [1] - 141:15
**double** [1] - 459:12
**Doubt** [1] - 376:19
**doubt** [49] - 28:12, 51:20, 51:25, 52:1, 52:5, 52:6, 52:9, 52:13, 323:17, 374:22, 382:8, 403:20, 404:11, 413:19, 414:13, 418:2, 418:6, 418:7, 418:8, 420:6, 421:2, 421:9, 425:16, 425:20, 429:4, 429:9, 429:16, 431:4, 431:12, 432:14, 432:23, 433:25, 435:11, 436:4, 436:12, 437:7, 437:15, 437:17, 437:18, 437:19, 438:3,

438:4, 438:7, 438:10, 438:12, 442:1, 442:3
**down** [59] - 34:6, 40:12, 42:17, 49:24, 51:3, 84:10, 84:18, 105:13, 119:19, 120:6, 122:21, 142:17, 144:25, 146:11, 162:24, 169:7, 171:25, 177:24, 180:15, 182:5, 207:9, 218:10, 236:1, 243:12, 260:24, 261:1, 261:13, 263:11, 269:1, 277:18, 280:17, 281:18, 295:11, 299:22, 301:2, 301:13, 302:2, 308:8, 314:7, 320:3, 326:20, 329:7, 329:18, 330:22, 332:5, 333:18, 333:23, 334:16, 335:4, 335:8, 335:14, 336:23, 336:25, 340:17, 340:19, 343:12, 362:18, 399:11
**download** [11] - 50:18, 117:20, 118:3, 121:9, 153:16, 174:7, 175:14, 194:23, 210:18, 313:6, 412:23
**downloaded** [16] - 11:21, 116:18, 173:3, 173:19, 174:1, 174:2, 174:6, 174:9, 174:12, 174:16, 174:22, 413:1, 413:3, 413:5, 413:8, 417:16
**downloading** [4] - 116:24, 117:9, 117:22, 119:14
**draw** [2] - 32:17, 63:19
**drawing** [2] - 108:5, 186:3
**draws** [1] - 321:6
**dressed** [2] - 25:22, 73:3
**dressing** [1] - 187:24
**dripping** [1] - 219:8
**drive** [27] - 4:19, 43:14, 73:9, 73:15, 83:4, 83:7, 83:10, 83:19, 117:23,

146:5, 146:16,
146:17, 147:6,
147:7, 147:19,
172:14, 176:20,
176:24, 177:3,
211:25, 225:10,
225:15, 225:24,
226:2, 226:24,
254:22, 414:24
**driver** [1] - 266:4
**driver's** [4] - 216:2,
313:25, 320:20
**drives** [3] - 40:1,
70:17, 82:24
**driving** [4] - 270:12,
298:16, 308:6, 308:7
**drop** [2] - 346:11,
346:17
**dropped** [6] - 47:16,
221:17, 325:11,
326:16, 326:17,
326:18
**drops** [1] - 120:6
**drove** [2] - 221:15,
306:3
**drowns** [1] - 68:24
**drugs** [2] - 346:1,
347:20
**duck** [1] - 304:3
**ducks** [3] - 45:20,
304:2
**dude** [5] - 274:15,
303:20, 304:11,
327:3, 346:11
**dude's** [2] - 316:7,
317:5
**due** [6] - 22:22, 133:2,
135:15, 280:7,
291:12, 368:6
**dumb** [2] - 302:20,
327:4
**dunked** [1] - 68:22
**during** [59] - 7:2, 11:1,
17:6, 17:8, 29:7,
29:15, 30:4, 30:20,
30:21, 31:11, 33:8,
33:20, 34:5, 34:13,
35:5, 35:25, 36:11,
54:12, 54:14, 54:18,
54:24, 56:10, 57:10,
60:4, 64:8, 68:8,
70:11, 74:15, 77:19,
78:6, 89:19, 98:16,
99:3, 101:22, 102:3,
128:25, 150:24,
153:23, 155:5,
173:11, 193:2,
199:5, 235:2,
239:19, 257:20,
264:4, 282:1, 344:9,

356:11, 409:8,
414:22, 415:18,
419:19, 434:7,
445:21, 446:22
**dusk** [1] - 126:10
**dusk-ish** [1] - 126:10
**duties** [2] - 39:24,
87:19
**duty** [17] - 17:18, 20:1,
32:14, 32:24, 41:5,
73:7, 88:13, 380:19,
383:13, 388:6,
391:1, 405:13,
422:21, 423:23,
426:12, 427:12,
441:4
**DVD** [5] - 117:13,
118:6, 119:18,
153:17, 197:17
**DVDs** [2] - 118:1,
118:4
**dwelling** [4] - 382:18,
382:19, 387:9,
387:10

# E

**early** [3] - 199:11,
294:19, 294:20
**earned** [1] - 399:16
**ease** [1] - 450:5
**easier** [1] - 109:6
**easily** [1] - 7:8
**east** [2] - 89:3, 89:6
**East** [1] - 2:10
**easy** [4] - 77:12,
197:22, 213:3, 392:3
**eat** [3] - 26:22, 191:18,
197:2
**eating** [1] - 267:12
**edge** [1] - 144:20
**education** [1] - 124:18
**effect** [1] - 194:25
**effective** [1] - 179:24
**efficiently** [1] - 213:17
**effort** [1] - 315:17
**egregious** [1] - 455:11
**eight** [3] - 39:14,
120:18, 138:18
**eight-hours** [1] -
120:18
**EIGHTH** [1] - 1:1
**Eighth** [1] - 452:4
**either** [17] - 51:1,
159:20, 171:19,
172:13, 185:16,
212:21, 280:19,
292:19, 354:3,
364:21, 432:17,

435:3, 443:16,
446:20, 449:11,
449:25, 452:19
**ejects** [2] - 240:6,
240:8
**elderly** [1] - 199:19
**elected** [1] - 20:19
**electric** [2] - 36:7,
203:16
**electricity** [6] - 36:2,
191:6, 191:7,
191:10, 191:13,
191:15
**electronic** [10] - 36:14,
36:23, 58:10, 65:15,
65:21, 67:13, 68:11,
205:20, 445:18,
446:4
**electronics** [1] - 31:23
**element** [6] - 370:22,
373:23, 374:21,
403:24, 404:11,
421:8
**Element** [1] - 186:1
**elements** [26] - 28:7,
280:4, 370:21,
372:5, 372:18,
372:22, 381:18,
382:3, 382:6,
382:16, 385:17,
385:20, 403:18,
420:5, 422:7,
422:25, 424:8,
425:23, 426:19,
427:24, 429:11,
429:16, 431:11,
432:13, 433:24,
436:12
**elicited** [1] - 59:8
**elsewhere** [1] - 453:25
**eluded** [1] - 460:3
**email** [2] - 194:24,
445:19
**emailing** [1] - 30:12
**embezzlement** [1] -
184:20
**emergency** [4] - 32:1,
32:6, 104:22, 114:21
**emotional** [1] - 93:13
**employed** [10] - 53:17,
87:1, 124:2, 124:9,
124:25, 189:18,
189:19, 244:20,
266:6, 439:17
**employee** [1] - 302:15
**empty** [3] - 158:21,
158:25, 159:24
**EMS** [2] - 151:24,
151:25
**enclosed** [2] - 207:5,

435:5
**enclosure** [1] - 435:7
**end** [18] - 48:12, 49:6,
76:24, 89:5, 89:6,
231:9, 294:21,
298:14, 304:16,
312:20, 323:4,
323:5, 323:6,
324:25, 333:23,
340:22, 384:3,
445:23
**endeavor** [1] - 433:9
**ends** [1] - 384:22
**energy** [1] - 304:5
**enforcement** [48] -
8:16, 41:10, 48:17,
49:9, 50:14, 50:24,
58:1, 74:18, 74:21,
75:1, 79:10, 86:20,
87:11, 91:4, 91:12,
98:18, 99:22, 114:2,
115:17, 116:24,
124:5, 139:16,
139:21, 163:13,
163:20, 180:9,
230:24, 237:5,
254:23, 257:18,
262:1, 262:18,
263:12, 263:23,
264:9, 302:25,
303:4, 331:22,
336:16, 339:13,
355:24, 368:4,
378:24, 405:24,
407:23, 412:8,
434:21, 439:18
**engaged** [10] - 380:2,
380:17, 382:23,
387:14, 388:4,
390:5, 390:9,
390:14, 422:19,
423:23
**enjoy** [1] - 266:9
**enjoyed** [2] - 350:7,
453:2
**ensuing** [1] - 411:19
**ensure** [1] - 175:22
**ensuring** [1] - 87:21
**enter** [6] - 98:20,
153:17, 153:18,
357:24, 434:11,
434:14
**entered** [10] - 29:14,
147:4, 174:16,
257:4, 259:15,
331:1, 429:22,
434:1, 436:13,
436:25
**entering** [4] - 98:22,
434:4, 435:8, 436:16

**enters** [3] - 187:19,
293:15, 393:24
**entertain** [1] - 320:8
**entire** [2] - 385:5,
447:14
**entirely** [1] - 439:25
**entitled** [8] - 15:21,
18:23, 20:19, 35:1,
283:18, 299:13,
309:17, 395:6
**entrance** [2] - 141:7,
336:13
**entrances** [1] - 77:5
**episodes** [1] - 39:12
**equal** [1] - 395:4
**equating** [1] - 417:14
**equipment** [15] -
36:24, 58:6, 58:7,
58:10, 64:23, 65:3,
67:11, 68:15, 70:14,
73:1, 77:16, 95:2,
117:2, 148:18,
205:21
**err** [1] - 99:18
**escalate** [1] - 47:20
**escaping** [2] - 424:3,
427:17
**escorted** [2] - 338:9,
338:12
**especially** [4] - 42:13,
251:14, 455:6,
455:10
**Esquire** [2] - 2:2, 2:9
**essentially** [2] - 60:21,
387:17
**estab** [1] - 289:5
**established** [1] -
342:4
**estimate** [2] - 246:22,
337:24
**et** [1] - 4:12
**evac** [1] - 104:22
**evening** [10] - 41:24,
71:22, 102:10,
129:22, 199:10,
223:1, 224:14,
249:25, 267:8, 403:5
**event** [4] - 12:11,
173:2, 406:5, 410:1
**events** [6] - 49:1,
157:17, 234:19,
234:22, 244:14,
244:18
**evicted** [1] - 226:17
**evicts** [1] - 226:7
**evidence** [172] - 27:22,
28:13, 28:14, 29:6,
29:8, 29:14, 29:15,
29:25, 32:23, 34:24,
35:3, 46:15, 50:19,

51:21, 51:22, 52:1, 52:4, 52:7, 52:8, 59:25, 63:17, 92:18, 93:2, 93:4, 95:18, 96:14, 98:2, 98:10, 98:13, 98:20, 99:8, 99:10, 99:15, 99:16, 99:23, 100:16, 109:1, 109:5, 109:6, 110:10, 112:2, 116:13, 116:17, 116:19, 118:9, 118:19, 119:10, 119:15, 119:19, 119:23, 120:1, 120:3, 120:9, 120:11, 120:17, 121:11, 121:13, 129:14, 134:15, 134:17, 134:21, 136:8, 136:17, 136:19, 136:21, 143:12, 143:21, 144:1, 144:5, 144:9, 144:11, 147:4, 147:14, 147:18, 147:20, 149:2, 149:6, 149:8, 150:1, 150:6, 150:8, 150:11, 150:21, 153:18, 155:17, 155:19, 160:25, 162:10, 174:11, 174:16, 175:15, 175:18, 175:22, 176:20, 177:4, 177:15, 178:10, 278:7, 279:9, 280:8, 281:4, 286:15, 286:19, 287:24, 289:23, 324:2, 338:19, 339:5, 367:19, 368:1, 370:18, 374:25, 376:23, 377:21, 380:16, 390:4, 392:6, 394:15, 395:1, 403:11, 405:19, 406:1, 407:12, 408:16, 410:5, 410:23, 411:2, 412:24, 413:6, 413:12, 413:18, 413:20, 420:19, 420:20, 420:23, 425:19, 429:8, 430:21, 430:23, 430:25, 435:19, 435:22, 435:23, 436:1, 437:6, 437:13,

437:23, 438:5, 438:9, 438:10, 438:14, 438:16, 438:17, 438:19, 438:20, 439:6, 439:16, 440:8, 440:20, 440:22, 441:14, 441:23, 444:18, 446:23, 449:14, 450:14, 457:6
**evidentiary** [8] - 111:22, 128:23, 132:7, 132:25, 133:12, 135:17, 136:18, 143:15
**ex** [1] - 306:25
**ex-roommates** [1] - 306:25
**exact** [4] - 6:5, 109:23, 178:18, 433:17
**exacting** [1] - 45:19
**exactly** [13] - 53:13, 109:6, 122:6, 127:7, 178:20, 190:8, 206:20, 241:16, 241:18, 334:18, 350:19, 351:2, 415:9
**Examination** [19] - 3:3, 3:4, 3:5, 3:7, 3:8, 3:9, 3:12, 3:13, 3:14, 3:16, 3:17, 3:20, 3:21, 3:23, 3:24, 3:25, 4:2, 4:3, 4:4
**examination** [2] - 291:12, 410:10
**EXAMINATION** [19] - 53:3, 80:18, 83:17, 86:12, 108:14, 121:18, 123:17, 155:1, 179:13, 188:20, 229:4, 244:1, 258:9, 265:20, 271:17, 276:18, 294:6, 341:9, 358:15
**examine** [1] - 446:24
**examined** [2] - 29:12
**example** [1] - 86:11
**except** [2] - 384:16, 453:4
**exception** [2] - 31:15, 34:9
**exclusion** [5] - 51:24, 403:20, 404:10,
███████████
**exclusively** [2] - 282:10, 441:16
**exculpatory** [1] -

278:8
**excuse** [10] - 300:23, 301:17, 322:21, 326:18, 328:21, 338:21, 398:20, 401:22, 423:12, 427:21
**excused** [7] - 84:11, 84:13, 122:22, 122:25, 123:1, 264:20, 264:24
**excuses** [3] - 418:23, 418:24
**exercise** [1] - 32:16
**exercised** [1] - 430:16
**exercising** [2] - 184:13, 433:7
**Exhibit** [19] - 93:4, 97:5, 98:2, 133:16, 134:17, 143:1, 144:11, 147:20, 147:24, 149:8, 149:18, 150:8, 161:9, 220:13, 222:18, 224:3, 225:11, 256:16, 342:4
**exhibit** [3] - 146:22, 147:24, 150:20
**EXHIBITS** [2] - 4:6, 4:24
**Exhibits** [2] - 93:9, 134:11
**exhibits** [8] - 29:13, 91:19, 220:2, 439:14, 440:22, 446:23, 446:24, 446:25
**exist** [1] - 287:15
**existed** [1] - 287:14
**exit** [1] - 326:4
**exiting** [1] - 435:8
**exits** [2] - 277:21, 362:21
**expect** [3] - 121:7, 395:17, 397:4
**expectation** [4] - 15:12, 107:2, 361:19, 362:6
**expected** [1] - 86:11
**experience** [6] - 69:9, 87:11, 124:6, 145:15, 153:23, 402:8
**experienced** [1] - 342:12
**experiences** [1] - 113:8
**explain** [33] - 21:4, 28:18, 54:23, 57:6,

60:24, 62:6, 62:11, 63:2, 65:20, 66:4, 68:17, 74:12, 88:3, 100:9, 125:20, 144:22, 152:17, 190:10, 190:20, 192:6, 197:10, 197:15, 205:5, 214:4, 214:6, 215:24, 226:4, 245:19, 253:23, 256:20, 323:19, 367:10, 401:21
**explained** [17] - 20:23, 20:25, 28:8, 55:3, 55:16, 55:17, 55:25, 57:7, 57:12, 65:13, 150:19, 403:18, 423:1, 427:11, 433:2, 436:21
**explains** [2] - 15:22, 16:1
**explanation** [4] - 63:4, 362:25, 401:9, 401:10
**explanations** [1] - 358:8
**expose** [1] - 400:12
**exposed** [2] - 430:13, 432:2
**exposure** [1] - 21:4
**express** [1] - 434:12
**extent** [2] - 41:9, 66:20, 87:10
**extra** [2] - 211:24, 374:16
**extract** [1] - 117:12
**extraordinary** [1] - 456:21
**extremely** [3] - 14:11, 14:23, 42:13
**eye** [10] - 220:21, 341:18, 341:20, 342:11, 342:12, 342:16, 398:5, 402:7, 402:10, 406:11
**eyes** [1] - 220:19

**F**

**F-150** [1] - 204:21
**face** [17] - 34:6, 91:1, 105:13, 216:18, 217:7, 219:6, 219:8, 219:12, 236:25, 237:2, 260:6, 322:8, 331:21, 336:23, 336:25, 362:18,

400:2
**facilitate** [1] - 208:4
**facing** [4] - 19:17, 43:21, 168:10, 216:3
**fact** [57] - 13:4, 14:7, 14:12, 14:13, 14:17, 19:18, 24:5, 25:1, 32:18, 38:10, 38:15, 62:16, 62:18, 62:19, 95:16, 163:25, 164:7, 231:5, 237:18, 238:4, 238:13, 278:11, 286:12, 286:22, 290:6, 291:12, 304:20, 343:9, 344:8, 347:4, 349:23, 350:22, 354:4, 355:4, 358:21, 402:23, 403:14, 403:15, 403:21, 408:19, 413:25, 414:4, 414:13, 415:24, 417:14, 424:16, 424:20, 425:2, 425:8, 428:9, 428:16, 428:22, 439:17, 454:20, 455:1, 455:6, 455:8
**factor** [3] - 369:4, 455:15, 458:12
**factors** [1] - 406:5
**facts** [15] - 28:19, 28:20, 30:7, 130:20, 401:8, 401:19, 403:13, 403:16, 404:7, 404:8, 407:1, 407:9, 410:2, 414:17, 430:20
**factual** [7] - 18:7, 19:5, 20:5, 21:13, 21:18, 21:24, 367:2
**factuals** [1] - 367:14
**fail** [1] - 440:13
**failed** [3] - 50:16, 278:6, 279:12
**failing** [1] - 440:15
**fails** [2] - 49:10, 52:7
**failure** [1] - 175:14
**fair** [16] - 19:6, 21:15, 22:4, 33:17, 64:7, 96:15, 121:25, 130:7, 131:19, 155:5, 170:3, 228:10, 241:19, 251:13, 445:4
**fairly** [2] - 139:7, 144:17
**fairness** [1] - 21:2

**faith** [4] - 6:8, 23:7, 23:8, 23:9
**fall** [2] - 401:24, 401:25
**familiar** [2] - 295:6, 352:24
**families** [2] - 246:10, 361:7
**family** [12] - 32:5, 248:8, 248:9, 248:10, 260:9, 299:23, 316:10, 316:11, 362:4, 398:9, 398:23, 457:5
**fantastic** [1] - 17:25
**far** [33] - 65:21, 67:21, 69:2, 76:17, 77:24, 78:9, 78:17, 84:14, 97:1, 114:17, 115:6, 120:20, 127:17, 139:22, 168:12, 180:5, 180:6, 191:5, 206:20, 206:21, 206:25, 219:19, 239:7, 285:23, 287:9, 304:9, 314:25, 315:3, 322:22, 324:5, 324:7, 339:11, 383:19
**Fargo** [1] - 46:17
**fashion** [1] - 170:22
**fast** [6] - 42:2, 107:23, 208:15, 251:15, 326:14, 408:24
**fat** [1] - 200:11
**father** [7] - 42:18, 248:25, 250:21, 252:9, 258:23, 258:24, 260:15
**fault** [3] - 51:1, 384:4, 453:24
**faults** [1] - 397:10
**favorable** [4] - 279:13, 279:20, 280:3, 280:8
**FCIC** [2] - 5:21, 8:15
**FCIC/NCIC** [1] - 8:2
**FDLE** [1] - 163:24
**fear** [3] - 22:4, 215:7, 323:14
**feared** [2] - 351:9, 351:10
**feature** [1] - 61:1
**February** [3] - 10:1, 10:7, 294:20
**fee** [1] - 458:23
**feed** [1] - 200:15
**feelings** [2] - 441:2, 441:12
**fees** [2] - 458:22,

459:2
**feet** [5] - 168:16, 201:12, 222:6, 246:23, 246:25
**fel** [1] - 281:1
**fell** [1] - 367:5
**felon** [7] - 24:18, 24:22, 28:6, 43:25, 48:23, 340:24, 370:14, 375:5, 397:20, 402:24, 408:4, 420:1, 429:15, 452:12, 456:11, 456:12, 458:20
**Felon** [3] - 370:11, 431:8, 443:8
**felonies** [2] - 10:4, 25:2
**felony** [11] - 6:12, 26:10, 227:23, 229:9, 279:9, 281:2, 283:19, 377:7, 381:19, 429:18, 439:8
**FELONY** [1] - 1:3
**FEMALE** [4] - 395:24, 396:17, 449:20, 449:23
**female** [1] - 338:2
**few** [11] - 130:17, 138:1, 181:2, 198:10, 290:20, 301:1, 313:18, 352:11, 402:11, 416:1, 444:23
**field** [5] - 75:10, 76:13, 77:7, 79:3, 311:21
**fields** [1] - 313:9
**fifth** [1] - 224:21
**fight** [3] - 82:4, 302:16, 417:10
**fights** [1] - 199:7
**figure** [9] - 9:7, 9:18, 40:16, 106:10, 122:5, 125:24, 126:2, 314:13, 358:5
**figured** [3] - 312:9, 314:10, 335:5
**figurehead** [2] - 408:10, 411:15
**figures** [1] - 48:11
**file** [4] - 18:5, 153:18, 175:14, 368:25
**filed** [2] - 23:24, 24:5
**files** [1] - 147:10
**fill** [1] - 119:25
**film** [1] - 337:11
**filtered** [1] - 11:4
**final** [7] - 29:17, 282:5,

369:25, 382:21, 394:24, 402:19
**finally** [2] - 264:6, 363:19
**finances** [1] - 246:16
**fine** [9] - 14:7, 85:5, 85:6, 243:6, 290:23, 305:25, 361:3, 371:24, 419:10
**fines** [1] - 458:22
**finger** [1] - 340:20
**fingernail** [1] - 316:1
**fingerprints** [1] - 408:1
**finish** [3] - 317:3, 367:8, 394:7
**Fire** [1] - 312:7
**fire** [7] - 45:16, 45:18, 251:14, 259:21, 312:16, 349:24
**firearm** [5] - 56:4, 169:4, 170:4, 415:10, 456:10
**firearms** [1] - 55:11
**first** [58] - 6:16, 7:6, 27:14, 32:3, 32:10, 46:4, 56:5, 80:23, 113:13, 128:25, 129:6, 139:18, 152:11, 152:24, 157:17, 158:2, 158:13, 159:20, 162:3, 162:14, 167:3, 238:18, 257:4, 261:9, 261:11, 261:15, 262:13, 269:7, 294:22, 295:17, 295:18, 299:2, 333:15, 335:1, 338:16, 339:14, 340:18, 343:8, 343:9, 348:18, 349:1, 352:23, 355:4, 369:21, 372:9, 372:13, 374:7, 376:23, 381:6, 382:24, 384:20, 393:10, 404:12, 412:21, 412:25, 416:21, 444:25, 450:21
**fit** [2] - 56:8, 401:20
**fits** [3] - 11:5, 32:9, 401:23
**fitting** [2] - 303:21, 401:18
**five** [37] - 6:22, 10:3, 10:7, 10:10, 10:19, 24:22, 25:1, 25:2,

48:22, 50:5, 50:6, 87:9, 87:10, 138:3, 168:13, 168:16, 180:8, 190:14, 192:9, 213:11, 219:21, 228:1, 229:9, 245:8, 263:17, 264:2, 264:4, 266:8, 274:4, 285:17, 335:4, 341:2, 397:19, 399:12, 408:4, 409:3, 409:8
**five-minute** [1] - 213:11
**five-minutes** [1] - 399:12
**five-more** [1] - 409:8
**five-time** [3] - 48:22, 397:19, 408:4
**five-to-ten** [3] - 264:2, 274:4, 409:3
**fixed** [1] - 29:23
**fixes** [1] - 154:2
**fixing** [1] - 321:21
**flap** [1] - 252:22
**flash** [1] - 4:19, 147:19, 172:14, 211:25, 225:10, 225:15, 225:24, 226:1, 226:24, 339:25, 340:1
**flashes** [1] - 339:24
**flashlight** [2] - 171:19, 337:3
**flawed** [1] - 397:8
**fled** [2] - 406:12, 415:11
**flee** [1] - 409:23
**fleeing** [1] - 358:3
**flinched** [2] - 323:3, 323:4
**flipped** [1] - 410:10
**floor** [3] - 203:23, 336:22, 336:23
**FLORIDA** [2] - 1:1, 1:5
**Florida** [24] - 1:15, 1:21, 1:24, 2:4, 2:6, 2:10, 5:3, 23:20, 27:19, 28:1, 35:13, 53:12, 86:23, 87:2, 106:18, 187:4, 244:15, 364:11, 449:4, 451:5, 452:5, 458:4, 462:3
**flowing** [1] - 388:9
**flows** [1] - 387:3
**flush** [1] - 249:8
**focus** [1] - 107:7
**folks** [4] - 33:15,

199:17, 293:9, 453:20
**follow** [9] - 65:16, 176:2, 389:8, 440:10, 440:12, 440:13, 440:16, 442:16, 447:4
**followed** [1] - 334:23
**following** [23] - 8:25, 29:10, 29:18, 59:4, 182:11, 309:6, 360:13, 382:2, 384:6, 387:21, 419:23, 420:5, 421:8, 422:7, 424:8, 426:19, 427:23, 429:15, 431:11, 432:13, 433:24, 436:11, 437:16
**follows** [15] - 24:7, 337:2, 389:4, 389:16, 442:11, 442:20, 443:5, 443:15, 443:20, 444:4, 450:8, 452:7, 452:9, 452:13, 452:15
**foot** [3] - 167:25, 168:13, 302:14
**footage** [4] - 166:15, 167:20, 173:4, 176:18
**football** [2] - 77:7, 79:2
**FOR** [1] - 1:1
**force** [41] - 38:21, 38:25, 323:9, 338:6, 348:11, 385:15, 387:23, 387:24, 391:18, 393:8, 407:7, 418:7, 421:20, 421:25, 422:2, 422:14, 422:15, 423:8, 423:12, 423:15, 423:20, 424:1, 424:22, 425:18, 425:22, 426:5, 426:11, 426:15, 427:1, 427:3, 427:5, 427:10, 427:15, 428:12, 429:6, 429:10
**forced** [5] - 260:22, 261:12, 285:13, 437:18
**forceful** [1] - 323:10
**foregoing** [2] - 462:5, 462:8

**forehead** [9] - 38:21, 39:1, 43:24, 51:9, 112:22, 171:2, 171:9, 180:10, 336:21

**forensics** [1] - 405:4

**foreperson** [5] - 444:12, 445:1, 445:2, 446:13, 452:17

**foreperson's** [1] - 445:5

**forest** [2] - 259:21, 415:13

**forgery** [4] - 6:1, 8:9

**forget** [2] - 230:15, 315:21

**forgot** [1] - 368:8

**form** [14] - 19:5, 29:23, 30:13, 71:7, 193:5, 440:21, 442:11, 442:19, 444:12, 445:7, 445:8, 451:18, 451:24

**format** [2] - 16:1, 16:21

**former** [1] - 345:15

**forth** [4] - 43:10, 216:4, 313:15, 410:11

**forward** [2] - 47:9, 304:5

**foundation** [1] - 316:22

**four** [33] - 6:11, 6:12, 6:16, 6:19, 6:22, 9:4, 25:16, 28:8, 78:21, 124:4, 163:22, 168:13, 168:15, 192:9, 194:16, 205:1, 208:5, 208:6, 215:20, 245:15, 245:24, 266:14, 266:15, 285:17, 295:8, 319:17, 319:18, 335:4, 400:15, 404:7, 433:24, 434:7, 442:18

**four-cylinder** [1] - 192:9

**four-door** [2] - 205:1, 215:20

**four-rows** [1] - 78:21

**four-way** [1] - 295:8

**four-wheeler** [1] - 194:16

**four-year-old** [1] - 245:24

**four/one** [1] - 6:9

**fourth** [1] - 444:1

**FPR** [2] - 1:20, 462:15

**Frankie** [1] - 120:14

**frankly** [1] - 302:19

**frantic** [1] - 14:8

**freak** [1] - 270:23

**free** [3] - 265:1, 283:2, 414:6

**fresh** [3] - 164:15, 349:9, 371:16

**friend** [10] - 189:25, 198:3, 198:24, 238:1, 248:25, 250:3, 294:25, 299:21, 300:1, 457:24

**friendly** [1] - 331:13

**friends** [19] - 39:4, 42:7, 196:11, 196:21, 196:24, 197:3, 249:4, 258:18, 258:19, 259:5, 259:6, 259:7, 259:8, 298:7, 352:8, 359:12

**from..** [1] - 72:13

**front** [15] - 76:20, 129:24, 141:11, 154:11, 212:16, 238:15, 254:15, 261:14, 298:22, 299:1, 307:1, 308:5, 336:12, 336:13, 336:25

**fruitless** [1] - 316:3

**fucked** [1] - 340:21

**fucking** [2] - 321:9

**fuel** [5] - 301:14, 301:25, 302:3, 302:4

**full** [11] - 18:20, 46:12, 46:13, 46:14, 46:18, 138:21, 162:9, 294:8, 326:4, 341:4, 389:21

**full-lights** [1] - 138:21

**full-sized** [4] - 46:12, 46:13, 46:14, 46:18

**fully** [6] - 10:25, 22:12, 107:11, 108:25, 430:13, 432:2

**fundamental** [1] - 28:23

**furniture** [3] - 305:1, 305:4, 305:11

# G

**gain** [1] - 354:3

**Gainesville** [3] - 1:24,

2:10, 68:2

**game** [1] - 418:4

**games** [2] - 210:19, 320:15

**gang** [2] - 366:19, 457:8

**gang-related** [1] - 457:8

**gas** [2] - 429:25, 432:5

**gash** [3] - 38:22, 47:11, 48:9

**gather** [1] - 34:15

**gathered** [2] - 35:20, 64:13

**Gene** [44] - 22:22, 420:6, 420:9, 421:9, 422:1, 422:10, 422:13, 422:18, 423:3, 423:20, 424:2, 424:8, 424:11, 424:14, 424:21, 425:1, 425:3, 425:13, 425:17, 425:21, 426:3, 426:10, 426:22, 426:25, 427:13, 427:16, 427:24, 428:1, 428:7, 428:10, 428:15, 428:17, 429:1, 429:5, 429:9, 429:17, 429:19, 431:12, 431:17, 432:14, 434:3, 434:8, 436:15, 452:6

**GENE** [1] - 1:8

**gene** [8] - 18:21, 294:9, 387:22, 388:3, 390:5, 419:22, 421:18, 423:7

**general** [7] - 72:19, 126:1, 139:9, 224:25, 301:19, 377:9, 440:9

**generally** [2] - 366:24, 450:2

**gentleman** [5] - 91:1, 92:1, 103:4, 126:17, 454:3

**gentlemen** [35] - 26:1, 26:4, 27:24, 35:4, 44:24, 105:22, 106:21, 107:21, 150:18, 180:17, 180:24, 187:8, 187:21, 187:24, 277:13, 277:23, 293:17, 361:14, 362:23, 393:23,

394:1, 394:3, 394:21, 419:2, 448:10, 448:18, 450:4, 450:6, 450:12, 450:19, 451:11, 451:13, 451:16, 452:24, 454:7

**gift** [3] - 241:2, 241:5, 241:7

**gig** [2] - 334:11, 335:2

**gigabyte** [1] - 340:20

**Giglio** [1] - 278:5

**girlfriend** [9] - 196:10, 199:14, 221:16, 295:3, 295:12, 295:13, 305:15, 311:25, 343:11

**gist** [2] - 176:12, 359:20

**given** [2] - 24:4, 31:14, 65:11, 94:16, 94:17, 111:5, 193:4, 193:20, 278:11, 351:7, 354:8, 354:11, 359:3, 359:4, 361:22, 434:12, 442:17, 445:25, 448:21, 449:15, 450:15, 460:8

**glad** [1] - 334:16

**glasses** [2] - 79:23, 154:13

**gleam** [1] - 398:4

**gleaned** [1] - 291:11

**glovebox** [4] - 195:12, 195:13, 223:4, 227:10

**gloves** [1] - 400:18

**glue** [2] - 242:20, 288:9

**glued** [10] - 239:9, 239:11, 239:12, 242:22, 288:8, 288:10, 288:12, 339:6, 339:12, 341:14

**goal** [1] - 304:4

**god** [1] - 123:11

**God** [9] - 18:16, 27:22, 52:21, 85:23, 188:17, 221:9, 243:19, 265:17, 294:4

**good-sized** [2] - 307:11, 319:23

**goodness** [1] - 317:11

**Gordon** [1] - 175:7

**gospel** [2] - 48:19,

49:1

**GP** [1] - 75:7

**GPS** [5] - 74:8, 74:10, 75:5, 75:7, 354:15

**grab** [13] - 47:4, 218:19, 223:24, 253:16, 307:8, 310:21, 322:17, 323:23, 326:12, 327:7, 374:10, 404:21, 404:24

**grabbed** [9] - 257:1, 270:1, 325:2, 325:3, 325:5, 326:8, 347:5, 405:9, 405:17

**grabbing** [2] - 220:23, 327:1

**grabs** [6] - 38:20, 39:3, 47:6, 326:23, 417:3, 417:4

**graciously** [1] - 26:7

**grand** [12] - 28:6, 44:10, 184:11, 185:9, 185:23, 279:4, 279:17, 280:11, 280:16, 371:3, 432:12, 454:24

**grand-theft** [3] - 279:4, 279:17, 280:11

**grandma** [1] - 241:6

**grandmother** [4] - 241:17, 396:23, 415:25, 416:5

**granted** [3] - 68:5, 280:13, 280:16

**gray** [2] - 79:22, 154:12

**great** [18] - 111:4, 183:22, 306:10, 312:8, 359:14, 387:25, 411:21, 420:11, 420:18, 421:21, 421:22, 422:3, 422:16, 426:6, 426:7, 435:16

**greater** [1] - 35:2

**greatly** [1] - 448:6

**green** [2] - 91:11, 232:3

**Greystone** [1] - 199:17

**grid** [1] - 36:7

**Griffis** [1] - 295:5

**grip** [1] - 110:18

**ground** [12] - 11:2, 17:6, 51:7, 142:1, 142:17, 170:22, 171:22, 238:18,

388:7, 422:22, 435:5, 456:19
**Ground** [1] - 17:9
**guard** [4] - 31:24, 34:7, 306:23, 446:10
**guess** [23] - 65:24, 67:4, 89:3, 91:8, 110:6, 119:7, 125:20, 178:21, 201:1, 201:13, 216:8, 216:22, 221:14, 225:9, 234:20, 241:10, 242:24, 270:17, 271:9, 287:25, 299:13, 324:21, 461:5
**guessing** [2] - 241:20, 241:25
**guesstimate** [2] - 69:16, 76:22
**guesstimation** [1] - 247:3
**guidelines** [1] - 410:4
**guilt** [8] - 28:16, 32:18, 406:9, 418:10, 418:12, 437:21, 437:24, 438:8
**guilty** [58] - 8:8, 44:19, 52:13, 194:4, 402:20, 407:11, 414:5, 414:9, 414:20, 418:9, 418:25, 421:3, 425:19, 425:23, 429:7, 429:11, 429:23, 431:5, 432:21, 435:9, 436:6, 437:1, 437:20, 438:4, 438:11, 438:13, 441:5, 441:8, 441:21, 441:22, 441:24, 441:25, 442:4, 442:23, 443:1, 443:6, 443:8, 443:10, 443:16, 443:17, 443:18, 443:21, 444:5, 444:6, 444:8, 444:20, 452:9, 452:10, 452:14, 452:16, 455:7, 455:17, 458:16, 458:17, 458:18, 458:19, 458:21
**Guilty** [2] - 376:19, 442:24
**gun** [7] - 51:8, 168:19,

168:21, 278:12, 336:18, 429:25, 432:5
**gushing** [1] - 39:8
**guy** [14] - 83:2, 215:6, 248:22, 262:3, 269:19, 269:24, 304:7, 306:10, 307:10, 313:17, 327:10, 330:24, 333:10, 395:25
**guys** [4] - 47:22, 127:15, 131:20, 199:6, 250:6, 250:14, 259:1, 306:17, 371:14, 375:6, 380:7, 380:9, 387:1

## H

**hair** [3] - 257:24, 306:11, 338:3
**half** [11] - 72:22, 128:3, 128:22, 197:18, 202:22, 202:25, 221:2, 221:14, 306:15, 331:7, 338:6
**half-an-hour** [1] - 72:22
**halfway** [1] - 352:24
**hallway** [1] - 365:11
**hammer** [1] - 406:7
**hand** [29] - 27:15, 33:21, 46:23, 119:24, 123:8, 179:2, 188:14, 243:16, 262:2, 265:14, 268:8, 272:18, 272:20, 273:14, 273:15, 273:16, 281:14, 281:18, 294:1, 321:14, 321:17, 321:20, 340:17, 340:19, 351:12, 419:3, 437:21, 451:19
**handed** [4] - 240:18, 240:22, 241:12, 270:17
**handle** [11] - 163:7, 302:21, 323:6, 323:7, 323:8, 324:17, 324:18, 324:20, 405:2, 405:5, 405:17
**handling** [1] - 326:1
**hands** [3] - 217:20,

330:17, 334:17
**hands-off** [1] - 330:17
**hang** [5] - 344:10, 347:24, 349:2, 352:9, 359:8
**Hang** [1] - 334:7
**hanging** [3] - 359:18, 359:22, 359:23
**hangs** [1] - 401:17
**hard** [4] - 117:23, 144:23, 178:2, 399:17
**harm** [15] - 183:23, 335:16, 388:1, 420:12, 420:16, 420:18, 421:21, 421:22, 421:23, 422:3, 422:16, 426:6, 426:7, 426:9, 435:16
**Harper** [1] - 297:2
**harper** [1] - 297:21
**Harper's** [1] - 298:21
**hat** [3] - 48:4, 237:6, 237:8
**hatch** [1] - 358:1
**head** [29] - 14:10, 16:3, 41:3, 47:11, 48:10, 51:15, 80:16, 126:23, 165:12, 170:24, 170:25, 176:9, 179:21, 180:11, 229:18, 237:7, 237:10, 238:17, 242:18, 308:14, 321:19, 326:19, 337:1, 339:12, 340:18, 342:16, 400:21
**headlights** [1] - 331:20
**heads** [2] - 285:1, 286:1
**heal** [1] - 221:11
**healed** [1] - 243:6
**health** [1] - 447:15
**hear** [12] - 44:17, 150:20, 193:22, 274:25, 289:8, 317:16, 321:7, 361:5, 361:20, 449:10, 454:15, 454:16
**heard** [20] - 8:12, 10:16, 11:1, 15:14, 29:24, 41:23, 47:19, 47:20, 162:15, 259:9, 270:19, 271:24, 325:13, 409:19, 440:20,

445:5, 456:16, 456:19, 456:20, 457:3
**hearing** [15] - 7:13, 7:15, 7:16, 7:23, 12:9, 15:14, 15:24, 16:8, 17:7, 17:10, 33:10, 59:5, 265:12, 309:7, 360:14
**hearsay** [14] - 95:14, 96:6, 114:5, 114:10, 133:5, 156:18, 165:14, 296:3, 296:15, 296:16, 309:1, 317:9, 318:8, 332:18
**heart** [2] - 322:15, 323:18
**heat** [1] - 49:17
**heavy** [1] - 110:8
**height** [1] - 285:16
**held** [1] - 361:10
**hello** [2] - 265:23, 271:20
**Help** [1] - 85:23
**help** [21] - 18:15, 27:22, 52:21, 99:1, 101:25, 103:14, 104:19, 104:22, 109:25, 123:10, 127:20, 188:17, 212:11, 212:12, 242:8, 243:19, 265:16, 294:4, 302:11, 365:23, 446:24
**helped** [3] - 38:15, 77:25, 238:3
**helpful** [1] - 29:1
**helping** [2] - 77:21, 198:24
**hereby** [1] - 22:22
**hi** [1] - 188:23
**hidden** [6] - 14:8, 14:9, 43:1, 415:13, 430:11, 431:25
**hide** [6] - 212:23, 304:15, 304:19, 304:20, 354:1
**hierarchy** [1] - 119:1
**high** [3] - 192:13, 319:20, 319:23
**highest** [1] - 441:25
**hilt** [1] - 335:15
**himself** [21] - 15:18, 47:6, 260:16, 260:22, 269:25, 388:1, 388:3, 404:20, 405:10, 405:12, 407:2,

407:4, 407:7, 416:2, 418:25, 422:3, 422:16, 422:18, 426:14, 426:17, 434:9
**hinges** [1] - 275:14
**hip** [5] - 335:11, 353:7, 406:20, 407:15, 407:16
**history** [1] - 401:14
**hit** [33] - 14:9, 15:25, 16:3, 38:25, 41:3, 43:23, 47:8, 95:12, 126:22, 133:4, 135:18, 216:18, 217:7, 236:25, 237:2, 238:13, 238:17, 240:5, 240:8, 260:5, 324:19, 327:11, 331:20, 397:16, 399:22, 400:1, 400:24, 401:21, 402:3, 402:7, 417:2
**hits** [1] - 38:20
**hitting** [1] - 400:20
**hold** [9] - 100:12, 169:2, 169:18, 169:23, 233:10, 269:17, 315:10, 333:21, 391:25
**Hold** [2] - 272:10, 273:3
**holding** [4] - 285:15, 321:18, 322:5, 324:22
**holes** [1] - 91:1
**home** [51] - 43:11, 44:6, 45:3, 49:22, 73:3, 82:11, 141:2, 141:7, 199:17, 245:20, 245:21, 246:2, 248:1, 248:4, 250:5, 251:20, 253:21, 255:24, 257:5, 257:9, 257:22, 259:15, 263:19, 267:9, 267:10, 271:8, 285:14, 285:16, 298:21, 300:20, 305:16, 305:18, 305:24, 306:3, 306:6, 307:16, 331:9, 333:3, 333:14, 346:9, 394:7, 397:24, 398:8, 398:10, 398:15, 398:25, 399:4, 409:17,

455:10, 455:22, 458:6

**homeless** [1] - 299:3

**honest** [9] - 241:19, 310:19, 328:1, 328:2, 328:5, 370:8, 406:16, 410:15, 439:1

**honestly** [4] - 236:19, 250:9, 327:21, 336:18

**honk** [1] - 334:5

**Honor** [98] - 5:10, 5:12, 8:13, 13:14, 16:9, 17:5, 24:12, 24:15, 25:8, 53:2, 54:4, 59:1, 59:6, 59:24, 60:20, 61:20, 64:1, 79:25, 80:9, 80:13, 84:16, 85:1, 86:8, 91:14, 92:17, 93:6, 95:13, 96:3, 98:4, 107:14, 130:10, 135:1, 142:20, 144:4, 149:2, 149:25, 150:15, 154:15, 154:25, 155:24, 156:13, 156:15, 175:17, 179:7, 179:9, 180:16, 182:25, 187:11, 210:4, 222:13, 228:21, 228:25, 242:14, 243:10, 256:11, 264:19, 264:20, 275:21, 277:4, 278:2, 290:16, 290:18, 291:9, 293:22, 296:24, 309:23, 324:11, 341:6, 342:18, 361:12, 363:2, 363:20, 364:15, 364:23, 369:8, 370:7, 371:5, 371:19, 375:17, 390:18, 391:12, 393:15, 394:19, 447:21, 447:22, 448:22, 448:24, 449:18, 450:24, 452:21, 452:22, 454:13, 454:14, 454:17, 456:18, 460:10, 460:12, 461:2

**honor** [1] - 45:1

**honorable** [1] - 1:16

**hook** [2] - 194:21,

194:22

**hooked** [2] - 191:6, 312:13

**hope** [1] - 188:1

**hopes** [1] - 114:2

**hoping** [1] - 6:4

**horn** [1] - 334:5

**horrendous** [1] - 50:22

**hospital** [35] - 39:6, 39:10, 41:4, 41:6, 44:13, 89:23, 90:5, 90:14, 90:17, 90:25, 92:2, 94:2, 94:8, 96:21, 102:21, 102:23, 102:24, 103:1, 103:3, 103:25, 106:4, 115:3, 128:12, 129:8, 151:5, 153:3, 219:15, 219:17, 219:20, 221:1, 234:9, 234:11, 239:2, 250:22, 288:24

**hot** [1] - 302:16

**hotspot** [2] - 43:19, 195:1

**hour** [12] - 26:17, 72:22, 94:11, 94:13, 96:24, 128:3, 128:22, 197:18, 221:2, 221:14, 314:16, 395:18

**hour-and-a-half** [2] - 221:2, 221:14

**hours** [9] - 120:18, 120:23, 121:7, 221:2, 221:14, 288:22, 305:13, 342:13, 343:2

**house** [26] - 44:3, 189:24, 190:13, 200:5, 204:6, 204:7, 245:24, 246:2, 250:17, 254:21, 254:25, 256:7, 261:12, 263:20, 267:17, 270:16, 271:1, 292:12, 304:25, 305:5, 352:15, 352:18, 353:8, 399:7, 401:12, 416:12

**houses** [2] - 36:2, 313:9

**Howard** [4] - 447:17, 447:20, 448:10, 448:13

**HOWARD** [3] - 447:25,

448:3, 448:8

**huge** [5] - 40:5, 87:23, 247:24, 402:25, 416:14

**human** [6] - 112:18, 397:13, 397:15, 417:2, 435:12

**hundreds** [1] - 453:8

**hunting** [1] - 145:14

**hurry** [1] - 259:17

**hurt** [6] - 144:15, 217:9, 218:7, 327:10, 400:11, 417:5

**hurting** [1] - 273:16

**husband** [7] - 42:12, 267:3, 274:1, 274:14, 274:21, 276:20, 277:1

**I**

**idea** [16] - 11:3, 110:25, 111:18, 126:1, 135:16, 139:9, 160:24, 162:21, 206:21, 269:13, 269:18, 270:25, 292:9, 333:19, 361:1

**identical** [2] - 23:25, 436:20

**identification** [9] - 97:5, 133:16, 143:1, 146:22, 147:25, 149:18, 222:18, 224:3, 342:5

**identified** [3] - 80:1, 154:16, 228:22

**identify** [2] - 91:3, 338:5

**II** [10] - 43:24, 181:13, 181:18, 183:5, 244:9, 374:18, 407:13, 429:13, 443:5, 452:10

**III** [6] - 44:9, 407:17, 432:10, 443:15, 443:21, 452:13

**illegal** [2] - 344:14, 347:19

**images** [2] - 60:2, 61:3

**imaginary** [2] - 418:7, 437:18

**imagination** [1] - 83:3

**imagining** [1] - 321:17

**immediate** [8] - 126:21, 127:8, 131:23, 148:6,

159:1, 159:16, 160:2, 430:15

**immediately** [12] - 31:4, 39:22, 45:23, 70:1, 70:2, 70:7, 72:8, 106:9, 137:20, 295:22, 435:6, 458:6

**imminent** [6] - 388:1, 422:2, 422:15, 422:17, 426:15, 426:16

**immunity** [7] - 7:13, 7:15, 7:16, 12:9, 15:14, 15:24, 16:8

**impact** [1] - 59:11

**impeach** [1] - 292:3

**impeachment** [5] - 9:10, 165:15, 285:6, 285:7, 292:19

**implicates** [1] - 407:1

**implied** [1] - 434:13

**importance** [1] - 94:19

**important** [7] - 7:16, 99:25, 108:25, 161:24, 162:4, 166:14, 176:18, 177:8, 181:13, 202:13, 270:8, 412:9, 447:4

**impose** [1] - 458:21

**impossible** [2] - 33:12, 383:21

**impression** [1] - 367:25

**improper** [2] - 21:8, 317:15

**improperly** [2] - 367:25, 370:12

**IN** [2] - 1:1, 1:1

**in-service** [1] - 124:21

**in..** [1] - 383:2

**incarcerate** [1] - 460:16

**inches** [3] - 178:21, 255:6, 285:17

**incidences** [2] - 327:24, 349:13

**incident** [27] - 55:6, 152:5, 152:10, 152:13, 152:16, 152:21, 158:6, 159:12, 198:9, 199:10, 252:10, 252:13, 260:11, 278:12, 307:21, 307:23, 309:15, 345:6, 348:2, 348:18, 348:21, 349:6, 353:14, 404:14, 406:22,

409:21

**incidents** [3] - 343:8, 350:21, 401:15

**include** [7] - 58:5, 60:10, 70:16, 81:1, 421:24, 426:9, 458:23

**Include** [1] - 432:12

**included** [19] - 181:14, 182:6, 185:8, 373:15, 375:2, 376:11, 420:24, 421:4, 421:17, 426:2, 431:2, 431:6, 436:2, 436:6, 436:7, 441:23, 442:25, 443:9, 444:7

**includes** [3] - 30:11, 30:12, 421:12

**including** [6] - 88:23, 416:11, 421:17, 426:2, 432:10, 454:22

**income** [1] - 246:9

**incoming** [1] - 246:9

**inconsistent** [3] - 377:24, 378:6, 439:10

**incriminating** [1] - 177:3

**indeed** [8] - 45:12, 45:25, 48:6, 48:8, 49:25, 164:14, 404:18, 405:7

**indicate** [1] - 370:9

**indicated** [12] - 5:16, 58:21, 279:5, 280:12, 281:22, 284:13, 292:18, 408:24, 421:4, 431:7, 436:7, 455:20

**indicating** [23] - 43:1, 43:12, 66:7, 111:2, 201:18, 207:12, 209:25, 222:8, 276:23, 331:7, 343:1, 352:17, 356:20, 357:20, 386:20, 397:16, 398:8, 399:17, 400:4, 416:10, 417:18, 417:20, 417:23

**indication** [1] - 234:3

**indications** [1] - 135:20

**Indiscernible** [2] - 85:14, 309:24

**indiscernible** [67] - 8:5, 17:11, 44:4,

59:13, 60:6, 60:7,
60:21, 61:5, 61:7,
61:8, 61:10, 61:11,
61:14, 61:16, 61:21,
62:9, 62:10, 62:11,
62:12, 62:14, 62:23,
62:25, 63:8, 63:11,
63:17, 63:20, 63:21,
81:11, 86:9, 91:18,
159:21, 180:19,
181:6, 184:18,
184:23, 186:17,
194:17, 221:18,
224:24, 230:9,
230:10, 231:9,
233:5, 241:3, 277:8,
289:3, 296:20,
296:21, 309:10,
309:14, 309:15,
309:17, 309:19,
309:20, 309:21,
310:3, 310:8,
310:10, 367:6,
377:2, 391:18,
396:22, 398:23,
410:24, 417:18,
455:21, 461:4
**individual** [15] - 35:2,
54:9, 92:24, 92:25,
116:25, 119:10,
119:13, 273:4,
275:25, 278:19,
285:11, 403:21,
425:5, 428:18,
450:13
**individual/collective**
[1] - 449:14
**individually** [4] -
33:23, 365:10,
419:11, 454:1
**inexcusable** [1] -
50:23
**infant** [1] - 285:15
**inference** [1] - 32:18
**inflict** [2] - 373:4,
420:15
**influence** [5] - 32:20,
300:2, 418:8,
437:19, 441:3
**influenced** [2] - 34:25,
441:12
**inform** [1] - 360:25
**information** [37] - 6:3,
9:23, 10:11, 16:1,
28:14, 30:15, 48:20,
49:10, 71:10, 90:10,
93:18, 93:19, 94:12,
94:16, 94:17, 96:12,
103:20, 130:22,
135:17, 138:11,

139:12, 140:24,
161:12, 278:8,
278:10, 283:17,
291:11, 292:6,
292:20, 362:17,
365:12, 367:21,
385:14, 419:7,
437:4, 441:22,
444:16
**informed** [2] - 18:4
**initial** [7] - 118:20,
118:22, 235:21,
235:23, 236:2,
425:9, 428:22
**initials** [2] - 143:23,
147:3
**initiated** [1] - 404:16
**injured** [4] - 251:17,
341:22, 342:11,
404:21
**injuries** [13] - 41:8,
41:10, 92:4, 92:9,
95:5, 130:1, 151:13,
151:17, 151:20,
343:3, 343:5, 400:3,
402:3
**injury** [8] - 39:5,
47:15, 151:7, 239:7,
289:2, 289:16,
342:12, 405:11
**innocence** [2] - 32:15,
437:9
**innocent** [2] - 414:6,
437:2
**inside** [37] - 42:23,
43:11, 43:13, 44:3,
44:6, 44:13, 47:21,
68:22, 76:9, 140:25,
146:19, 146:20,
149:19, 207:6,
207:22, 210:3,
214:5, 214:6,
226:16, 227:9,
253:21, 254:21,
254:25, 268:5,
274:2, 275:1,
291:24, 292:15,
325:23, 325:24,
332:5, 333:5, 333:7,
343:21, 353:7,
398:10, 455:9
**instance** [2] - 351:8,
351:11
**instances** [3] - 45:8,
301:5, 310:16
**instant** [1] - 355:14
**instead** [7] - 21:4,
262:19, 262:23,
273:15, 314:15,
415:8, 439:15

**instinct** [2] - 355:4,
416:21
**instruct** [3] - 29:19,
53:24, 362:11
**instructed** [1] - 22:8
**instruction** [26] -
25:10, 30:17, 61:18,
181:15, 280:15,
284:1, 371:8,
371:23, 372:4,
373:12, 373:15,
373:22, 374:18,
375:25, 376:8,
379:21, 379:24,
380:15, 382:9,
384:1, 393:5,
393:12, 396:19,
445:24, 445:25
**Instruction** [1] - 379:9
**instructions** [28] -
17:16, 29:21, 30:1,
31:14, 35:5, 66:21,
181:5, 361:6,
369:18, 369:25,
374:8, 380:12,
388:17, 393:17,
395:18, 402:17,
418:3, 419:4,
419:21, 440:13,
440:23, 441:15,
442:16, 447:5,
448:12, 448:21,
449:15, 450:15
**instrument** [2] - 39:1,
51:14
**insufficient** [2] - 24:3,
279:9
**intangible** [1] - 185:3
**intend** [4] - 184:12,
284:15, 360:20,
360:23
**intended** [2] - 364:21,
395:3
**intending** [1] - 16:11
**intense** [1] - 45:18
**intent** [2] - 59:10,
432:17
**intention** [2] - 361:4,
459:13
**intentional** [8] - 49:5,
49:8, 50:21, 50:22,
51:17, 289:20,
412:12, 421:11
**intentionally** [8] -
420:7, 421:10,
422:9, 423:3, 424:9,
426:21, 427:25,
435:1
**intentions** [2] -
457:13, 458:1

**inter** [1] - 156:8
**interacting** [1] -
297:12
**interaction** [2] - 47:19,
236:7
**interchangeably** [1] -
430:18
**interest** [2] - 108:5,
439:3
**interested** [2] - 320:6,
368:11
**interesting** [2] -
162:17, 404:23
**interference** [1] -
433:3
**internet** [28] - 11:20,
12:14, 12:20, 13:1,
13:8, 13:20, 14:6,
16:23, 37:20, 38:1,
43:18, 58:7, 58:11,
62:18, 64:5, 64:13,
64:14, 64:21, 64:23,
74:13, 81:4, 81:16,
83:6, 194:19, 195:4,
242:4, 354:11,
415:21
**internet-accessible**
[1] - 58:7
**interrupt** [1] - 367:9
**interruption** [1] -
108:10
**intervene** [1] - 285:18
**interview** [6] - 156:5,
157:24, 178:9,
232:11, 340:3, 413:9
**interviewed** [10] -
115:2, 156:2, 156:3,
234:8, 339:21,
339:23, 340:15,
405:24, 410:12
**interviewing** [1] -
156:9
**interviews** [1] - 405:25
**intimidation** [1] -
307:2
**intro** [1] - 369:24
**introduce** [3] - 17:10,
26:9, 129:14
**introduced** [4] -
129:15, 300:8,
331:10, 438:5
**introduction** [1] -
297:14
**introductory** [2] -
25:10, 35:5
**intrusion** [1] - 333:20
**intuitive** [1] - 16:17
**inverter** [10] - 197:16,
203:12, 203:17,
203:19, 203:24,

204:4, 312:4, 312:6,
312:11, 312:14
**inverter/power** [1] -
203:16
**inverters** [2] - 197:13,
197:14
**investigate** [2] -
68:20, 126:25
**investigating** [2] -
93:20, 136:15
**investigation** [10] -
48:16, 79:12, 79:14,
97:15, 98:9, 98:16,
98:17, 132:24,
155:5, 400:6
**investigator** [6] - 5:17,
7:20, 41:13, 128:18,
162:6
**invitation** [2] - 434:5,
436:18
**invite** [1] - 419:8
**invited** [5] - 30:6,
44:7, 201:21, 257:9,
349:18
**invoke** [1] - 85:10
**invoked** [1] - 85:8
**involved** [10] - 13:17,
13:18, 34:20, 95:24,
98:23, 129:5, 251:6,
347:21, 374:2, 396:8
**involving** [3] - 228:2,
252:13, 439:8
**iron** [1] - 320:24
**is..** [1] - 376:11
**Isaiah** [12] - 41:23,
245:15, 267:4,
267:14, 268:7,
269:2, 270:1,
271:11, 271:13,
272:19, 272:20,
273:10
**ish** [1] - 126:10
**issue** [26] - 6:24, 7:7,
7:8, 8:12, 8:15,
10:15, 10:22, 11:22,
12:12, 15:11, 71:5,
72:5, 106:23, 107:5,
107:12, 182:17,
280:10, 286:1,
286:6, 286:9, 364:1,
366:20, 425:11,
425:15, 428:24,
429:3
**issues** [6] - 13:15,
21:11, 21:13, 27:19,
290:7, 460:24
**issuing** [1] - 71:11
**IT** [1] - 83:3
**it'll** [2] - 179:23, 180:5
**it's..** [1] - 6:10

**italicized** [18] - 181:6, 186:6, 186:11, 382:15, 384:11, 384:16, 385:8, 385:9, 385:17, 385:23, 386:22, 387:2, 388:8, 388:11, 388:13, 388:16, 388:24, 389:11

**italics** [1] - 381:15

**item** [11] - 17:6, 79:21, 95:17, 109:5, 136:8, 154:10, 163:15, 164:13, 195:11, 228:19, 408:1

**items** [26] - 14:3, 14:5, 14:15, 14:23, 58:12, 58:16, 80:23, 81:1, 94:18, 96:9, 96:13, 96:16, 100:7, 100:10, 100:16, 128:23, 132:7, 133:23, 150:24, 163:24, 195:7, 208:7, 416:1, 416:6, 446:6, 446:22

**itself** [6] - 51:22, 215:17, 242:6, 252:25, 253:17, 402:12

**IV** [6] - 44:9, 185:25, 376:6, 433:22, 444:4, 452:15

**J**

**J.V** [1] - 5:18

**jacket** [2] - 79:22, 154:12

**Jacksonville** [2] - 163:25, 244:14

**jagged** [1] - 144:20

**jail** [9] - 14:20, 48:12, 152:2, 246:11, 262:22, 303:5, 328:19, 329:22, 459:24

**James** [2] - 1:16, 26:9

**Jami** [3] - 1:20, 462:3, 462:15

**jerked** [2] - 308:14, 308:15

**job** [13] - 9:2, 266:9, 286:4, 305:12, 305:13, 403:12, 404:12, 405:4, 414:2, 441:6, 441:16, 445:5

**jobs** [1] - 226:13

**join** [1] - 202:16

**Joyce** [1] - 270:18

**judge** [9] - 18:6, 18:24, 20:24, 21:3, 26:7, 26:10, 378:16, 391:8, 407:8

**Judge** [6] - 1:16, 368:13, 377:8, 410:3, 413:18, 419:13

**judged** [1] - 418:17

**judgment** [3] - 279:3, 429:21, 459:4

**judicial** [1] - 452:4

**JUDICIAL** [1] - 1:1

**July** [1] - 462:13

**jump** [5] - 147:6, 186:8, 315:16, 330:19, 457:11

**jumped** [3] - 51:6, 457:2, 457:9

**jungle** [1] - 143:8

**juries** [1] - 453:6

**jurisdiction** [1] - 89:17

**Juror** [2] - 105:25, 447:17

**juror** [14] - 27:12, 106:22, 169:13, 188:5, 403:21, 404:3, 405:7, 414:2, 440:6, 441:10, 447:10, 447:24, 453:2, 454:2

**juror's** [1] - 35:2

**jurors** [9] - 5:8, 24:6, 35:1, 404:12, 447:16, 448:16, 449:7, 453:2, 454:4

**jurors'** [2] - 450:23, 453:9

**jury** [141] - 6:23, 7:17, 13:6, 15:15, 16:24, 17:16, 25:15, 25:21, 26:1, 26:6, 26:8, 27:25, 28:21, 31:2, 31:21, 32:17, 49:13, 50:23, 51:17, 52:8, 52:19, 54:21, 59:5, 59:18, 59:23, 61:17, 61:23, 68:17, 74:12, 76:11, 78:23, 82:3, 85:21, 88:3, 93:7, 93:10, 98:5, 105:22, 107:21, 123:9, 125:21, 127:24, 135:2, 144:22, 145:8, 148:12, 149:11, 150:16, 150:18, 150:22, 150:24, 168:24,

172:23, 180:24, 181:5, 187:19, 187:22, 188:15, 190:10, 190:21, 192:6, 192:12, 206:21, 215:24, 226:4, 243:1, 243:18, 245:19, 265:12, 265:15, 277:21, 277:23, 279:23, 280:14, 283:16, 285:12, 288:20, 289:14, 290:2, 293:15, 293:17, 294:3, 294:8, 299:19, 309:7, 311:16, 319:13, 321:15, 331:5, 336:6, 341:4, 342:19, 342:22, 360:14, 360:25, 362:21, 362:23, 365:13, 365:25, 366:11, 367:21, 367:22, 369:17, 393:23, 393:24, 394:1, 401:23, 402:17, 404:2, 419:3, 419:5, 419:12, 419:19, 442:20, 443:4, 443:14, 443:3, 444:24, 445:13, 445:14, 446:6, 447:1, 448:10, 448:12, 448:18, 450:4, 450:12, 450:19, 451:9, 451:11, 451:13, 452:7, 452:9, 452:13, 452:15, 452:20, 453:4, 454:7, 458:15, 458:19, 460:24

**Jury** [1] - 379:18

**jury's** [3] - 187:8, 452:2, 453:13

**justice** [2] - 28:24, 440:15

**justifiable** [5] - 385:16, 407:6, 421:19, 421:25, 426:4

**justified** [12] - 387:23, 391:18, 422:13, 423:8, 424:1, 425:17, 425:21, 426:11, 427:1, 427:15, 429:5, 429:10

**justify** [4] - 423:12, 423:14, 427:5, 441:24

**K**

**Karen** [1] - 47:17

**keep** [21] - 14:8, 14:10, 65:25, 68:7, 100:14, 107:25, 116:17, 177:4, 193:1, 203:10, 219:6, 219:7, 354:17, 392:19, 394:6, 395:9, 396:15, 398:25, 408:1, 416:7, 416:8

**keeping** [4] - 271:11, 271:13, 327:2, 458:7

**keeps** [3] - 38:6, 289:24, 416:2

**Kentucky** [1] - 299:23

**kept** [10] - 14:7, 43:1, 116:12, 119:23, 122:9, 147:10, 193:3, 195:7, 230:21, 239:20

**key** [5] - 6:20, 11:17, 120:3, 204:15, 207:19

**keys** [3] - 15:1, 269:1, 270:1

**Keystone** [3] - 226:3, 266:5, 267:17

**kicks** [1] - 302:13

**kid** [2] - 332:13, 333:8

**kids** [2] - 112:21, 251:11

**kill** [2] - 51:15, 297:8

**kind** [80] - 40:17, 42:4, 42:6, 43:20, 51:11, 58:2, 66:19, 70:21, 73:8, 75:22, 77:4, 90:22, 93:13, 94:14, 95:6, 99:21, 101:20, 111:16, 112:24, 120:5, 124:12, 126:1, 126:10, 126:12, 126:24, 133:10, 136:16, 138:4, 140:6, 145:22, 145:23, 148:15, 152:11, 156:7, 163:17, 163:18, 167:13, 172:13, 176:1, 177:6, 189:21, 189:22, 191:22, 191:25, 192:23, 192:24, 193:1,

196:24, 197:21, 199:19, 200:13, 200:20, 205:7, 205:8, 212:14, 214:23, 216:15, 227:16, 236:17, 246:13, 269:15, 270:5, 270:7, 270:23, 277:1, 277:5, 297:20, 301:16, 304:3, 306:4, 321:7, 330:2, 330:17, 331:16, 335:5, 337:15, 341:19, 342:13, 435:3, 456:6

**kindly** [1] - 446:7

**kinds** [3] - 13:15, 14:22, 226:25

**king** [1] - 319:20

**kit** [1] - 319:22

**kitchen** [2] - 247:6, 269:20

**knee** [4] - 167:9, 167:10, 167:11, 168:8

**knees** [1] - 171:25

**knife** [50] - 4:18, 42:25, 43:12, 43:13, 44:1, 44:6, 56:7, 56:12, 142:18, 143:7, 143:8, 143:20, 144:10, 144:16, 145:1, 145:12, 146:1, 172:4, 172:23, 255:6, 256:9, 257:7, 328:15, 330:14, 334:13, 334:14, 334:15, 334:16, 335:9, 335:10, 335:13, 335:18, 337:5, 338:21, 353:2, 353:3, 353:8, 357:8, 403:1, 406:19, 409:6, 409:7, 409:9, 409:15, 416:12, 455:22, 456:1, 456:3, 456:22

**knives** [8] - 227:15, 227:16, 227:17, 227:18, 227:21

**knock** [8] - 217:17, 271:24, 275:4, 275:5, 275:6, 331:14, 408:17

**knocked** [5] - 38:23, 252:7, 253:24, 254:1, 269:3

**knocks** [1] - 399:17
**knowing** [1] - 322:13
**knowingly** [6] - 374:22, 429:19, 430:19, 431:13, 432:15, 435:2
**knowledge** [7] - 13:3, 13:4, 110:13, 135:22, 279:6, 296:16, 430:19
**known** [20] - 7:8, 54:19, 75:6, 184:14, 195:20, 196:11, 196:13, 248:12, 311:1, 344:24, 347:9, 347:13, 359:25, 392:12, 392:15, 392:19, 425:1, 428:15, 433:5, 433:8
**knows** [10] - 39:23, 48:11, 106:10, 218:3, 292:8, 316:8, 399:24, 417:8, 421:13
**knuckles** [2] - 429:25, 432:5

**L**

**lack** [8] - 28:13, 52:6, 68:24, 153:24, 413:11, 413:17, 413:20, 438:9
**Ladies** [2] - 150:18, 187:8
**ladies** [33] - 26:1, 26:3, 27:24, 35:3, 44:24, 105:22, 107:21, 180:17, 180:23, 187:21, 187:24, 277:13, 277:23, 293:16, 361:13, 362:22, 393:22, 394:1, 394:3, 394:20, 419:2, 448:9, 448:18, 450:3, 450:6, 450:11, 450:19, 451:10, 451:13, 451:16, 452:23, 454:2, 454:7
**lady** [5] - 193:20, 285:14, 295:23, 296:11, 305:1
**lag** [1] - 69:12
**laid** [3] - 142:17, 144:25, 171:25
**lake** [1] - 197:1
**landlord** [1] - 226:7

**lane** [2] - 287:9, 331:19
**language** [3] - 181:11, 182:1, 184:15
**laptop** [2] - 289:6, 407:20
**laptops** [1] - 446:4
**larceny** [2] - 184:15, 433:8
**Large** [1] - 1:21
**large** [3] - 142:18, 148:15, 371:11
**larger** [1] - 168:3
**lascivious** [1] - 454:25
**laser** [2] - 171:19, 171:20
**last** [39] - 5:23, 7:25, 8:6, 8:19, 8:21, 10:1, 33:14, 44:8, 53:8, 74:8, 74:10, 75:6, 78:16, 86:17, 93:3, 98:1, 118:23, 123:22, 134:16, 144:10, 147:19, 149:7, 150:7, 181:7, 188:25, 196:4, 240:20, 244:7, 308:10, 360:24, 361:16, 378:13, 380:4, 384:16, 385:23, 386:15, 389:21, 393:1, 411:17
**last-above** [7] - 93:3, 98:1, 134:16, 144:10, 147:19, 149:7, 150:7
**last-known** [1] - 75:6
**lasted** [1] - 396:14
**lasts** [1] - 197:18
**late** [2] - 7:24, 460:1
**latter** [1] - 312:21
**laughing** [1] - 340:22
**laundry** [1] - 320:18
**law** [69] - 8:16, 9:15, 27:21, 28:14, 28:20, 33:10, 41:10, 48:16, 49:9, 50:14, 50:24, 58:1, 74:18, 74:21, 75:1, 79:9, 86:20, 87:11, 91:3, 91:12, 98:18, 99:22, 106:3, 106:23, 114:2, 115:16, 116:23, 124:5, 139:16, 139:21, 163:13, 163:20, 180:8, 230:24, 237:4, 254:23, 257:17, 261:25, 262:17,

263:12, 263:22, 264:9, 302:25, 303:4, 330:22, 331:22, 336:16, 339:13, 355:23, 361:22, 362:11, 368:3, 370:12, 378:24, 403:17, 405:24, 407:23, 412:8, 434:21, 439:18, 440:12, 440:13, 440:16, 441:6, 441:14, 447:4, 447:10, 453:11, 457:22
**lawful** [5] - 434:2, 434:14, 434:17, 436:14, 440:11
**lawnmower** [1] - 308:1
**laws** [5] - 28:17, 28:18, 29:19, 447:6, 447:7
**lawyer** [2] - 439:25, 440:4
**lawyers** [7] - 29:8, 29:13, 29:25, 33:9, 361:21, 362:10, 441:1
**lay** [1] - 336:23
**laying** [4] - 218:10, 224:11, 336:25, 405:8
**lead** [6] - 41:13, 71:11, 128:18, 162:6
**leading** [8] - 54:5, 71:6, 101:19, 130:10, 210:5, 253:14, 310:23, 383:23
**league** [1] - 47:3
**learned** [1] - 397:6
**learning** [2] - 122:3, 124:18
**leash** [1] - 344:22
**least** [25] - 8:19, 9:3, 9:5, 23:15, 41:7, 43:15, 54:22, 55:5, 99:10, 100:3, 101:13, 132:18, 132:24, 148:9, 241:21, 277:20, 279:21, 280:2, 280:4, 337:24, 344:1, 349:19, 366:10, 366:12
**leave** [33] - 31:3, 33:22, 34:6, 45:22, 50:3, 50:14, 67:23, 78:1, 85:4, 96:20,

105:12, 128:7, 128:9, 182:20, 222:10, 261:16, 261:19, 261:22, 261:23, 276:9, 276:10, 277:17, 278:22, 303:10, 307:4, 312:5, 362:18, 371:2, 383:13, 389:18, 392:23, 409:1, 419:10
**leaves** [4] - 48:13, 313:1, 314:14, 333:22
**leaving** [2] - 388:11, 406:24
**LED** [1] - 134:7
**left** [44] - 27:9, 44:12, 45:2, 50:7, 100:25, 101:5, 101:7, 102:7, 102:21, 108:20, 127:18, 128:10, 137:11, 153:9, 157:7, 160:5, 167:6, 167:9, 172:13, 178:8, 181:13, 226:8, 263:11, 272:22, 275:3, 276:14, 305:1, 305:14, 305:17, 306:3, 306:9, 321:17, 329:25, 336:25, 355:20, 399:4, 399:7, 406:18, 409:17, 415:13, 443:2, 443:11, 444:9, 453:25
**leg** [10] - 66:2, 66:8, 66:9, 66:10, 127:22, 146:10, 172:13, 335:15
**legal** [7] - 124:15, 229:17, 317:14, 366:21, 407:15, 440:17, 454:10
**legally** [1] - 24:3
**lengths** [2] - 111:4, 411:21
**Leroy** [14] - 294:25, 300:11, 300:12, 301:20, 301:22, 302:10, 316:6, 321:4, 327:7, 330:20, 338:17, 340:4, 457:4
**leroy's** [1] - 311:18
**less** [15] - 16:17, 70:9, 102:21, 279:7,

279:23, 279:25, 315:4, 402:6, 432:25, 433:21, 438:19, 439:19, 443:23, 443:25
**lessee** [2] - 434:20, 434:23
**lesser** [27] - 181:14, 182:6, 183:20, 184:1, 185:8, 186:7, 373:15, 373:16, 373:19, 375:2, 375:11, 376:11, 420:24, 421:3, 421:4, 421:17, 426:2, 431:2, 431:6, 436:2, 436:6, 436:7, 441:23, 442:25, 443:9, 444:7
**lesser-included** [12] - 373:15, 421:17, 426:2, 431:2, 431:6, 436:2, 436:6, 436:7, 441:23, 442:25, 443:9, 444:7
**letting** [2] - 71:4, 86:8
**level** [1] - 185:20
**lewd** [1] - 454:25
**lexis** [1] - 200:11
**LG** [1] - 242:2
**liberty** [2] - 453:16, 453:18
**license** [2] - 434:5, 436:17
**licensed** [1] - 431:18
**lieutenant** [1] - 412:3
**life** [16] - 14:21, 32:1, 38:12, 47:1, 197:22, 214:10, 214:17, 249:6, 256:5, 320:12, 323:16, 411:20, 412:2, 415:7, 430:10, 431:24
**lifelines** [1] - 36:17
**lift** [1] - 319:21
**lifted** [1] - 319:21
**light** [15] - 126:8, 234:1, 234:5, 279:13, 279:20, 280:2, 280:8, 287:4, 288:5, 337:8, 337:10, 339:23, 340:1, 365:5
**lighter** [1] - 417:7
**lighting** [3] - 130:8, 131:24, 134:5
**lights** [12] - 114:21, 114:24, 115:10, 115:11, 115:14,

134:7, 138:21,
138:23, 165:24,
166:2, 166:6, 356:5
**like..** [1] - 220:22
**likely** [5] - 420:11,
420:18, 421:20,
426:6, 435:15
**likewise** [1] - 33:2
**limbs** [1] - 76:12
**limine** [1] - 10:24
**limit** [2] - 11:13,
362:15
**limited** [1] - 95:21,
352:13
**line** [4] - 145:2,
172:10, 325:20,
457:1
**link** [1] - 63:5
**linking** [1] - 63:10
**LISA** [1] - 3:22
**Lisa** [18] - 49:25,
50:10, 245:5,
264:19, 265:25,
278:21, 292:7,
292:8, 330:23,
333:15, 333:19,
334:7, 364:1,
408:13, 408:20,
408:24, 409:16,
455:24
**listen** [4] - 395:2,
402:16, 408:19,
418:3
**listening** [1] - 419:9
**lists** [1] - 373:15
**literally** [9] - 302:13,
307:9, 315:22,
322:16, 323:23,
326:12, 331:4, 335:4
**live** [10] - 35:19, 41:21,
72:9, 72:11, 72:12,
141:4, 189:24,
238:13, 245:17,
294:15
**lived** [13] - 76:19,
189:10, 248:3,
248:7, 294:16,
294:17, 299:3,
299:7, 300:17,
305:3, 331:20,
411:22, 447:9
**lives** [3] - 31:18,
39:23, 396:11
**living** [20] - 53:10,
73:19, 86:19,
123:24, 189:8,
189:13, 190:5,
190:6, 191:19,
191:24, 201:9,
244:12, 246:16,

247:10, 250:18,
266:1, 266:2,
266:23, 266:25,
267:2
**loaded** [2] - 261:21,
302:22
**loaned** [1] - 111:23
**locate** [5] - 72:25,
73:18, 77:12,
126:20, 132:6
**located** [9] - 72:16,
76:8, 78:9, 78:12,
78:19, 82:23, 132:8,
140:16
**location** [2] - 75:6,
89:13
**lock** [3] - 193:5,
195:13, 195:16
**locked** [10] - 120:2,
120:5, 143:17,
195:17, 222:10,
240:24, 449:9, 450:9
**locking** [1] - 193:5
**log** [1] - 120:1
**logging** [1] - 194:17
**logical** [2] - 63:14,
63:19
**logically** [1] - 388:10
**logistically** [1] - 117:5
**look** [71] - 8:5, 30:14,
38:14, 39:5, 40:6,
51:22, 66:5, 90:12,
91:18, 91:19, 94:22,
97:6, 103:13, 109:7,
111:12, 127:3,
127:20, 132:11,
133:17, 136:10,
139:25, 143:2,
146:23, 147:25,
149:19, 167:17,
167:20, 173:3,
176:15, 176:22,
178:12, 182:5,
186:2, 194:15,
220:11, 222:19,
224:4, 239:23,
240:10, 240:16,
242:19, 256:16,
262:3, 271:6, 304:5,
313:19, 313:22,
314:6, 315:19,
316:6, 317:5,
318:15, 322:7,
324:6, 327:3, 342:7,
342:17, 342:19,
350:2, 372:21,
379:22, 380:8,
401:5, 402:4,
402:10, 410:2,
414:3, 417:17,

417:19, 417:20,
438:6
**Look** [4] - 254:7,
254:18, 303:20,
307:4
**looked** [25] - 74:6,
76:5, 76:11, 92:4,
121:1, 132:25,
162:24, 173:14,
254:14, 259:17,
259:20, 274:14,
289:16, 300:4,
314:9, 321:11,
334:5, 341:13,
341:14, 341:22,
345:18, 350:16,
350:17, 355:24,
406:11
**looking** [58] - 9:24,
19:21, 22:17, 38:18,
40:2, 41:1, 46:21,
60:1, 61:3, 74:4,
74:8, 74:16, 77:7,
77:17, 78:10, 79:10,
94:18, 95:17, 95:19,
95:23, 96:10, 96:16,
101:10, 119:4,
126:16, 126:17,
126:25, 127:6,
127:11, 128:24,
129:2, 129:5,
137:17, 158:3,
159:4, 160:3, 162:5,
167:5, 213:20,
214:19, 216:2,
216:3, 216:12,
216:14, 220:17,
238:18, 245:24,
251:18, 292:17,
292:20, 320:5,
320:16, 336:21,
337:1, 339:15,
350:12, 358:23,
415:15
**lookout** [1] - 94:24
**looks** [14] - 10:1, 37:3,
111:16, 145:22,
168:25, 170:4,
186:7, 220:17,
224:19, 288:21,
331:16, 371:14,
376:20, 401:15
**Loop** [1] - 295:5
**loose** [2] - 66:10,
66:12
**lose** [2] - 83:24, 214:3
**lost** [47] - 35:17, 36:1,
40:1, 40:4, 42:21,
72:16, 73:21, 76:9,
81:24, 89:13, 89:21,

90:6, 90:14, 93:20,
93:23, 96:18, 97:13,
100:23, 101:3,
101:17, 102:9,
102:19, 104:1,
125:8, 125:13,
131:2, 138:13,
139:10, 190:6,
190:9, 190:16,
190:21, 245:17,
246:3, 266:24,
288:1, 294:16,
294:17, 297:6,
298:12, 298:13,
304:9, 308:8,
316:12, 316:15,
338:18, 411:15
**Lost** [1] - 4:11, 4:13,
73:12, 137:3,
138:17, 139:3,
165:19, 190:7,
219:19, 221:19,
330:1
**loud** [3] - 75:16,
194:4, 323:8
**loudly** [1] - 321:8
**loved** [1] - 32:5
**low** [5] - 192:15,
246:9, 315:6, 412:24
**low-income** [1] -
246:9
**lower** [4] - 86:2, 323:4,
323:5, 323:6
**luck** [1] - 461:1
**Luis** [2] - 2:2, 35:11
**lunch** [12] - 24:9,
26:17, 26:18, 26:19,
180:18, 180:21,
180:25, 181:4,
186:23, 188:1, 188:4

# M

**M2** [1] - 280:23
**ma'am** [3] - 18:17,
52:18, 53:10
**mad** [11] - 46:10,
113:22, 236:16,
236:23, 238:20,
239:20, 302:16,
316:7, 330:3, 406:21
**Madam** [1] - 452:1
**madam** [1] - 27:16
**madder** [4] - 213:21,
215:11
**main** [7] - 181:15,
420:22, 420:25,
430:24, 431:3,
435:25, 436:3

**mainframe** [1] - 118:3
**maintain** [1] - 176:18
**maintaining** [1] -
107:6
**makeup** [1] - 257:25
**MALE** [4] - 395:10,
395:14, 396:2,
396:16
**male** [3] - 231:21,
232:5, 331:1
**malfunction** [2] -
68:14, 68:17
**malice** [1] - 457:21
**malone** [1] - 450:8
**MALONE** [53] - 1:8,
4:1, 10:18, 84:24,
281:17, 282:7,
282:12, 282:17,
282:20, 282:23,
282:25, 283:3,
283:7, 283:11,
283:24, 284:8,
284:11, 284:21,
285:1, 286:3,
286:21, 287:2,
287:13, 287:18,
287:20, 288:3,
288:6, 288:15,
288:18, 288:25,
289:4, 289:10,
289:15, 289:18,
290:9, 290:12,
365:13, 365:18,
366:2, 366:6,
366:10, 366:16,
367:4, 367:6, 368:6,
368:17, 368:20,
368:22, 368:24,
456:17, 459:11,
459:18, 459:23
**Malone** [210] - 5:4, 5:5,
10:16, 12:10, 15:15,
15:19, 17:2, 18:21,
22:22, 23:21, 23:22,
23:25, 25:22, 28:1,
40:9, 41:12, 42:24,
42:25, 44:14, 45:2,
47:8, 54:19, 54:22,
55:17, 56:11, 57:7,
63:16, 64:12, 64:18,
65:14, 67:19, 68:10,
70:13, 73:18, 73:19,
77:17, 78:4, 79:17,
82:1, 101:8, 101:10,
101:23, 104:9,
104:23, 105:1,
106:19, 113:11,
126:18, 126:23,
128:22, 131:13,
132:3, 137:1, 137:7,

137:15, 138:10,
140:22, 141:19,
148:6, 151:11,
154:12, 157:3,
158:3, 159:4, 160:3,
160:8, 165:2,
165:22, 166:21,
167:3, 167:18,
168:6, 169:24,
170:19, 171:22,
181:2, 187:5, 187:6,
195:21, 196:19,
198:1, 202:8, 202:9,
205:24, 208:10,
213:19, 215:8,
215:11, 215:25,
219:1, 221:20,
223:22, 225:4,
227:8, 248:23,
249:9, 249:10,
251:6, 252:7,
252:14, 253:20,
254:20, 256:5,
260:18, 262:8,
274:8, 278:23,
279:1, 281:10,
281:13, 281:19,
284:14, 284:17,
288:1, 291:4, 291:5,
291:17, 292:13,
293:5, 293:23,
293:24, 294:9,
309:3, 310:15,
317:15, 318:15,
363:22, 364:12,
364:13, 364:17,
364:20, 365:2,
366:20, 368:18,
369:2, 387:22,
388:3, 390:5,
390:11, 390:14,
390:25, 391:21,
392:7, 405:9,
406:10, 407:6,
407:19, 411:13,
412:1, 413:14,
414:8, 414:9,
419:22, 420:6,
420:9, 421:9,
421:18, 422:1,
422:10, 422:13,
422:19, 423:4,
423:7, 423:21,
424:2, 424:8,
424:11, 424:14,
424:21, 425:2,
425:4, 425:13,
425:17, 425:21,
426:3, 426:10,
426:22, 426:25,
427:13, 427:16,

427:24, 428:2,
428:7, 428:10,
428:15, 428:17,
429:1, 429:5, 429:9,
429:17, 429:19,
431:12, 431:17,
432:14, 433:25,
434:8, 436:13,
449:5, 449:8, 451:6,
451:24, 452:6,
456:3, 456:15,
458:15, 459:20,
460:20
**Malone's** [16] - 12:13,
39:21, 58:15, 72:14,
76:17, 78:18,
106:19, 166:22,
167:9, 170:24,
176:25, 260:16,
290:21, 434:3,
436:16, 451:7
**Man** [3] - 312:7, 317:6,
327:3
**man** [24] - 45:16,
45:17, 190:1,
228:11, 242:19,
303:20, 307:4,
307:14, 308:9,
308:22, 312:16,
313:20, 331:17,
331:24, 332:2,
332:4, 332:10,
332:15, 349:24,
359:15, 399:20,
399:22, 401:22
**manager** [3] - 266:4,
302:5, 344:2
**mandy** [1] - 304:25
**manner** [13] - 15:17,
25:24, 32:20, 33:16,
284:3, 300:4,
420:13, 420:17,
430:2, 432:8, 433:6,
435:17, 458:1
**manpower** [1] - 88:10
**manually** [1] - 166:7
**map** [2] - 26:13, 389:3
**March** [5] - 55:4,
70:12, 266:19,
268:14, 294:20
**margaret** [1] - 305:2
**marijuana** [6] - 306:2,
332:24, 345:23,
346:7, 346:19,
346:20
**mark** [4] - 120:10,
220:20, 432:11,
461:6
**marked** [18] - 93:2,
93:4, 97:4, 98:2,

133:15, 134:17,
142:25, 144:11,
146:21, 147:20,
147:23, 149:8,
149:17, 150:8,
220:2, 222:17,
224:2, 256:15
**market** [1] - 433:12
**marks** [2] - 91:11,
374:8
**married** [4] - 245:2,
245:4, 245:6, 245:23
**Mary** [1] - 447:17
**mask** [3] - 52:25, 86:2,
123:14
**match** [1] - 52:2
**material** [3] - 52:8,
324:16, 437:3
**materials** [1] - 147:10
**math** [1] - 268:9
**MATHEWS** [3] - 3:19,
3:22, 244:9
**Mathews** [60] - 42:3,
42:10, 42:15, 42:18,
42:22, 43:3, 43:4,
43:6, 49:25, 50:2,
50:6, 50:11, 140:20,
243:14, 245:5,
264:20, 265:6,
265:8, 265:25,
267:3, 278:21,
278:23, 291:11,
291:23, 292:5,
292:7, 292:8, 300:5,
328:22, 338:16,
352:5, 357:1,
357:10, 364:1,
364:2, 364:22,
365:6, 365:20,
367:15, 368:4,
397:22, 398:12,
398:22, 399:5,
399:9, 408:16,
408:20, 408:24,
409:3, 409:10,
409:16, 434:3,
434:6, 436:15,
436:18, 455:24,
455:25
**Mathews'** [3] - 333:3,
356:25, 402:23
**matt** [9] - 255:8,
312:12, 314:12,
315:9, 315:10,
315:15, 315:19,
321:4, 327:3
**Matt** [6] - 256:19,
257:2, 260:13,
300:25, 315:11,
315:12

**Matt's** [1] - 311:23
**matt's** [1] - 321:5
**matter** [12] - 31:4,
49:6, 95:16, 210:12,
296:18, 322:16,
367:15, 367:16,
396:11, 412:14,
412:15, 440:18
**matters** [11] - 5:13,
24:14, 26:7, 33:10,
33:11, 49:8, 277:15,
281:21, 370:25,
395:23, 460:24
**matthew** [1] - 340:16
**Matthew** [58] - 41:21,
42:22, 44:3, 81:25,
92:14, 113:11,
165:2, 165:4, 165:7,
165:10, 188:10,
189:1, 189:4,
223:10, 244:9,
248:11, 264:21,
295:2, 295:9,
297:15, 301:12,
302:12, 306:15,
307:3, 307:13,
307:24, 308:13,
312:17, 312:22,
331:23, 338:17,
358:25, 368:12,
382:3, 400:24,
420:7, 421:10,
422:8, 422:11,
423:1, 423:4,
424:10, 424:15,
424:17, 424:23,
425:6, 425:14,
426:12, 426:14,
426:20, 426:23,
427:25, 428:8,
428:12, 428:19,
429:2, 432:16,
432:18
**MATTHEW** [1] - 3:15
**Matthew'** [7] - 13:24,
43:11, 44:6, 44:15,
49:21, 82:6, 82:11
**Matthew's** [1] - 306:24
**maximum** [1] - 456:12
**Mazda** [4] - 192:8,
295:8, 295:9, 301:13
**McCaullie** [50] - 35:23,
47:17, 47:18, 48:1,
48:5, 78:15, 103:18,
103:19, 157:22,
158:6, 158:19,
159:14, 159:24,
160:1, 196:6, 196:7,
221:17, 235:1,
235:14, 248:11,

258:17, 259:4,
259:10, 259:11,
259:13, 259:14,
294:25, 300:12,
312:17, 316:6,
317:20, 321:4,
325:16, 330:21,
338:17, 339:1,
339:2, 340:4,
340:14, 343:10,
359:12, 359:18,
359:23, 359:24,
360:1, 408:9,
408:14, 411:15
**McCaullie's** [8] -
35:20, 45:3, 45:13,
78:17, 215:15,
258:21, 308:7,
319:11
**McCaullies** [16] -
196:8, 196:9,
196:22, 201:7,
201:10, 202:2,
212:10, 222:4,
223:2, 225:1,
237:24, 299:10,
299:20, 312:8,
318:23, 349:17
**McDonald's** [6] -
43:19, 194:22,
194:25, 301:18,
332:14, 333:8
**mean** [57] - 8:1, 12:8,
16:15, 16:25, 31:10,
37:13, 49:7, 61:8,
62:1, 63:6, 67:10,
68:18, 72:4, 73:2,
75:9, 110:5, 120:7,
121:2, 139:22,
174:18, 175:12,
175:24, 184:17,
185:2, 202:7, 211:6,
216:20, 217:13,
217:24, 233:21,
235:21, 238:1,
239:7, 252:3, 270:5,
270:25, 277:3,
286:3, 290:1, 290:4,
310:22, 323:23,
324:22, 326:18,
338:25, 339:17,
341:13, 352:9,
362:6, 363:12,
367:8, 395:24,
399:15, 430:15,
439:18, 456:11,
456:18
**meaning** [1] - 114:2
**means** [32] - 67:11,
69:2, 72:5, 143:11,

181:22, 380:19,
387:16, 416:17,
417:16, 421:20,
421:22, 426:5,
426:7, 429:21,
429:24, 430:4,
430:8, 430:19,
431:19, 431:22,
432:4, 433:6,
433:10, 433:12,
434:20, 435:1,
435:2, 437:1,
445:20, 460:18,
462:10
**meant** [2] - 178:5,
400:20
**meanwhile** [1] - 42:17
**measure** [1] - 66:15
**mechanic** [2] - 189:15
**mechanism** [2] -
175:21, 175:24
**media** [1] - 453:24
**medical** [3] - 112:6,
112:11, 289:17
**medically** [1] - 97:2
**medicine** [1] - 342:1
**medium** [2] - 205:8,
205:9
**meet** [7] - 26:5, 82:17,
125:17, 127:12,
128:15, 159:10,
279:12
**meeting** [2] - 15:13,
125:18
**meetings** [1] - 352:13
**members** [2] - 419:12,
419:18
**memorialize** [1] -
116:14
**memories** [1] - 449:14
**memory** [8] - 34:22,
34:24, 35:3, 70:18,
368:8, 410:8, 439:1,
450:13
**men** [3] - 285:16,
365:14, 414:5
**mental** [1] - 447:15
**mention** [3] - 120:9,
255:10, 255:14
**mentioned** [7] - 9:19,
60:11, 255:12,
348:5, 377:12,
394:4, 445:6
**mere** [4] - 418:6,
421:24, 426:10,
437:17
**merely** [2] - 242:22,
313:19
**merits** [1] - 29:24
**message** [6] - 32:2,

75:18, 102:17,
105:17, 105:25,
445:19
**messages** [2] - 32:7,
75:13
**messaging** [1] - 30:12
**met** [12] - 51:23,
129:9, 131:7, 153:6,
195:24, 196:18,
197:25, 295:17,
295:18, 343:9,
414:18, 439:12
**metal** [11] - 38:20,
39:1, 43:23, 47:3,
213:10, 252:25,
253:4, 306:18,
306:20, 352:11,
400:20
**metallic** [2] - 429:24,
432:5
**method** [1] - 307:3
**Michael** [2] - 2:9,
44:25
**microphone** [1] -
301:24
**mid** [5] - 7:3, 26:15,
26:23, 192:15,
277:17
**mid-afternoon** [1] -
26:23, 277:17
**mid-morning** [2] - 7:3,
26:15
**mid-size** [1] - 192:15
**middle** [4] - 43:24,
76:13, 340:20, 391:7
**might** [14] - 12:24,
12:25, 31:17, 32:1,
33:4, 35:23, 130:8,
181:3, 352:2,
361:18, 397:24,
411:23, 453:23
**miles** [1] - 87:24
**mind** [9] - 23:5,
250:24, 310:17,
310:21, 349:9,
358:24, 409:22,
448:5, 456:25
**mine** [12] - 117:24,
118:4, 206:8, 211:4,
249:1, 250:3,
294:25, 299:25,
312:25, 313:1,
371:17, 372:11
**minimize** [1] - 411:7
**minimum** [3] - 433:19,
433:20, 454:19
**minor** [3] - 7:7,
421:23, 426:8
**minute** [20] - 84:21,
85:18, 105:11,

105:15, 180:25,
208:14, 213:11,
214:22, 217:24,
228:25, 231:6,
315:4, 334:7,
334:11, 363:5,
363:13, 363:14,
363:18, 363:21,
401:21
**minutes** [39] - 26:16,
40:22, 50:5, 50:7,
69:18, 73:14, 76:5,
102:22, 127:4,
130:17, 132:5,
137:5, 138:1,
138:18, 159:2,
159:5, 159:25,
198:10, 201:13,
202:17, 208:14,
214:22, 215:10,
219:21, 263:17,
264:2, 264:5,
267:10, 274:5,
290:20, 313:18,
334:3, 355:25,
361:18, 395:19,
399:12, 409:3,
415:16
**miscarriage** [1] -
440:14
**misdemeanor** [1] -
439:8
**misleading** [1] -
387:20
**miss** [2] - 350:8,
350:14
**missing** [14] - 46:1,
46:2, 139:25, 287:6,
289:24, 313:20,
313:21, 350:3,
350:25, 351:1,
368:12, 397:17,
415:20
**mistake** [7] - 49:4,
50:21, 51:19,
218:24, 412:12,
413:4, 461:3
**mistaken** [2] - 120:15,
272:4
**mistakes** [1] - 50:25
**mistrial** [5] - 59:7,
59:21, 60:17, 61:15,
63:21
**misty** [1] - 200:11
**mitigating** [1] - 458:12
**mobile** [1] - 306:6
**mode** [7] - 169:14,
171:17, 171:18,
218:1, 218:6, 218:9,
339:25

**moderate** [2] - 421:23,
426:9
**modern** [1] - 36:9
**mom** [1] - 270:18
**moment** [21] - 49:18,
80:9, 80:12, 128:25,
129:6, 155:23,
156:12, 179:6,
201:3, 217:10,
219:11, 242:13,
275:20, 298:2,
327:21, 327:22,
351:7, 355:14,
362:17, 364:19,
453:13
**moments** [1] - 444:23
**momentum** [2] -
325:8, 325:9
**money** [4] - 246:1,
246:5, 302:4, 343:22
**monitor** [11] - 65:9,
65:10, 65:14, 66:1,
67:7, 67:9, 67:14,
75:7, 127:21,
131:14, 131:17
**monitoring** [10] -
65:16, 65:22, 67:7,
67:13, 68:11, 69:6,
69:11, 69:12, 70:3,
119:9
**monitors** [3] - 38:4,
67:6, 67:8
**monopoly** [1] - 418:3
**month** [7] - 41:22,
42:11, 50:1, 236:13,
236:14, 306:14,
306:15
**month-and-a-half** [1] -
306:15
**months** [8] - 55:6,
268:9, 268:10,
268:15, 286:13,
368:25, 454:19,
454:20
**morning** [22] - 5:24,
7:3, 18:9, 26:4,
26:14, 26:15, 27:7,
27:11, 35:10, 44:24,
52:18, 53:5, 53:6,
80:20, 80:21, 85:9,
86:14, 86:15,
123:19, 123:20,
155:3, 155:4
**most** [10] - 23:25,
121:5, 279:13,
279:20, 280:3,
280:8, 282:1,
327:10, 363:14
**mother** [6] - 106:3,
106:23, 353:6,

398:6, 399:3, 416:21
**mother-in-law** [2] -
106:3, 106:23
**motion** [17] - 10:24,
11:12, 15:3, 18:5,
18:8, 18:23, 23:24,
24:2, 24:3, 24:4,
61:5, 61:6, 61:14,
61:15, 63:20, 280:6,
280:9
**motions** [3] - 283:15,
363:9, 369:10
**motivation** [1] - 415:7
**motive** [1] - 11:23
**mouth** [2] - 260:16,
316:1
**move** [16] - 10:23,
59:7, 92:18, 134:10,
144:5, 145:8, 145:9,
147:13, 149:1,
150:1, 230:14,
278:4, 279:3, 305:4,
335:15, 443:19
**moved** [3] - 226:10,
273:16, 352:12
**movie** [15] - 45:15,
46:17, 312:7, 312:8,
312:12, 312:20,
313:22, 314:16,
349:16, 350:7,
350:10, 350:15,
350:24, 350:25,
351:2
**movies** [6] - 210:18,
313:6, 320:7,
353:19, 397:18,
411:24
**moving** [2] - 194:4,
305:11
**MP3** [3] - 81:18, 81:21,
313:5
**MR** [621] - 5:10, 5:12,
5:16, 6:11, 6:14,
7:14, 7:22, 7:24,
8:13, 9:21, 10:9,
10:12, 10:16, 10:18,
10:19, 10:23, 11:7,
11:9, 11:15, 12:17,
12:19, 13:12, 13:14,
13:23, 15:6, 16:9,
16:13, 17:4, 17:9,
17:15, 17:22, 17:25,
18:3, 18:18, 18:19,
21:18, 21:21, 23:11,
24:11, 24:12, 24:15,
25:7, 25:8, 25:14,
25:17, 25:18, 35:8,
44:22, 52:17, 53:4,
54:4, 54:8, 56:22,
59:1, 59:3, 59:6,

59:24, 60:9, 60:20,
61:9, 61:12, 61:17,
61:22, 62:1, 62:15,
62:24, 63:1, 63:9,
63:22, 63:25, 64:2,
71:6, 71:9, 79:25,
80:4, 80:9, 80:12,
80:15, 80:19, 81:21,
81:22, 83:14, 83:16,
83:18, 84:8, 84:13,
84:15, 84:20, 84:24,
85:6, 85:8, 85:13,
85:15, 85:17, 86:7,
86:13, 91:14, 91:17,
92:17, 92:21, 92:25,
93:6, 93:11, 95:13,
95:15, 95:22, 96:3,
96:7, 96:8, 97:19,
97:23, 98:4, 98:7,
105:7, 105:19,
106:13, 107:11,
107:14, 107:18,
108:2, 108:7,
108:11, 108:15,
109:11, 109:13,
114:4, 114:7,
114:10, 114:12,
118:14, 121:17,
121:19, 122:19,
122:24, 123:1,
123:5, 123:18,
129:13, 129:20,
130:9, 130:14,
133:5, 133:9,
134:10, 134:13,
134:19, 135:1,
135:4, 142:20,
142:24, 144:4,
144:7, 144:13,
145:7, 145:11,
147:13, 147:16,
147:22, 149:1,
149:4, 149:10,
149:13, 149:25,
150:4, 150:10,
150:15, 151:3,
154:15, 154:18,
154:23, 154:25,
155:2, 155:23,
156:1, 156:12,
156:15, 156:19,
156:22, 165:13,
165:15, 165:17,
166:19, 175:1,
175:4, 175:16,
175:18, 175:20,
177:10, 177:13,
179:6, 179:9,
179:12, 179:14,
180:13, 181:9,
181:17, 181:19,

181:23, 182:3,
182:7, 182:9,
182:15, 182:19,
182:22, 182:24,
182:25, 183:7,
183:11, 183:15,
183:18, 183:21,
183:24, 184:2,
184:4, 184:16,
184:19, 184:22,
185:1, 185:6,
185:10, 185:13,
185:18, 185:21,
186:4, 186:15,
186:20, 186:22,
187:11, 187:12,
187:18, 188:10,
188:21, 189:6,
193:25, 203:3,
203:18, 209:15,
210:4, 210:8,
216:25, 220:4,
220:6, 220:10,
222:13, 222:16,
228:21, 228:25,
229:3, 229:5,
229:16, 229:20,
230:1, 230:5,
230:12, 230:14,
230:17, 233:6,
233:13, 234:14,
234:17, 242:13,
242:16, 243:10,
243:14, 244:2,
244:19, 253:12,
253:14, 253:19,
256:11, 256:14,
258:6, 258:8,
258:10, 264:19,
264:23, 264:25,
265:3, 265:21,
271:15, 271:18,
275:20, 275:23,
276:17, 276:19,
277:4, 277:7,
277:11, 278:2,
279:15, 280:21,
280:25, 281:3,
281:7, 281:12,
281:17, 282:7,
282:12, 282:17,
282:20, 282:23,
282:25, 283:3,
283:7, 283:11,
283:24, 284:8,
284:11, 284:16,
284:21, 285:1,
286:3, 286:21,
287:2, 287:13,
287:18, 287:20,
288:3, 288:6,

288:15, 288:18,
288:23, 288:25,
289:4, 289:10,
289:15, 289:18,
290:9, 290:12,
290:16, 290:18,
290:22, 290:23,
291:1, 291:9,
291:15, 292:17,
293:7, 293:12,
293:22, 294:7,
296:3, 296:6,
296:14, 296:21,
296:22, 296:24,
296:25, 297:25,
298:3, 298:4,
308:25, 309:13,
309:20, 309:22,
309:25, 310:5,
310:9, 310:11,
310:14, 316:19,
316:21, 316:25,
317:2, 317:8,
317:19, 318:3,
318:5, 318:21,
324:10, 324:15,
327:13, 327:16,
328:23, 328:25,
329:3, 329:5, 329:6,
330:10, 330:13,
332:17, 332:19,
332:21, 332:22,
332:25, 333:1,
340:6, 340:9,
340:12, 341:6,
341:10, 342:18,
342:21, 342:24,
358:12, 358:16,
360:3, 360:9,
360:15, 360:17,
360:22, 361:3,
361:11, 361:12,
363:1, 363:2, 363:5,
363:11, 363:14,
363:15, 363:19,
363:23, 364:3,
364:6, 364:15,
364:23, 365:13,
365:18, 365:23,
366:2, 366:6,
366:10, 366:16,
367:4, 367:6, 368:6,
368:17, 368:20,
368:22, 368:24,
369:8, 369:13,
369:16, 369:19,
369:23, 370:3,
370:6, 370:7,
370:19, 370:23,
371:1, 371:5, 371:9,
371:12, 371:16,

371:18, 371:22,
371:25, 372:6,
372:7, 372:8, 372:9,
372:11, 372:16,
372:19, 372:23,
372:25, 373:5,
373:8, 373:10,
373:13, 373:17,
373:20, 373:24,
374:3, 374:7,
374:11, 374:13,
374:15, 374:19,
374:24, 375:7,
375:10, 375:13,
375:16, 375:20,
375:23, 376:2,
376:5, 376:9,
376:12, 376:17,
376:21, 377:1,
377:4, 377:8,
377:11, 377:15,
377:17, 377:23,
378:2, 378:8,
378:11, 378:15,
378:18, 378:22,
379:1, 379:5, 379:8,
379:11, 379:13,
379:16, 379:19,
379:25, 380:6,
380:11, 380:15,
380:22, 380:25,
381:1, 381:8, 381:9,
381:12, 381:13,
381:24, 381:25,
382:10, 382:11,
382:13, 382:14,
383:3, 383:5, 383:7,
383:9, 383:10,
383:13, 383:15,
383:17, 383:18,
383:22, 384:5,
384:9, 384:14,
384:19, 384:24,
385:3, 385:7,
385:10, 385:13,
385:15, 385:19,
385:21, 385:24,
386:2, 386:4, 386:7,
386:10, 386:12,
386:14, 386:17,
386:19, 386:21,
387:5, 387:8,
387:16, 387:19,
388:15, 388:19,
388:22, 389:1,
389:5, 389:9,
389:13, 389:16,
389:20, 389:24,
390:3, 390:18,
390:21, 390:25,
391:3, 391:10,

391:11, 391:12,
391:22, 391:24,
391:25, 392:1,
392:8, 392:10,
392:14, 392:17,
392:21, 392:24,
393:3, 393:6,
393:13, 393:15,
393:18, 394:16,
394:19, 396:21,
403:3, 414:22,
428:6, 447:21,
447:22, 448:22,
448:24, 449:17,
449:18, 450:24,
451:1, 452:21,
452:22, 454:12,
454:14, 454:17,
455:13, 455:19,
456:17, 458:25,
459:8, 459:9,
459:11, 459:18,
459:23, 460:9,
460:12, 461:2, 461:7
**MS** [3] - 447:25, 448:3,
448:8
**mtruppert@gmail.**
  **com** [1] - 2:11
**multiple** [1] - 120:17
**Multiple** [1] - 379:15
**murder** [1] - 422:4
**muse** [1] - 442:4
**music** [5] - 193:9,
210:19, 320:8,
320:14
**must** [49] - 28:12,
30:18, 32:19, 33:3,
407:21, 418:8,
420:4, 421:8, 422:8,
422:25, 423:9,
423:16, 423:21,
424:7, 426:20,
427:2, 427:6,
427:13, 427:23,
429:15, 431:10,
432:13, 432:22,
433:20, 433:23,
435:10, 436:11,
437:1, 437:16,
437:19, 438:3,
440:10, 440:12,
440:19, 440:23,
441:9, 441:10,
441:13, 442:5,
442:6, 442:8,
443:21, 444:18,
444:21, 445:10,
445:16, 446:1, 447:8
**myriad** [1] - 368:3

# N

**name** [30] - 18:20,
26:9, 35:10, 44:25,
53:7, 53:8, 78:16,
86:16, 86:17, 92:10,
103:11, 118:23,
123:21, 123:22,
140:20, 188:24,
188:25, 231:24,
232:7, 244:7,
245:13, 245:15,
265:24, 265:25,
294:8, 300:12,
305:2, 306:5, 308:9,
332:15
**named** [6] - 126:17,
143:8, 248:22,
330:24, 375:21,
430:17
**names** [2] - 196:4,
200:10
**narcotics** [1] - 348:21
**narrative** [1] - 309:12
**narratives** [1] - 340:8
**narrow** [4] - 309:22,
310:15, 344:18,
346:5
**nasty** [1] - 242:21
**nature** [13] - 36:19,
62:7, 64:19, 70:18,
71:24, 95:21,
121:21, 124:22,
133:2, 191:1,
353:19, 433:9,
439:15
**NCI** [1] - 8:14
**NCIC** [3] - 5:21, 8:14,
9:8
**NE** [1] - 1:24
**near** [3] - 40:19,
222:3, 342:17
**nearby** [1] - 85:3
**nearly** [1] - 308:15
**neatly** [1] - 401:23
**necessarily** [3] -
161:6, 170:25,
392:19
**necessary** [12] - 33:8,
33:17, 99:20,
177:11, 279:24,
387:25, 422:2,
422:15, 424:22,
426:14, 428:11,
442:9
**necessitate** [1] -
24:20, 292:23
**neck** [2] - 180:10,
180:11

**need** [59] - 27:1, 27:2,
30:21, 32:1, 37:8,
39:6, 39:22, 42:12,
99:17, 105:17,
106:11, 107:17,
151:21, 174:21,
174:25, 204:7,
211:21, 212:3,
213:6, 226:24,
239:9, 252:9, 256:8,
276:8, 277:15,
282:18, 292:4,
300:23, 309:4,
309:5, 312:24,
317:16, 320:14,
321:10, 331:18,
331:24, 332:8,
333:20, 334:10,
351:25, 362:14,
363:7, 364:12,
370:1, 381:15,
401:21, 421:2,
423:11, 423:14,
427:4, 430:10,
431:5, 431:24,
434:12, 435:7,
435:20, 436:5,
446:11
**needed** [12] - 104:18,
122:5, 139:6,
139:10, 143:18,
218:16, 221:4,
305:12, 305:18,
311:6, 332:7, 343:14
**needing** [1] - 89:23
**needs** [16] - 60:3,
106:1, 111:8,
116:12, 191:12,
211:24, 254:9,
254:18, 265:3,
265:6, 304:11,
371:14, 371:20,
378:1, 378:9, 390:21
**nefarious** [1] - 417:15
**negative** [4] - 27:13,
188:6, 300:2, 300:3
**negligence** [1] -
412:18
**neighborhood** [2] -
42:9, 398:17
**never** [44] - 48:20,
49:3, 50:2, 50:3,
50:4, 50:12, 50:14,
60:11, 61:13,
113:10, 165:1,
165:10, 171:8,
187:25, 198:8,
217:25, 223:9,
230:22, 230:23,
236:19, 236:21,

240:25, 242:17,
248:24, 256:4,
259:22, 259:24,
260:1, 262:8,
264:13, 275:24,
276:4, 278:16,
351:9, 353:22,
355:20, 356:15,
356:16, 356:18,
388:16, 390:25,
405:21, 405:25,
409:25
**new** [9] - 111:12,
111:13, 193:19,
195:25, 299:22,
302:1, 302:5,
454:18, 456:9
**newly** [1] - 339:12
**news** [1] - 251:13
**next** [37] - 10:21,
52:16, 77:1, 84:19,
84:23, 88:19, 123:4,
134:11, 144:5,
147:14, 150:1,
160:4, 183:13,
187:16, 188:8,
221:25, 277:10,
297:23, 298:5,
298:6, 301:5,
304:22, 304:23,
309:9, 325:7,
326:15, 336:16,
360:7, 384:24,
398:19, 401:12,
402:11, 403:10,
410:22, 421:2,
431:4, 436:5
**nice** [2] - 143:14,
192:16
**night** [32] - 5:23, 7:25,
8:6, 8:21, 39:14,
39:25, 40:4, 41:6,
72:2, 73:3, 82:14,
88:17, 90:21, 92:5,
98:8, 102:10, 125:5,
149:15, 149:22,
154:7, 155:7,
156:24, 156:25,
289:17, 307:19,
308:24, 320:10,
337:21, 338:7,
366:17, 400:5
**nights** [1] - 121:5
**nighttime** [2] - 88:8,
90:20
**Nikon** [1] - 337:15
**nine** [1] - 40:4
**NO** [1] - 1:3
**nobody** [13] - 159:17,
236:6, 297:13,

299:22, 304:9,
330:19, 336:9,
368:7, 415:14,
455:23, 457:15,
457:16, 458:8
**nobody's** [1] - 398:12
**noise** [3] - 75:14,
75:15, 75:16
**non** [13] - 71:11,
207:19, 387:21,
393:7, 426:4, 426:5,
426:11, 427:1,
427:5, 427:15,
428:12, 429:6,
429:10
**non-accessory** [1] -
207:19
**non-deadly** [9] -
393:7, 426:4, 426:5,
426:11, 427:1,
427:5, 427:15,
429:6, 429:10
**non-issuing** [1] -
71:11
**non-scripted** [1] -
387:21
**NONE** [1] - 4:25
**none** [8] - 15:24,
183:1, 184:21,
288:9, 386:25,
387:1, 404:5, 454:12
**nonetheless** [2] -
373:6, 420:16
**nonexistent** [1] -
154:3
**nonresponsive** [3] -
327:14, 330:11,
340:7
**normal** [14] - 38:24,
66:13, 121:6, 169:4,
172:21, 197:22,
246:23, 247:2,
268:21, 311:19,
341:13, 430:9,
431:23
**normally** [1] - 201:24
**North** [1] - 2:3
**north** [3] - 89:2, 89:5,
89:6
**Notary** [1] - 1:21
**note** [7] - 25:21,
34:20, 370:15,
446:1, 446:12,
446:14, 447:12
**noted** [1] - 63:22
**notepad** [1] - 33:25
**notepads** [2] - 105:13,
362:18
**notes** [15] - 33:19,
33:22, 33:25, 34:1,

34:12, 34:15, 34:18,
34:19, 34:21, 34:23,
34:25, 35:1, 410:13,
448:12, 462:7
**nothing** [39] - 18:15,
21:8, 52:21, 79:9,
79:14, 80:10, 83:14,
84:8, 85:22, 122:19,
123:10, 154:23,
180:13, 183:6,
188:16, 199:5,
212:23, 229:1,
232:19, 243:19,
255:17, 258:6,
265:16, 271:15,
277:7, 292:2, 294:4,
309:16, 319:22,
320:10, 332:2,
332:9, 341:15,
354:1, 354:3,
356:10, 358:12,
396:3, 409:24
**notification** [2] -
71:25, 72:1
**notifications** [1] -
68:20
**notified** [4] - 69:5,
70:25, 71:20, 71:21
**notify** [3] - 70:24,
361:7, 362:4
**notifying** [1] - 30:18
**notwithstanding** [3] -
20:18, 22:3, 341:13
**nowadays** [1] - 152:12
**nowhere** [1] - 326:3
**nudged** [5] - 273:12,
273:15, 273:19,
275:25, 278:20
**num** [1] - 12:1
**Number** [14] - 44:9,
132:10, 144:11,
147:21, 150:8,
186:1, 299:4, 377:2,
377:6, 442:19, 452:6
**number** [33] - 5:19,
6:5, 8:22, 12:1, 12:2,
25:2, 32:4, 40:11,
43:24, 51:20, 61:22,
81:6, 85:4, 85:6,
118:23, 132:10,
186:9, 220:14,
224:3, 225:11,
291:10, 299:5,
370:2, 380:23,
439:13, 439:14,
442:18, 443:4,
442:18, 443:4,
459:10, 459:13
**Numbers** [4] - 93:5,
98:3, 134:18, 149:9

**numbers** [4] - 6:18, 129:14, 129:15, 283:23
**numeral** [2] - 244:10
**numerical** [2] - 144:5, 150:2
**numericals** [2] - 134:11, 149:2
**numerous** [1] - 316:2
**nursing** [2] - 305:16, 306:3

# O

**o'clock** [5] - 39:14, 40:4, 186:25, 305:20, 320:9
**oath** [6] - 22:21, 29:12, 161:11, 232:18, 278:25, 285:9
**object** [16] - 95:13, 156:16, 181:8, 182:16, 183:5, 183:13, 183:15, 233:11, 277:4, 316:19, 371:21, 373:3, 420:10, 420:15, 430:17, 435:14
**objection** [83] - 24:10, 32:25, 33:2, 33:4, 54:4, 71:6, 92:20, 96:3, 97:19, 97:20, 114:4, 114:10, 130:9, 133:5, 133:8, 134:12, 134:13, 144:6, 147:15, 147:16, 149:3, 150:3, 165:13, 175:1, 177:10, 210:4, 229:16, 230:1, 233:6, 233:10, 234:14, 253:12, 264:22, 296:3, 296:14, 308:25, 309:4, 316:25, 317:8, 317:16, 318:3, 327:13, 328:23, 330:10, 332:17, 332:25, 340:6, 361:1, 362:24, 363:1, 369:22, 370:1, 371:7, 372:24, 373:11, 373:16, 373:22, 374:17, 375:8, 375:12, 375:13, 375:25, 376:5,

376:7, 376:15, 376:16, 376:19, 376:21, 376:25, 378:13, 378:18, 379:7, 379:8, 379:10, 379:11, 379:12, 379:13, 379:15, 379:16, 379:18, 379:19, 381:12, 451:1
**objection's** [2] - 296:23, 310:13
**objections** [9] - 32:24, 63:22, 278:3, 361:10, 369:9, 371:3, 377:14, 448:20, 450:22
**obscene** [1] - 58:25
**obscured** [1] - 327:23
**observation** [4] - 430:9, 430:14, 431:23, 432:3
**observed** [1] - 92:1
**obtain** [2] - 129:9, 129:11
**obtained** [1] - 432:15
**obtains** [2] - 184:12, 433:6
**obviously** [5] - 15:11, 50:25, 259:1, 324:24, 348:9
**occupant** [1] - 434:18
**occur** [1] - 33:15
**occurred** [6] - 15:25, 33:4, 47:22, 125:15, 188:1, 453:4
**OF** [5] - 1:1, 1:1, 1:5, 1:11, 462:1
**Off-the-record** [1] - 105:20
**off-the-record** [1] - 265:11
**offender** [1] - 58:23, 59:10, 59:15, 60:10, 60:12, 60:14, 60:22, 61:19, 62:5, 62:19, 454:21
**offense** [14] - 185:9, 403:25, 421:17, 426:2, 433:13, 433:17, 441:25, 442:2, 442:25, 443:9, 444:8, 456:9, 458:21, 459:21
**offenses** [2] - 24:19, 280:4
**offer** [1] - 212:20
**offered** [5] - 20:10, 36:13, 206:1, 332:24, 439:14

**offers** [2] - 36:19, 36:20
**office** [28] - 4:14, 4:16, 4:17, 41:14, 41:18, 53:23, 77:23, 78:3, 87:6, 87:15, 87:17, 87:19, 93:24, 116:3, 116:5, 117:15, 117:19, 120:11, 121:23, 134:4, 134:8, 137:14, 137:23, 137:25, 153:17, 160:5, 170:9, 367:17
**Office** [5] - 2:3, 87:8, 124:1, 138:9, 138:17
**officer** [43] - 37:23, 39:20, 41:11, 49:9, 54:10, 54:16, 56:6, 69:8, 70:23, 72:2, 86:20, 86:25, 91:12, 98:18, 100:21, 115:17, 116:10, 116:21, 127:13, 127:20, 139:16, 139:21, 152:12, 163:20, 231:17, 231:21, 237:5, 287:7, 289:23, 327:25, 334:23, 337:2, 337:8, 337:19, 338:2, 340:3, 353:22, 355:19, 355:23, 355:24, 415:3, 415:15, 434:21
**officers** [13] - 41:1, 50:24, 57:24, 58:1, 163:13, 230:24, 231:15, 337:21, 337:22, 337:25, 338:3, 400:4, 417:14
**offices** [1] - 8:4
**old** [13] - 41:23, 42:11, 50:1, 111:16, 192:17, 199:17, 245:24, 263:24, 294:10, 294:11, 301:25, 302:4, 368:14
**older** [1] - 192:19
**omit** [1] - 381:20
**omitted** [1] - 287:5
**omitting** [1] - 285:12
**on-call** [2] - 69:7, 72:2
**on-scene** [1] - 152:2
**once** [16] - 29:15, 29:20, 34:14, 35:10, 41:17, 55:24, 73:17, 116:16, 117:11,

119:17, 131:10, 140:24, 152:8, 254:1, 268:23, 348:15
**One** [4] - 420:6, 429:16, 432:14, 433:25
**one** [176] - 6:11, 6:12, 6:19, 9:24, 10:4, 10:7, 10:10, 10:19, 12:1, 14:18, 15:1, 15:6, 17:5, 17:17, 20:9, 28:23, 30:6, 31:15, 34:9, 35:14, 38:10, 39:4, 39:11, 39:24, 40:10, 41:5, 46:23, 52:2, 60:3, 61:22, 64:8, 71:16, 74:25, 80:9, 84:21, 85:18, 91:11, 94:23, 96:9, 98:12, 98:19, 101:13, 115:20, 115:22, 116:2, 116:4, 116:8, 119:8, 119:25, 120:16, 120:21, 132:18, 132:19, 132:21, 135:5, 139:17, 143:15, 147:14, 151:1, 153:11, 155:9, 181:15, 181:20, 186:24, 190:4, 194:1, 194:18, 195:3, 195:6, 195:13, 203:6, 205:6, 205:9, 206:1, 208:3, 208:4, 211:15, 211:16, 219:5, 220:19, 223:13, 226:13, 227:8, 228:4, 228:25, 229:11, 245:12, 245:22, 246:19, 247:4, 247:12, 253:3, 256:17, 258:2, 260:5, 280:4, 281:19, 282:10, 284:6, 284:10, 287:14, 291:10, 297:7, 297:16, 297:17, 300:20, 302:1, 302:5, 314:2, 322:18, 326:12, 337:15, 337:25, 338:4, 343:9, 345:8, 347:12, 349:13, 367:17, 372:6, 372:9, 372:10, 372:13, 375:17, 380:22, 382:4,

382:24, 384:4, 384:24, 386:19, 388:25, 390:12, 390:14, 395:12, 396:9, 397:6, 397:20, 400:15, 402:17, 404:3, 404:4, 404:5, 404:6, 404:16, 410:22, 414:6, 414:22, 415:25, 416:1, 416:6, 417:25, 418:4, 431:12, 435:21, 437:25, 438:1, 441:19, 442:7, 442:12, 442:20, 442:21, 443:22, 444:21, 445:12, 456:7, 460:18
**one's** [2] - 34:17, 384:6
**ones** [2] - 32:5, 114:20, 116:22, 378:24, 380:23
**ongoing** [3] - 34:4, 97:16, 411:11
**open** [19] - 13:5, 75:10, 76:13, 144:14, 195:14, 252:22, 253:3, 269:5, 271:22, 275:12, 302:14, 312:18, 313:14, 314:1, 318:16, 320:21, 446:21, 450:1, 450:2
**opened** [9] - 141:9, 240:4, 268:4, 269:7, 272:1, 272:8, 278:19, 288:21, 408:20
**opening** [9] - 29:4, 29:5, 29:10, 35:6, 239:25, 395:7, 408:18, 408:22, 435:8
**opens** [5] - 12:23, 13:6, 42:4, 275:16, 416:16
**operate** [3] - 179:15, 179:17, 312:15
**operates** [1] - 122:6
**operating** [1] - 176:5
**opinion** [1] - 29:23
**opportunity** [9] - 8:21, 29:3, 52:24, 239:24, 280:16, 402:18, 403:8, 410:6, 438:23
**opposed** [2] - 59:18,

140:3
**opposite** [4] - 285:24, 308:17, 308:19, 314:17
**option** [4] - 118:2, 281:1, 359:6, 444:1
**options** [8] - 359:8, 376:3, 442:22, 443:1, 443:6, 443:14, 443:22, 444:2
**or..** [1] - 207:25
**oral** [1] - 24:7
**orally** [3] - 446:20, 450:1, 450:2
**ordeal** [1] - 213:12
**order** [37] - 9:9, 11:24, 14:10, 24:7, 36:4, 36:21, 40:12, 53:25, 55:14, 56:2, 56:3, 65:16, 72:23, 88:1, 95:17, 120:3, 124:13, 126:20, 142:1, 143:25, 197:22, 200:14, 207:3, 208:2, 213:7, 213:16, 301:9, 301:11, 304:24, 403:14, 414:9, 417:9, 434:24, 440:11, 453:5, 458:17
**ordered** [1] - 26:19
**orderly** [1] - 33:18
**ordinary** [13] - 181:25, 184:5, 420:13, 430:3, 430:7, 430:8, 430:14, 431:16, 431:21, 431:22, 432:3, 432:9, 435:16
**ore** [2] - 10:23, 11:11
**organized** [1] - 445:3
**orientation** [1] - 57:10
**orig** [1] - 219:24
**original** [2] - 371:23, 372:4
**otherwise** [7] - 58:21, 384:2, 388:4, 390:5, 394:12, 422:19, 423:23
**ourself** [1] - 316:10
**outbuildings** [1] - 435:5
**outcomes** [1] - 22:8
**outrage** [1] - 319:4
**outside** [36] - 33:9, 36:22, 43:7, 47:22, 50:1, 85:16, 91:1, 113:18, 140:18, 201:18, 206:18,

212:18, 222:7, 243:13, 254:14, 257:18, 261:24, 261:25, 262:17, 263:22, 264:8, 265:12, 270:9, 273:7, 277:15, 291:24, 292:15, 325:22, 334:8, 350:2, 350:12, 357:25, 392:22, 445:14
**outward** [2] - 271:23, 275:16
**outweighs** [2] - 14:25, 285:17
**overall** [1] - 49:8
**overcome** [2] - 437:5, 437:8
**overlap** [1] - 28:23
**overrule** [2] - 15:4, 16:20
**overruled** [9] - 54:6, 71:8, 95:20, 130:11, 133:8, 210:6, 253:15, 277:6, 296:23
**oversee** [2] - 87:20, 119:2
**own** [22] - 37:7, 37:8, 56:4, 56:5, 89:11, 89:12, 117:2, 119:10, 119:14, 192:3, 210:23, 211:3, 211:7, 230:7, 249:6, 283:2, 297:18, 299:12, 316:23, 402:8, 412:23, 440:5
**owned** [1] - 203:7
**owner** [5] - 111:6, 415:22, 434:17, 434:20, 434:23
**ownership** [1] - 100:7
**owning** [1] - 58:24
**owns** [1] - 295:23

**P**

**p-a-r-d-e-k-o-o-p-e-r** [1] - 189:5
**p.m** [9] - 71:23, 71:24, 73:13, 76:4, 88:18, 90:19, 125:6, 186:25, 187:2
**packet** [1] - 436:22
**packets** [2] - 436:23, 442:12
**pads** [1] - 277:18

**Page** [19] - 3:2, 22:20, 369:24, 374:6, 375:12, 376:6, 380:1, 380:5, 380:6, 381:4, 382:17, 383:12, 383:16, 384:17, 386:11, 387:17, 390:20, 391:6, 393:10
**page** [16] - 369:21, 369:22, 371:6, 372:20, 374:17, 384:10, 384:19, 386:17, 386:22, 387:17, 389:22, 390:18, 391:7, 392:2
**pages** [2] - 376:16, 411:4
**paid** [7] - 193:14, 241:17, 299:12, 305:4, 305:6, 320:18, 396:2
**pains** [1] - 106:5
**pair** [1] - 227:14
**panel** [1] - 203:23
**pants** [2] - 261:14, 335:13
**paragraph** [21] - 182:12, 373:2, 373:3, 380:5, 380:16, 381:2, 381:7, 384:17, 384:20, 384:22, 387:21, 388:9, 388:10, 388:12, 389:16, 389:22, 391:7, 391:16, 392:4, 393:10, 435:20
**paragraphs** [5] - 376:24, 378:14, 389:7, 389:12, 393:1
**parallel** [1] - 312:19
**pardekooper** [3] - 14:22, 16:7, 432:16
**PARDEKOOPER** [1] - 3:15
**Pardekooper** [187] - 4:7, 4:8, 4:9, 4:10, 5:20, 7:2, 8:7, 12:8, 13:2, 13:22, 14:17, 15:17, 16:2, 35:22, 36:13, 36:19, 37:3, 37:5, 38:11, 38:13, 38:19, 38:23, 39:7, 41:7, 43:5, 43:16, 43:23, 44:11, 44:12, 45:4, 45:5, 45:9, 45:13, 45:20, 45:24, 46:2, 46:4, 46:9,

46:10, 46:22, 47:7, 47:14, 47:16, 48:2, 48:4, 48:9, 48:15, 48:17, 48:18, 48:21, 49:15, 49:17, 81:25, 92:13, 92:14, 93:12, 94:9, 96:20, 112:5, 112:23, 113:11, 113:16, 114:9, 115:2, 115:6, 129:21, 130:16, 148:24, 151:5, 153:4, 156:2, 156:4, 156:6, 156:17, 161:3, 161:16, 161:21, 165:2, 165:4, 165:7, 165:10, 178:22, 179:5, 180:10, 188:11, 189:1, 189:4, 229:6, 233:11, 243:11, 248:11, 248:20, 250:22, 251:17, 286:21, 288:6, 294:12, 295:3, 295:10, 297:15, 299:7, 299:15, 301:21, 301:22, 302:8, 303:15, 304:13, 305:7, 310:3, 310:17, 311:3, 311:4, 311:10, 316:17, 318:22, 319:7, 322:13, 322:20, 322:25, 324:19, 325:15, 326:7, 338:17, 339:2, 339:4, 339:12, 339:20, 340:16, 341:11, 343:7, 343:21, 348:6, 356:14, 356:17, 358:18, 359:1, 359:18, 359:22, 360:1, 368:12, 382:4, 392:7, 400:2, 400:24, 401:13, 402:2, 405:11, 405:18, 405:21, 405:22, 406:2, 407:20, 408:3, 410:9, 410:18, 411:3, 411:12, 411:18, 413:10, 414:8, 415:5, 415:10, 415:19, 420:8, 421:11, 422:8, 422:11, 423:2, 423:5,

424:10, 424:15, 424:17, 424:23, 425:6, 425:14, 426:12, 426:20, 426:23, 428:1, 428:8, 428:13, 428:20, 429:2, 432:18, 457:4, 457:12
**Pardekooper's** [14] - 9:25, 15:22, 43:17, 45:10, 47:11, 156:10, 160:10, 160:17, 310:5, 349:18, 414:10, 426:15, 449:9, 450:9
**Pardekopper's** [1] - 13:23
**parent** [1] - 42:13
**parents** [1] - 267:12
**park** [6] - 139:5, 196:12, 200:4, 306:4, 306:6, 352:21
**parked** [3] - 254:17, 267:23, 312:19
**Parker** [1] - 304:25
**parole** [1] - 101:16
**part** [38] - 45:17, 65:9, 67:18, 79:13, 98:24, 111:7, 111:10, 139:10, 233:4, 233:8, 283:14, 294:19, 294:20, 305:5, 311:11, 312:21, 313:21, 313:22, 317:18, 343:18, 343:22, 345:25, 349:25, 350:3, 350:7, 350:14, 351:1, 368:20, 371:9, 378:13, 381:1, 381:3, 381:15, 383:19, 396:5, 404:9, 440:7
**participate** [1] - 441:17
**particular** [35] - 20:9, 29:20, 33:7, 37:2, 56:8, 64:17, 64:22, 73:20, 79:6, 88:15, 90:5, 92:5, 92:11, 101:16, 125:1, 129:22, 136:6, 141:2, 153:24, 163:15, 164:13, 165:22, 166:25, 177:2, 191:14, 192:13, 193:17, 195:11, 198:9,

204:16, 223:1,
283:5, 283:9,
283:10, 341:12
**particularized** [1] -
112:1
**particularly** [1] -
111:12
**parts** [3] - 301:15,
301:19, 303:11
**pass** [2] - 32:5, 342:18
**passed** [5] - 209:4,
254:3, 260:22,
276:1, 278:20
**passenger** [2] - 320:3,
320:21
**passenger's** [3] -
216:1, 314:8, 320:20
**passing** [1] - 248:24
**past** [5] - 39:14,
218:14, 358:22,
362:7
**patrol** [10] - 88:1, 91:5,
91:8, 104:7, 104:16,
117:17, 117:18,
117:19, 118:24,
412:23
**patrolling** [1] - 88:11
**patterson** [1] - 308:10
**pause** [2] - 105:10,
317:16
**pavilion** [2] - 333:18,
333:22
**pawn** [2] - 312:2,
312:5
**pay** [5] - 191:7, 226:6,
249:1, 250:24,
419:20
**paying** [6] - 213:23,
214:20, 216:4,
216:5, 299:10, 324:7
**peaceful** [1] - 458:1
**pen** [2] - 33:25, 366:25
**penalties** [1] - 19:14
**pending** [2] - 298:1,
309:11
**pens** [1] - 424:18
**people** [57] - 35:19,
35:20, 36:9, 36:12,
37:16, 53:14, 80:22,
88:13, 100:10,
119:5, 121:5, 121:7,
122:5, 127:10,
141:4, 190:22,
191:5, 191:18,
199:20, 236:3,
246:3, 246:4,
246:10, 297:6,
307:5, 313:10,
316:15, 318:10,
321:25, 330:5,

330:6, 330:7, 330:8,
331:13, 332:21,
344:13, 352:24,
359:9, 396:12,
397:7, 397:8,
397:23, 398:1,
398:10, 398:25,
399:19, 400:9,
400:10, 400:11,
408:12, 411:22,
416:19, 453:22,
457:3, 457:11
**People** [1] - 36:10
**people's** [1] - 100:12
**percent** [2] - 202:22,
203:1
**perfect** [5] - 62:15,
362:3, 397:12,
398:22, 400:6
**perhaps** [2] - 309:17,
358:17
**period** [8] - 42:23,
54:12, 54:24, 70:11,
109:2, 267:21,
415:18
**peripheral** [3] -
215:22, 215:24,
216:11
**perjuriously** [1] -
19:19
**perjury** [1] - 19:13
**permanent** [1] - 435:4
**permanently** [1] -
432:18
**permission** [11] -
56:12, 68:3, 68:4,
86:4, 145:10, 223:7,
399:2, 434:7,
434:17, 434:19,
436:19
**permit** [1] - 30:23
**permitted** [2] - 32:17,
33:6
**persist** [1] - 31:3
**persisted** [1] - 236:15
**person** [88] - 39:17,
39:18, 39:19, 41:3,
53:22, 54:9, 56:14,
57:3, 57:15, 65:2,
67:14, 68:21, 69:12,
90:7, 92:11, 93:20,
93:22, 93:23, 103:9,
103:12, 111:8,
112:18, 116:25,
117:8, 144:1, 146:8,
148:7, 179:18,
181:22, 181:25,
184:5, 184:6,
195:20, 228:15,
238:13, 257:21,

258:1, 258:2, 271:3,
271:7, 271:8, 272:8,
295:1, 297:18,
302:6, 344:6,
350:20, 351:10,
408:22, 414:6,
414:24, 416:1,
416:8, 423:17,
424:25, 425:4,
425:8, 427:7,
428:14, 428:18,
428:21, 430:2,
430:4, 430:5, 430:8,
430:16, 431:13,
431:15, 431:16,
431:19, 431:20,
431:22, 432:7,
432:9, 433:3, 434:6,
434:16, 434:18,
434:19, 436:18,
437:12, 445:14,
445:17, 447:24,
456:22, 457:18
**person's** [1] - 37:14
**personal** [3] - 34:2,
111:5, 296:15
**personally** [2] - 31:17,
288:8
**personnel** [1] - 175:14
**persons** [2] - 54:11,
99:13
**perusing** [11] -
109:16, 129:18,
132:14, 133:19,
148:3, 220:12,
220:16, 222:21,
224:6, 263:25, 342:8
**petit** [6] - 10:5, 185:9,
185:24, 279:22,
280:17, 376:4
**petit-theft** [2] -
279:22, 280:17
**phone** [68] - 11:19,
12:2, 12:12, 13:16,
13:18, 14:2, 15:8,
16:22, 37:4, 37:7,
37:20, 40:14, 45:24,
45:25, 63:3, 64:10,
66:3, 74:11, 74:13,
75:19, 81:5, 81:12,
106:1, 191:18,
194:21, 202:22,
202:25, 203:5,
203:6, 203:11,
203:20, 204:8,
204:17, 205:16,
205:22, 207:13,
208:8, 208:9, 211:9,
211:10, 211:14,
211:16, 212:2,

213:4, 213:8,
239:16, 240:1,
242:11, 270:17,
270:19, 302:17,
312:23, 312:24,
312:25, 313:2,
313:4, 313:12,
314:1, 314:2,
314:14, 314:19,
315:6, 315:16,
354:5, 415:2
**phones** [20] - 31:6,
31:22, 36:10, 36:18,
36:21, 37:2, 45:15,
81:4, 193:9, 207:25,
208:11, 209:23,
211:12, 211:13,
211:14, 220:1,
313:2, 361:9, 362:1,
446:3
**phonetic** [7] - 35:20,
84:24, 105:16,
120:15, 196:10,
305:2, 345:12
**photograph** [26] - 4:7,
4:8, 4:9, 4:10, 4:11,
4:12, 4:14, 4:15,
4:17, 4:20, 4:21,
100:4, 109:15,
109:16, 148:2,
151:21, 161:10,
220:15, 220:16,
224:5, 224:6,
224:10, 342:6,
342:8, 342:21,
342:22
**photographs** [28] -
23:13, 91:21, 91:22,
92:7, 92:8, 93:3,
97:7, 97:8, 97:15,
98:1, 129:16,
129:19, 132:12,
132:14, 133:18,
133:19, 134:1,
134:3, 134:16,
134:22, 134:23,
148:3, 149:7,
151:19, 220:8,
220:12, 222:20,
222:21
**phrase** [2] - 233:12,
234:16
**phrased** [1] - 329:2
**physical** [9] - 104:13,
151:13, 252:17,
345:19, 347:2,
392:25, 425:12,
428:25, 447:15
**physically** [3] -
354:21, 430:5,

431:20
**pick** [11] - 48:3,
236:23, 238:10,
295:2, 305:14,
307:25, 308:4,
314:19, 343:10,
359:5, 405:22
**picked** [10] - 49:25,
95:11, 95:25,
165:11, 221:19,
224:14, 233:15,
238:21, 305:15,
405:23
**picket** [1] - 91:9
**picking** [1] - 250:3
**picks** [2] - 46:11,
326:21
**pickup** [10] - 36:15,
192:10, 192:13,
192:17, 192:22,
193:2, 195:10,
203:10, 205:3,
205:17
**picture** [27] - 17:10,
17:11, 38:7, 46:12,
46:16, 109:9,
109:14, 109:17,
109:25, 110:14,
110:15, 110:17,
110:24, 111:2,
111:14, 129:21,
135:6, 136:11,
148:8, 155:13,
155:14, 155:16,
155:18, 155:19,
155:21, 161:12,
219:10
**pictures** [38] - 39:9,
112:5, 112:7, 130:3,
132:18, 133:22,
133:23, 135:5,
210:19, 226:25,
239:1, 239:4,
286:11, 286:14,
286:17, 286:20,
286:22, 287:6,
287:22, 288:13,
288:20, 289:1,
289:5, 289:6,
289:11, 289:12,
289:25, 313:8,
326:25, 337:14,
338:19, 338:22,
339:3, 339:5,
339:24, 353:18,
397:19
**picturing** [1] - 144:23
**piece** [3] - 213:10,
225:16, 225:18
**pieces** [2] - 63:17,

326:24
**pile** [6] - 40:19, 40:21, 76:8, 76:10, 76:12, 76:20
**pinpoint** [1] - 75:6
**pipe** [2] - 307:9, 347:5
**pissed** [1] - 217:12
**pit** [1] - 245:25
**place** [42] - 22:21, 35:17, 35:21, 38:23, 40:5, 40:6, 93:16, 103:5, 113:13, 117:8, 165:22, 175:22, 175:25, 190:22, 195:8, 197:9, 199:19, 210:18, 221:13, 221:20, 226:17, 242:10, 246:7, 247:1, 247:24, 267:5, 267:22, 268:24, 312:22, 346:18, 357:10, 357:12, 380:18, 388:5, 402:23, 406:21, 416:3, 422:20, 423:24, 433:13
**PLACE** [1] - 1:14
**Place** [1] - 443:2
**placed** [7] - 53:14, 66:1, 66:2, 118:9, 118:12, 120:1, 405:25
**places** [4] - 39:13, 90:12, 220:18, 316:2
**placing** [2] - 119:15, 171:1
**Plaintiff** [1] - 1:6
**plan** [3] - 26:24, 298:10, 352:25
**planning** [1] - 15:15
**plans** [1] - 225:9
**plastic** [1] - 118:15
**play** [5] - 19:13, 207:25, 251:11, 283:13, 456:23
**player** [2] - 197:17, 313:5
**players** [2] - 81:18, 81:21
**playing** [4] - 112:21, 202:11, 251:11, 323:10
**plea** [1] - 436:25
**Pleas** [1] - 376:18
**pleasure** [1] - 26:5
**plenty** [1] - 8:20
**plug** [6] - 36:16, 207:13, 208:2,

313:2, 313:19, 314:13
**plugged** [4] - 36:5, 36:6, 208:13, 208:19
**plugging** [3] - 208:3, 208:12, 209:22
**plugs** [1] - 314:14
**PN** [1] - 81:20
**pocket** [16] - 146:18, 146:19, 146:20, 172:9, 172:16, 172:24, 172:25, 176:25, 213:8, 335:18, 338:22, 357:20, 357:22, 357:24, 358:3, 417:22
**pockets** [5] - 38:14, 43:14, 46:5, 227:8, 315:24
**point** [119] - 16:5, 16:19, 26:24, 36:11, 38:11, 38:13, 39:4, 40:3, 45:5, 45:23, 46:10, 47:2, 48:6, 50:10, 51:5, 54:22, 59:13, 68:12, 71:1, 79:20, 90:4, 94:1, 95:14, 96:17, 98:23, 100:1, 100:11, 100:24, 100:25, 101:5, 102:7, 102:10, 104:8, 114:20, 115:18, 116:11, 121:22, 122:8, 126:15, 127:12, 128:17, 128:23, 129:1, 129:3, 131:8, 131:24, 132:6, 133:10, 135:19, 135:22, 137:4, 137:11, 138:7, 142:2, 142:3, 142:5, 145:25, 148:24, 154:9, 156:20, 156:21, 158:4, 161:23, 167:2, 167:8, 171:8, 196:18, 201:14, 202:18, 204:12, 209:2, 210:14, 212:20, 215:6, 219:14, 225:3, 228:18, 230:13, 239:22, 245:23, 246:15, 248:20, 254:22, 254:24, 262:25, 284:24, 285:13, 289:9,

292:15, 303:14, 333:5, 334:13, 336:3, 336:5, 338:10, 343:20, 344:5, 344:25, 345:13, 345:21, 346:17, 347:1, 347:9, 347:23, 348:6, 348:11, 349:23, 354:22, 355:13, 355:17, 369:6, 370:12, 394:22, 398:12, 402:15, 417:6, 455:6
**pointed** [3] - 142:4, 370:8, 399:5
**pointing** [4] - 169:6, 169:7, 170:23, 337:7
**points** [3] - 75:5, 340:18, 340:21
**poled** [1] - 452:20
**police** [39] - 41:1, 42:20, 43:7, 43:8, 48:18, 50:8, 82:21, 86:20, 86:23, 89:9, 104:11, 124:14, 124:16, 223:17, 225:5, 225:7, 230:18, 231:15, 256:5, 261:6, 264:13, 275:24, 286:23, 286:24, 302:12, 332:7, 338:6, 338:12, 338:13, 339:8, 354:22, 355:2, 356:4, 358:4, 366:17, 399:12, 400:4, 417:13
**Police** [1] - 87:2
**policies** [1] - 176:16
**policy** [3] - 175:25, 176:6, 176:7
**Polk** [2] - 5:25, 8:7
**pond** [8] - 190:14, 298:9, 299:9, 301:2, 301:3, 329:8, 329:10, 352:11
**poor** [4] - 398:9, 406:16, 416:1, 457:17
**pop** [2] - 213:11, 300:25
**pop-up** [1] - 300:25
**pops** [1] - 336:17
**porn** [3] - 61:11, 61:12, 61:13
**pornographic** [2] - 58:25, 60:2
**pornography** [3] -

62:20, 63:3, 454:23
**portion** [7] - 110:18, 371:11, 371:12, 382:15, 385:23, 387:2, 459:16
**portions** [4] - 148:9, 186:6, 186:12, 384:1
**portrayed** [1] - 130:1
**pose** [1] - 353:11
**posed** [1] - 353:11
**position** [9] - 59:22, 74:9, 74:10, 231:14, 325:19, 330:18, 390:17, 405:1, 414:11
**positive** [2] - 300:4, 304:6
**possess** [2] - 56:3, 56:4
**possessing** [1] - 58:24
**possession** [27] - 13:24, 28:5, 43:25, 56:15, 58:9, 58:13, 64:11, 83:19, 354:10, 370:17, 375:3, 402:25, 407:13, 419:25, 433:1, 433:4, 434:2, 436:15, 443:7, 449:8, 450:8, 452:11, 454:22, 455:9, 456:10, 456:11, 458:19
**Possession** [4] - 370:10, 429:14, 431:7, 431:9
**possibility** [3] - 420:20, 430:22, 435:23
**possible** [12] - 62:2, 95:3, 112:25, 118:4, 153:1, 170:1, 197:23, 254:10, 335:17, 397:17, 418:6, 437:17
**possibly** [10] - 14:16, 47:1, 56:17, 56:20, 65:7, 69:1, 71:2, 152:21, 358:19
**post** [2] - 289:2, 289:17
**post-medical** [1] - 289:17
**post-treatment** [1] - 289:2
**potential** [3] - 12:16, 22:8, 293:10
**potentially** [6] - 11:21, 17:1, 19:16, 19:21,

103:6, 278:7
**pounds** [6] - 285:18, 351:20, 351:21, 351:22, 351:24, 417:7
**power** [8] - 36:3, 36:6, 203:23, 312:3, 312:6, 312:11, 312:13, 366:24
**power's** [1] - 204:14
**practitioner** [1] - 58:22
**precious** [4] - 203:6, 353:21, 354:20, 416:6
**predicate** [1] - 310:23
**predicated** [1] - 12:11
**predict** [2] - 33:13, 362:8
**prefer** [1] - 72:10
**preferred** [2] - 377:3, 441:19
**prejudice** [6] - 12:22, 59:17, 59:20, 368:6, 368:17, 441:13
**prejudiced** [2] - 59:23, 288:19
**prejudicial** [3] - 14:24, 14:25, 59:11
**prejudicing** [1] - 367:12
**preliminary** [1] - 5:13
**preparation** [3] - 139:20, 139:22, 367:13
**prepare** [1] - 18:8
**prepared** [4] - 139:23, 142:8, 293:6, 442:10
**presence** [6] - 30:24, 31:1, 114:9, 198:14, 277:16, 307:6
**present** [36] - 5:5, 5:6, 5:8, 15:21, 23:11, 23:22, 23:23, 26:2, 50:17, 82:6, 106:19, 106:20, 107:22, 187:6, 187:7, 187:22, 193:21, 193:23, 291:5, 291:6, 360:23, 364:18, 367:22, 369:5, 394:2, 394:15, 394:18, 415:25, 437:13, 445:13, 449:5, 449:6, 451:7, 451:8, 451:14
**presented** [7] - 6:23, 29:7, 29:16, 290:2, 290:3, 439:16,

450:14
**presenting** [1] - 15:15
**preserve** [4] - 50:18,
166:14, 278:6, 454:1
**preserved** [2] -
175:23, 413:6
**preside** [1] - 445:1
**presided** [1] - 26:8
**pressure** [1] - 377:20
**presume** [1] - 437:1
**presumption** [2] -
437:2, 437:8
**pretrial** [1] - 15:13
**pretty** [22] - 10:11,
108:17, 152:12,
170:3, 217:15,
270:5, 273:15,
274:15, 276:6,
290:8, 307:10,
317:24, 320:13,
321:8, 334:19,
370:21, 381:7,
400:25, 408:10,
442:16
**prevent** [6] - 11:13,
387:25, 404:20,
405:11, 422:2,
422:15
**previous** [3] - 124:5,
210:7, 249:13
**previously** [4] - 87:4,
184:14, 427:11,
433:8
**primary** [1] - 98:18
**principles** [1] - 28:24
**priors** [1] - 454:22
**prison** [5] - 19:21,
214:15, 214:16,
246:11, 328:19
**privacy** [1] - 454:2
**private** [1] - 453:10
**privilege** [3] - 35:12,
45:1, 453:12
**privileges** [1] - 453:2
**privy** [1] - 365:11
**prized** [1] - 195:7
**probation** [87] - 12:18,
14:15, 37:13, 37:14,
37:16, 37:19, 37:23,
39:20, 41:11, 48:8,
53:15, 53:16, 53:21,
53:23, 53:25, 54:10,
54:12, 54:16, 54:24,
55:15, 56:6, 56:18,
56:21, 56:24, 56:25,
57:16, 57:25, 58:15,
59:9, 59:10, 59:14,
59:16, 59:19, 60:11,
60:12, 60:15, 60:22,
61:1, 61:20, 61:24,

62:5, 62:16, 62:19,
64:4, 64:25, 65:8,
65:19, 67:2, 67:18,
70:23, 71:12, 71:17,
80:22, 81:6, 81:10,
83:11, 83:24,
100:21, 101:16,
127:13, 127:20,
153:7, 302:18,
302:25, 303:3,
327:23, 327:25,
344:12, 344:21,
346:1, 346:18,
353:22, 354:5,
355:18, 355:23,
399:20, 406:14,
415:3, 415:12,
415:15, 455:3,
455:14, 456:6, 458:5
**probationer** [2] -
57:18, 84:3
**probations** [1] - 458:6
**probative** [3] - 12:23,
14:23, 14:24
**problem** [9] - 50:12,
63:10, 198:5,
235:23, 236:2,
236:21, 301:14,
308:3, 391:3
**problems** [7] - 236:10,
236:11, 306:25,
411:13, 412:20,
412:21, 413:1
**procedure** [7] - 32:23,
116:17, 143:24,
151:17, 152:8,
176:2, 176:5
**proceed** [7] - 5:9,
5:11, 23:15, 28:25,
367:21, 396:20,
454:10
**proceeding** [4] -
19:14, 32:12, 49:12,
429:22
**PROCEEDINGS** [1] -
1:12
**proceedings** [2] -
34:21, 293:4
**Proceedings** [1] -
1:19
**process** [7] - 38:18,
53:21, 101:25,
137:16, 311:11,
362:5, 367:6
**processing** [1] - 368:7
**procure** [1] - 56:11
**procuring** [1] - 56:5
**produce** [1] - 52:7
**produced** [1] - 29:14
**production** [1] -

287:19
**Professional** [1] -
462:3
**professional** [1] - 49:9
**professionals** [1] -
112:6
**profile** [1] - 192:15
**program** [3] - 58:22,
58:23, 303:21
**prohibit** [1] - 58:23
**promise** [1] - 33:14
**promised** [1] - 283:8
**prongs** [1] - 180:4
**pronounce** [1] - 78:15
**pronouncing** [1] -
429:23
**proof** [6] - 28:16,
374:21, 381:21,
382:7, 438:7, 439:12
**Proof** [1] - 433:1
**proper** [8] - 9:9, 32:25,
67:12, 121:10,
162:10, 439:25,
441:7, 451:24
**properly** [6] - 50:18,
73:1, 179:20, 262:1,
262:18, 264:12
**property** [39] - 57:4,
57:15, 57:20, 98:22,
100:11, 100:12,
111:5, 118:9,
118:13, 184:13,
184:24, 190:13,
212:21, 226:16,
226:18, 299:11,
305:3, 305:5,
329:25, 330:1,
356:14, 356:15,
408:7, 420:1,
432:16, 432:19,
432:24, 433:2,
433:4, 433:5, 433:7,
433:10, 433:13,
433:16, 433:17,
434:24, 443:23,
443:24
**proposed** [1] - 379:23
**prosecutor** [1] -
396:24
**protect** [2] - 347:5,
399:3
**prove** [28] - 14:5,
32:15, 382:1,
403:24, 404:9,
404:16, 420:3,
420:4, 421:7, 421:8,
422:6, 422:23,
424:6, 424:7,
426:18, 427:20,
427:21, 427:23,

429:13, 429:15,
431:10, 432:13,
433:22, 433:24,
436:10, 436:11,
437:14
**proved** [8] - 28:10,
425:24, 429:12,
431:4, 432:23,
435:11, 436:4, 438:2
**proven** [13] - 279:19,
280:5, 377:12,
382:3, 403:19,
414:11, 421:1,
422:8, 422:25,
426:20, 441:5,
442:1, 442:2
**provide** [1] - 24:8
**provided** [8] - 10:3,
10:6, 18:6, 19:4,
25:4, 26:18, 33:24,
106:22
**provider** [1] - 58:22
**providing** [1] - 71:10
**province** [2] - 28:21
**proving** [1] - 437:10
**prudent** [2] - 423:17,
427:7
**public** [2] - 214:8,
434:25
**Public** [1] - 1:21
**publish** [7] - 93:7,
98:5, 135:2, 145:8,
149:10, 150:16,
452:1
**publishing** [1] -
451:25
**pull** [7] - 51:13, 91:5,
168:24, 240:10,
331:8, 396:10,
451:18
**pulled** [11] - 92:2,
167:4, 168:5, 170:7,
254:16, 261:13,
263:11, 301:12,
301:25, 331:19,
338:18
**pulling** [3] - 308:10,
315:23, 332:5
**pulls** [1] - 306:8
**pump** [5] - 301:15,
301:25, 302:3, 302:4
**purchase** [1] - 306:2
**purchased** [1] -
111:22
**pure** [2] - 12:3, 12:24
**purported** [1] - 97:14
**purports** [1] - 133:23
**purpose** [9] - 7:14,
49:11, 59:19, 60:13,
60:14, 122:12,

154:4, 234:11,
336:10
**purposeful** [1] -
278:13
**purposefully** [1] -
59:8
**purposely** [2] -
330:17, 435:2
**purposes** [11] - 49:7,
97:5, 133:17, 143:1,
146:22, 147:25,
149:18, 222:19,
224:4, 285:6, 342:5
**push** [9] - 115:22,
116:9, 116:13,
116:14, 166:8,
213:10, 253:2,
253:7, 335:15
**pushed** [3] - 254:3,
269:24, 285:14
**pushes** [2] - 42:4,
399:1
**pushing** [1] - 302:9
**put** [80] - 8:24, 14:20,
15:6, 22:16, 38:12,
46:9, 49:10, 51:14,
53:20, 66:8, 96:2,
99:10, 99:14,
103:22, 117:13,
117:22, 117:23,
117:24, 118:2,
118:4, 118:6,
118:15, 118:18,
118:19, 118:23,
119:17, 119:18,
119:19, 121:2,
143:14, 157:2,
157:8, 173:18,
174:10, 174:15,
174:21, 178:9,
179:3, 179:4,
179:21, 180:9,
182:11, 185:22,
197:16, 204:13,
204:18, 206:8,
206:13, 207:16,
214:15, 214:16,
217:19, 218:1,
232:18, 237:8,
280:14, 281:18,
289:1, 290:14,
291:7, 302:1, 302:5,
304:5, 316:1, 316:2,
330:18, 335:22,
338:13, 354:13,
358:3, 365:8,
382:23, 382:25,
387:7, 415:6,
456:22, 457:6, 461:3
**putting** [7] - 38:7,

65:24, 118:1, 206:7, 347:25, 416:3, 457:17

## Q

qualified [1] - 58:22
quality [1] - 439:15
quarters [1] - 79:2
questioning [1] - 410:17
questions [22] - 12:5, 98:25, 179:10, 281:25, 309:15, 309:23, 318:18, 318:20, 327:14, 358:10, 359:22, 360:3, 410:16, 410:21, 414:23, 439:3, 446:15, 446:19, 449:8, 449:12, 449:25, 450:11
quick [7] - 184:8, 186:19, 322:16, 324:1, 326:13, 389:25
quickly [4] - 46:19, 214:23, 292:13, 408:8
quite [2] - 196:13, 302:19

## R

radar [1] - 321:11
radio [2] - 102:14, 207:25
railroad [1] - 329:14
rails [1] - 205:13
raise [8] - 27:15, 61:6, 123:7, 188:13, 243:16, 265:13, 281:14, 294:1
raised [3] - 6:19, 299:23, 319:19
raises [1] - 59:16
Ram [1] - 319:14
ran [6] - 197:12, 197:14, 308:15, 328:6, 329:7, 349:14
rank [1] - 86:24
rate [2] - 322:15, 323:18
rational [1] - 327:22
raylon [2] - 227:17, 227:21
razor [2] - 44:1, 144:18

re [1] - 226:11
re-rental [1] - 226:11
reach [1] - 107:4
reached [4] - 7:12, 445:15, 451:9, 451:17
reaching [1] - 307:8
react [2] - 17:1, 237:3
reacting [1] - 213:19
reaction [4] - 38:24, 59:17, 317:22, 318:9
read [16] - 18:8, 19:2, 23:16, 24:1, 34:18, 55:20, 55:22, 55:24, 156:10, 156:17, 389:17, 389:25, 417:25, 419:7, 419:9, 436:24
reader [1] - 23:5
readily [3] - 354:11, 430:5, 431:20
reading [1] - 419:7
reads [6] - 22:22, 442:19, 443:20, 444:3, 449:8, 450:7
ready [12] - 5:8, 5:9, 5:11, 46:24, 73:8, 73:15, 187:9, 187:10, 187:12, 226:11, 302:16, 317:25
real [10] - 297:5, 300:12, 306:11, 389:25, 402:9, 402:16, 423:16, 423:22, 427:6, 427:14
reality [1] - 62:3
realize [1] - 306:21
really [60] - 6:17, 19:20, 49:6, 62:2, 75:16, 99:17, 111:8, 177:9, 184:21, 192:13, 194:2, 196:1, 202:12, 205:6, 212:12, 213:23, 217:4, 217:25, 239:6, 239:8, 243:6, 243:7, 249:1, 257:23, 278:10, 287:9, 303:21, 303:23, 305:10, 305:21, 308:15, 309:11, 317:7, 324:6, 326:13, 326:14, 328:1, 330:16, 330:20, 331:24, 337:10, 338:4, 341:11, 349:24,

352:5, 362:8, 366:22, 368:5, 384:7, 396:7, 401:17, 407:24, 412:14, 412:15, 417:11, 458:7
reason [23] - 27:1, 33:1, 37:10, 47:10, 59:21, 63:11, 63:14, 63:15, 108:25, 111:6, 112:1, 142:10, 153:19, 176:17, 183:4, 308:12, 311:6, 374:16, 396:5, 406:12, 412:8, 440:15, 454:10
Reasonable [1] - 376:19
reasonable [49] - 28:12, 51:20, 51:25, 52:5, 52:6, 52:9, 52:13, 63:18, 374:22, 382:8, 403:20, 404:10, 405:7, 413:19, 414:12, 418:1, 418:5, 420:5, 421:2, 421:9, 425:4, 425:16, 425:20, 428:18, 429:4, 429:8, 429:16, 431:4, 431:12, 432:14, 432:23, 433:16, 433:25, 434:16, 435:11, 436:4, 436:12, 437:7, 437:15, 437:17, 438:2, 438:4, 438:7, 438:10, 438:12, 442:1, 442:3, 456:13
reasonably [9] - 387:24, 422:1, 422:14, 423:16, 424:21, 426:13, 427:7, 428:11, 434:16
reasons [5] - 169:9, 227:7, 368:3, 368:22, 369:14
rebut [3] - 287:21, 403:9, 413:24
rebuttal [6] - 293:10, 360:24, 394:18, 395:7, 409:8, 413:24
recalling [2] - 143:7, 364:1
receive [5] - 29:20, 32:6, 124:13, 419:6,

419:8
received [22] - 72:1, 82:15, 92:23, 96:13, 97:21, 97:25, 102:18, 103:19, 105:25, 126:22, 133:6, 134:15, 144:9, 147:18, 149:5, 150:6, 150:21, 156:7, 434:22, 446:23, 450:6, 459:5
receiving [1] - 22:4
recent [1] - 9:15
recently [2] - 245:22, 433:1
recess [24] - 23:16, 23:18, 24:9, 105:23, 105:24, 106:15, 106:16, 180:19, 180:22, 180:25, 186:23, 188:4, 277:24, 291:2, 362:20, 362:24, 364:8, 364:9, 449:1, 449:2, 450:21, 451:2, 451:3, 461:8
recessed [1] - 186:24
recesses [8] - 30:4, 30:21, 30:22, 31:12, 34:5, 107:3
recite [2] - 130:20, 176:11
recognize [23] - 18:22, 91:23, 91:25, 97:9, 97:11, 108:21, 132:15, 132:17, 133:20, 143:4, 143:6, 143:7, 146:25, 147:2, 147:3, 148:4, 222:22, 224:7, 224:10, 224:17, 225:12, 225:23, 271:5
recognized [1] - 453:8
recollection [4] - 16:11, 55:21, 103:15, 255:20
recommendation [1] - 292:4
reconvene [1] - 34:8
reconvened [1] - 186:24
record [70] - 5:3, 5:4, 8:19, 15:7, 23:20, 23:21, 24:1, 24:8, 25:22, 25:25, 53:8, 59:2, 63:23, 80:1, 80:3, 86:17, 105:20,

105:21, 106:18, 107:20, 123:22, 143:25, 152:5, 152:10, 154:16, 154:17, 166:14, 180:23, 187:4, 187:5, 187:20, 188:25, 196:3, 228:4, 228:22, 228:24, 233:20, 244:8, 265:10, 265:11, 277:22, 278:24, 280:12, 285:25, 289:25, 290:14, 291:3, 291:8, 291:18, 293:16, 362:22, 364:11, 365:4, 365:8, 377:20, 383:21, 384:8, 387:9, 393:25, 447:12, 448:17, 449:4, 450:3, 450:18, 451:5, 451:6, 451:12, 454:6, 460:4, 462:7
RECORDED [1] - 1:11
recorded [7] - 82:10, 116:19, 152:9, 152:16, 152:22, 152:24, 153:12
recording [8] - 97:18, 115:7, 116:22, 153:2, 153:15, 166:21, 461:9, 462:5
records [1] - 5:22
recreation [1] - 191:17
red [4] - 322:8, 322:9, 336:20, 337:7
redirect [12] - 3:5, 3:9, 3:14, 3:25, 4:4, 83:15, 121:16, 179:11, 243:9, 264:18, 276:16, 358:14
REDIRECT [5] - 83:17, 121:18, 179:13, 276:18, 358:15
reduced [3] - 184:25, 280:17, 459:3
refer [1] - 99:5
reference [3] - 125:14, 139:5, 381:20
referred [9] - 93:3, 98:1, 134:16, 144:10, 147:19, 149:7, 150:7, 165:4, 306:18
reflect [27] - 5:4, 23:21, 25:25, 80:1,

80:3, 92:3, 105:21,
107:20, 154:16,
154:17, 180:23,
187:6, 187:21,
228:22, 228:24,
277:22, 293:16,
326:1, 362:22,
393:25, 410:13,
448:17, 450:3,
450:18, 451:6,
451:12, 454:6
**reflection** [1] - 358:21
**refresh** [2] - 55:21,
103:14
**refreshing** [2] - 16:11,
292:19
**refuses** [1] - 46:4
**regard** [2] - 27:6,
282:22
**regarding** [1] - 55:10
**regardless** [3] -
122:14, 303:4, 402:5
**regards** [23] - 13:15,
24:17, 55:9, 55:17,
55:25, 57:7, 57:13,
64:16, 65:14, 66:22,
71:16, 84:5, 95:10,
99:14, 133:11,
182:11, 214:1,
214:5, 214:9, 251:5,
279:15, 316:21,
328:23
**register** [4] - 14:1,
15:8, 81:13, 83:9
**registered** [8] - 37:22,
38:2, 64:24, 65:4,
70:13, 70:22, 81:8,
415:2
**registering** [2] -
80:24, 82:25
**regret** [1] - 328:11
**regular** [7] - 14:5,
59:18, 62:16, 79:7,
252:21, 253:17,
351:8
**regular-sized** [1] -
253:17
**rehabilitate** [1] -
190:23
**rehearse** [1] - 401:6
**related** [2] - 457:8,
460:25
**relates** [4] - 280:10,
281:5, 290:6, 393:17
**relation** [4] - 201:9,
206:16, 254:12,
349:5
**relations** [1] - 248:6
**relationship** [2] -
299:6, 299:20

**relative** [2] - 425:12,
428:25
**relatively** [2] - 7:7,
9:14
**relay** [1] - 93:19
**relayed** [5] - 94:20,
94:21, 95:9, 139:12,
292:6
**release** [3] - 292:24,
364:14, 364:16
**released** [8] - 53:15,
246:11, 262:21
**relevance** [4] - 161:13,
162:15, 162:16,
367:24
**relevant** [11] - 11:5,
11:16, 14:11, 49:10,
52:8, 59:25, 162:10,
162:22, 175:16,
366:15, 387:6
**reliable** [3] - 438:15,
438:19
**relied** [2] - 438:17,
453:6
**rely** [4] - 34:24, 440:5,
449:13, 450:12
**remain** [14] - 32:13,
32:16, 84:12, 84:15,
100:16, 100:18,
122:23, 293:9,
371:21, 377:25,
385:20, 434:11,
434:14, 453:10
**remained** [3] - 274:1,
434:1, 436:13
**remaining** [4] -
279:11, 434:4,
436:16, 459:16
**remains** [4] - 377:7,
385:12, 385:14,
385:16
**remember** [43] - 8:5,
20:13, 105:4,
105:13, 115:21,
120:13, 120:23,
125:18, 138:22,
156:6, 157:1,
166:24, 170:15,
170:23, 171:1,
171:4, 171:7,
172:20, 178:24,
180:20, 195:11,
202:2, 231:14,
231:17, 231:24,
232:7, 234:21,
235:6, 235:10,
235:13, 236:9,
237:4, 237:13,
239:25, 250:8,
277:18, 324:5,

324:8, 352:14,
368:8, 403:10,
408:19, 441:1
**remembers** [2] -
292:10, 401:19
**remind** [4] - 30:9,
408:8, 411:10, 447:3
**remove** [5] - 67:1,
123:14, 181:6,
181:12, 186:6
**removed** [8] - 183:10,
183:20, 183:23,
243:4, 304:14,
371:15, 377:19,
378:20
**removes** [1] - 67:2
**removing** [1] - 371:3
**render** [1] - 441:9
**rendered** [2] - 27:21,
34:14
**renew** [3] - 278:3,
369:9, 369:10
**renewed** [1] - 363:9
**rent** [2] - 191:8, 226:6
**rental** [1] - 226:11
**rented** [1] - 304:25
**repeat** [1] - 11:7
**rephrase** [1] - 238:14
**replace** [1] - 343:22
**replaced** [1] - 343:15
**replacement** [1] -
433:15
**report** [20] - 31:4,
43:9, 51:11, 53:23,
84:5, 99:5, 103:13,
103:23, 162:5,
173:8, 173:12,
173:17, 173:18,
174:13, 174:15,
174:20, 174:22,
179:3, 179:4, 354:25
**reported** [1] - 69:24
**reporter** [5] - 85:19,
177:23, 178:2,
273:24, 462:11
**Reporter** [3] - 1:20,
462:4, 462:15
**REPORTER** [23] -
17:8, 21:16, 56:19,
81:20, 118:12,
166:17, 189:2,
193:22, 202:24,
203:14, 209:12,
216:23, 225:17,
230:4, 230:15,
244:17, 291:14,
296:19, 383:6,
391:15, 419:13,
419:16, 462:1
**Reporters** [1] - 1:23

**reports** [1] - 122:16
**represent** [1] - 35:12
**representation** [1] -
22:3
**represented** [2] -
15:13, 281:5
**representing** [1] -
45:1
**reproduction** [1] -
462:9
**reputation** [19] -
48:24, 229:15,
229:21, 229:25,
230:7, 316:18,
350:22, 377:9,
377:13, 392:15,
392:18, 424:24,
425:1, 425:5, 425:7,
428:13, 428:14,
428:19, 428:20
**request** [2] - 142:14,
206:10, 280:5
**requesting** [2] -
373:18, 375:6
**requests** [4] - 151:25,
393:16, 453:20,
453:22
**require** [2] - 9:16,
33:11
**required** [11] - 15:8,
33:13, 33:21,
353:24, 354:7,
354:12, 354:15,
354:16, 412:9,
437:13, 453:3
**requires** [2] - 374:21,
388:11
**res** [1] - 37:17
**rescue** [1] - 304:1
**research** [1] - 30:14
**residence** [15] - 13:25,
44:15, 57:21, 72:14,
82:19, 159:15,
166:25, 291:13,
291:16, 334:21,
356:25, 382:18,
382:19, 387:10,
387:11
**residents** [2] - 297:6,
406:21
**resisting** [1] - 422:4
**resolve** [1] - 20:11
**resorted** [1] - 399:22
**respect** [1] - 359:15
**respectfully** [1] -
278:15
**respects** [1] - 23:25
**respond** [5] - 87:20,
89:23, 211:1,
257:13, 279:14

**responded** [4] -
125:13, 127:18,
127:20, 157:17
**response** [23] - 23:16,
65:18, 95:12, 133:7,
199:4, 199:8, 206:4,
215:9, 219:2,
221:22, 222:9,
223:20, 223:23,
228:20, 229:13,
234:4, 235:12,
235:15, 240:14,
309:14, 328:7,
328:14, 346:25
**responses** [3] - 27:14,
188:6, 309:12
**responsibilities** [1] -
447:16
**responsibility** [4] -
28:9, 28:16, 28:19,
109:19
**responsible** [2] -
116:23, 162:8
**rest** [12] - 270:15,
277:12, 277:14,
278:1, 281:22,
287:5, 287:23,
293:20, 339:5,
358:23, 360:21,
365:1
**restating** [1] - 210:7
**rested** [1] - 394:22
**restrained** [1] - 25:24
**restrict** [2] - 10:24,
11:12
**restricted** [1] - 67:20
**restrictions** [3] -
37:15, 37:18, 60:16
**restroom** [1] - 363:16
**rests** [2] - 282:10,
394:16
**result** [4] - 22:9,
47:15, 278:5, 421:14
**retain** [1] - 17:12
**retaliate** [3] - 39:4,
39:7, 336:8
**retire** [4] - 29:21,
31:19, 34:10, 448:14
**retreat** [11] - 17:18,
380:20, 383:14,
388:6, 391:1,
405:13, 405:14,
422:21, 423:23,
426:12, 427:12
**retrial** [1] - 60:7
**retrieve** [1] - 98:19
**return** [11] - 302:3,
361:19, 414:20,
418:8, 437:19,
440:11, 441:24,

444:14, 445:9, 448:11, 450:16

**returned** [8] - 34:8, 148:24, 158:10, 159:9, 178:22, 179:5, 442:7, 444:19

**returns** [1] - 448:13

**revealed** [1] - 308:23

**revenge** [1] - 45:19

**review** [6] - 23:24, 117:12, 174:19, 367:1, 407:9, 418:19

**reviewed** [2] - 24:2, 173:24

**reviewing** [1] - 367:18

**rich** [2] - 190:1, 397:23

**rid** [4] - 184:15, 185:23, 303:15, 317:25

**ride** [2] - 219:19, 406:15

**ridiculous** [3] - 47:24, 416:18, 416:24

**rifle** [2] - 338:1, 338:2

**rig** [1] - 197:22

**rights** [1] - 185:3

**rims** [1] - 192:16

**ring** [1] - 40:15

**rings** [1] - 75:19

**rip** [1] - 275:12

**ripped** [2] - 326:24, 327:1

**rise** [1] - 433:3

**road** [18] - 26:13, 89:3, 190:12, 263:12, 295:4, 295:8, 298:15, 298:17, 298:20, 301:12, 308:16, 329:16, 333:23, 333:24, 348:7, 348:23, 349:6, 389:3

**roads** [1] - 297:18

**rocky** [1] - 297:18

**rodeo** [1] - 340:22

**Roger** [56] - 78:15, 78:17, 195:25, 196:3, 200:25, 201:6, 202:2, 202:6, 209:7, 212:10, 212:17, 216:3, 216:14, 218:14, 218:23, 218:25, 219:18, 231:7, 235:1, 235:19, 235:21, 238:24, 248:10, 258:17, 258:21, 299:21, 300:10, 300:11,

300:12, 300:13, 300:24, 303:17, 303:19, 303:20, 306:15, 307:17, 307:18, 307:21, 311:19, 311:22, 312:17, 313:1, 316:6, 317:4, 319:11, 325:13, 326:22, 331:11, 331:18, 333:21, 343:10

**Roger's** [14] - 198:23, 204:6, 204:7, 204:14, 204:19, 205:17, 206:16, 207:14, 208:8, 216:3, 218:12, 326:20, 327:1

**Rojas** [1] - 35:12

**roof** [1] - 435:4

**room** [22] - 31:21, 117:17, 117:18, 117:19, 118:24, 119:5, 121:11, 150:22, 150:24, 247:10, 336:18, 412:23, 419:5, 444:24, 445:13, 446:7, 447:1, 447:24, 450:5, 453:4

**roommate** [2] - 310:6, 345:15

**roommates** [1] - 306:25

**roughly** [1] - 313:8

**routinely** [2] - 117:20, 163:23

**row** [1] - 299:2

**rows** [3] - 76:19, 77:3, 78:21

**Rozas** [1] - 35:12

**ruby** [1] - 297:20

**Ruby** [1] - 298:20

**ruckus** [1] - 303:22

**rule** [6] - 85:9, 233:11, 309:4, 310:2, 317:17

**Rule** [1] - 85:10

**Rules** [1] - 379:6

**rules** [13] - 32:22, 65:21, 67:13, 176:1, 186:8, 418:4, 418:15, 439:22, 440:9, 440:11, 445:22, 446:5, 447:11

**ruling** [1] - 360:18

**rulings** [1] - 369:12

**run** [13] - 203:22, 259:20, 326:3,

328:2, 328:3, 328:17, 348:7, 348:22, 355:5, 406:6, 459:4, 459:14, 460:15

**running** [6] - 138:23, 139:1, 269:20, 269:23, 326:1, 459:14

**runs** [3] - 48:13, 203:25, 251:14

**Rupert** [46] - 3:4, 3:8, 3:13, 3:17, 3:21, 3:24, 4:2, 4:4, 9:19, 25:10, 44:25, 183:3, 264:22, 278:1, 282:5, 282:14, 284:12, 284:18, 284:24, 287:11, 290:5, 290:15, 291:7, 293:21, 297:23, 318:17, 360:7, 363:3, 364:19, 365:8, 365:19, 366:5, 366:23, 371:4, 372:4, 374:20, 376:1, 376:25, 378:13, 379:22, 386:9, 392:9, 403:2, 455:12, 458:24, 460:3

**RUPERT** [313] - 5:12, 5:16, 6:11, 6:14, 7:14, 7:22, 7:24, 9:21, 10:9, 10:16, 10:19, 10:23, 11:9, 11:15, 12:17, 12:19, 13:12, 15:6, 17:4, 17:9, 17:15, 17:22, 17:25, 18:3, 18:18, 18:19, 21:18, 21:21, 23:11, 24:11, 25:7, 25:14, 25:17, 44:22, 54:4, 59:1, 59:3, 59:6, 60:9, 61:9, 61:12, 61:17, 61:22, 62:15, 62:24, 63:1, 63:9, 63:22, 63:25, 71:6, 80:12, 80:15, 80:19, 81:21, 81:22, 83:14, 84:15, 84:20, 85:6, 85:8, 85:13, 85:17, 92:21, 95:13, 96:3, 96:7, 97:19, 106:13, 107:11, 107:18, 108:11, 108:15, 109:11, 109:13, 114:4, 114:7, 114:12, 118:14, 123:1,

130:9, 133:5, 134:13, 144:7, 147:16, 149:4, 150:4, 154:25, 155:2, 155:23, 156:1, 156:12, 156:19, 156:22, 165:15, 165:17, 166:19, 175:4, 175:18, 175:20, 177:13, 179:6, 179:9, 182:19, 182:22, 182:25, 183:7, 186:22, 187:11, 210:4, 229:3, 229:5, 229:20, 230:5, 230:12, 230:14, 230:17, 233:13, 234:17, 242:13, 242:16, 253:12, 253:14, 258:8, 258:10, 264:23, 264:25, 265:3, 271:18, 275:20, 275:23, 277:4, 278:2, 280:21, 280:25, 281:3, 281:7, 281:12, 284:16, 288:23, 290:16, 290:22, 291:1, 291:9, 291:15, 292:17, 293:7, 293:12, 293:22, 294:7, 296:6, 296:22, 296:24, 296:25, 297:25, 298:3, 298:4, 309:13, 309:20, 309:22, 309:25, 310:5, 310:9, 310:11, 310:14, 317:2, 317:19, 318:5, 318:21, 324:10, 324:15, 327:13, 327:16, 328:25, 329:3, 329:6, 330:13, 332:19, 332:21, 332:22, 333:1, 340:9, 340:12, 341:6, 358:16, 360:3, 360:9, 360:15, 360:17, 360:22, 361:3, 361:11, 363:1, 363:5, 363:11, 363:14, 363:19, 363:23, 364:3, 364:6, 364:23, 365:23,

369:8, 369:13, 369:16, 369:19, 369:23, 370:7, 370:19, 370:23, 371:1, 371:5, 371:12, 371:16, 372:6, 372:8, 372:11, 372:16, 372:19, 372:23, 372:25, 373:5, 373:8, 373:10, 373:13, 373:17, 373:20, 373:24, 374:3, 374:7, 374:13, 374:19, 374:24, 375:7, 375:10, 375:13, 376:2, 376:5, 376:9, 376:17, 376:21, 377:1, 377:4, 377:8, 377:15, 377:17, 377:23, 378:2, 378:8, 378:11, 378:15, 378:18, 379:5, 379:8, 379:11, 379:13, 379:16, 379:19, 379:25, 380:15, 380:25, 381:8, 381:12, 381:24, 382:10, 382:13, 383:3, 383:9, 383:13, 383:17, 386:10, 386:12, 386:14, 386:17, 386:21, 387:8, 387:19, 388:15, 388:19, 388:22, 389:1, 389:5, 389:9, 389:13, 389:16, 389:20, 389:24, 390:3, 390:25, 391:3, 391:11, 391:25, 392:10, 392:14, 392:17, 392:21, 392:24, 393:3, 393:6, 393:13, 393:18, 394:16, 403:3, 447:21, 448:24, 449:17, 451:1, 452:21, 454:14, 455:13, 455:19, 458:25, 459:9, 460:9

**Rupert's** [1] - 281:22

**Ruppert** [1] - 2:9

**rush** [2] - 104:1, 325:1

# S

**S-a-p-p** [1] - 53:9
**S-u-m-n-e-r** [1] - 123:23
**safe** [7] - 169:14, 171:17, 171:18, 332:8, 332:9, 332:10, 416:3
**safely** [1] - 169:21
**safest** [1] - 170:1
**safety** [6] - 169:9, 254:10, 257:16, 260:9, 351:15, 434:25
**salad** [1] - 187:23
**salesperson** [1] - 344:3
**samples** [1] - 163:23
**Samsung** [1] - 242:2
**sanctioned** [2] - 175:10, 175:12
**sanctuary** [3] - 298:10, 303:24, 304:3
**Sapp** [7] - 11:10, 12:4, 39:21, 64:3, 84:11, 128:1, 137:5
**sapp** [11] - 11:25, 13:3, 52:17, 52:24, 53:9, 84:9, 127:19, 128:5, 131:7, 131:12, 159:10
**SAPP** [1] - 3:2
**sapp's** [1] - 10:24
**Sapp's** [2] - 12:15, 61:23
**sat** [15] - 49:24, 50:5, 254:15, 257:14, 260:24, 261:1, 261:13, 261:14, 263:22, 286:23, 314:16, 335:3, 338:15, 409:3, 456:18
**Sate** [1] - 447:19
**satisfaction** [1] - 279:19
**satisfactorily** [2] - 433:2, 433:14
**satisfied** [1] - 284:23
**save** [3] - 47:1, 118:20, 181:3
**saves** [1] - 184:9
**saw** [47] - 47:17, 59:17, 79:6, 79:15, 92:4, 102:15, 104:15, 110:18, 113:10, 125:12,

127:13, 129:22, 130:5, 135:23, 149:21, 151:4, 151:5, 158:8, 164:19, 165:1, 167:3, 168:6, 172:3, 177:17, 217:17, 234:1, 235:4, 236:7, 238:20, 240:20, 253:24, 261:10, 292:1, 292:3, 317:20, 317:23, 326:6, 326:7, 335:1, 343:2, 350:4, 351:22, 357:15, 400:11, 402:3, 409:25
**scare** [3] - 352:3, 358:18, 359:2
**scared** [2] - 350:21, 401:18
**scars** [1] - 221:7
**scary** [1] - 409:10
**scenario** [2] - 367:2, 401:20
**scenarios** [1] - 136:15
**scene** [33] - 4:11, 4:13, 72:24, 77:23, 78:2, 94:18, 96:18, 97:12, 98:19, 100:20, 100:23, 101:16, 102:16, 103:4, 125:19, 126:5, 128:14, 130:16, 130:21, 131:11, 135:6, 135:10, 135:24, 137:18, 139:19, 140:3, 152:2, 152:17, 152:25, 288:14, 288:15, 406:18, 406:25
**schedule** [1] - 184:10
**scheduled** [1] - 120:24
**scheduling** [2] - 361:2, 361:15
**school** [2] - 249:21, 399:16
**score** [4] - 10:2, 10:5, 454:18, 461:2
**scores** [1] - 454:19
**SCOTT** [1] - 3:19
**Scott** [45] - 50:2, 50:10, 140:20, 243:14, 244:9, 267:3, 267:14, 269:19, 269:20, 269:25, 272:14, 272:21, 273:6,

273:9, 276:6, 276:10, 276:14, 278:21, 278:23, 285:10, 291:23, 292:5, 300:5, 328:21, 330:23, 331:15, 331:17, 333:8, 333:17, 333:25, 334:5, 338:16, 357:1, 357:9, 364:1, 399:5, 408:13, 434:3, 434:6, 436:15, 436:18, 455:25
**scrap** [6] - 306:13, 306:17, 306:18, 306:19, 306:20, 352:11
**scratch** [2] - 152:1, 402:1
**screen** [1] - 8:4
**scripted** [2] - 387:21, 397:11
**scrutinized** [1] - 162:25
**SD** [75] - 11:20, 12:3, 12:12, 12:19, 12:25, 13:15, 13:17, 16:22, 37:3, 37:4, 37:6, 37:7, 37:8, 37:9, 38:8, 38:12, 38:17, 43:5, 45:25, 46:2, 95:2, 209:9, 209:13, 209:14, 210:15, 210:17, 211:2, 211:6, 211:11, 211:14, 211:20, 211:24, 212:3, 212:25, 213:4, 213:20, 214:2, 219:25, 225:5, 236:15, 239:13, 239:16, 239:21, 239:22, 240:1, 240:4, 240:12, 255:11, 313:5, 313:19, 315:7, 315:12, 315:13, 315:15, 315:18, 315:20, 315:25, 320:4, 320:5, 320:7, 321:9, 338:22, 340:20, 353:16, 353:22, 354:20, 397:18, 399:21, 411:6, 411:24, 415:1, 415:6, 416:25, 417:10
**seal** [1] - 121:10
**sealed** [1] - 118:9

sealing [1] - 119:14
**search** [28] - 14:3, 14:5, 38:13, 38:15, 57:4, 57:15, 57:19, 57:20, 57:21, 60:5, 64:8, 64:10, 77:21, 77:25, 83:20, 101:25, 111:12, 212:11, 212:12, 212:13, 212:21, 215:14, 315:24, 315:25, 332:7
**searched** [13] - 41:11, 43:14, 44:14, 58:12, 60:4, 71:3, 101:8, 126:21, 128:3, 131:20, 131:22, 354:8, 354:10
**searches** [8] - 40:22, 57:8, 57:13, 58:3, 58:5, 64:9, 212:7
**searching** [15] - 39:3, 57:17, 64:12, 77:20, 78:4, 78:7, 102:3, 127:15, 128:22, 132:2, 136:25, 212:9, 212:15, 215:10, 215:12
**seat** [6] - 18:22, 243:12, 308:6, 313:15, 360:5, 399:10
**seated** [19] - 26:3, 27:23, 44:14, 45:2, 52:24, 85:25, 107:24, 108:9, 123:13, 188:19, 265:19, 277:25, 293:19, 394:3, 448:20, 450:5, 451:15, 452:18, 454:9
**secluded** [2] - 330:2, 356:9
**second** [34] - 158:10, 159:6, 159:12, 159:20, 159:24, 292:21, 297:19, 297:21, 307:21, 309:15, 323:1, 323:12, 323:22, 323:23, 326:7, 331:19, 345:6, 347:8, 347:11, 347:18, 348:19, 349:1, 372:13, 374:5, 378:15, 383:3, 383:8, 404:13, 404:19, 404:24, 405:8,

407:2, 407:3, 448:7
**seconds** [4] - 70:8, 70:9, 210:13, 363:11
**secret** [3] - 14:11, 416:7, 416:9
**secrets** [2] - 414:24, 415:7
**section** [4] - 17:17, 25:11, 381:14, 385:4
**sections** [1] - 186:16
**sector** [1] - 89:12
**secure** [2] - 121:12, 416:2
**see** [122] - 6:25, 7:10, 33:24, 34:17, 39:9, 40:8, 41:8, 41:9, 42:7, 43:13, 44:1, 46:12, 46:13, 49:17, 51:12, 73:17, 73:25, 78:7, 79:5, 79:17, 81:24, 90:24, 99:5, 100:20, 104:4, 104:12, 104:18, 104:25, 105:16, 112:9, 121:7, 125:17, 129:8, 131:6, 131:16, 133:11, 135:24, 137:9, 141:18, 141:23, 141:24, 141:25, 142:16, 142:18, 143:22, 145:4, 151:1, 153:3, 154:6, 158:1, 158:12, 159:11, 162:16, 162:25, 176:22, 186:21, 188:6, 201:6, 206:20, 215:21, 216:9, 221:20, 228:15, 233:19, 234:3, 238:18, 256:3, 257:21, 260:11, 262:25, 265:9, 269:6, 270:13, 271:3, 271:9, 271:10, 272:16, 276:22, 289:14, 292:21, 304:23, 308:11, 309:5, 312:6, 314:1, 321:15, 324:2, 325:14, 326:25, 331:17, 336:19, 339:9, 339:10, 339:25, 340:1, 342:10, 342:15, 343:3, 343:4, 350:7, 356:3, 356:7, 356:10, 374:9,

374:20, 388:7, 390:3, 397:9, 398:4, 398:6, 400:21, 403:1, 410:6, 413:9, 413:11, 413:16, 438:24, 442:15, 445:2, 447:15

**seeing** [8] - 27:13, 43:6, 112:10, 135:25, 159:3, 203:4, 216:13, 402:8

**seek** [1] - 453:23

**seem** [10] - 6:17, 186:12, 270:3, 352:14, 410:5, 410:8, 410:23, 411:23, 438:23, 438:25

**sees** [5] - 41:6, 43:10, 46:22, 48:1, 48:2

**seize** [3] - 96:14, 100:12, 146:3

**seized** [10] - 98:10, 98:12, 99:3, 99:10, 135:12, 135:15, 144:2, 146:1, 149:14, 149:22

**seizing** [2] - 99:23

**selected** [2] - 27:9, 27:25

**selection** [4] - 26:6, 26:8, 50:23, 404:2

**self** [14] - 15:16, 189:18, 189:19, 374:1, 379:21, 383:24, 393:17, 400:25, 401:3, 404:19, 425:11, 425:15, 428:24, 429:3

**self-defense** [11] - 15:16, 379:21, 383:24, 393:17, 400:25, 401:3, 404:19, 425:11, 425:15, 428:24, 429:3

**self-defenses** [1] - 374:1

**self-employed** [2] - 189:18, 189:19

**send** [2] - 75:13, 75:18

**sending** [1] - 446:12

**sense** [19] - 61:5, 61:6, 62:13, 62:16, 62:21, 380:8, 382:12, 399:13, 399:14, 399:15, 399:18, 402:13, 405:15, 409:18,

413:2, 417:25, 418:21, 418:24, 438:15

**senses** [2] - 217:23, 217:25

**sent** [10] - 30:8, 69:7, 90:6, 163:24, 186:18, 378:12, 442:12, 447:1, 449:7, 449:16

**sentence** [10] - 385:8, 423:13, 441:7, 455:5, 458:13, 459:4, 459:5, 459:15, 460:20, 460:22

**sentenced** [3] - 10:1, 455:13, 456:5

**sentences** [1] - 460:16

**sentencing** [5] - 454:10, 455:16, 456:3, 459:14, 461:1

**separate** [4] - 8:3, 326:21, 401:14, 442:18, 444:15, 444:19

**separated** [2] - 89:6, 365:10

**separately** [2] - 291:20, 444:19

**sequestration** [1] - 85:9

**Sequestration** [1] - 85:11

**sergeant** [9] - 87:16, 87:18, 88:14, 89:25, 91:7, 128:11, 129:9, 156:3, 158:15

**Sergeant** [1] - 335:1

**sergeants** [1] - 41:5

**series** [1] - 309:12

**serious** [4] - 47:15, 402:6, 405:11

**seriousness** [1] - 306:21

**serve** [4] - 27:12, 188:5, 396:11, 459:17

**served** [3] - 456:8, 460:5, 460:19

**server** [1] - 174:3

**service** [4] - 124:21, 453:14, 454:3, 454:4

**services** [1] - 284:24

**servicing** [1] - 460:17

**SESSION** [1] - 187:1

**set** [6] - 85:19, 201:1, 268:25, 374:4, 374:7, 440:12

**settle** [1] - 225:7

**settles** [1] - 10:14

**seven** [5] - 41:22, 42:11, 50:1, 138:18, 337:24

**seven-month** [1] - 41:22

**seven-month-old** [2] - 42:11, 50:1

**seven-to-eight** [1] - 138:18

**several** [4] - 35:19, 285:23, 301:7, 301:8

**sewed** [1] - 342:16

**sex** [6] - 58:23, 59:10, 60:10, 60:12, 60:14, 60:22

**sex-offender** [5] - 58:23, 59:10, 60:10, 60:12, 60:22

**sexual** [6] - 59:15, 61:3, 61:19, 62:5, 62:19, 454:21

**sexual-offender** [3] - 59:15, 61:19, 62:5

**shackled** [1] - 25:23

**shaken** [1] - 260:21

**shall** [2] - 18:14, 27:20

**Shands** [1] - 113:13

**shape** [1] - 148:16

**shaped** [1] - 314:3

**share** [1] - 447:11

**shared** [1] - 330:8

**sharp** [5] - 44:2, 144:15, 144:17, 144:18, 145:22

**sharply** [1] - 321:8

**sheet** [4] - 10:2, 10:5, 454:18, 461:3

**sheriff** [4] - 123:25, 124:13, 175:5, 175:8

**sheriff's** [19] - 77:22, 78:3, 87:6, 87:15, 87:16, 87:19, 93:24, 116:3, 116:4, 117:14, 117:19, 120:10, 121:23, 125:1, 137:14, 160:5, 170:8, 297:9, 367:17

**Sheriff's** [4] - 87:8, 124:1, 138:9, 138:17

**shift** [10] - 9:15, 88:7, 88:8, 88:10, 88:16, 88:17, 89:20, 120:18, 125:4, 125:5

**shifts** [2] - 87:25, 88:5

**shirt** [9] - 91:2, 145:2, 256:24, 256:25, 335:12, 335:23, 335:24, 417:18

**shirt's** [2] - 326:24, 326:25

**shit** [2] - 209:10, 209:16

**shock** [2] - 179:23, 180:4

**shocked** [1] - 236:17

**shop** [2] - 312:2, 312:5

**shopping** [1] - 68:2

**short** [12] - 23:18, 42:23, 106:16, 267:21, 268:2, 290:19, 290:24, 291:2, 362:20, 402:16, 449:2, 451:3

**shorter** [2] - 138:20, 292:21

**shortly** [1] - 292:12

**shorts** [2] - 335:12, 335:25

**shot** [2] - 323:11, 325:20

**shots** [1] - 8:4

**shoulder** [5] - 46:22, 119:4, 321:12, 321:13, 322:7

**shoved** [1] - 270:6

**show** [17] - 51:6, 132:9, 166:21, 168:24, 220:13, 256:9, 278:13, 287:1, 287:2, 288:2, 288:13, 313:10, 316:3, 342:3, 405:19, 409:7, 416:13

**showed** [13] - 42:25, 110:15, 110:18, 135:5, 212:25, 240:4, 240:12, 319:3, 334:21, 334:22, 338:17, 338:23, 353:2

**shower** [4] - 66:16, 66:17, 297:11

**showing** [13] - 97:4, 133:15, 134:24, 142:25, 146:21, 147:23, 149:17, 220:1, 222:17, 224:2, 240:1, 256:15, 288:20

**shown** [3] - 171:13, 280:2, 345:1

**shows** [6] - 42:3, 171:19, 302:25, 303:4, 340:18, 340:19

**sic** [1] - 260:6

**side** [31] - 48:15, 48:17, 59:4, 99:18, 111:1, 141:17, 167:4, 168:5, 172:17, 216:2, 216:6, 216:7, 216:8, 226:13, 240:6, 247:12, 253:3, 254:17, 275:6, 295:4, 298:17, 298:19, 309:6, 313:25, 314:8, 320:20, 320:21, 320:23, 360:13, 395:4

**side's** [1] - 216:2

**side-bar** [3] - 59:4, 309:6, 360:13

**sidebar** [3] - 106:2, 265:9, 309:5

**sight** [8] - 164:20, 181:25, 184:5, 430:3, 430:7, 431:16, 431:21, 432:9

**sign** [7] - 19:19, 23:6, 278:17, 341:17, 444:13, 445:6, 458:17

**signal** [1] - 27:2

**signed** [2] - 24:16, 446:13

**significance** [1] - 16:24

**signified** [1] - 408:18

**silent** [3] - 31:10, 32:14, 32:17

**similar** [1] - 433:9

**simply** [2] - 419:9, 453:23

**simultaneously** [1] - 459:20

**single** [3] - 373:23, 379:14, 402:1

**siren** [1] - 114:24

**sirens** [3] - 114:22, 138:24, 166:6

**sit** [6] - 202:15, 261:3, 261:25, 335:14, 338:14, 360:6

**sits** [1] - 42:16

**sitting** [32] - 48:9, 48:10, 50:9, 51:3, 51:4, 141:19, 141:25, 146:11, 148:21, 166:22, 167:23, 168:6, 172:11, 172:23, 202:19, 247:16, 247:17, 247:18,

277:18, 325:21,
333:24, 335:8,
336:11, 336:15,
339:15, 350:24,
357:4, 357:8,
357:11, 357:13,
398:19, 404:23
situation [19] - 32:9,
42:12, 45:21, 49:8,
99:22, 142:6, 262:2,
262:19, 264:11,
270:3, 275:11,
306:22, 326:2,
336:8, 367:2, 384:3,
411:11, 457:10,
458:10
situations [1] - 421:12
six [4] - 6:22, 190:14,
305:20, 337:24
size [11] - 109:23,
110:2, 177:18,
178:18, 192:15,
246:23, 246:24,
247:2, 307:10,
315:25, 335:19
sized [8] - 46:12,
46:13, 46:14, 46:18,
252:18, 253:17,
307:11, 319:23
skin [3] - 112:22,
112:24, 180:10
skip [2] - 181:12,
374:1
slash [1] - 266:4
sleeve [2] - 118:16,
118:17
slide [1] - 141:17
slight [2] - 421:23,
426:8
slightly [2] - 42:4,
46:21
slip [1] - 120:6
small [19] - 17:5, 40:6,
42:1, 42:14, 141:19,
152:1, 167:14,
251:9, 251:10,
258:11, 258:13,
267:5, 316:12,
316:13, 330:5,
330:6, 408:15,
409:19
smart [2] - 36:18,
354:14
smartphone [2] -
64:19, 354:14
smith [1] - 175:7
smoke [2] - 332:16,
399:11
smoked [1] - 334:1
smoking [1] - 291:25

smoky [1] - 336:19
so.. [4] - 8:10, 213:25,
275:3, 370:14
socialize [1] - 30:6
society [3] - 36:9,
37:15, 453:5
solar [1] - 203:22
sole [3] - 234:11,
336:10, 408:5
solely [2] - 28:13,
413:19
solemn [1] - 28:9
solemnly [3] - 18:12,
22:22, 27:17
solid [1] - 275:8
someone [7] - 17:1,
90:6, 102:15,
126:22, 269:3,
414:1, 414:2
sometime [2] - 90:18,
199:11
sometimes [10] - 9:8,
36:2, 36:17, 109:1,
111:5, 125:25,
191:19, 194:3,
397:12, 397:14
somewhere [7] -
119:19, 197:10,
219:10, 222:7,
301:16, 343:18,
374:14
son [8] - 245:24,
246:2, 248:5, 250:4,
251:25, 254:18,
263:4, 263:6
songs [3] - 313:7,
353:18, 397:19
soon [6] - 36:25,
106:9, 254:10,
273:8, 448:10,
448:13
SOP [1] - 176:2
SOPs [1] - 176:17
sorry [21] - 11:8,
21:17, 56:19,
100:23, 110:19,
118:12, 131:4,
136:3, 147:7,
166:17, 182:23,
182:25, 230:4,
230:15, 273:25,
296:19, 333:20,
371:12, 383:6,
419:16, 440:24
sort [4] - 9:23, 251:14,
303:8, 364:20
sorts [2] - 367:3,
367:10
sound [1] - 323:9
sounds [4] - 198:17,

365:22, 366:8,
459:11
source [1] - 36:6
south [3] - 89:2, 89:4,
89:5
space [5] - 435:5,
443:2, 443:10,
444:9, 444:11
span [1] - 198:15
Spanish [1] - 397:3
sparked [1] - 6:15
speaking [6] - 101:18,
156:6, 160:23,
161:15, 231:14,
366:24
special [1] - 453:1
specialist [1] - 53:11
specific [16] - 45:8,
54:11, 63:11, 63:12,
63:14, 120:22,
202:10, 296:8,
301:5, 309:18,
310:16, 311:9,
322:10, 343:8,
392:6, 392:12
specifically [5] - 8:6,
13:25, 119:8, 157:1,
170:15
speculate [3] - 13:7,
33:1, 33:3
speculation [5] - 12:3,
12:24, 233:7,
234:15, 277:5
speculative [2] -
418:7, 437:18
speed [1] - 192:9
spell [5] - 53:8, 86:17,
123:22, 188:25,
244:7
spelled [1] - 447:4
spend [4] - 158:24,
159:23, 254:24,
323:23
spent [1] - 121:20
spin [2] - 310:21,
326:12
spine [3] - 256:23,
256:24, 256:25
spit [3] - 313:16,
350:10
split [13] - 90:3, 305:7,
323:1, 323:12,
323:22, 323:23,
326:6, 404:13,
404:19, 404:24,
405:8, 407:2, 407:3
split-second [3] -
404:13, 407:2, 407:3
spoken [1] - 395:8
sports [1] - 112:21

spot [3] - 22:16,
191:17, 201:2
spread [1] - 180:4
spun [1] - 322:18
square [3] - 148:16,
246:25
squared [3] - 216:17,
216:19, 216:21
squatting [1] - 299:17
stab [4] - 255:7,
256:19, 257:2, 260:7
stable [1] - 437:25
stage [1] - 437:5
stairs [1] - 314:7
Stand [1] - 17:9
stand [17] - 11:1, 17:6,
27:15, 32:19,
188:13, 237:1,
283:16, 284:7,
285:3, 293:23,
293:25, 321:15,
388:7, 422:22,
451:25, 456:19,
457:7
standard [10] - 57:9,
176:3, 186:10,
237:15, 375:2,
376:20, 376:21,
381:7, 382:7, 458:22
standing [3] - 91:1,
113:18, 313:23
Stanley [3] - 1:20,
462:3, 462:15
staples [1] - 242:20
Starke [13] - 1:15, 2:4,
35:16, 36:7, 72:19,
89:9, 113:14, 125:9,
266:24, 298:17,
304:1, 306:5, 343:18
stars [1] - 217:18
start [21] - 6:15, 9:6,
31:19, 36:16, 36:23,
160:7, 180:20,
187:16, 231:1,
277:18, 303:14,
307:14, 341:20,
346:4, 362:18,
381:4, 411:9, 418:1,
423:13, 446:9,
448:15
started [12] - 27:7,
82:4, 188:3, 206:13,
255:16, 255:19,
298:7, 311:16,
312:15, 336:20,
340:22, 344:2
starting [1] - 307:7
starts [5] - 17:17,
38:22, 45:17,
387:22, 412:25

STATE [2] - 1:1, 1:5
state [67] - 5:6, 6:5,
6:20, 8:3, 9:2, 9:6,
10:9, 10:12, 13:13,
15:18, 15:20, 18:20,
20:10, 22:15, 23:23,
24:16, 24:24, 25:3,
35:7, 35:13, 44:18,
51:23, 52:16, 61:18,
62:11, 84:19, 89:3,
93:13, 122:24,
134:10, 145:8,
147:13, 149:1,
187:4, 187:7,
277:11, 277:14,
277:25, 279:13,
279:14, 279:20,
280:3, 285:10,
290:17, 293:9,
293:19, 303:5,
366:24, 368:10,
379:25, 382:21,
387:12, 390:16,
393:14, 393:19,
406:6, 407:17,
412:5, 421:7,
432:12, 450:23,
452:5, 452:19,
454:12, 454:16,
456:25, 458:4
State [62] - 1:21, 2:3,
2:6, 5:3, 5:9, 8:11,
10:3, 10:6, 23:20,
24:20, 27:19, 28:1,
28:10, 44:20, 52:7,
59:8, 92:18, 106:18,
106:20, 111:4,
144:4, 147:24,
149:25, 187:10,
188:8, 220:2,
279:11, 279:18,
280:1, 280:9,
281:21, 291:4,
302:18, 302:25,
342:4, 364:11,
367:18, 394:17,
394:21, 396:19,
404:15, 407:22,
414:11, 414:18,
414:21, 419:1,
420:4, 424:7,
427:23, 429:15,
431:10, 432:22,
433:23, 435:11,
436:11, 437:9,
439:12, 448:21,
449:4, 449:6, 451:5,
458:23
state's [20] - 11:23,
16:2, 17:2, 59:14,
62:4, 109:10,

132:10, 146:22,
147:24, 149:6,
149:18, 210:5,
291:5, 390:8,
390:13, 390:16,
391:20, 395:5,
406:25, 451:8
**STATE'S** [1] - 4:6
**State's** [24] - 11:18,
84:14, 93:4, 93:9,
97:5, 98:2, 133:16,
134:17, 143:1,
144:9, 144:11,
147:20, 149:8,
150:6, 150:8, 161:9,
187:12, 220:13,
222:18, 224:3,
225:11, 256:16,
390:8, 409:7
**statement** [24] - 16:6,
16:14, 16:16, 29:4,
29:5, 63:7, 63:10,
129:10, 130:24,
145:18, 156:8,
156:10, 156:17,
160:11, 160:13,
160:18, 161:17,
233:20, 340:5,
369:25, 370:10,
377:24, 378:5,
439:10
**statements** [8] -
22:23, 23:8, 29:10,
35:6, 49:15, 82:10,
378:21, 378:23
**states** [1] - 91:19
**stating** [3] - 82:16,
133:3, 138:9
**station** [3] - 50:18,
82:21, 157:7
**stations** [1] - 208:3
**status** [3] - 86:9,
430:13, 432:2
**stay** [29] - 14:13, 85:2,
130:15, 189:25,
201:2, 257:9, 261:6,
261:24, 262:11,
262:16, 262:17,
265:4, 265:6,
278:23, 279:1,
298:24, 299:13,
327:18, 327:20,
344:17, 349:21,
350:23, 390:21,
393:2, 396:1, 409:1,
409:4, 457:4
**stayed** [13] - 42:23,
198:22, 198:23,
238:2, 257:18,
262:17, 264:9,

299:1, 299:23,
301:21, 312:12,
355:20, 355:22
**staying** [1] - 384:17,
388:17, 415:8
**stays** [11] - 42:15,
184:6, 391:7,
391:10, 391:13,
391:20, 392:13,
392:16, 393:1,
399:17, 437:3
**steady** [1] - 315:11
**steak** [1] - 145:16
**steal** [9] - 209:14,
211:3, 227:5,
315:13, 316:24,
321:9, 347:20, 357:2
**stealing** [15] - 184:14,
236:15, 241:13,
316:7, 316:8, 316:9,
316:11, 316:18,
317:5, 318:12,
353:16, 354:20,
398:13, 411:18,
433:8
**steals** [1] - 316:8
**steering** [1] - 308:14
**stenographic** [1] -
462:7
**step** [17] - 84:10,
84:17, 122:20,
180:15, 192:23,
192:24, 205:6,
205:8, 205:9,
205:11, 243:12,
319:24, 322:18,
326:13, 394:11,
448:2
**stepdad** [4] - 258:22,
269:7, 270:13, 272:7
**stepfather** [3] - 42:19,
408:14
**Stephanie** [3] - 39:20,
52:17, 53:9
**STEPHANIE** [1] - 3:2
**stepped** [3] - 26:7,
346:16, 350:9
**stepping** [2] - 205:13,
448:5
**steps** [2] - 176:2,
207:9
**stepson** [1] - 331:12
**stick** [1] - 417:9
**still** [31] - 5:18, 22:4,
34:3, 38:18, 47:25,
60:16, 96:24,
122:15, 131:25,
159:17, 175:8,
188:2, 213:1,
280:15, 318:12,

322:5, 336:19,
346:5, 347:23,
349:1, 349:9, 356:1,
360:15, 363:25,
371:13, 398:3,
398:24, 399:6,
401:16, 457:18,
459:15
**stipulation** [1] - 24:16
**stitched** [2] - 239:11,
239:12
**stitches** [6] - 239:9,
242:18, 242:20,
243:2, 243:3, 288:9
**stole** [3] - 43:5,
209:10, 225:5
**stolen** [3] - 13:19,
433:1, 433:5
**stomach** [1] - 142:1
**stood** [3] - 313:13,
337:4, 337:5
**stop** [11] - 31:3, 47:24,
48:6, 61:18, 124:19,
138:7, 170:19,
218:7, 231:7,
245:25, 322:4
**stopped** [5] - 138:8,
218:23, 218:25,
219:3, 238:24
**storage** [3] - 37:21,
308:1, 308:5
**store** [11] - 301:15,
301:19, 301:23,
302:6, 302:7, 302:9,
302:15, 303:11,
343:18, 343:21,
344:3
**stores** [2] - 83:4,
111:21
**story** [8] - 48:15,
156:7, 309:11,
399:14, 401:1,
401:6, 418:20,
418:22
**straight** [9] - 70:5,
154:11, 167:6,
170:19, 250:17,
325:20, 328:2,
344:18, 346:5
**straightforward** [3] -
410:16, 410:19,
439:2
**stranded** [1] - 295:4
**strange** [1] - 331:16
**strap** [3] - 66:7, 72:2,
72:3
**strategic** [2] - 282:3,
282:9
**strategical** [1] - 282:4
**straw** [1] - 411:17

strawberry [2] -
311:21, 313:9
**street** [3] - 254:16,
308:2, 308:20
**Street** [1] - 1:24
**stretch** [1] - 83:3
**strike** [7] - 46:24,
47:7, 421:13,
422:10, 423:3,
426:21, 435:21
**striking** [1] - 421:12
**struck** [7] - 79:7,
112:23, 405:10,
420:7, 421:10,
424:9, 427:25
**structure** [14] - 434:1,
434:2, 434:4,
434:12, 434:14,
435:2, 435:6,
435:10, 435:12,
436:14, 436:16,
444:7, 454:24
**Structure** [9] - 376:13,
433:23, 436:8,
436:9, 436:11, 444:6
**struggles** [1] - 398:23
**stuck** [4] - 26:25, 51:8,
145:1, 295:8
**stuff** [29] - 16:4, 40:18,
43:9, 43:20, 75:22,
76:13, 121:2,
189:22, 194:17,
197:4, 197:13,
219:25, 224:16,
224:23, 227:1,
246:11, 246:13,
257:25, 302:8,
302:9, 313:10,
368:15, 384:11,
384:12, 388:13,
388:16, 388:24,
389:11, 457:8
**style** [1] - 442:15
**subject** [6] - 14:3,
57:3, 57:14, 83:20,
122:23, 297:19
**submit** [11] - 65:15,
278:15, 279:10,
289:22, 401:1,
401:7, 404:17,
405:6, 409:18,
412:17, 414:15
**Submitting** [1] -
379:17
**subsequent** [2] - 7:21,
162:13
**subside** [1] - 201:3
**substance** [4] -
118:21, 163:14,
164:1, 405:2

**substantially** [1] -
421:14
**substantiate** [1] -
407:24
**substantive** [1] -
383:25
**successful** [1] - 102:2
**sudden** [3] - 45:19,
216:6, 399:12
**suffered** [1] - 151:8
**sufficient** [2] - 52:5,
282:14
**suggest** [1] - 17:18
**suggestion** [2] -
120:5, 120:8
**suggests** [1] - 16:18
**suit** [2] - 91:8, 91:9
**Suite** [1] - 2:10
**sum** [2] - 290:8,
290:11
**Sumn** [1] - 41:13
**SUMNER** [2] - 3:11,
123:12
**Sumner** [48] - 4:14,
4:15, 4:17, 41:14,
43:8, 44:2, 46:15,
48:14, 49:1, 49:2,
49:19, 50:11, 50:15,
51:2, 51:5, 51:10,
82:9, 82:14, 82:15,
82:18, 82:20, 93:25,
94:3, 104:5, 123:6,
123:23, 182:19,
232:8, 232:10,
233:3, 233:14,
233:20, 234:10,
234:22, 239:1,
278:6, 287:21,
334:21, 334:22,
335:1, 336:17,
338:4, 338:18,
410:17, 411:3,
412:3, 413:10,
413:13
**Sumner's** [1] - 104:11
**sums** [1] - 290:12
**sunglasses** [1] -
227:14
**supervise** [1] - 53:14
**supervised** [1] - 71:16
**supervising** [7] -
54:19, 56:11, 57:19,
65:3, 70:12, 70:23,
99:13
**supervision** [6] - 38:4,
53:21, 54:25, 56:3,
62:7, 65:10
**supervisor** [3] - 155:6,
160:23, 161:20
**supervisors** [1] -

119:1
**supervisory** [1] -
175:21
**supplemental** [3] -
173:8, 174:13,
174:20
**support** [1] - 368:1
**supported** [1] -
367:19
**supposed** [12] - 14:1,
39:17, 87:22,
140:14, 176:2,
190:22, 284:4,
287:23, 296:1,
316:11, 346:1, 372:2
**surprise** [1] - 217:1
**surprised** [3] - 8:6,
113:4, 331:16
**surrender** [1] - 391:9
**surrounded** [3] -
334:12, 423:10,
427:3
**surrounding** [2] -
112:21, 435:6
**survival** [3] - 218:1,
218:6, 218:9
**survived** [1] - 377:13
**suspect** [1] - 140:13
**sustain** [2] - 96:6,
279:9
**sustained** [24] - 33:2,
33:5, 47:14, 95:5,
114:6, 114:11,
165:16, 175:3,
175:19, 177:12,
233:12, 234:16,
296:4, 310:13,
317:1, 317:10,
317:17, 318:4,
327:15, 329:4,
330:12, 332:20,
340:11, 377:15
**swear** [13] - 18:11,
18:12, 22:23, 27:16,
27:17, 52:19, 85:20,
123:8, 188:14,
243:17, 265:14,
281:15, 294:2
**swing** [3] - 219:1,
321:22, 326:12
**swinging** [1] - 307:9
**sworn** [4] - 18:10,
19:10, 22:21, 160:24
**swung** [1] - 322:19,
322:20
**sympathy** [1] - 441:13
**system** [7] - 28:24,
49:11, 116:19,
117:10, 121:23,
122:1, 153:24

# T

**T-ball** [2] - 216:21,
216:24
**table** [2] - 45:2, 46:24
**tablet** [68] - 4:20, 4:21,
13:19, 37:8, 43:17,
44:11, 44:16, 46:6,
46:7, 49:23, 64:10,
146:6, 146:7,
146:13, 148:5,
148:9, 172:11,
177:14, 177:18,
178:10, 178:13,
178:15, 178:19,
178:22, 179:4,
185:4, 193:10,
193:12, 193:15,
193:18, 194:11,
194:14, 194:18,
203:9, 211:16,
212:2, 222:25,
223:2, 227:12,
227:13, 239:13,
240:3, 240:13,
240:18, 240:21,
240:25, 241:17,
242:3, 255:13,
255:15, 255:17,
255:21, 255:23,
256:1, 256:4,
261:10, 261:11,
279:7, 281:6,
338:20, 398:18,
401:11, 415:19,
415:20, 449:9, 450:9
**tablets** [6] - 31:22,
36:10, 37:25, 81:15,
193:9, 446:3
**tactical** [4] - 124:15,
282:3, 282:4, 282:9
**TAKEN** [1] - 1:13
**talks** [1] - 48:14
**tall** [3] - 214:25,
276:20, 351:17
**taller** [1] - 399:5
**tangible** [1] - 185:3
**tap** [2] - 217:11,
217:13
**tape** [1] - 118:18
**tase** [2] - 169:13,
278:12
**Taser** [15] - 51:10,
51:12, 51:13, 142:4,
142:5, 168:19,
168:21, 170:23,
171:8, 171:15,
179:15, 179:17,
179:19, 179:21,

180:9
**tattoo** [1] - 330:9
**taxes** [2] - 299:11,
299:12
**team** [1] - 305:10
**tear** [2] - 429:25, 432:5
**telephone** [2] -
207:16, 445:17
**television** [6] - 35:21,
36:4, 36:12, 39:12,
197:5, 202:19
**televisions** [1] - 81:2
**temper** [2] - 344:6,
348:9
**Temple** [2] - 1:15, 2:3
**temporarily** [1] -
432:17
**temporary** [1] - 435:3
**ten** [15] - 20:10, 20:15,
50:7, 102:22,
105:11, 105:15,
138:3, 219:21,
263:17, 264:2,
264:5, 274:4, 320:9,
334:3, 409:3
**ten-minute** [2] -
105:11, 105:15
**tended** [1] - 133:18
**tender** [1] - 341:7
**tendered** [21] - 23:13,
91:21, 93:9, 97:7,
109:15, 129:16,
129:17, 132:12,
132:13, 143:3,
148:2, 161:10,
220:8, 220:9,
220:15, 222:20,
224:5, 342:6,
342:21, 342:22,
451:21
**tends** [2] - 107:12,
112:24
**tent** [8] - 73:20, 74:1,
76:18, 78:18, 299:1,
299:2, 299:3, 320:9
**Tent** [1] - 299:4
**tents** [2] - 40:8,
190:25
**tenus** [2] - 10:23,
11:11
**term** [6] - 120:9,
184:4, 430:4, 430:7,
431:19, 431:21
**terms** [6] - 37:18,
38:3, 53:24, 64:4,
71:11, 430:17
**terrell** [2] - 84:24,
86:18
**Terrell** [1] - 338:1
**TERRELL** [1] - 3:6

**terrible** [1] - 397:14
**testified** [17] - 12:4,
12:9, 12:11, 15:23,
163:6, 235:1,
258:11, 285:9,
286:18, 289:10,
328:21, 343:7,
345:11, 357:15,
365:17, 410:7,
438:25
**testifies** [1] - 7:2
**testify** [22] - 12:10,
14:22, 24:25, 29:11,
36:13, 47:18, 49:21,
230:6, 281:24,
282:8, 282:16,
282:23, 282:24,
293:6, 317:12,
317:13, 317:14,
317:18, 318:9,
318:13, 332:19,
400:12
**testifying** [9] - 11:13,
25:12, 53:1, 86:3,
123:15, 283:22,
285:3, 309:19,
406:11
**testimony** [84] - 6:21,
10:25, 11:1, 11:3,
12:13, 12:15, 12:21,
16:21, 18:13, 44:17,
52:2, 52:3, 52:19,
85:21, 123:8,
160:24, 161:11,
171:21, 172:22,
188:15, 210:5,
210:7, 235:18,
236:6, 243:17,
265:14, 278:9,
279:5, 281:15,
284:3, 284:5,
285:22, 287:21,
290:21, 293:11,
294:2, 328:24,
342:25, 343:1,
344:9, 377:21,
378:6, 392:22,
403:7, 406:2, 411:1,
411:2, 415:4,
415:21, 418:16,
418:18, 439:5,
439:6, 439:11,
439:19, 439:23,
439:24, 440:1,
440:4, 440:8,
440:20, 455:23,
456:20
**Testimony** [7] - 3:2,
3:6, 3:11, 3:15, 3:19,
3:22, 4:1

**testimony's** [1] -
400:24
**text** [2] - 30:12, 445:19
**texts** [1] - 81:7
**THE** [534] - 1:1, 5:2,
5:11, 5:15, 6:10,
6:12, 7:5, 7:18, 7:23,
8:11, 9:13, 9:22,
10:14, 10:21, 11:11,
12:7, 12:18, 13:10,
13:13, 13:22, 15:3,
15:10, 16:12, 16:15,
17:8, 17:14, 17:20,
17:23, 18:1, 18:12,
18:17, 21:16, 21:20,
23:14, 23:19, 24:13,
25:6, 25:9, 25:15,
25:19, 27:17, 27:23,
44:20, 52:15, 52:18,
52:22, 52:23, 53:2,
54:6, 54:7, 56:19,
56:20, 59:2, 60:6,
60:19, 61:4, 61:10,
61:14, 61:21, 62:8,
62:21, 62:23, 63:6,
63:13, 63:24, 71:8,
80:3, 80:11, 80:14,
80:16, 81:20, 83:15,
84:9, 84:17, 84:22,
84:25, 85:1, 85:3,
85:7, 85:12, 85:18,
85:24, 85:25, 86:5,
86:6, 86:10, 91:16,
92:20, 92:22, 93:1,
93:8, 95:20, 96:5,
97:20, 97:24, 98:6,
105:9, 105:21,
106:14, 106:17,
107:13, 107:16,
107:19, 108:3,
108:8, 108:13,
109:12, 114:6,
114:11, 118:12,
118:13, 121:16,
122:20, 123:2,
123:7, 123:13,
123:16, 129:18,
130:11, 130:12,
133:7, 134:12,
134:14, 135:3,
142:22, 144:6,
144:8, 147:15,
147:17, 149:3,
149:5, 149:12,
150:3, 150:5,
150:17, 154:17,
154:24, 155:25,
156:14, 156:21,
165:16, 166:17,
166:18, 175:3,
175:19, 177:12,

179:8, 179:11,
180:14, 180:16,
180:17, 181:10,
181:18, 181:20,
181:24, 182:5,
182:8, 182:13,
182:16, 182:21,
183:1, 183:9,
183:13, 183:17,
183:19, 183:22,
183:25, 184:3,
184:7, 184:17,
184:20, 184:23,
185:2, 185:7,
185:11, 185:14,
185:19, 185:25,
186:5, 186:16,
186:21, 186:23,
187:3, 187:13,
187:20, 188:11,
188:18, 188:19,
189:2, 189:4,
193:22, 193:23,
202:24, 202:25,
203:14, 203:16,
209:12, 209:13,
210:6, 216:23,
216:24, 220:5,
222:15, 225:17,
225:18, 228:24,
229:2, 229:18,
230:3, 230:4, 230:9,
230:13, 230:15,
233:8, 233:10,
234:16, 242:15,
243:9, 243:11,
243:15, 243:20,
243:21, 243:22,
243:23, 243:24,
243:25, 244:17,
244:18, 253:15,
253:16, 256:13,
258:7, 264:18,
264:21, 264:24,
265:1, 265:5,
265:18, 265:19,
271:16, 275:22,
276:16, 277:6,
277:8, 277:9,
277:10, 277:13,
279:14, 280:7,
280:22, 281:1,
281:4, 281:8,
281:13, 281:18,
282:8, 282:13,
282:18, 282:21,
282:24, 283:1,
283:4, 283:8,
283:12, 283:25,
284:9, 284:12,
284:17, 284:23,

286:2, 286:5, 286:8,
286:20, 286:25,
287:8, 287:14,
287:19, 287:25,
288:4, 288:12,
288:17, 289:1,
289:8, 289:13,
289:16, 290:4,
290:10, 290:13,
290:17, 290:19,
290:24, 291:3,
291:14, 292:16,
293:3, 293:8,
293:13, 293:24,
294:5, 296:4, 296:5,
296:17, 296:19,
296:20, 296:23,
297:22, 298:1,
309:2, 309:3, 309:8,
309:14, 309:21,
309:24, 310:1,
310:7, 310:10,
310:12, 316:20,
316:23, 317:1,
317:10, 317:11,
317:13, 318:4,
318:15, 318:19,
318:20, 324:12,
324:13, 327:15,
329:2, 329:4,
330:12, 332:20,
340:11, 341:8,
342:20, 358:14,
360:5, 360:11,
360:16, 360:20,
360:23, 361:4,
361:13, 363:3,
363:6, 363:12,
363:17, 363:21,
363:24, 364:4,
364:7, 364:10,
364:16, 365:2,
365:16, 365:19,
365:24, 366:3,
366:7, 366:15,
366:20, 367:5,
367:8, 368:16,
368:18, 368:21,
368:23, 369:2,
369:11, 369:14,
369:17, 369:20,
369:24, 370:4,
370:15, 370:20,
370:24, 371:2,
371:6, 371:13,
371:20, 371:23,
372:3, 372:14,
372:17, 372:21,
372:24, 373:1,
373:6, 373:9,
373:11, 373:14,

373:18, 373:21,
373:25, 374:4,
374:17, 374:20,
375:1, 375:8,
375:11, 375:14,
375:19, 375:22,
375:24, 376:3,
376:6, 376:10,
376:15, 376:18,
376:22, 377:2,
377:5, 377:9,
377:16, 377:18,
377:24, 378:4,
378:9, 378:12,
378:17, 378:19,
378:25, 379:3,
379:6, 379:9,
379:12, 379:14,
379:17, 379:20,
380:4, 380:7, 383:6,
383:20, 383:23,
384:6, 384:10,
384:15, 384:23,
385:2, 385:5, 385:9,
385:12, 385:14,
385:17, 385:20,
385:22, 386:1,
386:3, 386:6, 386:8,
386:11, 386:13,
386:15, 386:24,
388:13, 388:16,
388:20, 388:24,
389:2, 389:6,
389:10, 389:14,
389:18, 389:21,
390:2, 390:7,
390:20, 390:23,
391:2, 391:5,
391:13, 391:15,
391:16, 391:23,
392:2, 392:9,
392:11, 392:15,
392:18, 392:22,
392:25, 393:4,
393:7, 393:14,
393:16, 393:19,
394:17, 394:20,
395:12, 395:16,
396:4, 396:18,
403:2, 414:21,
419:1, 419:13,
419:14, 419:16,
419:18, 428:7,
447:23, 448:1,
448:4, 448:9,
448:23, 448:25,
449:3, 449:19,
449:22, 449:24,
450:25, 451:2,
451:4, 451:23,
452:3, 452:18,

452:23, 454:15,
455:12, 455:18,
456:15, 458:14,
459:1, 459:12,
459:19, 459:24,
460:11, 460:14,
461:6, 461:8
the.. [1] - 326:17
Theft [6] - 375:25,
432:12, 432:22,
443:16, 443:18,
443:21
theft [29] - 10:5, 28:6,
44:10, 184:11,
185:9, 185:15,
185:23, 185:24,
228:5, 228:6, 279:4,
279:15, 279:17,
279:22, 280:11,
280:14, 280:16,
280:17, 281:5,
348:19, 356:12,
370:2, 375:15,
407:17, 420:1,
432:11, 454:24
thefts [1] - 376:4
their's [1] - 388:21
themselves [1] - 83:25
then.. [1] - 183:12
theoretically [2] -
22:11, 22:13
theory [3] - 15:21,
16:2, 62:12
thereafter [1] - 292:13
therefore [5] - 24:3,
262:23, 279:7,
431:2, 453:11
Therefore [2] - 420:25,
436:3
they've [6] - 41:1,
127:10, 196:12,
352:10, 368:15,
454:8
thief [1] - 230:7
thievery [2] - 45:11,
408:5
thin [3] - 112:24,
276:20, 399:6
thinking [9] - 217:5,
320:2, 327:22,
353:9, 355:15,
359:2, 395:24,
408:21, 457:1
thinks [3] - 14:19,
116:11, 321:10
third [9] - 157:5,
157:9, 165:18,
307:23, 348:1,
348:21, 348:25,
349:1, 454:25

Thomas [3] - 5:18,
5:20, 7:20
thorough [1] - 58:3
threat [4] - 353:11,
353:12, 377:21,
434:25
threaten [3] - 409:24,
457:15, 457:16
threatened [18] -
259:22, 259:24,
260:1, 260:5, 262:8,
283:4, 296:13,
297:5, 297:8,
409:12, 409:13,
420:12, 420:17,
424:1, 455:23,
455:24, 455:25,
456:1
threatening [2] -
199:6, 416:20
threats [4] - 114:8,
392:4, 392:5, 392:6
three [61] - 7:8, 35:14,
77:5, 79:2, 87:14,
88:13, 88:21, 94:6,
100:15, 100:17,
105:6, 108:20,
109:23, 116:5,
120:11, 120:18,
121:22, 124:11,
124:12, 152:18,
162:1, 162:2,
162:13, 177:4,
179:1, 190:4,
196:17, 196:18,
198:16, 200:8,
200:9, 208:5, 208:6,
242:19, 295:9,
300:19, 333:13,
333:14, 335:4,
338:3, 343:8,
347:15, 349:12,
350:21, 358:22,
368:14, 380:9,
401:4, 401:6, 401:7,
401:14, 406:1,
431:11, 431:17,
436:12, 442:22,
443:1, 443:6, 444:2,
452:12, 457:11
Three [1] - 434:3
three-quarters [1] -
79:2
three-years [13] -
87:14, 94:6, 105:6,
109:23, 116:5,
120:11, 121:22,
162:1, 162:2, 179:1,
242:19, 368:14,
401:4

**three-years-and-a-week** [1] - 100:15
**threw** [4] - 51:7, 320:4, 321:11, 414:23
**throughout** [2] - 198:15, 447:13
**throwed** [1] - 308:20
**thrown** [1] - 274:23
**throws** [3] - 327:5, 327:6
**thumb** [12] - 43:14, 70:17, 82:24, 83:3, 83:7, 83:10, 83:19, 146:16, 147:7, 176:20, 176:24, 177:3
**tidbit** [1] - 162:17
**tied** [1] - 183:14
**tight** [3] - 66:10, 66:12, 344:22
**Tim** [28] - 202:6, 202:7, 205:22, 205:23, 209:4, 209:9, 235:23, 236:4, 236:7, 236:10, 236:11, 236:14, 238:23, 239:20, 248:25, 258:16, 259:3, 259:14, 261:19, 263:21, 264:5, 264:14, 274:10, 274:12, 274:19, 275:25, 278:22, 302:10
**tim's** [1] - 208:9
**timing** [1] - 24:4
**Timothy** [90] - 5:3, 18:21, 22:22, 23:20, 28:1, 45:1, 54:19, 81:25, 106:18, 113:11, 126:18, 126:23, 127:21, 165:2, 165:21, 166:21, 166:22, 167:3, 167:9, 167:18, 168:6, 169:24, 187:5, 195:21, 223:22, 248:22, 269:6, 269:11, 278:25, 291:4, 293:23, 294:9, 364:11, 387:22, 388:3, 390:5, 405:9, 407:6, 412:1, 413:14, 419:21, 420:6, 420:8, 421:9, 421:18, 422:1,

422:10, 422:13, 422:18, 423:3, 423:7, 423:20, 424:2, 424:8, 424:11, 424:14, 424:21, 425:1, 425:3, 425:13, 425:17, 425:21, 426:3, 426:10, 426:22, 426:25, 427:13, 427:16, 427:24, 428:1, 428:7, 428:10, 428:15, 428:17, 429:1, 429:5, 429:9, 429:17, 429:18, 431:12, 431:17, 432:14, 433:25, 434:3, 434:8, 436:13, 436:15, 449:4, 451:6, 452:6
**TIMOTHY** [2] - 1:8, 4:1
**tiniest** [1] - 417:21
**tire** [1] - 224:20
**tired** [1] - 310:4
**tires** [2] - 224:12, 319:23
**title** [2] - 369:22, 370:25
**titled** [1] - 370:17
**today** [26] - 19:2, 26:13, 27:1, 31:19, 49:7, 52:20, 79:18, 85:21, 105:1, 109:22, 112:2, 123:9, 154:7, 168:22, 188:15, 228:16, 235:18, 236:6, 243:18, 265:15, 271:4, 294:3, 324:2, 328:3, 403:7, 447:14
**today's** [2] - 403:7, 455:16
**together** [15] - 7:10, 8:24, 66:8, 96:2, 238:2, 239:10, 242:23, 251:12, 288:9, 294:16, 298:8, 305:8, 305:10, 339:7, 444:17
**tomorrow** [5] - 394:8, 395:11, 395:13, 396:6, 396:8
**took** [48] - 46:2, 46:16, 49:1, 73:14, 93:16, 103:5, 109:18, 134:23, 143:11, 143:21, 144:1,

155:16, 155:18, 160:20, 176:20, 199:15, 199:24, 200:2, 200:4, 200:12, 204:10, 205:16, 211:18, 212:5, 219:17, 226:21, 240:23, 270:1, 289:6, 302:22, 313:8, 313:12, 322:18, 337:4, 338:22, 339:3, 339:5, 353:10, 354:9, 356:15, 372:1, 382:7, 399:4, 400:4, 406:19, 407:25, 416:10
**tools** [5] - 193:3, 193:9, 213:16, 320:19, 320:23
**top** [12] - 144:20, 148:21, 176:8, 225:15, 225:18, 287:4, 287:6, 304:7, 357:4, 393:10, 405:9, 461:4
**tore** [1] - 297:6
**torn** [1] - 417:18
**Toro** [1] - 193:13
**tossing** [1] - 302:8
**total** [5] - 287:3, 368:9, 395:17, 459:1
**totally** [1] - 285:3, 285:4
**touch** [6] - 164:17, 164:18, 421:13, 422:9, 423:3, 426:21
**touched** [4] - 420:7, 421:10, 424:9, 427:25
**touching** [1] - 421:12
**tough** [1] - 403:12
**toward** [1] - 272:23
**towards** [19] - 168:10, 169:25, 170:19, 172:8, 302:14, 307:8, 308:8, 312:20, 314:23, 323:6, 335:18, 337:1, 392:7, 459:25, 460:6, 460:20
**towed** [1] - 295:15
**town** [1] - 408:15
**track** [4] - 38:6, 40:12, 68:7, 355:9
**tracking** [9] - 65:25, 66:3, 69:3, 75:11, 75:13, 75:14, 77:25,

78:10, 131:14
**tracks** [1] - 329:15
**Tracy** [11] - 196:10, 221:16, 295:10, 295:12, 295:13, 295:14, 295:15, 300:25, 305:14, 308:5, 311:24
**traffic** [1] - 412:22
**trailer** [24] - 49:21, 82:7, 157:22, 158:19, 158:21, 158:25, 159:24, 160:1, 167:24, 200:19, 200:20, 207:6, 208:20, 208:22, 208:25, 209:5, 209:7, 235:24, 238:15, 306:4, 306:9, 352:21, 358:1, 413:14
**trailers** [1] - 35:19
**trained** [1] - 32:22
**training** [6] - 112:11, 113:2, 124:12, 124:15, 124:21
**transcribe** [2] - 178:3, 462:5
**transcribed** [1] - 1:19
**transcript** [2] - 462:6, 462:9
**TRANSCRIPT** [1] - 1:11
**translate** [1] - 397:2
**trauma** [1] - 341:19
**travel** [2] - 180:5, 180:6
**travels** [2] - 42:1, 180:4
**treated** [3] - 39:11, 97:1, 152:1
**treatment** [5] - 58:21, 58:23, 289:2, 289:17, 377:3
**tree** [1] - 76:12
**tremendous** [1] - 51:24
**trespass** [19] - 28:7, 44:5, 44:10, 49:23, 276:1, 278:14, 278:16, 279:2, 308:24, 367:20, 376:7, 402:22, 420:1, 434:8, 435:9, 435:13, 444:5, 455:17
**Trespass** [9] - 186:1, 376:12, 376:13, 408:7, 433:23,

436:8, 436:9, 436:10, 444:7
**trespassed** [2] - 50:13, 297:9
**trespassing** [6] - 50:4, 264:15, 291:17, 295:25, 297:4, 409:5
**trial** [35] - 7:17, 9:6, 18:6, 18:24, 19:6, 20:20, 22:5, 22:12, 24:6, 26:14, 29:1, 29:2, 29:7, 30:20, 32:23, 33:8, 33:18, 33:20, 34:3, 34:9, 107:7, 281:20, 282:2, 282:16, 367:12, 394:23, 419:20, 437:5, 438:6, 441:1, 446:22, 447:14, 450:14, 460:25, 461:5
**tried** [8] - 72:25, 73:18, 142:8, 165:11, 298:7, 348:7, 382:5, 444:17
**tries** [2] - 47:6, 343:22
**triggered** [2] - 39:15, 39:16
**trip** [1] - 114:25
**trivial** [2] - 421:23, 426:8
**trouble** [8] - 14:14, 262:24, 263:3, 263:4, 276:7, 331:17, 449:21, 449:22
**truck** [82] - 36:15, 43:15, 46:6, 47:4, 192:3, 192:10, 192:13, 192:17, 192:23, 193:2, 195:11, 195:17, 203:10, 204:13, 204:14, 204:15, 204:18, 204:19, 204:20, 204:23, 204:25, 205:18, 206:16, 207:14, 208:12, 210:1, 212:8, 212:9, 212:14, 212:16, 215:13, 215:14, 215:15, 215:17, 216:1, 216:17, 219:23, 219:24, 221:23, 222:3, 223:3, 223:5, 223:19, 225:24, 227:9, 240:23,

240:24, 295:10,
301:13, 301:14,
301:21, 302:5,
302:11, 306:9,
307:3, 307:7, 307:8,
307:14, 308:3,
308:7, 311:23,
312:18, 313:2,
314:24, 319:8,
319:10, 319:11,
319:12, 319:16,
319:23, 320:16,
326:4, 327:5,
343:12, 343:14,
404:23, 416:2,
447:10, 450:10
**truck's** [3] - 311:22,
312:19, 313:24
**trucks** [1] - 205:3
**true** [24] - 14:4, 19:20,
20:7, 20:16, 22:23,
22:24, 27:21, 52:11,
81:15, 133:22,
133:23, 148:8,
160:20, 236:20,
236:22, 242:17,
242:22, 263:15,
355:13, 359:11,
414:4, 414:19,
453:15, 462:6
**truly** [2] - 27:18, 59:11
**trunk** [3] - 339:16,
339:18
**trust** [1] - 408:3
**truth** [33] - 18:14,
18:15, 52:20, 52:21,
85:22, 85:23, 95:15,
123:9, 123:10,
188:16, 188:17,
232:16, 232:19,
232:20, 243:18,
243:19, 265:15,
265:16, 281:16,
294:3, 294:4, 341:4,
357:15, 430:20
**truthful** [3] - 161:4,
412:11, 415:23
**try** [16] - 24:8, 27:16,
27:18, 27:25, 56:11,
62:1, 62:4, 75:6,
126:20, 223:24,
303:8, 348:20,
367:25, 369:5,
402:16, 433:10
**trying** [46] - 8:25,
14:13, 31:2, 75:8,
75:24, 184:7, 201:1,
217:3, 219:6,
219:12, 220:5,
259:20, 268:19,

269:25, 285:5,
285:20, 293:2,
300:2, 302:2, 302:3,
303:22, 314:4,
314:13, 321:1,
346:5, 347:20,
348:22, 350:23,
352:3, 354:13,
358:4, 358:18,
358:23, 359:2,
367:9, 381:25,
389:6, 403:25,
411:13, 416:6,
457:15, 457:22,
457:23, 460:1,
460:2, 460:4
**tub** [1] - 68:23
**tucked** [2] - 335:13,
335:24
**Tuesday** [3] - 24:1,
26:5, 284:13
**turn** [16] - 31:22,
36:15, 114:18,
115:10, 115:11,
138:4, 166:6, 166:7,
169:25, 208:1,
269:2, 269:18,
298:9, 310:21,
323:23, 446:8
**turned** [10] - 46:21,
114:18, 114:19,
145:3, 169:17,
171:15, 269:5,
272:14, 272:25,
337:1
**turns** [3] - 203:25,
298:14, 302:3
**TV** [11] - 167:16,
197:17, 202:3,
202:11, 202:16,
206:16, 206:17,
207:4, 312:15,
325:21, 354:14
**TV-viewing** [3] -
206:16, 206:17,
207:4
**tweeting** [1] - 30:12
**twice** [3] - 336:10,
348:15, 435:20
**twitter** [1] - 445:19
**two** [79] - 5:24, 6:16,
8:10, 9:4, 12:2, 55:6,
76:19, 77:3, 87:3,
88:5, 88:14, 90:11,
97:22, 101:13,
183:20, 196:16,
198:15, 200:8,
200:9, 208:14,
211:3, 211:6, 211:7,
211:10, 211:12,

211:13, 211:14,
211:20, 214:22,
215:10, 221:2,
221:14, 244:24,
247:18, 267:10,
285:15, 288:22,
305:13, 335:5,
338:3, 347:15,
349:8, 349:13,
356:12, 363:18,
363:21, 365:14,
372:5, 372:7,
372:18, 372:22,
373:1, 374:1, 376:3,
376:23, 377:18,
382:2, 382:6, 393:1,
393:17, 420:5,
420:8, 422:7,
422:11, 422:24,
424:8, 426:19,
427:23, 429:15,
429:18, 431:15,
432:13, 432:16,
434:2, 443:14,
443:22, 447:8,
454:23, 457:10
**two-days** [2] - 349:8,
349:13
**two-hours** [1] - 288:22
**two-months** [1] - 55:6
**type** [50] - 5:21, 16:16,
36:5, 37:17, 41:15,
41:16, 53:20, 57:4,
58:6, 61:24, 64:10,
64:18, 68:24, 70:14,
70:16, 75:15, 78:7,
81:10, 120:2, 125:3,
132:7, 135:20,
139:20, 147:9,
148:17, 151:6,
151:7, 151:16,
192:4, 192:6,
193:12, 204:20,
205:10, 207:7,
207:8, 224:20,
250:19, 253:5,
253:7, 297:18,
300:1, 307:2,
313:10, 341:18,
345:9, 400:3,
411:24, 418:19,
457:8, 458:7
**types** [5] - 32:6, 68:19,
81:5, 136:15, 345:1
**typically** [2] - 88:13,
98:18
**typing** [1] - 41:19
**typo** [1] - 237:9

## U

**ultimately** [1] - 366:5
**unanimous** [5] -
441:10, 442:5,
443:3, 443:11,
443:17
**unaware** [1] - 82:22
**unbold** [2] - 186:2,
384:11
**under** [36] - 29:11,
37:12, 37:18, 62:16,
65:3, 161:11,
172:10, 172:13,
181:5, 181:10,
181:18, 183:5,
183:14, 183:20,
185:15, 185:17,
185:22, 191:25,
224:23, 232:18,
278:24, 280:19,
280:21, 280:22,
285:9, 335:11,
357:25, 386:6,
423:17, 427:8,
434:15, 455:1,
458:4, 458:11,
462:10
**underneath** [6] - 43:2,
144:22, 145:1,
145:19, 146:9,
256:24
**understood** [5] -
86:10, 95:25,
165:21, 166:13,
344:5
**unduly** [1] - 34:25
**unfair** [1] - 9:5
**ungated** [1] - 435:8
**uniform** [3] - 232:3,
332:14, 333:9
**uninvited** [1] - 257:22
**union** [1] - 460:15
**Union** [2] - 67:24,
459:6
**unique** [2] - 314:3,
453:12
**unitalicized** [1] -
384:13
**University** [2] - 2:10,
87:2
**university** [1] - 86:22
**UNKNOWN** [8] -
395:10, 395:14,
395:24, 396:2,
396:16, 396:17,
449:20, 449:23
**unknown** [1] - 38:19
**unlawful** [1] - 426:15

**unlawfully** [1] -
432:15
**unless** [11] - 58:21,
61:7, 62:13, 67:1,
68:3, 114:21,
296:15, 403:20,
433:2, 437:5, 462:10
**unlocked** [1] - 207:14
**unnatural** [1] - 194:2
**unprovoked** [1] -
228:13
**unrebutted** [1] - 415:4
**unrelated** [1] - 77:24
**untimely** [2] - 156:19,
156:20
**unusual** [6] - 206:9,
209:3, 250:25,
251:14, 252:2, 267:7
**up** [175] - 5:24, 9:19,
14:21, 16:23, 19:17,
19:21, 21:12, 24:7,
24:25, 30:14, 33:23,
34:15, 41:15, 41:16,
41:19, 42:3, 46:11,
46:24, 48:3, 48:12,
49:25, 50:16, 85:19,
86:1, 87:3, 88:24,
89:1, 89:25, 90:3,
91:5, 92:2, 95:11,
95:25, 116:19,
125:17, 125:18,
127:12, 128:15,
144:14, 145:3,
146:13, 153:6,
162:13, 165:11,
166:24, 168:15,
176:15, 179:21,
184:9, 186:19,
188:12, 189:2,
191:6, 192:13,
193:5, 194:15,
194:21, 194:22,
195:14, 201:1,
205:6, 205:8, 205:9,
217:19, 221:3,
221:19, 224:14,
230:22, 230:23,
231:4, 233:15,
236:23, 238:10,
238:21, 239:25,
240:4, 246:1, 250:3,
252:22, 253:3,
254:22, 256:24,
260:21, 261:21,
263:12, 270:12,
276:10, 276:14,
277:15, 279:19,
286:4, 287:21,
288:7, 288:21,
289:24, 290:8,

290:11, 290:12,
295:3, 297:6, 300:4,
300:25, 302:22,
302:25, 303:4,
305:5, 305:14,
305:15, 307:13,
307:25, 308:4,
308:13, 309:18,
311:18, 312:14,
312:22, 313:13,
314:19, 315:11,
319:19, 319:24,
321:11, 321:15,
322:9, 322:15,
323:4, 323:11,
325:12, 326:22,
327:1, 328:2, 331:8,
334:11, 334:21,
334:22, 335:2,
336:21, 337:4,
337:5, 338:17,
338:18, 338:23,
340:21, 342:16,
343:11, 351:11,
352:1, 359:5,
367:17, 368:5,
384:3, 404:2,
405:22, 405:23,
406:8, 408:20,
408:22, 412:19,
413:21, 416:4,
416:15, 417:12,
417:18, 417:19,
417:20, 417:22,
419:10, 422:6,
438:14, 453:25,
454:20, 455:6, 456:6
**update** [3] - 106:7,
106:21, 361:14
**updated** [1] - 108:1
**upheld** [1] - 33:3
**upload** [1] - 117:11
**uploaded** [1] - 287:15
**uploads** [1] - 117:11
**upset** [7] - 113:23,
114:1, 289:14,
302:19, 307:20,
308:21, 317:24
**urge** [1] - 407:10
**urgent** [1] - 37:5
**USB** [2] - 146:5,
146:17
**use-non-deadly** [1] -
428:12
**useful** [1] - 227:3
**uses** [2] - 184:12,
433:6
**usual** [3] - 137:16,
420:13, 435:17
**utilized** [1] - 46:19,

48:7
**uttering** [2] - 6:1, 8:9

## V

**vacillates** [1] - 438:1
**Valley** [12] - 4:11,
4:13, 73:12, 96:18,
137:3, 138:17,
139:3, 165:19,
190:7, 219:19,
221:19, 330:2
**valley** [45] - 35:17,
36:1, 40:2, 40:5,
42:21, 72:17, 73:21,
76:9, 81:24, 89:14,
89:21, 90:6, 90:14,
93:20, 93:23, 97:13,
100:23, 101:3,
101:17, 102:9,
102:19, 104:1,
125:9, 125:13,
131:2, 138:13,
139:10, 190:6,
190:10, 190:16,
190:21, 245:17,
266:24, 294:16,
294:17, 297:6,
298:12, 298:13,
304:10, 308:9,
308:11, 316:12,
316:15, 338:18,
411:15
**valley's** [1] - 246:3
**valuable** [1] - 49:10
**value** [31] - 12:23,
14:24, 111:22,
128:23, 132:7,
132:25, 133:12,
135:17, 136:18,
184:25, 185:7,
185:15, 185:20,
279:6, 280:18,
411:9, 417:1, 417:2,
432:24, 433:11,
433:12, 433:14,
433:17, 433:19,
433:20, 433:21,
443:22, 443:24
**vehicle** [10] - 36:22,
44:13, 57:15, 104:7,
104:11, 104:16,
192:4, 192:7,
219:22, 261:21
**vehicles** [1] - 57:22
**verdict** [55] - 27:21,
28:12, 29:22, 32:20,
34:11, 34:14, 52:12,
185:19, 379:12,
407:11, 414:19,

414:20, 418:9,
437:20, 438:18,
440:11, 440:14,
441:9, 441:11,
441:13, 441:16,
441:19, 441:24,
442:4, 442:5, 442:6,
442:7, 442:8, 442:9,
442:11, 442:14,
442:19, 443:3,
443:12, 443:18,
444:12, 444:19,
444:21, 445:6,
445:7, 445:8,
445:16, 447:5,
449:1, 451:10,
451:17, 451:18,
451:23, 451:25,
452:2, 453:18,
453:21, 460:24
**verify** [2] - 8:22,
300:24
**version** [4] - 15:23,
49:1, 234:19, 234:21
**versus** [11] - 5:3,
23:20, 28:1, 106:18,
187:4, 288:21,
291:4, 364:11,
449:4, 451:6, 452:5
**vibe** [1] - 304:8
**vibrate** [2] - 31:10,
40:15
**vibration** [1] - 40:17
**victim** [19] - 6:21,
35:22, 128:11,
128:15, 129:10,
135:18, 151:7,
165:5, 228:22,
279:5, 353:16,
354:19, 356:12,
369:1, 381:20,
392:12, 392:15,
392:18, 417:8
**victims** [1] - 397:4
**video** [11] - 115:5,
115:6, 117:20,
154:3, 287:6,
287:14, 289:24,
290:7, 320:15,
337:12, 337:13
**video/audio** [1] -
97:18
**videos** [4] - 194:15,
210:19, 400:7,
417:15
**view** [3] - 49:13,
167:8, 350:6
**viewed** [3] - 111:1,
300:3, 330:18
**viewing** [4] - 58:24,

206:16, 206:17,
207:4
**violate** [4] - 56:20,
65:8, 344:20, 447:10
**violated** [1] - 56:17
**violates** [2] - 56:24,
56:25
**violation** [8] - 12:16,
30:16, 31:13, 278:5,
289:19, 445:24,
456:6
**violations** [1] - 455:14
**violence** [14] - 45:11,
296:5, 296:8, 301:6,
309:16, 309:18,
310:16, 311:10,
322:11, 347:21,
399:22, 401:15,
424:16, 428:9
**violent** [15] - 140:4,
142:7, 297:5, 307:6,
343:25, 344:13,
348:16, 348:23,
349:14, 351:25,
401:14, 424:24,
425:7, 428:13,
428:20
**violently** [2] - 142:9,
308:15
**visible** [4] - 221:7,
336:1, 336:2
**visiting** [2] - 197:7,
197:8
**visual** [2] - 164:23,
164:24
**vital** [2] - 99:25,
100:13
**voice** [1] - 321:7
**voiced** [4] - 291:10,
304:18, 304:19,
318:25
**voir** [1] - 414:22
**volunteering** [1] -
303:25
**VOP** [4] - 459:22,
459:25, 460:6, 460:8
**vote** [1] - 446:14
**voted** [1] - 446:13
**votes** [1] - 453:10
**vowed** [1] - 263:3
**vs** [1] - 1:7

## W

**W-i-l-l-i-a-m-s** [1] -
86:18
**Wahl** [3] - 105:16,
105:25, 106:22
**wahl** [1] - 107:25

**WAHL** [3] - 105:19,
108:2, 108:7
**waistband** [3] -
142:19, 172:6, 173:1
**wait** [9] - 39:5, 231:6,
309:4, 368:24,
401:20, 446:18
**waited** [4] - 43:7, 50:7,
257:16, 335:3
**waiting** [1] - 113:17
**Wakes** [4] - 196:10,
221:16, 295:14,
295:15
**walk** [8] - 119:19,
168:15, 200:15,
201:20, 315:11,
329:24, 346:10,
369:20
**walked** [7] - 200:23,
201:22, 208:20,
264:8, 267:25,
293:1, 316:5
**walking** [17] - 45:24,
127:8, 159:3,
166:24, 190:15,
206:13, 219:5,
268:18, 273:18,
273:19, 314:22,
314:23, 315:5,
315:11, 328:20,
398:3
**wall** [3] - 169:25,
331:5, 331:7
**wants** [6] - 37:4,
293:9, 387:6, 391:5,
407:18, 417:10
**warning** [1] - 278:16
**warrant** [6] - 41:15,
41:16, 137:15,
160:7, 332:7, 354:9
**warrantless** [1] -
57:14
**warrants** [3] - 295:25,
297:4, 456:12
**washed** [1] - 270:15
**Washington** [2] -
45:19, 312:7
**watch** [10] - 35:21,
36:4, 46:17, 197:5,
197:17, 312:10,
312:16, 314:15,
349:16
**watching** [10] - 36:12,
45:15, 61:10,
118:25, 119:4,
202:3, 202:16,
202:19, 325:21,
350:24
**water** [3] - 68:22,
200:16

**waterproof** [1] - 66:18
**wavers** [1] - 438:1
**waves** [1] - 303:22
**ways** [3] - 51:21,
195:3, 259:9
**wealthy** [2] - 191:3,
228:11
**weapon** [74] - 28:5,
43:22, 43:25, 56:5,
56:15, 78:9, 135:21,
136:7, 151:6,
181:16, 181:22,
182:1, 182:13,
183:4, 183:5, 183:6,
183:11, 370:14,
371:13, 371:15,
371:18, 371:20,
373:3, 373:7,
374:23, 375:4,
400:17, 400:19,
402:21, 402:25,
407:6, 407:14,
409:12, 414:14,
419:24, 419:25,
420:4, 420:10,
420:16, 421:16,
422:12, 423:6,
424:12, 426:24,
428:3, 429:14,
429:20, 429:24,
429:25, 430:1,
430:3, 430:10,
430:12, 430:14,
431:14, 431:15,
431:18, 431:24,
432:1, 432:3, 432:4,
432:6, 432:7, 432:8,
434:10, 435:14,
443:7, 455:9,
456:11, 457:18,
457:19, 458:20
**Weapon** [16] - 370:11,
372:12, 421:6,
424:5, 424:7,
424:14, 426:1,
427:19, 427:23,
428:6, 428:7, 431:8,
431:9, 442:24,
443:9, 452:11
**weapons** [4] - 37:24,
55:11, 78:8, 129:2
**wear** [1] - 91:7
**wearing** [10] - 39:18,
79:21, 79:22,
154:10, 157:11,
167:18, 228:19,
257:24, 332:14,
335:11
**weed** [3] - 332:16,
334:1, 399:11

**week** [10] - 8:20,
35:14, 100:15,
190:4, 244:22,
244:23, 345:2,
345:3, 345:4, 347:12
**weekend** [1] - 311:20
**weeks** [2] - 198:16,
347:16
**weigh** [7] - 110:11,
215:4, 284:2, 284:4,
351:19, 406:9,
407:12
**weighed** [2] - 351:20,
351:21
**weighing** [4] - 376:23,
410:5, 410:23,
437:23
**weight** [1] - 35:2
**welcome** [5] - 26:11,
30:5, 31:11, 50:13,
321:6
**welfare** [1] - 434:25
**were..** [1] - 259:4
**west** [2] - 89:3, 89:7
**whack** [2] - 217:14,
217:15
**whatever's** [1] - 226:8
**whatnot** [7] - 12:13,
73:20, 75:10, 207:8,
224:20, 345:16,
362:4
**whatsoever** [5] -
25:24, 27:2, 32:21,
59:12, 418:21
**wheel** [2] - 224:21,
308:14
**wheeler** [1] - 194:16
**whereabouts** [1] -
138:10
**whichever** [1] - 443:11
**white** [7] - 192:8,
231:20, 231:22,
231:23, 232:5,
▬▬▬▬▬▬▬
**whole** [35] - 5:22,
11:25, 12:11, 18:14,
47:17, 52:20, 85:22,
123:10, 156:24,
156:25, 157:11,
168:18, 188:16,
232:19, 235:2,
242:24, 243:18,
246:25, 265:16,
294:3, 304:8,
306:14, 336:3,
350:10, 383:16,
387:17, 390:7,
390:8, 411:20,
412:1, 457:1,
457:12, 458:3,

458:11
**wife** [19] - 42:16,
245:22, 248:5,
250:4, 251:22,
252:8, 254:3, 254:7,
254:12, 254:22,
257:15, 259:24,
260:22, 261:15,
261:20, 263:6,
263:13, 300:13,
300:14
**WiFi** [4] - 194:20,
242:7, 242:9, 242:10
**wild** [2] - 16:4, 251:14
**willfully** [3] - 434:1,
435:1, 436:13
**Williams** [10] - 84:24,
86:18, 108:16,
129:9, 155:6, 156:3,
158:15, 160:15,
161:20, 338:1
**WILLIAMS** [1] - 3:6
**willing** [4] - 9:3, 394:5,
394:8, 417:2
**win** [2] - 303:9, 417:10
**window** [6] - 288:7,
314:8, 314:9,
314:10, 334:6,
340:16
**windows** [1] - 332:6
**Winn** [2] - 306:4,
345:9
**Winn-Dixie** [2] -
306:4, 345:9
**wise** [1] - 440:17
**wish** [7] - 8:11, 29:4,
107:9, 394:14,
394:17, 452:19,
456:15
**witness** [83] - 6:20,
11:14, 32:19, 33:5,
49:15, 52:16, 80:1,
84:19, 84:23, 91:15,
91:21, 91:22, 97:7,
97:8, 103:7, 109:11,
109:15, 109:16,
122:22, 123:4,
129:10, 129:17,
129:18, 130:23,
132:13, 132:14,
133:18, 133:19,
142:21, 143:3,
148:2, 148:3,
161:10, 187:16,
188:9, 188:12,
220:9, 220:12,
220:15, 220:16,
222:20, 222:21,
224:5, 224:6,
277:10, 279:16,

289:10, 292:23,
293:25, 324:11,
341:7, 342:6, 342:8,
357:7, 360:8, 378:4,
394:14, 404:2,
410:5, 410:7, 410:8,
410:15, 410:23,
418:14, 438:21,
438:23, 438:24,
438:25, 439:1,
439:3, 439:7, 439:9,
439:13, 439:17,
439:20, 439:21,
440:1, 440:2, 440:6,
440:8, 457:3
**WITNESS** [40] - 18:17,
21:20, 52:22, 53:2,
54:7, 56:20, 85:1,
85:24, 86:5, 118:13,
123:16, 129:18,
130:12, 166:18,
180:16, 188:18,
189:4, 193:23,
202:25, 203:16,
209:13, 216:24,
225:18, 233:8,
243:20, 243:22,
243:24, 244:18,
253:16, 265:18,
277:9, 286:8, 294:5,
296:5, 309:2,
316:20, 316:23,
317:11, 318:19,
324:13
**witness's** [6] - 52:2,
52:3, 284:5, 328:24,
411:1, 439:5
**witnessed** [1] - 400:10
**witnesses** [24] -
24:21, 29:11, 44:17,
86:8, 101:13,
101:14, 159:12,
283:14, 283:18,
284:18, 284:22,
285:2, 285:23,
286:10, 291:20,
364:14, 364:17,
364:25, 378:23,
397:4, 401:5,
418:17, 439:24,
440:21
**wits** [1] - 39:2
**woke** [1] - 311:18
**wood** [4] - 218:15,
237:16, 238:10,
253:4
**wood-chopping** [1] -
237:16
**wooded** [2] - 330:1,
356:8

**word** [9] - 42:1, 68:24,
153:25, 176:15,
209:16, 414:7,
414:8, 432:11
**words** [3] - 318:1,
434:12, 437:15
**works** [2] - 88:4, 408:2
**world** [1] - 402:9
**worn** [1] - 321:5
**worried** [1] - 270:7
**worry** [3] - 332:2,
332:9, 412:7
**worse** [2] - 239:8,
401:16, 402:11
**worth** [3] - 111:19,
241:20, 411:8
**wound** [2] - 287:3,
342:16
**wrapped** [2] - 150:12,
456:6
**wrench** [1] - 307:9
**wrestler** [1] - 307:11
**writing** [5] - 43:9,
442:8, 445:17,
446:20, 449:25
**written** [5] - 18:8,
19:5, 24:6, 175:13,
434:22
**wrote** [3] - 21:19,
173:17, 367:17

**Y**

**y'all** [3] - 304:11,
306:12, 332:15
**yard** [2] - 189:16,
238:3
**yards** [5] - 77:8, 78:23,
78:24, 78:25, 301:1
**year** [7] - 194:12,
194:13, 196:16,
235:8, 245:24,
262:22, 266:15
**years** [52] - 7:9, 19:17,
20:10, 20:16, 21:4,
21:5, 35:14, 53:19,
87:3, 87:9, 87:10,
87:14, 94:6, 100:15,
100:17, 105:6,
108:21, 109:23,
116:5, 120:11,
121:22, 124:4,
124:11, 124:12,
162:1, 162:2,
162:14, 163:22,
177:4, 179:1, 180:8,
190:4, 196:16,
196:17, 196:18,
242:19, 245:8,

266:8, 294:11,
299:14, 358:22,
368:14, 401:4,
401:6, 401:7, 406:1,
453:8, 454:20,
455:5, 455:21,
456:5, 460:21

**yesterday** [5] - 5:16,
15:13, 18:3, 27:10,
28:3

**you-all** [20] - 31:17,
102:12, 107:24,
187:23, 255:4,
281:8, 285:18,
364:20, 394:2,
394:5, 394:10,
399:16, 400:13,
447:14, 448:11,
448:13, 448:20,
450:5, 451:17

**you-all's** [1] - 188:5

**young** [4] - 41:21,
353:6, 398:8, 398:22

**younger** [1] - 396:24

**yourself** [28] - 49:13,
91:3, 108:18,
114:23, 115:15,
118:25, 144:15,
196:21, 237:21,
239:23, 240:16,
251:22, 311:7,
321:18, 323:2,
323:13, 323:21,
325:2, 325:6, 326:9,
330:15, 335:19,
347:5, 359:6,
404:25, 405:1,
413:8, 413:24

**yourselves** [4] - 30:3,
180:21, 277:19,
362:19

## Z

**zero** [1] - 460:19